UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Stephen Danforth,

Petitioner,

vs. REPORT AND RECOMMENDATION

David Crist, Warden; and
Minnesota Department of
Corrections,

Respondent. Civ. No. 01-2137 (JRT/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 17th day of February, 2004.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon a Petition for a Writ of Habeas Corpus, see Title 28 U.S.C. §2254. The Petitioner appears pro se, and the Respondent appears by Michael K. Walz, Assistant Hennepin County Attorney.

For reasons which follow, we recommend that the Petition for a Writ of Habeas Corpus be dismissed.

## II. Factual and Procedural Background

The Petitioner is a State prisoner who, on March 16, 1996, was convicted of first-degree criminal sexual conduct. He is currently

serving a 316-month sentence at the Minnesota Correctional Facility, in Stillwater, Minnesota.

During the 1970s and 1980s, the Petitioner was convicted on multiple occasions for sexually abusing young boys.[1] State v. Danforth ("Danforth I"), 573 N.W.2d 369, 372 (Minn. Ct. App. 1997), rev. denied, (Minn., February 19, 1998). The Petitioner was very close friends with the parents of the complainant in that matter, J.S., and "was like a 'favorite uncle' to J.S. and his siblings, having spent a great deal of time with the family." Id.

On August 11, 1995, J.S. was discovered by a neighbor "with his pants down atop a younger girl, acting in a sexual manner." Id. J.S. was confronted by his mother, and was asked where he had learned such things, and J.S. responded "that 'Steve' had put his mouth on J.S.' 'pee-pee' and his finger in J.S.' 'poopie butt.'" Id. J.S.' mother called the police that evening to report possible sexual abuse. Id. J.S. was interviewed by the police, and stated that "'Steve' had put his 'pee' in his buttocks and that 'Steve' had made him 'kiss his pee.'" Id.

On August 23, 1995, J.S. was interviewed at CornerHouse Interagency Child Abuse Evaluation and Training Center ("CornerHouse"),

[1]It appears that Petitioner had up to six prior criminal sexual conduct convictions. See, Petitioner's Appendix, Exh. B, January 29, 1996, Transcript of Proceedings at 2.

and gave substantially similar information. Id. The CornerHouse interview was videotaped, and J.S. "clearly indicated that he had been sexually abused by [the Petitioner]." Id. The Petitioner was arrested and charged with first degree criminal sexual conduct. Id.; Minnesota Statutes Section 609.342, Subdivision 1 (1995).

A Trial by Jury commenced February 7, 1996, and lasted through March 6, 1996. Danforth I, supra at 372. The Petitioner, with access to stand-by counsel, represented himself during much of the Trial. Id.

At the start of the Trial, a Hearing was conducted in order to determine whether J.S., and his five year old sister, A.S., were competent to testify. Id. The Petitioner urged that the State District Court[2] find J.S. incompetent, and that the CornerHouse videotape be ruled inadmissible. Id. The District Court found J.S. incompetent to testify, based on a limited ability to focus on questions and give relevant answers, but found A.S. competent because she exhibited a superior ability to concentrate. Id. The Petitioner requested that the Jury be instructed that J.S. had been found incompetent, but the District Court refused, informing the Jury simply that J.S. was unavailable to testify. Id. at 376.

[2]The Honorable Richard B. Solum, Retired Judge of the Fourth Judicial District Court.

The District Court admitted the CornerHouse videotape, finding that it bore sufficient indicia of reliability, including the appearance that J.S.'s remarks were spontaneous, largely unsolicited by leading questions, and that J.S. lacked apparent motive to fabricate the accusation. Id. at 372. The CornerHouse tape was shown to the Jury. Id.

A.S. provided testimony that she had witnessed the Petitioner "put his mouth on J.S.' 'pee-pee' and 'private' in the men's room by the pool at their aunt's apartment[,]" but did not, however, identify the Petitioner in the courtroom. Id. The Jury also listened to testimony from the Petitioner's former victims. Id.

The Petitioner took the stand and testified in his own defense, claiming "that J.S.' parents trumped up the charges because J.S.' father was repulsed by [the Petitioner's] admitted homosexuality and J.S.' mother was angry with [the Petitioner] for various disparaging comments and criticism of her parenting skills." Id.

During Jury deliberations, the bailiff informed the District Court that the Jury deliberations were tense and that he believed violence might be imminent, and that one of the Jurors was threatening to leave. Id. at 373. The District Court spoke with the Juror on the record, but without contacting the Petitioner, or his stand-by counsel, or the prosecutor. Id. The District Court noted

that the exigent circumstances had prevented him from contacting counsel. Petitioner's Appendix, Exh. D, March 5, 1996, Transcript of Proceedings at 23.

The District Court addressed the Juror's concern that "it's never going to end." Id. at 25. The District Court subsequently spoke to the whole Jury and attempted to correct the mistaken impression that a hung Jury was not an option. Danforth I, supra at 373. The District Court then reassured the Jury that it was only asking them to deliberate until the next day. Id.; Petitioner's Appendix, Exh. D at 32. Following the Verdict, the District Court conducted a Schwartz[3] Hearing, and polled each Juror on whether the tension during deliberations influenced their Verdict, to which each responded that they had not been unduly influenced. Danforth I, supra at 374.

The Petitioner was convicted of first degree criminal sexual conduct, and was sentenced by the District Court to a 216-month term of imprisonment, "an upward durational departure of 58 months, but less than double the presumptive sentence[.]" Id. at 372. The Petitioner appealed his conviction, arguing that irregularities during Jury deliberation deprived him of a fair Trial, that the

[3]A "Schwartz hearing" is legal shorthand in Minnesota for a Hearing held to determine whether Jury misconduct occurred. See, State v. Rainer, 411 N.W.2d 490, 498 (Minn. 1987)(subsequent history omitted).

Trial Court erred in admitting the CornerHouse videotape, and that the Trial Court erred in refusing to instruct the Jury that J.S. had been found incompetent. Id. at 371. The Stated appealed the Petitioner's sentence, claiming that the District Court erred in failing to sentence the Petitioner to a term of imprisonment of not less than double the presumptive sentence pursuant to Minnesota Statutes Section 609.1352 (1996).[4] Id. at 371-72. The Minnesota

[4]Section 609.1352 is the statute which governs sentencing for patterned sex offenders, and mandates a sentence of "not less than double the presumptive sentence" if certain findings are made by the court. Minnesota Statutes Section 609.1352, Subdivision 1(a) (1996). In order to trigger the enhancement provision of Section 609.1352, the Court must:

> 1) * * * impos[e] an executed sentence, based on a sentencing guidelines presumptive sentence * * * for aggravating circumstances or a mandatory minimum sentence, on a person convicted of committing or attempting to commit a violation of 609.342 * * *;
>
> 2) * * * find that the offender is a danger to public safety; and
>
> 3) * * * find that the offender needs long-term treatment or supervision beyond the presumptive term of imprisonment and super-vised release. The finding must be based on a professional assessment by an examiner experienced in evaluating sex offenders that co-cludes that the offender is a patterned sex offender. The assessment must contain the facts upon which the conclusion is based, with reference to the offense history of the offender or the severity of the current offense, the social history of the offender, and the

(continued...)

Court of Appeals denied the Petitioner's arguments, but agreed with the State's contention, and remanded the matter for resentencing. Id. at 373-78.

Following remand, a psychological report was compiled by Dr. Lawrence Panciera ("Dr. Panciera") pursuant to Minnesota Statutes Section 609.1352, Subdivision 1(a)(3). See, State v. Danforth ("Danforth II"), No. CV-98-2054, 1999 WL 262143, *1 (Minn. Ct. App. May 4, 1999), rev. denied, (Minn., July 28, 1999). The Petitioner refused to participate in Dr. Panciera's evaluation, and Dr. Panciera based his evaluation on records submitted and a previous psychological report. Id. at *3; Respondent's Appendix, at 4-5; [Docket No. 20].

Dr. Panciera concluded that the Petitioner's pedophilia was long standing and compelling, his characteristics indicated he was among "a group of sex offenders who have the highest likelihood of reoffending[,]" and that, for successful treatment to be possible, the Petitioner "would require long term sex offender treatment in a secure setting." Respondent's Appendix, at 4.

---

[4](...continued)

> results of the offender's mental status unless the offender refuses to be examined.

Id., Subdivision 1(a)(1)-(3).

Minnesota Statutes Section 609.1352 was repealed in 1998 and replaced by Section 609.108. Minn. Laws 1998, c. 367, art. 6, §§ 5 and 16, eff. Aug. 1, 1998; Minnesota Statutes Section 609.108.

