**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

**United States, *ex rel.***
**Stephen Danforth**,

Petitioner,

vs.

**David Crist**, Warden of MCF-Stillwater, and the **Department of Corrections of the State of Minnesota,**

Respondents.

Civil File No. 01-2137 (JRT/RLE)

RECEIVED
BY MAIL
JUL 26 2004
CLERK, US DIST. COURT
ST. PAUL, MN

---

**MEMORANDUM OF SUBSEQUENTLY DISCOVERED AUTHORITY IN SUPPORT OF PETITIONER'S MOTION FOR RECONSIDERATION OF ORDER ADOPTING REPORT AND RECOMMENDATION**

---

**Introduction**

Petitioner, Stephen Danforth, has previously supported his *Petition for Writ of Habeas Corpus* with his *Incremental Briefs*, addressing each of his claims for relief in that petition, and with his *Traverse*, refuting each of the procedural affirmative defenses raised by Respondents. Subsequently, Petitioner has filed his Objection to Report and Recommendation of Magistrate Judge. Each of those documents was drafted with cited authorities then available to Petitioner.

Petitioner has only more recently discovered each of the following further authorities. All of them lend substantial additional support to one or more of the respective claims in the petition herein, and by extension, to Petitioner's present Motion for Reconsideration of the District Judge's current

SCANNED
JUL 26 2004
U.S. DISTRICT COURT ST. PAUL

Order adopting the Report and Recommendation. Hence, the following is submitted for such support, both in that context specifically, and as to Petitioner's claims generally.

For the Court's convenient reference, the following cases are organized below in the order of claims in the Petition which they address.

Petitioner hereby moves for leave to file this Memorandum.

**Claims I.1.A., I.2., I.3., and I.4:**

*Crawford v. Washington,* 124 S.Ct. 1354 (U.S. Supreme Court, No. 02-9410, March 8, 2004), abrogated the longstanding precedent, *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531 (1980), from which *Idaho v. Wright* was a specific offshoot. In a nutshell, *Crawford* replaced Roberts with a flat rule that no testimonial out-of-court statement can be admitted under the Confrontation Clause unless the person making that statement is unavailable as a witness and the defendant has had the opportunity to cross-examine that person concerning that statement.

At page 1374, Justice Scalia, writing for the majority of justices, states:

> "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the State flexibility in their development of hearsay law – as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'[10] Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses which the Confrontation Clause was directed.
>
> "In this case, the State admitted Sylvia's testimonial statement against Petitioner, despite the fact that he had no opportunity to cross-examine her. That alone is sufficient to make out a violation of the Sixth Amendment. *Roberts* notwithstanding, we decline to mine the record in search of indicia of reliability. Where testimonial

statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." (emphases supplied)

At footnote 10 on the same page, Justice Scalia calls the former Roberts test "inherently, and therefore permanently unpredictable."

There is no doubt that complainant's CornerHouse interview in the case at bar was "testimonial' in nature; it made effective assertions of an incriminating nature by way of complainant's responses to the CornerHouse interviewer's questions. It is equally beyond question that Petitioner had no prior opportunity to cross-examine complainant at all about anything, much less about the content of that interview in particular. Therefore, that CornerHouse interview is inadmissible under *Crawford*.

*Crawford*'s majority opinion (by Justice Scalia) represents the view of seven justices. The remaining two justices (Rehnquist and O'Connor) filed a joint concurring opinion.

*Crawford* involves a police interview-statement by the defendant's wife. The Washington Supreme Court upheld *Crawford*'s conviction by determining that his wife's statement, not falling under a "firmly rooted" hearsay exception, nevertheless bore "particularized guarantees of trustworthiness", just as at Petitioner's trial herein (124 S.Ct. at 1358; see also *Idaho v. Wright*, discussed at length in *Petitioner's First and Second Incremental Briefs*.) *Crawford*'s trial did not include any testimony by his wife, because of a state law marital privilege.

At 124 S.Ct. 1359, the majority opinion describes the Confrontation Clause as a "bedrock procedural guarantee," thus connoting that *Crawford*'s profound realignment of the proper construction of that Clause is indeed "watershed" in scope, for retroactivity purposes (although retroactivity is not explicitly discussed).

*Crawford* more specifically explains that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." (124 S.Ct. 1364). At footnote 4 (p. 1365), *Crawford* applies "interrogation" in the broadest possible terms:

"We use the term 'interrogation' in its colloquial, rather than any technical legal, sense... . [Defendant's wife's] recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." (emphasis supplied)

At footnote 7 (124 S.Ct. 1367) the majority opinion in *Crawford* explains why hearsay exceptions can have no justifying role to authorize out-of-court statements in the absence of prior cross-examination opportunity:

"... .Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse – a fact borne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances." (emphases supplied)

*Crawford* should accurately be viewed as not being a new rule at all. As declared in footnote 9 (p. 1369), "... .If nothing else, the test we announce is an empirically accurate explanation of the results our cases have reached... ."

*Crawford*, at footnote 8, (p. 1368), notably distinguishes *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (relied upon by Respondents herein) on an identical basis to that previously proffered by Petitioner herein:

"One case arguably in tension with the rule requiring opportunity for cross-examination when the proffered statement is testimonial is *White v. Illinois* [cite omitted], which involved, *inter alia*, statements of a child victim to an investigating officer admitted as spontaneous declarations. *Id*, at 349-351, 112 S.Ct. 736... . [T]he only question presented in White was whether the Confrontation Clause imposed an unavailability requirement on the types of hearsay at issue. See 502 U.S. at 348-349, 112 S.Ct. 736. The holding did not address the question of whether certain of the statements, because they were testimonial, had to be excluded even if the witness was unavailable... ." (emphases supplied)

At 124 S.Ct. 1369, *Crawford* criticizes the now-abrogated *Ohio v. Roberts* standard thus:

"Roberts conditions the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness'... . [T]he test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations."