The District Court[5] held a resentencing Hearing on August 4, 1998. Danforth II, supra at *1. The District Court stated that it was imposing an executed sentence, and found that the Petitioner was a danger to public safety and needed long-term treatment and supervision beyond the presumptive term of imprisonment. Respondent's Appendix, at 24; Minnesota Statutes Section 609.1352, Subdivision 1(a) (1996). The District Court sentenced the Petitioner to a 316-month term of imprisonment. Danforth v. State ("Danforth III"), No. C6-00-699, 2000 WL 1780244 at *1 (Minn. Ct. App., December 5, 2000), rev. denied, (Minn., February 13, 2001).

The Petitioner appealed his resentencing, contending that the District Court erred: 1) in denying his request for a continuance; 2) in denying his notice of removal; 3) in denying him his full right to allocution; and 4) by imposing a more severe sentence than that offered in plea negotiations. Danforth II, supra at *1-4. The Petitioner also argued: 1) that his due process rights were violated because a different Judge than the Judge who presided over his Trial, presided over his resentencing; 2) that he was penalized for exercising his right to freedom of speech, and against self-incrimination, in choosing not to cooperate with Dr. Panciera; 3)

[5]The Honorable Daniel H. Mabley, then Chief Judge of the Fourth Judicial District Court. Judge Mabley took over proceedings when Judge Solum retired. Respondent's Appendix, at 10, 12-13; [Docket No. 20].

that Minnesota Statutes Section 609.1352, Subdivision 1 contained unconstitutionally vague language; and 4) that he could not be sentenced as a patterned sex offender, because the State did not notify him that it would seek such an enhancement. Id. at *4-5. The Minnesota Court of Appeals rejected the Petitioner's arguments, and affirmed his sentence. Id. at *5.

On September 9, 1999, the Petitioner filed a Petition for Post-Conviction relief asserting 18 claims. Danforth III, supra at *1; Respondent's Appendix, at 31-32. Specifically, the Petitioner claimed:

> (1) New polygraph evidence should be admitted and the Court should appoint a particular polygraphist as an expert for [the Petitioner];
>
> (2) The admission of the CornerHouse videotape prejudiced him and violated the confrontation clause;
>
> (3) The District Court failed to conduct a "taint" Hearing before allowing two children to testify;
>
> (4) [The Petitioner's] pretrial counsel was ineffective;
>
> (5) The District Court violated [the Petitioner's] right to self-representation by holding ex parte Hearings and conferences without [the Petitioner's] knowledge;
>
> (6) Issues surrounding preparation of the CornerHouse videotape deprived [the Petitioner] of his confrontation clause rights;

(7) Testimony of a particular witness improperly bolstered the credibility of the victim's videotaped responses;

(8) The District Court's refusal to allow discovery of the victim's school records violated the confrontation clause and [the Petitioner's] due process rights;

(9) Admission of an audiotape on which [the Petitioner] invoked his Miranda rights caused irremediable prejudice to [the Petitioner];

(10) The prosecution withheld evidence in violation of Minn.R.Crim.P. 7.01 and the confrontation clause, thereby affecting [the Petitioner's] right to present his defense, his right to a Jury Trial, and his due process rights;

(11) The prosecution engaged in misconduct by committing a discovery violation;

(12) The prosecution committed misconduct by having conversations with a Juror;

(13) Another Juror's nondisclosure deprived [the Petitioner] of his right to an impartial Jury;

(14) The State did not disclose a witness's specialty in child hypnosis or pre-accusation contact between the witness and the victim's family;

(15) The failure of police officers to keep notes and the prosecution's refusal to disclose notes of conversations with victims violated [the Petitioner's] due process rights and right to confront witnesses;

(16) Closure of the courtroom during testimony of a child witness deprived [the Petitioner] of a public Trial and due process;

> (17) Improper contacts between the Court and Jurors deprived [the Petitioner] of his rights to a Trial by Jury and to a fair Trial; and
>
> (18) The Court improperly relied on a psychological report.

Id. at *1-2, 31-32.

The District Court[6] denied the Petition and the Petitioner appealed.[7] Id. at *1; 33-34. The Minnesota Court of Appeals held that claims 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 15, 17 and 18, had been raised on direct appeal, and thus, could not provide a basis for relief. Id. at *1-4. With respect to claims 8, 12, 14, and 16, the Court held that the Petitioner knew, or should have known of them on direct appeal, and therefore, they could not provide a basis for relief. Id. at *3-5. The Court rejected the Petitioner's appeal and affirmed the District Court. Id. at *5.

In December of 2000, the prosecutor was notified that some of the Jurors from the Petitioner's Trial had received a questionnaire from the Petitioner's mother, Shirley Rabideau ("Ms. Rabideau").[8]

---

[6]The Honorable Marilyn Brown Rosenbaum, Judge of the Fourth Judicial District Court.

[7]The Minnesota Court of Appeals noted that Petitioner withdrew claim 13. Danforth III, supra at *2 n. 1.

[8]The twenty-three page questionnaire was accompanied by a cover letter in which Ms. Rabideau purported to be "currently engaged in research regarding the jury trial process." Respondent's Appendix, Vol. II; [Docket No. 51]. In support of the request for the no contact Order, the prosecutor wrote a letter to the State "dis-
(continued...)

State v. Danforth ("Danforth IV"), No. C3-01-959, 2002 WL 47792 at *1 (Minn. Ct. App., January 15, 2002). The questionnaire presented the Jurors with new information such as the Petitioner's lie detector test, and asked them how the new facts would have impacted upon their deliberations. Id. The prosecutor requested an Order from the District Court barring the Petitioner, his mother, and anyone else acting under his control, from having contact with the Jurors. Id. The District Court found that Ms. Rabideau had acted as the Petitioner's agent, granted the Respondent's request, and issued an Order barring contact with the Jurors. Id.

The Petitioner appealed the District Court's Order, denied that he was the author of the questionnaire, but vigorously defended it. Id. The Petitioner asserted that: 1) the District Court lacked subject matter jurisdiction because his case was closed; 2) the District Court lacked personal jurisdiction because Ms. Rabideau was a Wisconsin resident; 3) the prosecutor lacked standing; 4) the prosecutor was prohibited from making such a request by a conflict of interest as a party opponent; 5) the District Court violated his due process rights by not holding an evidentiary

[8](...continued)
trict court stating that he had a 5-year familiarity with the writing style of [the Petitioner] and that he believed [the Petitioner] was the author of the questionnaire. Danforth IV, supra at *1.

Hearing; 6) since the responses could not support a Schwartz Hearing he should not be barred; 7) he was deprived of his freedom of speech; and 8) the no contact Order improperly modified his sentence so as to punish him twice for the same conviction. Id. at *1-5. The Minnesota Court of Appeals rejected the Petitioner's arguments, and affirmed the Order of the District Court. Id.

In his Petition[9] before this Court, the Petitioner claims that he is entitled to relief, under Title 28 U.S.C. §2254, because: 1) he was deprived of his Constitutional right to confront his accuser; 2) the Trial Court's admission of other-wrongful-act evidence denied him a fair Trial; 3) the Trial Court's admission of other prosecution evidence denied him a fair Trial; 4) closure of the courtroom denied him a public Trial; 5) the Trial Court's refusal to admit defense evidence deprived him of his constitutional rights; 6) he was deprived of his right to representation,

[9]The Petitioner filed an Amended Petition for Writ of Habeas Corpus, [Docket No. 17], due to the fact that the original Petition contained an unexhausted claim. Danforth v. Crist, 01-CV-2137, 2003 WL 1572012 at *1 (D. Minn., March 20, 2003). In the Amended Petition, the Petitioner "simply excised the unexhausted claim from his original petition and supporting documents." Id. On November 19, 2002, the Minnesota Supreme Court denied review of the Minnesota Court of Appeals ruling regarding the Petitioner's unexhausted claim, State v. Danforth, No. C2-02-283, (Minn., November 19, 2002), and the Petitioner moved to add that newly exhausted claim by reinstating his original Petition, Danforth, 2003 WL 1572012 at *1. The Petitioner's Motion was granted, and his original Petition was reinstated. Id. at *2.

to a fair trial, and to due process, because he received ineffective assistance of counsel, and the Trial Court refused to appoint replacement counsel; 7) prosecutorial misconduct deprived him of his right to a fair Trial and due process; 8) errors and misconduct related to Jury selection and deliberation deprived him of his right to Trial by Jury, to a fair Trial, and to due process; 9) his conviction was supported by insufficient evidence; 10) errors related to resentencing deprived him of his due process rights; and 11) the Order barring contact with the Jurors improperly added a condition to his sentence and violated his right to free expression and due process.[10] See, Addendum to Petition for Writ of Habeas Corpus, at 1, 64, 78, 88, 90, 107, 115, 117, 126, 139, 143, 166; [Docket No. 2].