At p. 1370, *Crawford* continues this thought to its logical conclusion:

"Admitting statements deemed reliable by a judge is fundamentally at odds with the right to confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural, rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing through the crucible of cross-examination... ."

At pp. 1371-72, *Crawford* observed that:

"Whether a statement is deemed reliable depends heavily on which factors the judge considers and how much weight he accords each of them. Some Courts wind up attaching the same significance to opposite facts... .

"To add insult to injury some of the courts that admit untested testimonial statements find reliability in the very factors that make the statements original... . That inculpatory statements are given in a testimonial setting is not an antidote to the confrontation problem, but rather the trigger that makes the Clause's demands most urgent."

The 'watershed intent of *Crawford* is implicit in the following discussion in the majority opinion, p. 1373-4:

"We readily concede that we could resolve this case by simply reweighing the 'reliability factors' under *Roberts* and finding that Sylvia *Crawford*'s statement falls short. Burt we view this as one of those rare cases in which the result below is so improbable that it reveals a fundamental failure on our part to interpret the

> Constitution in a way that secures its intended constraint on judicial discretion... . The constitution prescribes a procedure for determining the reliability of testimony in criminal trials, and we, no less than the state courts, lack authority to replace it with one of our own devising.
>
> "We have no doubt that the courts below were acting in utmost good faith when they found reliability. The Framers, however, would not have been content to indulge this assumption. They knew that judges, like other governmental officers, could not always be trusted to safeguard the rights of the people;... They were loath to leave too much discretion in judicial hands... . By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design. Vague standards are manipulable, and, while that might be a small concern in run-of-the-mill assault prosecutions like this one, the Framers had an eye toward politically charged cases like Raleighs – great state trials where the impartiality of even those at the highest levels of the judiciary might not be so clear. It is difficult to imagine Roberts providing any meaningful protection in those circumstances." (emphases supplied)

Similarly herein, application of factors under *Roberts*, and its more specifically applicable progeny, *Idaho v. Wright*, has been an exercise in the strained manipulation of such vague terms to apply them in such a way as to reach a desired result, i.e., admissibility of complainant's CornerHouse interview in Petitioner's trial, even though complainant was barred from testifying as incompetent. Because Petitioner had no contemporaneous knowledge of that interview, and had no opportunity at any time to cross-examine complainant, admission of that interview-'statement' violates the clear, unambiguous rule of *Crawford* v. *Washington*.

Retroactivity of *Crawford* is clearly intended because the above excerpts demonstrate the following alternatively.

First, *Crawford* represents not just an overruling of prior precedent as to future cases, but rather an implicit declaration that the *Ohio v. Roberts* 'balancing' approach, employing "reliability"/"trustworthiness" factors was fundamentally incorrect, a "fundamental failure" to enforce

the Confrontation Clause at all. In this, the Supreme Court, per seven-justice majority, effectively eradicated the *Ohio v. Roberts* approach as *an aberration that should never have existed*. Thus firstly, *Crawford* is not a "new" rule of criminal procedure, but instead is merely a restoration of pre-*Roberts* confrontation law, wiping away the error and potential for abuses by way of partial manipulation and inconsistent application of vague and open-ended standards under *Roberts*. In this way, *Crawford* v. *Washington* is not subject to either *Teague v. Lane*, 489 U.S. 288, 103 L.Ed.2d 334, 109 S.Ct. 1060 (1989), or to the habeas corpus review limits of the *AEDPA*.

Second, alternatively, even assuming *Crawford* to be properly deemed as "new", it nevertheless represents a profound "watershed" under *Teague v. Lane*. This is clear both in the radical 'paradigm shift' apparent in the doctrine announced in *Crawford*, and in its completely different, functionally applicable standard as to outcomes. As to the latter aspect, there can be no doubt, for instance, that the CornerHouse interview admitted in Petitioner's trial is absolutely inadmissible under *Crawford*.

Moreover, the *Crawford* review of the history of the right to confrontation clearly demonstrates that, although viewed as procedural, that right is properly to be treated as a "bedrock procedural guarantee" (Id, p. 1359) to the procedural fairness of trials. Thus, in barring all extrajudicial statements with "testimonial" content (i.e., content relevant in any way at trial to any fact-finding decision) where there has been no prior opportunity for cross-examination of the unavailable-at-trial declarant, *Crawford* does not merely change answers to questions erected under *Ohio v. Roberts*, it instead replaces the very questions themselves with other, different inquiries, in the process replacing all ambiguities with a simple, certain set of three yes/no questions:

1. Is the declarant unavailable at trial?
2. Is the statement "testimonial" in nature?
3. Did the defendant have a prior opportunity to cross-examine the declarant as to that statement?

Indeed, as to Question 2, immediately above, the concurring opinion (Rehnquist, joined by O'Connor) concedes that this testimonial/nontestimonial dichotomy has never before been drawn (Id, p. 1376).

This replacement of the Roberts inquiry of "reliability"/"trustworthiness" is so complete and revolutionary that "watershed" status of *Crawford* v. Washington is transparent and unquestionable. In sum, therefore, *Crawford* retroactively applies to Petitioner's trial, requiring relief herein.

Completely independent from Crawford v. Washington, the following, earlier authority is offered for its alternative support to Claims I.1.A and I.1.B of the Amended Petition herein:

*State v. Koontz,* cited by its slip opinion appeal number in connection with the quotation from that case appearing at pp. 35-36 of *Petitioner's First Incremental Brief,* is published at: 145 Wash.2d 650, 41 P.3d 475 (Wash. 2002). The quote appears at: 145 Wash.2d 654-5, 41 P.3d 478.

Proper child interviewing techniques in the context of child sexual abuse investigations are discussed by *Ann S. Botash, Evaluating Child Sexual Abuse: Education Manual for Medical Professionals* (Johns Hopkins, 1995) at Section II, pp. 18-24. Open-ended questions are urged on the topic of abuse, as well as during the preceding rapport-building stage. (*Id*, p. 18). Open-ended questions are those calling for a narrative response.