III. Discussion

"[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Title 28 U.S.C. §2254(a). "In conducting habeas review, a federal court is limited to deciding whether a conviction vio-

[10]The Petitioner raises fifty-one sub-issues in this matter. For clarity and brevity's sake, those issues will be addressed in the aggregate, wherever possible.

lated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). As a result, before a Writ may issue, the Petitioner must establish that the State's exercise of custody over his person is an affront to the Constitution, a Federal law, or a Federal treaty. Id.; see also, Robinson v. Leapley, 26 F.3d 826, 829 (8th Cir. 1994); Maynard v. Lockhart, 981 F.2d 981, 986 (8th Cir. 1992); Garcia v. Powers, 973 F.2d 684, 685 (8th Cir. 1992).

In 1996, Congress restricted the scope of a Federal Court's review of Habeas Petitions, where the underlying claims were adjudicated in State Court. See, Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996). A Federal Court's authority to vitiate State Court decisions, by the granting of a Writ of Habeas Corpus, is now limited to the narrow class of claims which have been fully exhausted in the State Courts, and which involve an adjudication that either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

Title 28 U.S.C. §2254(d).

In a recent Supreme Court decision, the Court explained that the "contrary to," and "unreasonable application" clauses of Section 2254(d)(1), present two separate grounds on which a Federal Court may grant Habeas relief to claims adjudicated in the State Courts. Williams v. Taylor, 529 U.S. 362 (2000). The Court went on to instruct as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decide[d] a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principal to the facts of the prisoner's case.

Id. at 412-13.

The Court further explained that a consideration of a State Court's decision, under the "unreasonable application" clause, requires a Federal Court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.

Under this heightened standard of review, a Federal Court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly," but

"[r]ather, that application must also be unreasonable." Id. at 411; see also, Siers v. Weber, 259 F.3d 969, 972-73 (8th Cir. 2001) (examining the impact of Williams on Habeas proceedings); Newman v. Hopkins, 247 F.3d 848, 850-51 (8th Cir. 2001); Copeland v. Washington, 232 F.3d 969, 973 (8th Cir. 2000).

As a consequence, Williams affirmed the distinction, which had previously been drawn by several Circuit Courts, that the "contrary to" clause was to be used in cases addressing pure questions of law, whereas the "unreasonable application" clause addressed mixed questions of fact and law. See, Evans v. Rogerson, 223 F.3d 869, 872 (8th Cir. 2000)(the "in custody" determination for Miranda purposes is a mixed question of law and fact that is properly reviewed under the "unreasonable application clause of §2254(d)(1)"); Becerrill v. Sternes, 2001 WL 1669398 at *3 (7th Cir., December 14, 2001) (District Court improperly analyzed question of fact under "unreasonable application" clause, believing it to be a mixed question of law and fact). Therefore, when a petitioner argues that the State Court improperly applied clearly established Supreme Court law to a particular set of facts, the Federal Courts may not grant a Writ absent a finding that such an application was unreasonable.

Additionally, Section 2254(e)(1) retains a presumption of correctness for all purely factual determinations, which are rendered by a State Tribunal, and which can, as a result, only be rebutted

by the production of clear and convincing evidence to the contrary. Despite this presumption, Section 2254(d)(2) authorizes the issuance of a Writ if the State Court Judgment "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001); McDonald v. Bowersox, 101 F.3d 588, 592 (8th Cir. 1996)("[W]e presume state court findings of fact to be correct in habeas proceedings unless the petitioner establishes, the respondent admits, or the record shows otherwise."), cert. denied, 521 U.S. 1127 (1997). Thus, "[f]actual findings by the state court 'shall be presumed to be correct,' a presumption that will be rebutted only 'by clear and convincing evidence.'" Kinder v. Bowersox, supra at 538, citing Title 28 U.S.C. §2254(e)(1).

A. Procedural Default.

1. Standard of Review. It has long been settled that a State prisoner must normally exhaust available State judicial remedies before a Federal Court will entertain his Petition for Habeas Corpus. Picard v. Connor, 404 U.S. 270, 275 (1971). This exhaustion-of-State-remedies doctrine is now codified in the Federal Habeas Statute, and reflects a policy of Federal-State comity. Id.; see also, Title 28 U.S.C. §2254(b)(1)(A). The exhaustion of State remedies requires more than the fact that the Federal Habeas

applicant has been through the State Courts. Id. at 275. To serve the purpose of the rule, the State Courts must have the first opportunity to hear the claim sought to be vindicated in a Federal Habeas proceeding. Id. at 275-276. The State Court has an opportunity to hear a claim, when the claim has been fairly presented, by reference to a specific Federal constitutional right, a Federal case, or a State case raising a pertinent Federal constitutional issue. See, Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996), cert. denied, 517 U.S. 1215 (1996). Claims are exhausted only when the same factual underpinnings, and legal theories, were first properly raised in the State Courts. Id.

Under Minnesota law, "[o]nce a defendant has had a direct appeal, 'all matters raised therein, and all claims known but not raised, will not be considered upon a subsequent petition for post-conviction relief." Zenanko v. State, 587 N.W.2d 642, 644-45 (Minn. 1998), quoting State v. Knaffla, 243 N.W.2d 737, 741 (Minn. 1976). Where a prisoner has defaulted on his Federal claims in State Court, pursuant to an independent and adequate State procedural rule, Federal Habeas review is barred, with a few exceptions. See, Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Although the State Court procedural bar is "nearly absolute," a Petitioner can avoid the bar if he "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation

of federal law." Reagan v. Norris, 279 F.3d 651, 656 (8th Cir. 2002), quoting Coleman v. Thompson, supra at 750. Here, the Petitioner makes no such showing, nor has he demonstrated that our "failure to consider his claims would result in a fundamental miscarriage of justice." McCall v. Benson, 114 F.3d 754, 758 (8th Cir. 1997), citing Coleman v. Thompson, supra at 750; see also, Abdullah v. Groose, supra at 412-13.

2. Legal Analysis. The Respondent argues that the Petitioner has procedurally defaulted a number of claims, where he either did not raise them on direct appeal, or failed to assert a violation of a Federal constitutional issue. The Petitioner, apparently anticipating that some of his claims faced a procedural bar, makes general allegations as to all of his claims that: 1) he has suffered actual prejudice, and that, "but for each said deprivation, and all said deprivations collectively, a verdict of acquittal would have been substantially likely;" 2) the State Court findings of fact are not entitled to a presumption of correctness due to misapplication of clearly established Federal law; 3) a procedural bar would frustrate the exercise of a Federal right; and 4) the Petitioner is actually innocent. Addendum to Petition for Writ of Habeas Corpus, at 169-172.

The Petitioner's general allegations are insufficient to support his arguments in this respect. Reagan v. Norris, supra at

656. The Petitioner's assertion, that he is actually innocent, is premised on the submission of the results of a polygraph that was administered following his conviction. Petitioner's Appendix, Exh. K; Addendum to Petition for Writ of Habeas Corpus, at 169-172. The Petitioner presented that claim to the State Courts, and it was rejected. Danforth I, supra at 378. A polygraph result does not necessarily indicate actual innocence. Lucas v. Johnson, 132 F.3d 1069, 1075 n.3 (5th Cir. 1998); cf., Roberts v. Bowersox, 170 F.3d 815, 815-16 (8th Cir. 1999)(holding that polygraph results did not satisfy the standards of Title 28 U.S.C. § 2244(b)); United States v. Edwards, 159 F.3d 1117, 1131 (8th Cir. 1998)(holding that the District Court did not abuse its discretion in excluding polygraph results at a non-capital sentencing). We note that the Petitioner failed an earlier polygraph test, which was administered prior to Trial, Petitioner's Appendix, Exh. B, at 37-38, and that the Minnesota Court of Appeals considered his presentation of the polygraph, and deemed it an argument without merit. Danforth III, supra at *2. Based on a review of the Record in this matter, the Petitioner plainly has not demonstrated his actual innocence.

We have reviewed the Petitioner's briefs, which were submitted in support of his appeals in the State Courts. In doing so, we have construed the Petitioner's pro se pleadings liberally, in accordance with this Circuit's longstanding practice. Bracken v.