In addition, *Botash* calls for competency testing of the child before the substantive-inquiry phase of the interview. Specifically, *Botash* offers these suggestions for such competency testing:

> "Asking the child about his or her family, pets, teachers, friends, etc., often provides insight into the child's development.... You can also perform a brief developmental screening. For example, asking, 'Do you eat breakfast before or after lunch?' ascertains a child's concept of before and after. An understanding of inside, over, and under can be similarly assessed.... In children who are younger than 12 years old, the quality and quantity of memory may be ascertained. For example, asking a few details regarding a recent school, field trip may assist in later interpretations of the child's memory of abuse.

"The concept of truth can be easily ascertained using drawings. For example, draw an animal such as a teddy bear in the center of a piece of paper. Add two stick figure drawings of people, each with speech bubbles above them. One stick figure can say that it is a teddy bear and the other that it is a duck. Assuming that your drawing is not too clumsy, ask the child which stick figure is telling the truth. Other methods of truth ascertainment may be useful but often require the child to make an accusation that 'you' are not telling the truth. A child might feel safer agreeing that your hair is green because of his or her perception that you will be angry with him or her for disagreeing." (emphases in original)

These pre-substantive-inquiry probes for general competency, including adequate and accurate memory, and for knowledge of truth and a willingness to adhere to it, versus the impact of agreeability or suggestibility, have been thoroughly discussed in *Petitioner's First Incremental Brief*, as also has been the need for use of open-ended, as opposed to "directed" questioning, used by CornerHouse interviewers. The latter type of questions, *i.e.*, focused, multiple-choice, yes/no, and leading questions, are indicated by *Botash,* at Sec. II, p. 24, to possess "less confidence" in the responses evoked. The fact that even elementary training manuals, such as *Botash,* for child interviewers contain these instructions underscores their fundamental importance. Failure by the CornerHouse interviewer in Petitioner's case to employ these techniques in the interview of complainant (or, in the case of competency questions, using questions about complainant's family without knowledge of underlying facts to match them against), as well as all other failings and improprieties in that interview, prove its lack of any "guarantees of trustworthiness", as required under *Idaho v. Wright.*

**Claim II.1.:**

(At end of first paragraph on p. 68 of *Petitioner's Third Incremental Brief*):

Accord: *U.S. v. Varoudakis,* 233 F.3d 113, 120 (1st Cir. 2000):

"When prior bad act evidence is offered to prove a motive for the crime, 'courts must be on guard to prevent the motive label from being used to smuggle forbidden

evidence of propensity to the jury.' [22 *C.A. Wright & K.A. Graham, Jr., Federal Practice and Procedure*, §5240 (1978)]. That is the problem here.... It involves an inference of propensity as 'a necessary link in the inferential chain.' [*United States v.*] *Frankhauser*, 80 F.3d [641] at 648 [1st Cir. 1996]..... Contrast this forbidden inference with the permissible inference to be drawn in a case in which the prior bad act – say, a botched robbery by the defendant that was frustrated by the ineptitude of his cohort – provided the motive for the defendant's subsequent assault on his cohort. There the prior bad act would provide circumstantial evidence of the commission of the assault without the involvement of any propensity inference." *Ibid.*

**Claim III.1.:**

*Ann S. Botash, Evaluating Child Sexual Abuse: Education Manual for Medical Professionals* (Johns Hopkins, 1995) at Section III, p. 44, lists numerous physical findings often cited as indications of sexual abuse, but which in fact are merely "normal variants." Among these, as might be relevant to sexual abuse of a male child are: "failure of midline fusion; diastasis ani; increased perianal skin pigmentation; erythema of... perianal tissues...; anal fissures; venous congestion in the perianal tissues; flattened anal folds; anal dilation with stool present in the rectal vault; [and] ...periurethral bands or ligaments." *Ibid.* However, none of even these normal variants were present in the physical examination of the complainant performed by CornerHouse physician Gary Fifield, nor were any actual indicators of sexual abuse. This absence of any observations whatsoever makes Fifield's contention of "consistency" with a diagnosis of sexual abuse even more ludicrous than previously noted. In fact, all such findings of a lack of such real and spurious indications are far more consistent with a diagnosis of no sexual abuse of the complainant.

Moreover, the complainant was examined with a photocolposcope (lighted magnifier with camera). As explained by *Botash*, at Sec. III, p. 56, "Most colposcopes have a setting for use of green light filters. This type of filter will highlight areas of decreased and increased erythema, as well as major lacerations and minor abrasions." The fact that no such findings were made by Fifield, even with the aid of colposcope, drives home the certain absence of any indicators that could in any rational sense have

been deemed to have truly been "consistent" with sexual abuse. "Consistency" was an unscientific fiction from the lips of Fifield.

**Claim V.1.-8.:**

*Wynne v. Renico,* 279 F.Supp.2d 866 (E.D. Mich. 2003), granted a habeas corpus petition where the defendant's constitutional right to present a defense was held to have been violated by the state trial court's refusal to allow the jury to hear and consider extrinsic evidence tending to establish a prosecution witness' motive to fabricate. At 279 F.Supp.2d 883, the federal court declares:

> "Likewise, extrinsic proof tending to establish a reason on the part of a witness to fabricate is never collateral and may not be excluded on that ground. *Justice v. Hoke*, 90 F.3d 43, 48 (2d Cir. 1996) (granting habeas relief where such evidence was excluded). '(I)t is axiomatic that defense counsel should be permitted to expose to the jury facts relevant to a witness' possible motivation to testify favorably for the prosecution or his potential bias for or against any party to the criminal proceeding. Such information is "always relevant as discrediting the witness and affecting the weight of his testimony."' *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir 2000)... ."

Herein, each of the above claims concerns denial of testimony and/or evidence deemed by the state trial court to be "extrinsic" and thus supposedly inadmissible over Petitioner's objection based on his right to present impeachment evidence as part of his defense. *Wynne* establishes that protestations as to the "extrinsic" character of such evidence cannot bar such constitutionally required defense evidence.