Dormire, 247 F.3d 699, 702-03 (8th Cir. 2001), cert. denied, 534 U.S. 934 (2001).

The Petitioner did not raise the following issues in his direct appeal of his conviction, or of his resentencing: 1) that the non-disclosure of the child psychologist's alleged specialization in hypnosis, and his pre-accusation contact with J.S., violated the Petitioner's confrontation clause rights and due process rights; and 2) the closure of the courtroom during A.S.'s testimony deprived the Petitioner of a public Trial and his due process rights.

In addition, the Petitioner failed to "fairly present" to the State Courts his claim that the admission of the Petitioner's audiotaped interrogation violated his rights under Miranda v. Arizona, 384 U.S. 436 (1966), his confrontation clause rights, and his due process rights. Kelly v. Trickey, 844 F.2d 557, 558 (8th Cir. 1988). On direct appeal, the Petitioner argued that his interrogation was conducted in violation of the requirements of State v. Scales, 518 N.W.2d 587 (Minn. 1994), and he did not raise a Miranda argument.

As a result, the State Courts have not had an opportunity to correct the Petitioner's alleged constitutional errors, with respect to the referenced claims. O'Sullivan v. Boerckel, 526 U.S. 838, 844 (1999). The Petitioner's claims of cause and prejudice,

or actual innocence, are without merit, and do not excuse the default. Therefore, those claims cannot be reviewed by this Court.

B. The Petitioner's Confrontation Clause Arguments.

1. Standard of Review. The Confrontation Clause of the Sixth Amendment mandates that: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend. VI; Idaho v. Wright, 497 U.S. 805, 813 (1990). The Confrontation Clause "does not necessarily prohibit the admission of hearsay statements against a criminal defendant[.]" Idaho v. Wright, supra at 813. It does, however, bar "the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." Id. at 814.

Out-of-court statements, which incriminate a defendant, putatively violate the Confrontation Clause, and may not be admitted without meeting two requirements: 1) the declarant must be unavailable to testify; and 2) the out-of-court statement must bear adequate indicia of reliability, either because it "falls within a firmly rooted hearsay exception," or it is supported by a "showing of particularized guarantees of trustworthiness." Ohio v. Roberts, 448 U.S. 56, 65-66 (1980).

2. Legal Analysis. The Petitioner contends that his Confrontation Clause rights were violated when the District Court admitted: 1) the CornerHouse interview of J.S.; and 2) hearsay

statements made by J.S. to his mother, to Officer Castilleja, and to child psychologist Patrick Cotter ("Cotter"). Addendum to Petition for Writ of Habeas Corpus, at 1-38. The Petitioner further contends that his Confrontation Clause rights were violated when the District Court refused to admit the transcript of J.S.'s incompetency Hearing or to inform the Jury that J.S. had been found incompetent. Id. at 38-41. The Petitioner also asserts that the failure of the police, and investigators, to make and keep notes of their interviews violated his Confrontation Clause rights. Id. at 61-64.

a. Admission of the CornerHouse Videotape.

The Petitioner asserts that the CornerHouse videotape violates the strictures of Idaho v. Wright, supra, and that it was manufactured evidence obtained solely in anticipation of fabricating charges against him. J.S. was interviewed at CornerHouse[11] on August 23, 1995. Danforth I, supra at 372. A video-

[11]CornerHouse investigates and assesses cases of child abuse, specifically those involving sexual abuse. See, http://www.cornerhousemn.org/pages/2/index.htm. The CornerHouse procedure involves a multidisciplinary approach to investigation, and includes individuals from law enforcement, child protection, and the County Attorney's office. Id.

"Forensic interviews are conducted in a child friendly environment by [interview specialists], who have received training in a wide spectrum of areas related to childhood development, sexual abuse dynamics and other pertinent issues pertaining to questioning (continued...)

tape of the interview was made, on which J.S. "clearly indicated that he had been sexually abused by [the Petitioner]." Id. The District Court reviewed the tape in accordance with the guidelines set forth in Minnesota Statutes Section 595.02, Subdivision 3 (1996).[12] The District Court reasoned as follows:

---

[11](...continued)
children regarding allegations of abuse." Id. CornerHouse has developed a protocol by which the interview is conducted so as "to maximize the child's ability to communicate his or her experience." Id.

"Members of the multidisciplinary team observe the forensic interview through closed-circuit television." Id. Following the interview, the interview specialist will meet with the multi-disciplinary team and make a finding as to whether abuse occurred. See id. "The finding is based on only what the child is capable of communicating during the interview." Id. The interview specialist must maintain "his or her objectivity as a neutral fact finder to determine whether something happened to the child." Id.

[12]Section 595.02, Subdivision 3, governs the admissibility of certain out-of-court statements made by a child under the age of 10, who describes any act of sexual contact. Minnesota Statutes Section 595.02, Subdivision 3. Such a statement is admissible as substantive evidence if:

> (a) the court or person authorized to receive evidence finds, in a hearing conducted outside of the presence of the jury, that the time, content, and circumstances of the statement and the reliability of the person to whom the statement is made provide sufficient indicia of reliability; and
>
> (b) the child * * * either:
>
> (i) testifies at the proceedings; or
>
> (ii) is unavailable as a witness and there is

(continued...)

> I have made a determination with respect to * * * the videotape, and that determination is that that videotape of [J.S.] would be admissible. Because, I have found, in looking at the videotape, that the degree of spontaneity, not total absence, but largely the want of leading and suggestive questions, the want of any apparent motivation on the part of the child, and some other features dealing with the child's reactions and language and movement around the room * * * were sufficient in my mind to lead me to conclude, especially in a 595.02 situation where the child is going to testify * * * [that the] criteria of 595.02 has been met. It is that kind of analysis that I think the law permits and requires with regard to out-of-court statements of child witnesses if they're going to be used affirmatively

Respondent's Appendix, at 35-36; id. at 74-75.

The state intended to have J.S. testify, but a competency Hearing, which was conducted by the District Court, revealed that he was not competent to testify at Trial. The District Court found "that J.S. had an ability to know and remember the truth, but that [he] was not capable of paying attention long enough to communicate meaningfully to the jury in a trial setting." Danforth I, supra at 376; see, Idaho v. Wright, supra at 824-25. The Jury subsequently viewed the videotape. Danforth I, supra at 372.

---

[12] (...continued)

> corroborative evidence of the act[.]

Id., Subdivision 3(a)-(b). Video, audio and other recorded statements are "out-of-court" statements for the purpose of Section 595.02, Subdivision 3.

The Minnesota Court of Appeals considered the Petitioner's claim, that the CornerHouse tape was improperly admitted, and concluded as follows:

> Given J.S.' strong and substantially consistent statement regarding the abuse, his attention-deficit problems (which render him relatively impervious to suggestion and coaching), his apparent lack of motive to fabricate an allegation harming an avuncular figure, and the professionalism of the CornerHouse interview, we agree with the district court that the videotape was sufficiently reliable to be admitted into evidence.

Id. at 375.

While the Petitioner couches his argument in the hearsay concerns of Idaho v. Wright, supra, we understand the main thrust of his argument to rest on his continued contention that "the accusation against him was really concocted by complainant's mother, and had been carefully coached to complainant, for rote 'regurgitation' at [the] interview." Addendum to Petition for Writ of Habeas Corpus, at 2. We cannot accept either contention. While the Petitioner does claim that J.S. was "coached," and was lying, he does not meaningfully challenge the findings of the District Court regarding the reliability of the videotape. Nor does he so much as mention the determination by the Minnesota Court of Appeals which upheld the District Court's determination.

The District Court made findings pursuant to Minnesota Statutes Section 595.02, Subdivision 3, which is, in effect, a codi-

fication of the requirements set forth in Idaho v. Wright, supra at 821-22. Based on a review of the Record, we are unable to conclude that the State Courts engaged in an unreasonable application of established Federal constitutional principles. Accordingly, we recommend that this aspect of the Petition be denied.

b. The Admission of J.S.'s Statements to his Mother, Officer Castilleja, and Mr. Cotter.