**Claim VI.:**

(At *Petitioner's Fourth Incremental Brief*, p. 40):

The correct citation for *Williams v. Washington* is 59 F.3d 673 (7th Cir. 1995).

**Claim VIII.:**

*State v. Kelly*, 668 N.W.2d 39, 2003 WL 22039477 (Minn. App., Sept. 2, 2003), held that a prosecutor's unfounded cross-examination of the defendant about his acquaintance with two unidentified courtroom spectators, insinuating that the spectators were the defendant's unapprehended accomplices described by the victim, constituted plain error, entitling the defendant to a new trial. *Kelly* also held it to be improper for a prosecutor: (a) to ask a question of a witness, implying a factual predicate which the prosecutor cannot support by evidence; or (b) to intentionally mislead the jury in argument as to inferences it may draw. As one application of these precepts, *Kelly* specifically held it to be improper for a prosecutor to ask questions to a witness that are calculated to elicit or insinuate an inadmissible and highly prejudicial answer.

In Petitioner's Fourth Incremental Brief, pp. 51-54, instances 2 through 6 each constitute exactly such elicitation and insinuation of answers that were both inadmissible and highly prejudicial to Petitioner. Instances 7 through 10 (pp. 54-56), and instances 13(a) through 14 (pp. 57-61) constitute such improper argument to unwarranted inferences, as well as including blatant misstatements of facts of record. In each of these particulars, *State v. Kelly* stands as further authority that the prosecutor's questioning and argument at Petitioner's trial, as alleged herein, constituted prosecutorial misconduct, and that such misconduct herein was even more prejudicial than that in *State v. Kelly*, hence requiring a new trial herein.

**Claim IX.3.:**

*Peterson v. State*, 672 N.W.2d 612 (Minn. App., Dec. 30, 2003), involving criminal sexual conduct charges, held that the defendant's constitutional right to be present during all stages of trial was violated when the trial court communicated verbally with the jury during deliberations in the absence of the defendant's personal presence.

In particular, *Peterson* holds that this requirement of the defendant's personal presence applies to any communication beyond "mere housekeeping" questions – "those questions addressing matters relating to physical comforts and the like. See *State v. Kelley,* 517 N.W.2d 905, 908 (Minn. 1994)... ." *Peterson,* at 672 N.W.2d 616. It should be observed that *Peterson,* at p. 615, quotes the comparatively short exchange between judge and jury. By contrast with the lengthy counseling in Petitioner's trial herein, the *Peterson* judge's comments were limited to such advisories as to "Keep working", "You have to use your best judgment... ", and "Get some rest. Come back and start working."

The reasoning of *Peterson*, at 672 N.W.2d 616, is eloquent and compelling in the case at bar:

> "In considering whether the trial court's communication with the jury is harmless beyond a reasonable doubt, we must be mindful of a judge's position in the eyes of the jury. 'An act, a sentence, or a word from the presiding judge may exert a controlling influence on the verdict.' *State v. Mims,* 306 Minn. 159, 163, 235 N.W.2d 381, 386 (1975).
>
> "Here, we conclude that the trial court responded to questions from the jury on substantive matters. Although it appears the trial court intended to provide neutral, nonsubstantive responses, the responses are too easily interpreted as providing additional instructions. The response to "keep working" could well be interpreted to mean that the jury must reach a verdict. See *Kelley,* 517 N.W.2d at 909-10... .
>
> "A trial court's response to a deliberating jury's questions regarding substantive matters provides far too great a possibility the jury will understand the responses as an additional instruction. When the communication occurs outside the presence of the defendant and his or her attorney, the defendant is deprived of essential knowledge and stripped of his opportunity for input. See *Kelley,* 517 N.W.2d at 910... ." (emphases supplied)

*A fortiori,* the same logic should apply herein, where the trial judge's colloquy with the jury was very extensive, and included such counseling to jurors as to consider the importance of the case to the community, and to the effect that cases of Petitioner's type required extra effort, beyond ordinary

criminal cases, on the part of jurors to reach a verdict, as well as numerous other improper and prejudicial remarks to the jury by the trial judge, all as already cited by Petitioner in earlier briefing.

*Brown v. State*, App. No. A-03-1588, ___ N.W.2d ___ (Minn. Supr. Ct., July 1, 2004), concerned improper communication by a trial judge with a deliberating jury in a criminal case without the defendant's presence. Insofar as applicable herein, *Brown* held that the trial judge thereby violated the defendant's right to be present during such communications under *Rushen v. Spain*, 464 U.S. 114, 117 (1983). Despite the presence of Brown's attorney, and that attorney's attempted waiver of Brown's right to be personally present, *Brown* held that these facts did not effectively surrender that right to be personally present. Herein, there has never been any assertion of waiver by Petitioner.

*U.S. v. McElhiney*, 275 F.3d 928 (10th Cir. 2001), held that a trial judge's comments directing the jury to deliberate further were not just observations, but rather constituted an *Allen* charge, since they served the purpose of encouraging a unanimous verdict and were given to a deadlocked jury. *McElhiney* also held that the judge's remarks were fraught with potential for jury coercion. The discussion in *McElhiney* of the evolution of *Allen* charge doctrine is the most complete and scholarly the undersigned has ever encountered.

Claim IX.3. herein does not turn on whether the trial judge's extensive *ex parte* comments in dialog with jurors (individually and collectively, without prior notice to the parties) constituted an *Allen* charge, or were coercive in character. Rather, the focus of Claim IX.3. is upon the improper *ex parte* nature of the judge's dialog with jurors, without notice to Petitioner or any prior opportunity to be heard as to the nature of that communication, and to be present during such communication, because of its character as further instruction. Nevertheless, by comparing the coercive, *Allen*-instruction nature of the judge's commentary in *U.S. v. McElhiney* to the closely similar comments by the trial judge

herein, the indispensable need for such advance notice, opportunity to be heard, and to be present can be dramatically underscored.