The Petitioner argues that his Confrontation Clause rights were violated by the District Court's admission of J.S.'s hearsay statements to his mother, Officer Castilleja, and Mr. Cotter, as substantive evidence. We cannot agree with his characterization of the purpose for which the evidence was admitted. The prosecuting attorney sought to have their testimony, regarding J.S.'s statements, admitted substantively, Respondent's Appendix, at 36, but the District Court ruled that the Jury could only consider the testimony for corroborative purposes, id., at 147-49. Additionally, we note that the Petitioner recognizes, elsewhere, that such testimony was not admitted for substantive purposes. See Addendum to Petition for Writ of Habeas Corpus, at 39. The Petitioner's argument in this respect is plainly without merit. Accordingly, we recommend that this aspect of the Petition be denied.

c. The Instruction to the Jury Regarding J.S.'s Incompetency to Testify.

The Petitioner requested the District Court to either admit the transcript of J.S.'s incompetency Hearing into evidence, or have it read aloud to the Jury. Alternatively, the Petitioner asked the District Court to instruct the Jury that J.S. had been found incompetent. The District Court expressed concern that an instruction that J.S. was incompetent might cause the Jury to conclude that either J.S. was too frightened of the Petitioner to testify, or that such an instruction might be construed as the District Court's assessment of J.S.'s credibility. Danforth I, supra at 376. The District Court simply instructed the Jury that J.S. was unavailable, and the Court prohibited the parties from mentioning the incompetency finding. Id. Nonetheless, the Petitioner did mention the incompetency finding during the cross-examination of a witness. Id. at 376 n.3.

The Petitioner argues that he needed to inform the Jury about J.S.'s incompetency in order to impeach the credibility of the accusation on the videotape. We note that the District Court's incompetency determination did not go to credibility, but rather, it addressed J.S.'s ability to concentrate in a Jury Trial setting. See, Respondent's Appendix, at 62-63. Moreover, we conclude that the District Court properly weighed the concerns of giving the Jury

a misguided impression as to the reason for J.S.'s incompetency. As such, we are unable to find that the State Courts engaged in an unreasonable application of Federal constitutional principles. Accordingly, we recommend that this aspect of the Petition for a Writ of Habeas Corpus be denied.

d. The Failure of the Police, and Investigators, to Keep Notes.

The Petitioner contends that the failure or refusal of the police, and investigators, to preserve or disclose their notes violated his Confrontation Clause rights, as well as his right to defense materials under Brady v. Maryland, 373 U.S. 83 (1963). The Petitioner does not offer a theory as to how his Confrontation Clause rights were violated and, as to his Brady rights, his argument is wholly speculative, and we conclude that neither of the Petitioner's arguments have merit. See, California v. Trombetta, 467 U.S. 479, 487-88 (1984); Killian v. United States, 368 U.S. 231, 242 (1961). Accordingly, we recommend that this aspect of the Petition for a Writ of Habeas Corpus be denied.

C. The Petitioner's Due Process and Fair Trial Arguments.

1. Standard of Review. A criminal defendant is guaranteed the right to a Trial by Jury. Duncan v. Louisiana, 391 U.S. 145, 156 (1968); Miller v. Dormire, 310 F.3d 600, 603 (8th Cir. 2002)(8th Cir. 2003). The Constitution concomitantly guarantees a

defendant the right to a fair Trial through the Due Process Clause. California v. Trombetta, supra at 485; Strickland v. Washington, 466 U.S. 668, 684-85 (1984); Washington v. Texas, 388 U.S. 14, 19 (1967).

2. Legal Analysis.

a. Debra Martinetti's Testimony.

The Petitioner contends that Debra Martinetti's ("Martinetti's") testimony deprived him of a fair Trial, and due process, because it constituted improper vouching for the credibility of J.S. Addendum to Petition for Writ of Habeas Corpus, at 46-47. Martinetti conducted the CornerHouse interview, and provided testimony as to the interviewing process, as well as her observation that J.S. appeared to accurately convey his experiences. We cannot agree with the Petitioner's assessment that Martinetti was impermissibly vouching for J.S.'s credibility. Martinetti provided testimony comparing J.S.'s responses to those of a typical abuse victim, as allowed by Minnesota law. See, Matter of Welfare of K.A.S., 585 N.W.2d 71, 76 (Minn. Ct. App. 1998). As such, we cannot conclude either that Martinetti provided improper testimony, or that the Petitioner's constitutional rights were violated by her testimony.

b. The Petitioner's Claims Regarding the Jury.

The Petitioner asserts that he was deprived of his rights to a fair Trial, and of a Trial by Jury because: 1) the District Court failed to dismiss a Juror for cause; 2) there was Juror misconduct, and the District Court failed to take remedial action; and 3) the District Court's engaged in an ex parte contact with the Jury. Addendum to Petition for Writ of Habeas Corpus, at 126-138.

During voir dire, the Petitioner engaged in a colloquy with one of the venire members, who later sat on the Jury. The venire member indicated that he had a little difficulty hearing the Petitioner, but responded to all of the Petitioner's questions. Respondent's Appendix, at 158-80. Following the colloquy, the Petitioner advised that he was "marginally concerned about the hearing issue," and he requested the District Court to dismiss the Juror for cause. Id. at 180. The District Court declined to do so. The Petitioner now contends that the Juror suffered a hearing deficit to such a degree that it fundamentally affected the structure of the Trial. We disagree. The Petitioner's ability to communicate with the Juror demonstrates that the Juror was able to appropriately fulfill his duties during the Trial. We cannot say that the District Court committed any constitutional error in declining to dismiss the Juror for cause.

The Petitioner next contends that an atmosphere of violence so pervaded the Jury proceedings that he was deprived of a Trial by Jury, and a fair Trial. The Petitioner contended on appeal, and contends here, that Juror Hall threatened other jurors with violence. The Minnesota Court of Appeals found that the Record did not support such a contention. Danforth I, supra at 374. Based on a review of the Record, we find no support for the Petitioner's contention either. At most, the Record discloses that strong feelings were present in the Jury room that were less than ideal, but were not such that the Petitioner was deprived of any constitutional right.

Finally, the Petitioner contends that the District Court committed constitutional error in meeting with Juror Hall and, subsequently, the rest of the Jury without counsel, or the Petitioner, present. The District Court reasoned that, due to exigent circumstances, it was discussing, with a Juror, tensions in the Jury room, and made a Record of the incident. Petitioner's Appendix, Exh. D at 23-25. On appeal, the Court rejected the Petitioner's argument, and found that the District Court acted appropriately in view of the exigent circumstances. Danforth I, supra at 373. The Jury ultimately left for the evening and resumed deliberations on the following day. Id. We find nothing in the Record to call into

question the Minnesota Court of Appeal's determination that the District Court did not improperly pressure the Jury for a Verdict.

We conclude that the Petitioner's argument, that the District Court took no remedial action, is without merit. Following the Verdict, the District Court conducted a Schwartz Hearing, and questioned each Juror as to whether the tension involving Juror Hall had influenced their Verdict. Id. at 374. Each Juror responded that they had not been unduly influenced. Id. Accordingly, we recommend that this aspect of the Petition be denied as without merit.

D. The Petitioner's Claims Regarding the Trial Court's Evidentiary Rulings.

1. Standard of Review. "'[F]ederal habeas corpus relief does not lie for errors of state law' * * * [and] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, supra at 67-68 (citations omitted). Questions regarding the admissibility of evidence are matters of state law and are reviewable in Federal Habeas proceedings "only when the alleged error infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process." Manning-El v. Wyrick, 738 F.2d 321, 322 (8th Cir. 1984), cert. denied, 469 U.S. 919 (1984), citing Wallace v. Lockhart, 701 F.2d 719, 724 (8th Cir. 1983), cert.

denied, 464 U.S. 934 (1983). In this Circuit, a petitioner must prove that the asserted error was so conspicuously prejudicial, or of such magnitude, that it fatally infected the Trial and deprived the petitioner of fundamental fairness. Bennett v. Lockhart, 39 F.3d 848, 856 (8th Cir. 1994). A Federal Habeas Court must review the totality of the facts in the case, and analyze the fairness of the particular Trial under consideration. Id.

2. Legal Analysis. The Petitioner raises evidentiary issues regarding the admission of: 1) the testimony of Dr. Gary Fifield as to his physical examination findings; 2) Spreigl[13] evidence; 3) a videotape depicting a partly naked boy; 4) a video taken in a locker room; 5) several nudist videos; and 6) the Petitioner's interrogation. Addendum to Petition for Writ of Habeas

---

[13]The terms "Spreigl evidence," or "Spreigl witnesses," refer to evidence or testimony which is inadmissible to prove a defendant's propensity to commit the charged offense, but may be admitted to establish motive, intent, absence of mistake or accident, identity or common scheme or plan. Rule 404(b), Minnesota Rules of Evidence; State v. Landin, 472 N.W.2d 854, 859 (Minn. 1991) (citations omitted).