In particularly, the *McElhiney* commentary by trial judge to the deliberating jury was faulted in that it did not caution jurors about the burden of proof; it failed to admonish that no juror should surrender conscientiously held convictions; and in that the trial judge repeatedly emphasized the desire that a verdict be reached, and underscored the issue of expense of trial. 275 F.3d at 943-45. The fact that the trial judge did not express a desire for a particular verdict was deemed irrelevant to the coerciveness of the comments. *Id*, p. 944.

What is important is that each of the foregoing criticisms applies herein. Here, the trial judge likewise omitted any mention of burden of proof or any counseling to jurors against surrender of conscientiously held belief as to guilt or innocence, and clearly and repeatedly communicated his desire for return of a verdict, rather than deadlock, by alluding to investment of the parties, the court, and of jurors themselves in the case and its "importance to the community", and the jurors' duty, and by intimation of potentially adverse media scrutiny to the verdict, or lack thereof, all as are thoroughly cited and discussed in *Petitioner's Fifth Incremental Brief*, pp. 7-20. In sum, the trial judge's comments to jurors in the case at bar were every bit as much a re-instruction during deliberations, and were every bit as fraught with potential for coercion of a verdict as the judge's comments in *U.S. v. McElhiney*.

There is yet another nearly identical similarity between *U.S. v. McElhiney* and this case. In *McElhiney*, aware of a deadlock condition, the trial judge asked jurors "to deliberate until noon." (275 F.3d 946). About this fact, "cases such as *Burroughs v. United States*, 365 F.2d 431 (10th cir. 1966), and *Goff v. United States*, 446 F.2d 623 (10th Cir. 1971), suggest that setting a time deadline exacerbated the coercive effect of the *Allen* charge... ; *Goff*, 446 F.2d at 626 (concluding that '[i]t was impermissibly suggestive and coercive for the court to place a time fuse [i.e., a deadline] on the period of jury deliberation')." (*McElhiney*, 275 F.3d at 949, emphasis supplied).

Almost eerily, in Petitioner's case as well, a similar deadline of the day following the judge's comments was set by the judge for the jury to reach a verdict. See: *March 5, 1996 Transcript*, pp. 254, 26-28, 33; *Petition*, Claim IX.3., Paragraph 14; *Petitioner's Fifth Incremental Brief*, p. 12. In light of the observations in *U.S. v. McElhiney,* above, this further profound similarity drives home the coerciveness of the trial judge's comments to jurors herein.

Especially in light of the '*Allen* charge' instruction nature of parts of those comments, together with such deadline imposition upon deliberations, there is no room left for doubt that those comments required that Petitioner herein be given advance notice of the fact of those projected comments/instructions, and of their content, and be allowed to be heard thereon before their delivery to the jury, and be allowed to be present during such reinstruction. Because the trial judge chose to dispense with all of this, Petitioner's constitutional rights to notice, to be heard, and to be present were violated.

(At *Petitioner's Fifth Incremental Brief*, p. 19, line 14, before: "See generally... ."):

As to the additional, compounding, *ex parte* bailiff contacts with jurors herein, *Weaver v. Thompson*, 197 F.3d 359, 365-6 (9th Cir. 1999), illustrates the improper coercion upon the jury, in violation of the defendant's due process rights, comprised even only of a bailiff's responsive offhand message (in the judge's absence) to the jury, to the effect that a verdict on all counts was required, because it omitted any offsetting cautionary instruction informing jurors that they were not required to give up their conscientiously held views. Comparatively, during jury deliberations in Petitioner's trial, the bailiffs' *ex parte*, and judicially unsupervised counseling of at least one, and possibly other jurors herein was more intrusive, in admittedly advising on how to deliberate, and is, to date, of unknown extent and exact content. *A fortiori*, under Weaver, that counseling of deliberating jurors by bailiffs herein comprised a further constitutional violation (beyond the trial judge's own free-ranging, *ex parte* commentary to deliberating jurors).

**Claim XI.1.:**

(At *Petitioner's Fifth Incremental Brief*, p. 28, end of first paragraph of text of argument as to this claim):

*Arizona v. Rumsey*, 467 U.S. 203, 211, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), followed *Bullington*'s rationale. The trial court in *Rumsey* found in sentencing that no statutory aggravator had been proved by the prosecution. Notably as applicable herein, on a cross-appeal by the prosecution, the Arizona Supreme Court concluded that the trial court had erred in its interpretation of one of the statutory aggravating circumstances, and remanded for re-sentencing, analogously to Petitioner's re-sentencing. Nevertheless, ultimately, on certiorari in *Rumsey*'s subsequent habeas corpus case, the United States Supreme Court held that the trial court's finding served as an acquittal as to the matter of aggravated penalty, barring re-sentencing under the bar against double jeopardy, regardless of legal error. *Id*, at 211.

Herein, Respondents would make much of the observation that Petitioner's original sentence was overturned for legal error. However, as in *Rumsey*, that does not, and cannot erase the fact that in Petitioner's case, in levying that original sentence, the trial court made a finding of a lack of proof by the prosecution to fulfill one of the three required elements for enhanced sentencing under the enhancement statute urged. Under *Rumsey*, regardless of any error, that constituted an acquittal of Petitioner of the requisite elements for enhanced sentencing under that statute.

**Claim XI.3.:**

The recent United States Supreme Court decision in *Blakely v. Washington*, No. 02-1632, 2004 U.S. Lexis 4573 (June 24, 2004) applied *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L.Ed.2d 435, 120 S.Ct. 2348 (2000), in a manner effectively establishing a new construction of *Apprendi* that

absolutely mandates its application herein, profoundly supervening the argument advanced in *Petitioner's Fifth Incremental Brief*, pp. 33-36 as to application of *Apprendi* herein.