> To admit Spreigl evidence, the trial court must find that (1) the evidence is clear and convincing that the defendant participated in the Spreigl incident; (2) the Spreigl evidence is relevant and material to the state's case; and (3) the probative value of the Spreigl evidence outweighs its potential for unfair prejudice.

Id.

Corpus, at 64-68, 75-82, 84-86. The Petitioner also claims that the District Court erred in failing to strike the testimony of A.S. when she was unable to identify the Petitioner in the courtroom. Id. at 87-88.

The Petitioner raises evidentiary issues related to the District Court's refusal to: 1) grant the Petitioner access to the CornerHouse protocol manual; 2) grant the Petitioner's request for a subpoena for J.S.'s school records; 3) allow testimony from Dr. Ralph Underwager; and 4) allow the Petitioner to conduct a psychological examination of J.S. and A.S. Id. at 41-46, 57-60. The Petitioner also raises evidentiary issues related to the refusal to admit: 1) evidence that J.S.'s mother engaged in a pattern of familial abuse; 2) evidence that J.S. had been sexually abused by family members; 3) evidence that J.S.'s mother had abused a young girl in the 1980s; 4) evidence that J.S.'s mother practiced "communal bathing" with her children; 5) evidence that J.S.'s mother had "propositioned" the Petitioner; 6) evidence that J.S.'s half-brother was discovered "lurking" in J.S.'s bedroom; and 7) evidence that J.S.'s parents had not reported allegations of sexual abuse against another individual. Id. at 90-104. The Petitioner also takes issue with the District Court's excuse of eleven defense witnesses from Subpoena. Id. at 104.

The Petitioner's referenced evidentiary claims are nothing more than an improper attempt to relitigate his Trial. See, McFarland v. Scott, 512 U.S. 849, 859 (1994)(holding that a criminal Trial is the "main event" and that the Habeas Writ should not be used to "relitigate state trials"). We conclude that Petitioner's evidentiary complaints are precisely the type of issues the Supreme Court has emphasized are not appropriate bases for Federal Habeas relief. Estelle v. McGuire, supra at 67-68. The Petitioner raised the same contentions on direct appeal, and the Minnesota Court of Appeals "painstakingly considered each of [the Petitioner's] numerous * * * arguments," and found "them to be without merit." Danforth I, supra at 578. Neither the Petitioner's repetition of the contentions here, nor the Record, provides any reason to question the State Court's resolution of those claims. This is especially so, given that the Minnesota Court of Appeals reiterated that it had considered each of the Petitioner's claims and, we find, properly rejected them. Danforth III, supra at *2.

The Petitioner has not established that the District Court's evidentiary decisions, either singly or in combination, were errors that were so conspicuously prejudicial as to fatally infect his Trial or deprive him of fundamental fairness. Maggit v. Wyrick, 533 F.2d 383, 385 (8th Cir. 1976), cert. denied, 429 U.S. 898 (1976). We conclude that the State Courts did not engage in an

unreasonable application of established Federal constitutional principles in rejecting the Petitioner's contentions that the District Court erred in its evidentiary rulings. See, Williams v. Taylor, supra at 413. Accordingly, we recommend that this aspect of the Petition also be denied.

E. The Sufficiency of the Evidence.

1. Standard of Review. On a challenge to the sufficiency of the evidence, the critical inquiry is whether the "record evidence would reasonably support a finding of guilt beyond a reasonable doubt * * *." Jackson v. Virginia, 443 U.S. 307, 318 (1979). A reviewing court must view the evidence in the light most favorable to the prosecution, here the successful party, and answer the question of whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original); United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003).

2. Legal Analysis. The Petitioner asserts that there was insufficient evidence to support the "penetration" element of Minnesota Statutes Section 609.342, Subdivision 1. Addendum to Petition for Writ of Habeas Corpus, at 139-43. The Petitioner argues that J.S.'s statements in the CornerHouse video that the Petitioner placed his mouth on his "poopie" and his "pee" cannot support a finding of "sexual contact" as defined in Minnesota Sta-

tutes Section 609.341, Subdivision 11©) (1996).[14] The Petitioner asserts that the term "fellatio" is not defined, and therefore, cannot be the basis of his conviction. The Petitioner specifically argues that the mere contact of his closed lips with J.S.'s penis cannot constitute fellatio.

We disagree. This same claim was presented to the Minnesota Court of Appeals and rejected and, as a result, we presume that the State Court was correct in its factual determination. "Fellatio" is defined as "[a] sexual act in which the mouth or lips come into contact with the penis." Black's Law Dictionary, at 616 (6th Ed. 1990). J.S.'s statements, that the Petitioner placed his mouth on his "poopie," and his "pee," were sufficiently clear, and we cannot conclude that no rational trier of fact could find that they constituted "sexual contact" within the meaning of Section 609.341. Accordingly, we recommend that this aspect of his Petition be denied.

---

[14] "Sexual contact" is defined as "the intentional touching of the complainant's bare genitals or anal opening by the actor's bare genitals or anal opening with sexual * * * intent * * *." Minnesota Statutes Section 609.341, Subdivision 11(c)). "Sexual penetration" is defined as "any of the following acts committed without the complainant's consent * * * sexual intercourse, cunnilingus, fellatio, or anal intercourse[.]" Id., Subdivision 12(1).

F. The Petitioner's Allegation of Ineffective Assistance of Counsel.

1. Standard of Review. "Whether [the Petitioner] was deprived of his right to effective assistance of counsel is analyzed under the familiar two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." Smith v. United States, 182 F.3d 1023, 1025 (8th Cir. 1999). Under that test, the Petitioner must first "show that counsel's conduct fell below an objective standard of reasonableness," and then "must show that counsel's alleged ineffectiveness prejudiced the defense." Smith v. United States, supra at 1025-26; Siers v. Weber, supra at 974, citing Strickland v. Washington, supra at 687. "In order to show prejudice, a habeas petitioner must establish 'that there is a reasonable probability that but for counsel's unprofessional errors, the result * * * would have been different.'" Siers v. Weber, supra at 974, quoting Strickland v. Washington, supra at 694.

2. Legal Analysis. The Petitioner asserts that his attorney's conduct, during the pretrial proceedings, was ineffective, in that his attorney failed to investigate the facts, or prepare for Trial, in any meaningful way, and that such ineffective representation prejudiced the Petitioner's ability to confront his accusers and present his defense. Addendum to Petition for Writ of

Habeas Corpus, at 107, 114. The Petitioner also asserts that his standby counsel acted without his authority,[15] and that the District Court failed to appoint replacement counsel in violation of his right to representation. Id. at 107, 115-16.

Prior to Trial, a Hearing was conducted to address the Petitioner's request to represent himself. Petitioner's Appendix, Exh. B, January 29, 1996, Transcript of Proceedings at 2-3; [Docket No. 3]. The Petitioner asserted that he had received ineffective assistance of counsel, because his lawyer had "failed to investigate a number of things." Id. at 5. The Petitioner asserted that his attorney, Joseph Tamburino ("Mr. Tamburino"), had been ineffective for: (1) his failure to investigate a defense of mistaken identity; (2) his failure to contact witnesses whom the Petitioner had identified; (3) his suggestion a polygraph examination; (4) his failure to investigate a defense of "concocted" allegations; (5) his failure to read the Petitioner's "explanatory materials" in a timely manner; (6) his failure to procure the videotaped CornerHouse interview so the Petitioner could view it; (7) his failure to have an investigator interview the Petitioner; (8) his failure to retain an expert witness; (9) his failure to timely move for a continu-

[15] This contention is without any merit. The Petitioner's standby counsel advised that he had only discussed administrative matters with the District Court.

ance; (10) his failure to procure a treatise on the defense of "sex cases;" (11) his failure to prepare a video of the alleged crime scene; (12) his failure to procure copies of videos seized from the Petitioner's apartment so the Petitioner could review them; (13) his failure to prepare adequate witness questions for use at Trial; and (14) his failure to investigate Spreigl witnesses. Id. at 6-9, 12, 14-16, 18-20, 25-26, 28-29, 32. The District Court[16] noted that the Petitioner had been before it the previous week, and had made no mention of dissatisfaction with his attorney, and the Court characterized the Petitioner's complaint as "a fairly calculated effort to try to get * * * a continuance by firing your lawyer on the date of trial." Id. at 20.