The original argument at that location addressed the increase in the upper theoretical limit in punishment under the statute penalizing first-degree criminal sexual conduct herein (*Minn. Stat.*, §609.342: 30 years) by the enhancement statute applied herein (the "*Patterned Sex Offender*" statute, *Minn. Stat.*, §609.1352, now §609.108).

*Blakely* now clarifies that *Apprendi* inherently applies in any determinate, 'guidelines-based' sentencing jurisdiction to any sentence that exceeds the presumptive sentence. This is confirmed by the unequivocal analysis in the majority opinion in *Blakely*:

> "Our precedents make clear... , that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant... . In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." (*Id*, 2004 U.S. Lexis *13-14, emphases in original)

It is also now clear from *Blakely* that *Apprendi* applies equally to upward durational departures under a 'guidelines' regime, and to enhanced sentencing statutes:

> "Finally, the State tries to distinguish *Apprendi* and *Ring* by pointing out that the enumerated grounds for departure in its regime are illustrative rather than exhaustive. This distinction is immaterial. Whether the judge's authority to impose an enhanced sentence depends on finding a specified fact (as in *Apprendi*), one of several specified facts (as in *Ring*) or any aggravating fact (as here), it remains the case that the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact.[8]

(footnote 8): "Nor does it matter that the judge must, after finding aggravating facts, make a judgment that they present a compelling ground for departure. He cannot make that judgment without finding some facts to support it beyond the bare elements of the offense. Whether the judicially determined facts require a sentence enhancement or merely allow it, the verdict alone does not authorize the sentence."

(resuming text): "Because the State's sentencing procedure did not comply with the Sixth Amendment, petitioner's sentence is invalid." (emphases in original)

Under the *Blakely* view of the applicability of *Apprendi* as applied in Petitioner's case, the "statutory maximum" sentence was that provided by the applicable *Sentencing Guidelines* 'grid box, i.e., 153 to 163 months (15 *Minnesota Statutes* (1994), p. 330). Both Petitioner's original, "upward durational departure" sentence (216 months), and his, subsequent, 316-month sentence based on sentence enhancement under the *Patterned Sex Offender* statute exceeded that presumptive sentence range.

The jury verdict of guilt found only the purported 'fact' of the alleged crime (notwithstanding Petitioner's actual innocence). Under the *Minnesota Sentencing Guidelines* (15 *Minnesota Statutes*, 1994, *supra*), at Section II.D., and "Definition of Terms" (pp. 314, 344); accord: *Minn. Stats*, Section 244.10, Subd. 2, at least one substantial, compelling, aggravating factor must be present to support any upward departure from the presumptive sentence range set by the *Guidelines*. See, *e.g., State v. Taylor*, 670 N.W.2d 584 (Minn. 2003), holding that only circumstances that make the facts of a particular case different from a typical case support upward departure under Minnesota law. This is obviously the very kind of finding that *Blakely* requires a trial jury make, upon a standard of proof beyond reasonable doubt.

In Petitioner's original sentencing, the trial judge made findings (notwithstanding Petitioner's innocence) that the complainant was vulnerable, and that Petitioner abused a position of trust by committing the crime. *Taylor* rejected these very factors as a basis for upward departures, since they were deemed not to be different, but rather inherent in the nature of the crime of sexual abuse itself.

In Petitioner's subsequent re-sentencing, the replacement judge made findings of the presence of each of the three factors required for enhanced sentencing under the *Patterned Sex Offender* statute, *supra*. (August 4, 1998 Re-sentencing Transcript, pp. 35-36). In Minnesota, the standard of proof required for sentencing decisions (including enhanced sentencing decisions) is merely a preponderance of the evidence. *State v. Stirens*, 506 N.W.2d 302 (Minn. 1993); *State v. Christie*, 506 N.W.2d 293 (Minn. 1993). Under the *Blakely* explanation of *Apprendi*, such findings at both Petitioner's original sentencing and his re-sentencing must be made by a jury, and only upon a standard of proof beyond reasonable doubt. Thus, neither of Petitioner's sentences can stand under *Apprendi* as explained by *Blakely*. The verdict returned by the jury can sustain only the presumptive guidelines sentencing range.

Moreover, the *Blakely* interpretation of *Apprendi* must be deemed applicable herein notwithstanding the 'non-retroactive' application proscription in *Teague v. Lane*, 489 U.S. 288, 103 L.Ed.2d 334, 109 S.Ct. 1060 (1989) for each of the following independent reasons:

1. Minnesota's *Rules of Criminal Procedure*, Rule 27.03, Subd. 9, allows a sentence "not authorized by law" to be directly challenged within the same criminal case (by same case caption and case number) "at any time", rather than requiring such challenge to be brought in a collateral, independent, post-conviction relief action. Accord: *McCarr, Minnesota Practice,* Criminal Law and Procedure, Section 36.22. Thus, appeal of Petitioner's Rule 27.03 motion for sentence correction based on *Apprendi* was a "direct" appeal, rather than a collateral appeal. Because a "conviction" under Minnesota law occurs only at the "judgment", which must include the sentence (*Rules of Criminal Procedure*, Rule 28.02, Subd. 2), an illegal sentence makes the judgment of conviction itself a nullity, and hence non-"final" for *Teague v. Lane* purposes (489 U.S. at 301). In effect, Minnesota has in this

way provided for correction of sentences that are revealed at any time to be illegal, such as under *Apprendi*. Therefore, no retroactive application of *Apprendi* is involved herein.

2. By bypassing any question of retroactivity as to *Apprendi*, and addressing the merits of Petitioner's *Apprendi* argument in Petitioner's appeal from denial of his motion for sentence correction, the Minnesota Court of Appeals implicitly accepted that *Teague v. Lane* is not offended by *Apprendi*'s application to Petitioner's re-sentencing. Because *Teague* applies only to procedural rulings, this disregard of this threshold procedural defense effectively extinguished this issue in any event.