Tamburino then requested that he be allowed to defend himself, pursuant to Rule 1.6, Minnesota Rules of Professional Responsibility,[17] and that he had discussed with the Petitioner the possibility of violating the attorney-client privilege in his own defense. Id. at 35. The Court agreed, but suggested that any testimony from Tamburino be given in camera, and asked the Assistant

---

[16]The Honorable Kevin S. Burke, then Chief Judge of the Fourth Judicial District Court.

[17]An attorney may disclose the confidences and secrets of his or her client in order to defend against an accusation of wrongful conduct. Rule 1.6(b)(5), Minnesota Rules of Professional Responsibility (1995).

County Attorney to leave. Id. at 35-36. The Assistant County Attorney left without objection. Id. at 36. Tamburino proceeded to assert that he had given the Petitioner discovery as it was coming in, indicated that they had a difference of opinion as to how to try the case, and what strategies to use to prepare for it. Id. at 36-46.

The Court subsequently asked the Petitioner if he still wished to represent himself, to which he replied that he did not want to be represented by his attorney. Id. at 48. The Court asked him, again, if he wanted to represent himself, to which he replied "I would prefer to be represented by a lawyer[.]" Id. at 49. The Court informed the Petitioner that he could represent himself or he could continue with his attorney, and the Petitioner stated he would represent himself. Id. The Court noted that the Petitioner had completed law school. Id. The Court then appointed Tamburino as standby counsel. Id. at 51. The Petitioner's request, that the Court appoint a different attorney, was denied. Id. at 52. The Petitioner's repeated request that the Court allow him to remove his attorney, and be appointed new counsel, was again denied. Id. at 53.

At the outset, we note that the Petitioner received the assistance of not only Tamburino as stand-by counsel, but also the assistance of John P. Mahoney ("Mahoney"). The Record shows quite

clearly that the Petitioner strongly disagreed with Tamburino's tactical decisions, during the pretrial phase, and was of the opinion that Tamburino was not doing what the Petitioner requested of him. The Record does not, however, demonstrate that Tamburino, at any time, committed any professional error. Siers v. Weber, supra at 974. The Petitioner has presented no evidence, which so much as suggests let alone demonstrates, that his attorney's conduct fell below an objective standard of reasonableness. Instead, the Record convincingly demonstrates that the Petitioner received adequate standby advice, from not one, but two attorneys.

Given the nature of the Petitioner's claims of ineffective assistance of counsel, we are unable to find that he has satisfied his obligation to show that his counsel's conduct fell below the standard of objective reasonableness. Garrett v. United States, 78 F.3d 1296, 1301, 1307 (8th Cir. 1996)(recognizing that, in determining whether counsel's performance was constitutionally deficient, an "objective reasonableness" standard applies, and "there exists a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance and sound trial strategy."); Cochrell v. Purkett, 113 F.3d 124, 126 (8th Cir. 1997)(noting that Strickland established an "objective reasonableness performance standard").

Since the Petitioner has failed to satisfy the first prong of the Strickland ineffective assistance of counsel test, we need not proceed to the second prong, and we conclude that the Petitioner was not denied the effective assistance of counsel. Given our conclusion, that the Petitioner was not denied ineffective assistance of counsel, the district court did not commit unconstitutional error in refusing to appoint new counsel. See, United States v. Espino, 317 F.3d 788, 798 (8th Cir. 2003)(noting that a criminal defendant does not have the absolute right to counsel of his own choosing); Carey v. Minnesota, 767 F.2d 440, 441 (8th Cir. 1985)(holding that an indigent defendant has no right to demand that a Court appoint a particular attorney). Accordingly, we recommend that this aspect of his Petition also be denied.

G. The Petitioner's Allegations of Prosecutorial Misconduct.

1. Standard of Review. Prosecutorial misconduct does not merit Habeas Corpus relief unless the prosecutor committed an error that effectively eliminated the defendant's due process right to a fair Trial. Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998), citing Darden v. Wainwright, 477 U.S. 168, 181 (1986). Thus, a Habeas petitioner "bears the **heavy burden** of showing that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." Mack v. Caspari, 92 F.3d 637, 643 (8th Cir. 1996)

(emphasis added), citing Jones v. Jones, 938 F.2d 838, 844-45 (8th Cir. 1991).

2. Legal Analysis. The Petitioner asserts that he was denied a fair Trial by an "egregious pattern of prosecutorial misconduct." Addendum to Petition for Writ of Habeas Corpus, at 117. The Petitioner alleges that the prosecutor "covered-up" relevant information, repeatedly engaged in improper questioning, and engaged in improper and misleading closing argument. Id. at 117-26. The Petitioner argues that the cumulative prejudice "rose to a level of impact such that the outcome of trial, would more likely than not, have been different in the absence of such prosecutorial misconduct." Id. at 126.

The State Court considered the Petitioner's prosecutorial misconduct allegation, and found it to be without merit. Danforth I, supra at 378. We have reviewed the Petitioner's allegations, and find that he simply has not presented facts, or argument, which demonstrate that the prosecutor committed error so egregious as to fatally infect the proceedings, and render his Trial fundamentally unfair. Mack v. Caspari, supra at 643. As such, we cannot conclude that the State Court's decision was an unreasonable application of Federal constitutional law. Williams v. Taylor, supra at 413. Accordingly, we recommend that this aspect of the Petition be denied.

H. The Petitioner's Resentencing Arguments.

The Petitioner advances the following arguments as to why his resentencing was flawed: 1) the Trial Judge's refusal to impose an enhanced sentence acted as an "acquittal," and the Petitioner was subject to double jeopardy on resentencing; 2) the lateness of Dr. Panciera's report subjected the Petitioner to double jeopardy, and deprived him of due process; 3) the Petitioner's resentencing violated Apprendi v. New Jersey, 530 U.S. 466 (2000); 4) the District Court's "offer" of a lesser sentence in exchange for a guilty plea, combined with a greater sentence on resentencing, deprived the Petitioner of his right to a Trial by Jury, and due process; 5) Minnesota Statutes Section 609.1352, Subdivision 1, is unconstitutionally vague; 6) the Petitioner was punished for his refusal to cooperate with Dr. Panciera, and therefore, he was deprived of his right to freedom of speech; 7) Dr. Panciera's report was based on hearsay, and other improper evidence, and deprived the Petitioner of his due process and Confrontation Clause rights; 8) the District Court refused to give the Petitioner an opportunity for full discovery thereby depriving him of his due process rights; and 9) the subsequent bar on contact with the Jurors violated the Petitioner's

rights to free expression and due process.[18] Addendum to Petition for Writ of Habeas Corpus, at 150-66.

1. The Petitioner's Double Jeopardy Arguments.

a. Standard of Review. No person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" United States Constitution, Amendment V. "[O]nce a defendant is placed in jeopardy for an offense, and jeopardy terminates with respect to that offense, the defendant may neither be tried nor punished a second time for the same offense." Sattazahn v. Pennsylvania, 537 U.S. 101, 106 (2003), citing North Carolina v. Pearce, 395 U.S. 711, 717 (1969).

> The [c]onstitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense * * *. The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

Green v. United States, 355 U.S. 184, 187-88 (1957)(citations omitted).

---

[18]This contention requires no discussion. It does not collaterally attack his conviction, and is not a cognizable basis for Habeas relief.

The prohibition against multiple trials is the "'controlling constitutional principle.'" United States v. DiFrancesco, 449 U.S. 117, 132 (1980), quoting United States v. Wilson, 420 U.S. 332, 346 (1975). Of prime concern, in the prohibition against successive Trials, "is the barrier to 'affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.'" United States v. DiFrancesco, supra at 132-33, quoting Burks v. United States, 437 U.S. 1, 11 (1978).

b. Legal Analysis. The Petitioner's contention, that he was subject to double jeopardy because his original sentence acted as an acquittal, and because Dr. Panciera's report was accepted after the Court imposed deadline, are without merit. Neither event served to act as an acquittal. See, Sattazahn v. Pennsylvania, supra at 102; United States v. DiFrancesco, supra at 137-38. As correctly noted by the Minnesota Court of Appeals, the state may appeal a defendant's sentence without offending double jeopardy principles. Danforth III, supra at *4, citing United States v. DiFrancesco, supra at 132. Furthermore, the Double Jeopardy Clause does not prohibit the state "from seeking review of a sentence nor restricts the length of a sentence imposed" following appeal. Monge v. California, 524 U.S. 721, 730 (1998). Accordingly, we recommend that this aspect of the Petition for a Writ of Habeas Corpus be denied.