3. *Teague v. Lane* applies only to "new" rules in decisions "not dictated by precedent." *Id*, 489 U.S. at 301 *Apprendi*, as thus explained by *Blakely*, is <u>not new</u>, since it is now clear that it was always a result logically compelled by *In re Winship*, 397 U.S. 358, 25 L.Ed.2d 368, 90 S.Ct. 1068 (1970). This is now apparent because *Blakely* explains that even aggravating sentencing "factors" that provide a basis for upward "departure" from the "presumptive" sentence under sentencing guidelines are facts beyond guilt of the offense that must themselves be found by a jury beyond reasonable doubt, because a jury verdict solely as to guilt does not authorize such upward departure. Hence, under *Winship*'s dictate, such facts are actually <u>elements</u> required to be proved in that manner and on that standard of proof.

4. In the same analysis, the *Apprendi* holding, as explained by *Blakely*, is now clearly understandable as grounded in substance, in addressing the <u>substance</u> which must be established to authorize exceptional punishment. In essence, *Apprendi,* under the *Blakely* clarification, <u>treats any proffered upward departure factor as an element of an aggravated offense</u> that must be established in the same way and to the same degree as any other element of that aggravated offense. *Blakely* clarifies that upward departures from presumptive sentences imposed, without proving the fact relied upon to do so to a jury beyond reasonable doubt, are beyond the "power to punish" (*Saffle v. Parks*, 494 U.S. 484, 494-5, 108 L.Ed.2d 415, 110 S.Ct. 1257 (1990), and also constitute punishment that the law cannot impose (*Bousley v. United States*, 523 U.S. 614, 620, 140 L.Ed.2d 828, 118 S.CT. 1604 (1998). <u>This</u>

is the pure essence of substantive, rather than procedural due process. Therefore, *Teague v. Lane* does not apply at all. 489 U.S. at 311.

5. Finally, even if viewed as procedural in nature instead, *Apprendi*, as now interpreted and explained by *Blakely*, is retroactive under *Teague v. Lane* itself. This conclusion is required because *Blakely* undeniably elevates the *Apprendi* Doctrine not just to 'watershed' status under *Teague*, but to monumental status as a veritable 'continental divide' in the way that the interrelationship between criminal offenses (simple or aggravated) and corresponding sentences is to be constitutionally viewed. *Blakely* itself is not "new", but rather simply "appl[ies] the rule... in *Apprendi v. New Jersey*." *Blakely*, 2004 U.S. Lexis 4573, *10). Any sentencing findings used to justify punishment departing from presumptive sentences must, under *Blakely*'s explanation, be submitted to a jury, and can be found only upon a standard of proof beyond reasonable doubt, identical to that applied to the offense itself. This is indispensable because the jury's verdict on guilt of the simple offense itself "alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact." (*Blakely*, 2004 U.S. Lexis 4573, *17). No view previously expressed has thus interpreted upward departure from presumptive sentences in determinate sentencing-regime jurisdictions as a matter of lack of authorization by verdict. Moreover, the exact constitutional provision cited as violated in *Blakely* is the "Sixth Amendment right to trial by jury." (*Id*, *4, accord: *10). Yet *Apprendi*'s grounding in the due process guarantee of the Fourteenth Amendment, together with *Blakely*'s own clearly substantive due process-based conceptualization of a lack of authorization for upward departure sentencing without jury findings of additional facts upon proof beyond reasonable doubt, connotes an unmistakable intermingling of procedural and substantive law principles that comprises a new view of both the Sixth and Fourteenth Amendments, calling into question the continued logical viability of *Teague v. Lane* itself. No reasonably conjecturable development of constitutional law could exceed the earth-moving significance of *Apprendi* as applied by *Blakely*. Because it thus attains – indeed, exceeds 'watershed' status in *Teague*, *Apprendi*, post-*Blakely*, is universally applicable, without regard to retroactivity.

(Also, at p. 36, following discussion of *State v. Grossman*):

In *State v. Jones,* 659 N.W.2d 748 (Minn. 2003), the Minnesota Supreme Court concedes that a term of conditional release under present *Minn. Stat.*, Section 609.108, subd. 6 (former Sec. 609.1352) is constitutionally significant, so as to be subject to the *Apprendi* rule, requiring a jury determination by proof beyond a reasonable doubt.

The *State v. Jones* approach was limited to sentences actually exceeding the statutory maximum, unlike the *Ring* analysis advanced at pages 32-36 of *Petitioner's Fifth Incremental Brief.* Nevertheless, *Jones* held that *Apprendi* was violated by a conditional release term that extended beyond the statutory maximum.

Petitioner's sentence in this case (after re-sentencing) is 316 months. That is only 44 months less than the statutory maximum under the first-degree criminal sexual conduct statute (*Minn. Stat.*, Sec. 609.342). Petitioner's sentence under the sentence-enhancing provisions of *Minn. Stat.*, § 609.108 (the same statute as in *State v. Jones*) also includes a ten-year conditional release term of intensive parole-like supervision, which commences only upon Petitioner's release from prison under his 316-month sentence, and counts only time during which Petitioner is not under renewed imprisonment under that sentence. *Minn. Stat.*, §609.108, subd. 6. The fact that that subsection calls for "the statutory maximum period or for ten years, whichever is longer," adds crystal clarity to the 'above-statutory-maximum' intent and effect of that statute.

In Petitioner's case, Petitioner may serve more time on conditional release (or on re-imprisonment from that status) in either or both of two scenarios: (1) Petitioner's release (or subsequent re-release) may be delayed by prison disciplinary action; or (2) Petitioner, through revocation of conditional release status, may have the running of that conditional release period tolled during such re-imprisonment, only to resume thereafter.