2. Apprendi.

a. Standard of Review. A criminal defendant is entitled to a Jury determination as to whether he is guilty of every element of the crime charged, beyond a reasonable doubt. United States v. Gaudin, 515 U.S. 506, 510 (1995). In 2000, the Supreme Court reviewed the historical importance of Trial by Jury, and the requirement of proof beyond a reasonable doubt, concluding that "[t]he historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties provided highlight the novelty of a legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." Apprendi v. New Jersey, supra at 482-83. The Court went on to make clear that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490. A fact other than a criminal conviction, used in such a manner, becomes the "functional equivalent of an element of the offense." United States v. Aguayo-Delgado, 220 F.3d 926, (8th Cir. 2000).

b. Legal Analysis. The Petitioner contends that his resentencing violated the strictures of Apprendi. Specifically, he contends that his 316-month executed sentence, as coupled with a mandatory 10-year term of conditional release, placed his sentence above the statutory 30-year maximum for first degree criminal sexual conduct. See, State v. Jones, 659 N.W.2d 748, 751 (Minn. 2003)(holding that conditional release is "constitutionally significant" for purposes of Apprendi).

We agree with the Petitioner that his sentence would be subject to review under Apprendi, if that claim were properly before us. The Petitioner's direct appeal of his resentencing was final on July 28, 1999. Danforth II, supra. Because the Petitioner's appeal of his resentencing was final, prior to the Supreme Court's ruling in Apprendi, it cannot apply retroactively to his case. Griffith v. Kentucky, 479 U.S. 314, 328 (1987)(holding that new rules for the conduct of criminal prosecutions are only to be applied retroactively to cases pending on direct review or not yet final); United States v. Ross, 279 F.3d 600, 608 (8th Cir. 2002). Since Apprendi is inapplicable to the Petitioner's claim, we recommend that this aspect of his Petition be denied.

3. Void for Vagueness.

a. Standard of Review. A law is void for vagueness if it fails to define a "criminal offense with sufficient

definiteness that ordinary people can understand what conduct is prohibited," or fails to establish guidelines to prevent "arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983); see also, Broadrick v. Oklahoma, 413 U.S. 601, 607 (1973)(holding that a law is unconstitutionally vague if men of common intelligence must guess at its meaning).

> The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

Colten v. Kentucky, 407 U.S. 104, 110 (1972).

The proper degree of definition is not susceptible of mathematical precision, and vagueness review is deferential. Tuilaepa v. California, 512 U.S. 967, 973 (1994).

b. Legal Analysis. The Petitioner argues that the terms "engrained," "offense history," "severity of the current offense," "social history," "results of an examination of the offender's mental status," and "risk of reoffending is great," are not defined and are unconstitutionally vague. Addendum to Petition for Writ of Habeas Corpus, at 150. The Petitioner presented this claim on appeal from his resentencing, but it was rejected because he did not raise it in the District Court. Danforth III, supra at *5. As such, it would appear to be procedurally defaulted. Nonetheless,

we note that the Minnesota Supreme Court has considered a vagueness challenge to Section 609.1352, and rejected it. State v. Christie, 506 N.W.2d 293, 301 (Minn. 1993), cert. denied, 510 U.S. 1201 (1994). We cannot say that the State Court's ruling is contrary to established Federal constitutional law. Williams v. Taylor, supra at 413. Accordingly, we recommend that this aspect of the Petition for a Writ of Habeas Corpus be denied.

4. Contentions Regarding Dr. Panciera's Report.

a. Standard of Review. A Sentencing Court is not bound by the rules of evidence that apply at Trial. See, e.g, United States v. Shevi, 345 F.3d 675, 679 (8th Cir. 2003)(noting that sentencing court was entitled to consider reliable hearsay); accord, Summerlin v. Stewart, 341 F.3d 1082, 1111 (9th Cir. 2003) (noting that presentence reports are an extremely useful sentencing tool but, by their nature, they contain hearsay).

b. Legal Analysis. The Petitioner contends that Dr. Panciera's report was based on improper evidence, and that he was punished for exercising his rights not to speak with Dr. Panciera. The Petitioner also contends that the District Court erred in not allowing him full discovery, and that the District Court improperly relied on a 10-year old psychological report.

Pursuant to the remand Order of the Minnesota Court of Appeals, the District Court was required to resentence the Petitioner

consistent with Section 609.1352, the patterned sex offender statute. Danforth I, supra at 378. In doing so, the District Court was required to make a finding as to whether the Petitioner required long-term treatment or supervision, Minnesota Statutes Section 609.1352, Subdivision 1(a)(3), and, to that end, requested that Dr. Panciera evaluate the Petitioner. Danforth II, supra at *1. The Petitioner refused to submit to testing, or to interviews, during Dr. Panciera's evaluation. Id. at *3.

Dr. Panciera prepared his report based on 112 documents that related to the Petitioner's history, including a psychological report dated February 19, 1988. Respondent's Appendix, at 1-4. Dr. Panciera noted that the Petitioner had refused to participate in the evaluation, and that "it would have been optimal to have current interview and test information * * *." Id. at 4. Dr. Panciera, nonetheless, completed his evaluation, as required by Minnesota Statutes Section 609.1352, Subdivision 1(a)(3), and concluded that "the defendant's pedophilia is so long standing and so compelling that it qualifies as being 'engrained.'" Respondent's Appendix, at 8. Dr. Panciera opined that "any possibility of successful treatment would require long term sex offender treatment in a secure setting." Id. at 9. With respect to the Petitioner's refusal to participate in the evaluation, Dr. Panciera noted only that it

"precludes consideration of current interview or psychological testing." Id. at 7.

Dr. Panciera's report was dated July 1, 1998, which was after the District Court's deadline of June 19, 1998. Danforth II, supra at *1. The Petitioner's counsel received it on July 21, 1998, but was unable to immediately deliver it to the Petitioner due to a "lockdown" at the Stillwater Correctional Facility. Id. The Petitioner subsequently requested a continuance in order to prepare his cross-examination of Dr. Panciera, which the District Court denied. Id. The Minnesota Court of Appeals rejected the Petitioner's assertion that the District Court had committed error by denying him a continuance, noting that "(1) [The Petitioner] and his counsel were aware that the psychological report was being compiled as of the May 27, 1998, court order; (2) [the Petitioner] knew his psychological condition would be at issue; (3) [the Petitioner] could have, but did not, hire his own expert prior to receiving the Panciera Report at any time between May 27 and July 21; (4) [the Petitioner] had one to two weeks after receiving the Panciera Report to prepare for the hearing; and (5) [the Petitioner] did not attempt to either examine or subpoena Dr. Panciera." Id.

The Minnesota Court of Appeals also rejected the Petitioner's claim that the District Court had improperly relied on the 1988 psychological report, and on hearsay evidence, which was contained

in Dr. Panciera's report. Id. at *3. The Court noted that it was appropriate to consider the report in determining whether the Petitioner's behavior was "engrained," and that the introduction of hearsay evidence, at a sentencing, did not violate a defendant's due process rights. Id.; see also, State v. Adams, 295 N.W.2d 527, 536 (Minn. 1980).

The Court also considered, and rejected, the Petitioner's contention that the District Court's attempt to broker a plea limited, in some way, its authority to impose a longer sentence at a later date. Danforth II, supra at *4. The Court noted that the District Court was not "limited to a sentence proposed by the state and declined by defendant." Id.; see also, State v. Ackerley, 207 N.W.2d 272, 273 (Minn. 1973). Finally, the Court rejected the Petitioner's argument that his free speech rights had been violated, noting that neither the District Court nor Dr. Panciera commented negatively on his decision not to participate in the evaluation. Id.

We cannot agree with any of the Petitioner's argument, that the District Court infringed upon his constitutional rights during resentencing. The District Court made appropriate, and detailed findings, based upon a comprehensive evaluative report compiled by Dr. Panciera, in accordance with governing Minnesota law. As such, we cannot say that the State Courts engaged in an unreasonable ap-

plication of established Federal constitutional principles. Accordingly, we recommend that this aspect of the Petition for a Writ of Habeas Corpus be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1. That the Petition for Writ of Habeas Corpus [Docket No. 1] be denied.

2. That the case be dismissed with prejudice.

3. That the Petitioner's Motion for Correction of Respondent's Answer [Docket No. 53] be denied.

s/Raymond L. Erickson
Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

Pursuant to Federal Rule of Civil Procedure 6[a], D. Minn. LR1.1[f], and D. Minn. LR72.1[c][2], any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than March 5, 2004**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of the Hearing by no later than **March 5, 2004,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.