The very likely probability of the first scenario is pointed up by the interaction of three facts. First, Minnesota Dept. of Corrections Disciplinary Rule 510 imposes a 360-day period of extended imprisonment for refusal to participate in, or for failure in sex offender treatment, and a 540-day similar extension cumulatively for a second violation of this rule. Second, Petitioner is aware that refusal to 'admit' the 'truth' of one's conviction is deemed by Minnesota Dept. of Corrections sex offender therapists as such a refusal or failure of such treatment. Third, Petitioner, as a wrongly convicted individual, will never accede to any such demand to 'admit' that this false accusation is 'true'. Therefore, it appears virtually certain that the date of Petitioner's initial release from prison, and hence, commencement of that ten-year conditional release period will be delayed for slightly less than two-and-a-half years. This will mean that Petitioner is not released until after more than twenty years of imprisonment. Because this leaves less than ten years until the statutory maximum sentence would theoretically end, the ten-year conditional release period will necessarily exceed that statutory maximum sentence.

Likewise, *Jones* points up that conditional release may include a condition of "successful completion of treatment... .." while on such release status. Thus, even if Petitioner's initial release is not delayed as in the scenarios above, he very likely will be re-imprisoned for the same refusal to 'admit' truth of the false accusation against him, while in treatment on such conditional release. Analogously then, the tolling of such conditional release period during such resulting re-imprisonment will very likely cause that period to extend beyond – perhaps nearly a decade beyond the statutory maximum sentence period. Under *Jones,* quite apart from the '*Ring* doctrine', this constitutes an *Apprendi* violation.

**Claim XI.4.:**

This Circuit held in *Hess v. United States,* 496 F.2d 936, 938 (8th Cir. 1974), that a defendant's decision to exercise his constitutional right to a trial by jury must have no effect on the sentencing

decision. See also elsewhere: *U.S. v. Mazzaferro*, 865 F.2d 450, 460 (1st Cir. 1989) (declaring that the law is clear that a judge may not retaliate against a defendant for exercising his/her right to stand trial); *U.S. v. Hutchings*, 757 F.2d 11, 14 (2d Cir. 1984); *U.S. v. Wright*, 533 F.2d 214, 216 (5th Cir. 1976).

*U.S. v. Bruce*, 976 F.2d 552 (9th Cir. 1992), squarely held that a trial judge's participation in plea bargain discussions was inherently coercive upon the defendant, regardless of the judge's compassionate motivation toward the defendant. See, e.g., *W. White*, "A Proposal for Reform of the Plea Bargaining Process", 119 *U. Pa. L. Rev*. 439, 452 (1971) ("When a judge suggests to a defendant, either directly or through his counsel, that he should plead guilty , the coercive effect of this suggestion is likely to be overwhelming.")

The incisive analysis in *Bruce*, at 976 F.2d 557-8 is aptly applicable herein:

> "... [S]ee also *White*, [*supra*] note 3, at 452-53 ('[T]he judge may jeopardize his role as an impartial arbiter of justice if he participates in plea negotiating.') The loss of judicial integrity is <u>particularly serious when</u>, as here, see *supra* at 7, n. 2, <u>the judge explicitly or implicitly advocates a particular bargain</u>. See *Werker*, 535 F.2d at 203 ('As a result of his participation, the judge is <u>no longer a judicial officer or neutral arbiter</u>. Rather, he becomes or seems to become <u>an advocate for the resolution he has suggested to the defendant</u>.'). However, legitimate concerns exist even when the judge does not urge a particular course of action upon the defendant: '[t]he unequal positions of the judge and the accused... <u>raise a question of fundamental fairness</u>' regardless of the degree or type of judicial involvement. *United States ex rel. Elksnis v. Gilligan*, 256 F.Supp. 244, 254 (S.D. N.Y. 1966); see also: *White*, *supra*, note 4, at 453 ('[A]ctive judicial participation in plea bargaining may unfavorably color the defendant's view of the system. To the defendant, the judge becomes an adversary or at least a compromiser rather than an embodiment of his guarantee to a fair trial and impartial sentence.'). The judge's role must be that of a neutral arbiter of the criminal prosecution; his involvement in the adversary process of plea negotiation is beyond and detracts from that judicial duty.
>
> "... .[J]udicial participation in plea discussions that ultimately fail inherently risks the loss of a judge's impartiality during trial, not only because he becomes aware

of the defendant's possible interest in pleading guilty, but also because he may view unfavorably the defendant's rejection of the proposed agreement... . [I]nvolvement in plea negotiations diminishes the judge's objectivity in post-trial matters such as sentencing and motions for a judgment of acquittal. See [*Werker*]; *White, supra*, note 4, at 453; see also *Gallagher* ["Judicial Participation in Plea Bargaining: A Search for New Standards", 9 *Harv. C.R.-C.L. L. Rev.* 29 (1974)] at 44 ('If a judge urges a defendant to plead guilty in exchange for a sentencing concession and the defendant rejects the arrangement, the judge may desire to reaffirm his initial belief in the defendant's probable guilt after the defendant has been convicted at trial.')

"... .No matter how benign the court's intent, its awesome power to impose a substantially longer or even maximum sentence in excess of that proposed is present whether referred to or not', and '[a] defendant needs no reminder that if he rejects the proposal, stands upon his right to trial and is convicted, he faces a significantly longer sentence.' *Elksnis*, 256 F.Supp. at 254." (emphases supplied)

As pointed out in Claim XI.4. in the Amended Petition itself herein, and in *Petitioner's Fifth Incremental Brief*, pp. 37-39, the trial judge clearly advocated that Petitioner accept the plea bargain offered to him. The judge specifically threatened Petitioner with a longer-than-usual sentence if Petitioner declined the plea bargain offer. Thus, the considerations of *Bruce* apply herein with full force, highlighting the resulting abridgement of Petitioner's constitutional rights to jury trial and to due process and fundamental fairness.

**CONCLUSION**

Based upon the foregoing, as well as upon all prior briefing to this Court, Petitioner submits that his claims are all valid, and therefore urges the Court to reconsider and to withdraw its Order dated July 14, 2004, and to allow this case to proceed accordingly.

Dated: July 22, 2004.

**Stephen Danforth**
Petitioner, *pro se*
970 Pickett St., N. - (147636)
Bayport, MN 55003-1490
Telephone: (651) 779-2700