**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth**,

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## TRIAL TRANSCRIPT,

## Volume IX

## March 1, 1996

joke going on. She just taps me on the shoulder, if you will, and says, "And don't touch Josh," just smiled this kind of smirk face as she says it.

I looked over and thought about that for a second, and thought what's going on. And I looked in the back seat and I realized it was the fact that Terese of talking to Josh that had prompted her to say that.

MS. QUAINTANCE: Objection. Conclusion. Ask that it be stricken.

THE COURT: Sustained. It will be.

MR. DANFORTH: In any event, I turned my head over the back seat for a second and I says, "Terese, is there something that I should know about in terms of what you and Josh are talking about in light of what Amanda just said?"

And Terese paused and gave out a kind of a big sigh, and then she says, "Well," she says, "I'm just talking to him about the things that I have to talk to him every now and then about." And I said, "Well, this has to to with me, I take it, otherwise Amanda wouldn't have said this." And she says, "Yes." And I said, "What are you telling or asking him about me?"

And she says, "Well, I just have to ask him every now and then if you you've touched him." And I said, "You mean in some way I'm not supposed to?" And she says, "Yes,

sexually."

BY MR. MAHONEY:

Q. Do you believe there were other similar warnings or cautions from Terese to Josh during that summer?

A. Oh, I know there were.

Q. Were there also warnings or cautions to Amanda that you were aware of?

A. Yes, but less directly I'm aware of that. I'm aware of that because --

Q. Were there -- was, in the years that you knew them, were the warnings or cautions getting more frequent during the summer of 1995?

A. Yes, late spring as well.

Q. Did you know whether the Story parents told Larry Hull or warned him in some way?

A. I knew that two ways. They told me and he told me.

Q. What did he tell you that the parents said about you?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

MR. MAHONEY: Your Honor, I'd offer this testimony not for the fact for proof of what was said but goes to the state of mind of the particular witness,

Terese, and her biases towards this defendant during operative periods.

THE COURT: But this is a question about what Larry said.

MR. MAHONEY: What Larry said Terese told him.

MS. QUAINTANCE: Double hearsay.

THE COURT: No. Overruled. Or the objection is sustained.

You can ask the question with respect to Terese.

BY MR. MAHONEY:

Q. Do you know whether -- I'm sorry Judge?

THE COURT: You can ask the question, however, with respect to Terese, but not with respect to Larry.

BY MR. MAHONEY:

Q. Did Terese tell you that she had warned or cautioned Larry the son in some way?

A. It was Gary who did.

Q. Do you know whether they warned or cautioned their neighbors about your history?

A. Yes. In fact, on one occasion at Rosemount I heard them talking about it.

MR. MAHONEY: May I approach, Your Honor?

THE COURT: You may.

(Whereupon, a discussion was held off the record at the bench.)

BY MR. MAHONEY:

Q. Who's Becky Bennett?

MS. QUAINTANCE: Objection.

THE DEFENDANT: She is a friend of mine who lives in Fairbault.

MS. QUAINTANCE: They know who she is.

THE COURT: (No audible response.)

BY MR. MAHONEY:

Q. During the summer of '95, did Terese leave you as the caretaker of her children during some period of time?

A. Oh, yes. But that was more frequent previously.

Q. What do you mean?

A. Well, in the Spring of '95 there were a number of incidents when she did that, including one with Becky Bennett.

Q. And as the summer progressed that happened less and less often?

A. Yes. And in the time that they stayed with me, the spring came to an abrupt halt very close to the tail end of the time that they were with me.

parents weren't?

A. No, not completely. No. I mean, it hampered my visits with the Storys, again, but it didn't prevent either of those things.

Q. I understand that there was a period of time that Gary was not at his home before the summer of '95, is that correct, that he wasn't there for a period of time?

A. I think you might be referring to about a 30 day period or so in May.

Q. During that 30 day period, did Gary ask you to do or not do something about his family?

A. Yes. In fact, he was quite pointed about it. He told me not to hang around a lot. And in particular, he told me to, you know, govern myself in such a fashion that I was not essentially alone in the company of the children.

Q. Did you agree to that?

A. Yes, I did. I was, once again, kind of startled by the fact that he had felt moved to the necessity of saying it, but.

Q. But, yes, you did?

A. I said "Certainly." I said, "Sure, Gary."

Q. Strike that.

You didn't take them swimming during that period then?

A. No. This, of course, was in this May period. And, as I say, Josh's birthday was May 19. So that one

I did them. Or sometimes I did them in conjunction with them so as to save gas, obviously, that sort of thing.

BY MR. MAHONEY:

Q. So it was inconvenient for you to have them there?

A. After a while it became inconvenient, yes.

Q. Did you have any particular feelings about the way that Terese supervised her children?

MS. QUAINTANCE: Objection. Asks for an opinion.

THE WITNESS: Yes, I did.

THE COURT: Sustained.

BY MR. MAHONEY:

Q. Did you chide Terese for how she --

MS. QUAINTANCE: Objection.

MR. MAHONEY: Goes to the witness' -- Terese's bias again at the operative time.

THE COURT: Goes to his feelings, not hers.

MR. MAHONEY: He was the recipient of it.

MS. QUAINTANCE: Your Honor, this should not be in front of the jury.

THE COURT: The objection is overruled. Go ahead.

awake before the family was?

A. Yes. When -- you mean the entire family? But the children would get up first of all. You know how children are, crack of dawn, that sort of thing.

Q. What would they do when they got up?

A. Well, sometimes what they would do -- this requires understanding that the only T.V. in this place was the T.V. in my bedroom. It was all set up for, I just always watched the T.V. from bed, frankly. And I had a big Texas-sized water bed, you know, California king they call it. It's the largest made. I just liked living like that. And the kids would come in and turn the T.V. on, and watch cartoons or whatever else might be on the morning broadcast.

Q. And you were there at the time?

A. Oh, yeah. I'd still be trying to sleep.

Q. Did the children again involve you in their going to bed rituals?

A. Well, yeah. Yes. That actually had gone back quite a ways.

Q. And that continued while they were there?

A. It did in the first part, but as Terese grew more and more irritated and --

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

BY MR. MAHONEY:
Q. At some point during their stay it stopped?
A. Yes, it did.
Q. Did you have a certain method for doing housework, particularly the dishes?
A. Well, yes. I mean --
Q. Did Terese --
MS. QUAINTANCE: Objection, relevance.
THE COURT: Well, I don't know where it's going. Is the problem --
BY MR. MAHONEY:
Q. Did Terese follow that at your request?
A. No.
Q. Was that another cause for friction between you?
A. To say the least. I mean, she would rinse the dishes in a greasy sink that she hadn't even washed out.
Q. During Terese's stay there, did she become increasingly nosy or prying into your private life?
MS. QUAINTANCE: Objection.
THE COURT: Sustained.
BY MR. MAHONEY:
Q. Did you ever find Terese going through your things?
A. Yes, and asking about whether things were --

BY MR. MAHONEY:

Q. What was the weather like that summer?

A. Oh, it was hot.

Q. Did you have air conditioning?

A. No.

Q. There has been testimony about an incident where Josh kissed you.

Do you have a recollection of that incident?

A. Yes, I do.

Q. Can you tell the jury what happened, please?

A. Well, it was another one of these computer game things. I was sitting in there working on my computer just finishing up one of these little word processing parts of a legal research project.

Q. And Josh was with you?

A. He came into the room. Um-hum.

Q. The door of the office was open, and he came in?

A. Sure. Yeah. I always left it open at that point.

Q. Did he close the door, you know?

A. No.

Q. Did you close the door?

A. No.

Q. Was Terese present?

A. She was, yes. Although, I wasn't sure that she was present right at the particular moment when the actual incident incurred.

Q. And what happened?

A. Okay. Well, he comes in, walks around in front of me, kind of worms his way up on my right knee and asked me to put in a computer -- I had a game for him.

And, I said, "Well, just give me a second." And I was literally about four key strokes away from being done with my computer program and putting it away. And I did that. And then I said, "Okay." You know. And I slipped this CD disk of computer games that I had in. And that was what he was always fascinated by, and had put that in by then probably about 10 or so times already in this time that they had lived there with me.

This incident I think was either the 15th or the 16th or so of July. It was very close to the end. They left on the 19th. And at this point, as we were waiting for that particular computer game that I knew that he wanted to play, I asked him if that's the one he wanted to play again. And he said, "Yes." And we were waiting for it to load up. And I am just sitting there staring at the computer screen. And all of a sudden, he was also he's looking forward at this point, he turns around, throws his arms around my neck in a big broad gesture, and planted a

big wet one right about her on the jaw line, just underneath the jaw line.

Q. And was Terese present when that happened?

A. Yes, she was. She was standing there in the doorway.

Q. How do you know?

A. Well, because I knew she had come in and out of the room. I, at that point, wasn't sure she was present at that particular moment, but I guess I really didn't think anything of Josh's actions except that I thought --

Q. I asked you whether she was there?

A. Yes.

Q. Did she leave Josh with you then?

A. No.

Q. What did she do about Josh?

A. Okay. Well, finishing the episode chronologically here, what Josh did as soon as he had finished kissing me was he leaned back and, you know, "Ha, ha, ha," liked kissed me there too. All right. So I saw that and I said, "Well, okay," indicating the same thing, you know, big wet one.

At this moment Terese says, "Steve," in a very, you know, imploring, irritated tone. And, you know, then a discussion ensued between Terese and I.

Q. What did she do with Josh?

A. Okay. That discussion was very short. And as soon as it was over, she took Josh out of the room, literally by the hand escorted him out of the living room. And I heard them talking in lower tones out there, but I didn't bother to try to listen to what they were saying.

Q. From her demeanor during the short discussion before she took Josh, what did you think her reaction had been to things she had just seen?

MS. QUAINTANCE: Objection. Speculation.

THE COURT: Sustained.

BY MR. MAHONEY:

Q. What did she state when she talked to you?

A. Okay. Her exact words as near as I recall them is that it was definitely not okay with her that I do this. You know, I had already said by that point that I was --

Q. What else did she say?

A. Okay. I'm sorry. Paraphrasing as near as I can recall it, was to the effect that she didn't want to see that ever happen again.

Q. Did she say they things loudly or softly?

A. Pretty loud for Terese, yeah.

Q. Did you think she was angry?

A. Oh, she was clearly angry.

Q. Was there any other incident that same day that

made Terese mad at you?

A. Well, yeah. That was sort of, pardon the expression, hell day, if you will. Because later, about mid afternoon was that comment that I had already testified to yesterday about "How dumb are you?"

Q. That was the same day?

A. Oh, yeah. And at that point --

Q. Did she -- was Gary there then?

A. Not then.

Q. Gary wasn't there when you said "How dumb are you?"

A. No. She called him.

Q. What do you mean "she called him?"

A. He was in Minneapolis somewhere, and she apparently knew where he was.

Q. And did he come home after she called him?

A. Apparently right away. He was there in less than an hour.

Q. How long did it usually take him to get there?

A. Unless you were already on the freeway, from South Minneapolis, it would take almost a complete hour from there.

Q. Was it earlier than he usually arrived home?

A. Well, he didn't have a set schedule, but it's clear that he came home just because of that call.

MS. QUAINTANCE: Objection, speculation.

THE COURT: Sustained.

THE DEFENDANT: But I think it's what, when he said he --

MS. QUAINTANCE: Objection.

THE COURT: No. There is no question Mr. Danforth.

BY MR. MAHONEY:

Q. On the date that the Storys were moving, you -- strike that.

Did you ask the Storys to leave?

A. In the end, yes.

Q. When was that?

A. Well, there was really two occasions when I asked them to leave. I asked them to be prepared to leave on or about the 15th or 16th.

Q. Of what month?

A. Yes.

Q. Of what month?

A. Of July.

Q. And what was their reaction to that?

A. Well, it was clear that made them upset that I told them that. And later they came to me and said that they weren't ready to go, they didn't have anyplace to go

over for movie night?

A. Right. That was the last time that I was there. And I recall it was the evening of August 8th.

Q. Did Terese seem comfortable with your presence there?

A. No, she didn't.

Q. In what way did she not seem comfortable?

A. Well, she sort of circled the wagons, you might say. She kept the children very close by her side at that point.

Q. How did the children react to you that night?

A. They were fine with me. In fact, Amanda went along with us when we rented videos. I recall Terese wouldn't let Josh go. At the time I didn't think anything of that.

Q. Did you take back the videos that had been rented that night?

A. No. Evidently, they did later.

Q. Did you stop by their house the next day?

A. I did, because at that point I was trying to pick up those videos to take them back. So I knocked on the door, but I didn't get an answer.

Q. Did you see the Story children at any time after that day?

A. No.

to lead him a little more on some of these topics. I didn't see that one coming in these questions.

THE COURT: All right.

THE DEFENDANT: I am sorry Your Honor.

THE COURT: And let me just say a couple other things, if there is slippage on this issue or the sexual abuse allegation against Terese any time from now until the end of the trial, I will tell the jury that the authorities have found that no such abuse occurred. That is in fact what they found, and I will tell the jury that if there is any reference, unpermitted reference to that.

Do you understand?

THE DEFENDANT: Yes. I understand Your Honor.

(Whereupon, the jury returns to the courtroom.)

THE COURT: Members of the jury, you will disregard the last comment that was made by the witness.

Mr. Mahoney?

BY MR. MAHONEY:

Q. Thank you, Your Honor.

During your conversation with Gary at Comp USA, did he bring up your past sexual conduct with boys?

transferred it from the eight millimeter to the cassette?

A. That video never got transferred. I did not know of its existence. It became lost footage.

Q. As far as you could tell during the summer of '95, were the Story children always happy to be with you?

A. Oh, yeah, throughout.

Q. Did you talk with Gary about the sentence you received for the previous sexual misconduct?

A. Yeah, I did.

Q. How did that come up?

A. Well, I remember a conversation that really kind of disturbed me that we had.

Q. When was it?

A. I think this was like the 18th of July, the day before they left my place. And it was at my place.

Q. Who was present during the conversation?

A. Gary and Terese.

Q. Did he tell you that you should have gotten more time?

A. He said if he had been the judge, he certainly would have given me more.

Q. Did he say that because he was angry with you or his general feelings?

A. Well, he was -- he was angry with me for what I had done back in the '80's. And it was clearly also his

had done were wrong then. And I felt bad about that. And oddly enough, that did have sort of a relationship with why the occasions in the '80's happened again, but it was really a screwy thing, Your Honor.

THE COURT: Yeah, but, you know, you talked about you had kind a romantic view of this in the '80's.

MR. DANFORTH: Exactly.

THE COURT: And you had this sudden realization because of those proceedings that this was wrong, and it wasn't a victimless crime. And then you've been charged with a felony offense in another state well before that where you were required to do counseling, and so on. It seems to me that's probative to your testimony that this light went on all of a sudden, and there was this big change. And this is not something we have failed to talk about. This was -- I've talked about this issue, kind of cautioned you about it from time to time during the course of these proceedings.

Well, I will not receive Exhibit 46. I don't know. I don't think it's germane. I will allow you to inquire into this issue of the defendant being charged with and agreeing to be counseled as part of the resolution of those charges in the 1970's as it bears on the credibility of the witness' statements about the revelation occurring in the

late '80's. And that's my word, I realize, and not necessarily yours, Mr. Danforth, but I'm using it because I think we all know what I'm talking about.

MR. DANFORTH: Yes, we do, Your Honor.

THE COURT: And I would allow you to not show the tapes, unless there is a dispute as to what their contents is, but to ask Mr. Danforth if he had in his possession at the time of his arrest in his automobile tapes that depicted, among other things, nude children. That would be the end of it.

MS. QUAINTANCE: Okay. With regard to the '70's offenses, I just want to be clear on the extent of it Am I allowed to talk about how many counts, how many victims, and what he was charged with or just that it was a sex offense against minors?

THE COURT: Well, why don't we just leave it sex offenses, sexual conduct or misconduct or whatever they call it over there with minors. I'm not doing a Spriegl analysis of this. I think it's got probative value because it directly relates to some of the testimony that he gave upon direct. And so I'm not putting it in so that they can think he did something very comparable to what he did earlier. Although, I will note that the allegations appear, from what I can understand in the police reports, appear to be quite comparable in terms

of conduct.

MS. QUAINTANCE: Is it permissible to bring out the big brother relationship in that context?

THE COURT: Well, you can ask him about that. You're probably going to have to live with what he says about it.

MS. QUAINTANCE: Well, I'd ask it as a leading question. Isn't it true that you were in a big brother relationship?

THE DEFENDANT: Your Honor --

THE COURT: Yes, sir?

MR. DANFORTH: It doesn't seem it has anything to do with whether or not I had a perception of wrongness at the time. That's what we're doing this for.

MS. QUAINTANCE: Well, it has to do with all this.

THE COURT: No, but you got charged. You got charged. You talked about this romantic kind of viewpoint about all this. You got charged in the 1970's by the prosecuting authorities, felony offenses, I assume, involving your sexual abuse of boys with whom you had a close, you know, relationship, if you want to call it connectedness sort of relationship through that program. That seems to me to be probative on whether the light went off in the 1980's that this kind of thing was real wrong,

indications from me as to the kinds of things that I would be asking Dr. Underwager about on direct examination or alternatively have Dr. Underwager here for an offer of proof and have him testify in that manner for an offer of proof.

THE COURT: Well, I think we have got some pretty good detailed material from him in Court's Exhibit 35. So why don't we let that be the offer. But I think in light of the schedule, we've got going here, we might as well do this at the end of the day.

THE DEFENDANT: All right, Your Honor.

THE COURT: And make the argument at the end of the day. Because even if he was permitted to testify, he's not going to get on the stand today.

MR. DANFORTH: All right.

MR. MAHONEY: Based upon upon the questions and answers thereto in this partial exhibit, which I'd ask the Court to mark for purposes of clarity at this time of the record, it's our position that the government has opened the door to eliciting testimony from the defendant on redirect that part of his argument included the child protection theory. He's advanced that as a theory of his case on number of different occasions. He showed remarkable restraint in not blurting it out again based upon the questions posed to him about the basis of

Q. But you had this other camera from the mid '80's through '95, and you're still having problems knowing when it was off or on?

A. Yeah. That's the first one I had.

Q. This photo of Joshua Story which is marked Exhibit 5J?

A. Um-hum.

Q. That's this one that you said that you didn't want to give to Joshua's parents because you thought it might look as if Joshua was trying to be salacious or sexy?

A. Well, it does. He certainly was. I'll tell you what, about two seconds --

Q. He certainly was what?

A. Being sassy, okay.

Q. You said salacious or sexy in your prior testimony, did you not?

A. Yes. Yes. Yes. No. He was being sassy, but what I'm saying is that if you take one look at that picture, you would think it was being otherwise. And on the heals of that little talk to that I had by Gary at the Thanksgiving over at Diane Connor's, good Lord, I took one look at that photo --

MS. QUAINTANCE: Objection. Nonresponsive.

THE COURT: Sustained.

Illinois, 1975.

Q. And has your area of focus or expertise always been children?

A. Yes, it has.

Q. Did you have occasion to meet with a young man named Joshua Story

A. Yes, I did.

Q. And did he come to you in your capacity as a psychologist?

A. Yes, he did.

Q. How many times have you seen him in total?

A. Five.

Q. And when was the first time you saw him?

A. September 6th, 1995.

Q. Okay. Of those five times how many, if any, of those five times, did you have any discussion of somebody named Steve?

A. In all five occasions.

Q. Okay. And in how many of those occasions -- well, let's begin with the 6th of September then.

That was the first meeting?

A. Correct.

Q. What conversation, if any, did you have with Joshua about Steve on that occasion?

A. On September 6th --

THE COURT: Before you do that, Dr. Cotter, members of the jury, the conversations that you are about to hear, to the extent they are statements made by Josh, they may not be considered by you for the truth of that matter, but rather for you to appreciate the credibility or lack of credibility of Josh with respect to the statements that he made on the video tape that's in evidence.

Okay. Miss Quaintance?

MR. DANFORTH: Your Honor, I still object.

THE COURT: I appreciate that you do. I understand that.

BY MS. QUAINTANCE:

Q. On September 6th what, if any, conversation did you have with Josh about Steve?

MR. DANFORTH: Your Honor, I still object and want to approach the bench.

(Whereupon, a discussion was held off the record at the bench.)

BY MS. QUAINTANCE:

Q. Dr. Cotter, I notice you have a file before you. What is that?

A. That's the records that I keep on Joshua.

Q. Okay. And does that include notes that you

took during the sessions?

A. That's correct.

Q. And were those notes taken contemporaneously with the statements made to you?

A. Yes, they were.

Q. So as Josh was talking, you would be taking notes?

A. That's correct.

Q. And was it your -- were those notes verbatim or what?

A. Well, Josh talks pretty fast, so I doubt very much if they were verbatim, but I captured what I could.

Q. Okay. And are you referring to them at this point in order to tell us as exactly as possible what was said to you?

A. That is correct.

MR. DANFORTH: I would like to have Mr. Mahoney be able to ask him a couple of questions here.

THE COURT: Sure.

**VOIR DIRE EXAMINATION**

BY MR. MAHONEY:

Q. Did you review those notes before testifying today?

A. That's correct.

Q. Before you reviewed those notes, did you have

an independent recollection of any of these conversations?

A. Yes, I did.

MR. MAHONEY: I have no more questions.

THE COURT: Okay.

BY MS. QUAINTANCE:

Q. Turning your attention to September 6th, what, if any, conversation did you have with Josh about Steve?

MR. DANFORTH: Your Honor, the objection for the record is as I discussed previously.

THE COURT: It will be there.

THE WITNESS: Okay. What he told me at that time is that he didn't like Steve, that he was a bad guy. And that's why he's in jail now.

BY MS. QUAINTANCE:

Q. Did you ask Josh any questions about Steve on that date?

A. I can't tell you for sure. I would suspect that I did, since it was an initial interview.

Q. Okay. Was there anything else said about Steve besides that?

A. I believe on that date I lost him.

Q. Excuse me?

a. I lost him in the sense that he got real active and he quit on me.

Q. Okay. Now, when he brought up Steve, was that

in response to a question from you or was that spontaneous from him?

A. On that occasion I suspect I would have asked a question of him because --

Q. What question?

A. -- because I had already interviewed his mother who had concerns about sexual abuse.

Q. And what question would you have asked him?

A. Probably something along the lines of, I understand you have some --

MR. DANFORTH: Objection, Your Honor.

THE COURT: No. Overruled.

THE WITNESS: Something along the lines that you have some concerns about Steve.

BY MS. QUAINTANCE:

Q. Okay. Now, when was the next time you met Josh?

A. I saw him on September 20th.

Q. Okay. And was there any conversation related to Steve on that occasion?

A. Yes, there was.

Q. Who brought up the subject?

A. That one Joshua did.

Q. And what did he say?

A. Well, the setting in which it was brought up, I

was doing some ability testing with him, and I was administering a subjective test called similarities. And at that time he asked if I wanted to know about Steve. And he went on to say "He put his mouth on me, and I don't want to talk to him. And I don't like him."

And then he added that they were taking a shower, and that "he was looking at me."

Q. And was there anything more in that session about Steve?

A. Not that I can recollect.

Q. Excuse me. How long are these sessions?

A. Typically I will start out a session by talking to the parents to get some update. So they're probably lasting 30, 20 to 30 minutes.

Q. 20 to 30 minutes with the kid?

A. Um-hum.

Q. Not including the parents' time?

A. Not including the parents' time.

Q. So when was the next appointment?

A. Next appointment was on October the 16th.

Q. And what -- did the topic of Steve come up on that occasion?

A. Yes, it did.

Q. And who brought it up?

A. Joshua had done that.

Q. Okay. And what did he say on that occasion?
A. He said that he didn't want to deal with him, and that he told his mom and dad about Steve.
Q. And was there anything else?
A. No, there wasn't.
Q. And did you question him at all on that occasion about that?
A. No, I didn't push it any father. I was trying to collect additional information from him.
Q. Okay. And what about on the 20th, did you ask any questions relating to this topic?
A. Again, I didn't push it. I was -- he -- I was concerned that he was avoiding something, some of my questions at times, and so I didn't want to push him.
Q. Okay. Avoiding your questions about this or other things?
A. Just about anything, you know, you have him for a few minutes, and then he would change his mind and not want to talk about anything. And, you know, 15 minutes is about as long as I could get with him being concentrated on anything. And then it's, "I want to go now."
Q. Okay. Did you have any further discussions with him after the 16th?
A. Yes, I did. I had one on October the 30th.
Q. Did anything come up about Steve on that date?

A. Yes, it did. On that date he asked to talk about Steve.

Q. Yes. At that time he says, "I don't want to deal with him. He's in jail. Don't want to mess with him or watch T.V. with him. He put his mouth on me."

Then he added, "It's only Steve that does it, only Steve does it."

Q. And did you ask him any questions in connection with that?

A. I believe I did, but I lost him again.

Q. Lost his attention?

A. Lost his attention again.

Q. When was the next time you saw him?

A. The next time I saw him was on February the 21st.

Q. Of this year?

A. That's correct.

Q. And did the topic of Steve come up on that occasion?

A. Yes, it did. And on that occasion he asked to talk about Steve.

Q. So he brought it up, not you?

A. That's correct.

Q. Okay. And what did he say about Steve on that occasion?

A. He said on that occasion that Steve put his mouth on his poopie. I asked him when it happened, and he said it was warm when it happened. And I asked him about how he felt about it. And he said that he felt sad about Steve.

And then he volunteered some information about a person named Darleen who lives far away, and that she had touched him. And that he had taken a bath with Amanda, and at that time she had touched him on the pee pee and in the butt hole.

Q. Amanda or Darleen?

A. Darleen had touched Joshua.

Q. Okay. And did you ask him any questions about that?

A. I lost him again. We switched topics or I lost his attention again.

Q. Okay. Now, you refer to losing Josh. Is it your practice to follow where he goes with the session or what?

A. It kind of depends on where I am in the sessions or and how well I know a kid, and what I'm trying to accomplish at the time.

As I see the issues with Josh, I've got a number of goals that I'm setting out to do. One is I'm concerned about his attention --

MR. DANFORTH: Objection, Your Honor.

THE COURT: Yeah. Sustained.

BY MS. QUAINTANCE:

Q. Okay. So is it -- strike that.

After the 21st of February, did you see Josh again?

A. I have not seen him since.

Q. Okay. So you have described here every conversation that you had with Josh relating to this person named Steve?

A. That is correct.

Q. And you also told us about Darleen?

A. That's correct.

Q. And I assume you told us about that because that involved possible sexual abuse as well?

A. That's correct. It also just came out of Josh's mouth.

Q. And during these sessions, I assume you talked about a lot of other things as well?

A. Correct.

MS. QUAINTANCE: Thank you. I have nothing further.

THE COURT: Mr. Danforth?

CROSS-EXAMINATION

BY MR. DANFORTH:

Q. All right. You indicated that you had talked

to the mother first, is that correct?

A. That's correct.

Q. And when was that?

A. That was also on September the 6th.

Q. How long of a meeting was that? Did you meet with her personally?

A. I'm sorry?

Q. Did you meet with her personally?

A. Yes, I did.

Q. How long of a meeting was that?

A. Probably 30, 35 minutes.

Q. An adult can say a lot in 30 minutes, can't they?

A. Sure.

Q. So I take it that Terese essentially described the entire situation for you, is that right?

A. Sure.

Q. Now, that was, other than Josh, your only source of information?

A. I'm sorry?

Q. Other than Josh then, was that your only other source of information regarding this case?

A. Terese, the father, and Amanda.

Q. Okay. So you had spoken with the father before Terese?

A. No, I had not.

Q. Okay. When was the first time that you spoke with the father?

A. I believe that -- I don't know for sure, but I believe that would have been on the October 30th session.

Q. Okay. It would not have been on the September 6th session?

A. No, it would not have.

Q. So at the time that you undertook to talk to Josh, the first one, two, three, four times, Terese was your principal, if not sole source of information other than Josh?

A. That's correct.

Q. Now, is it your testimony that these sessions with Josh lasted 15, 20 minutes?

A. 20, 30.

Q. Tops?

A. Um-hum.

Q. Okay. And if I'm not wrong, I think my notes reveal that you indicate you testified, did you not, that you lost him that day, referring to the first meeting?

A. That's correct.

Q. And then the same thing happened in the second meeting?

A. Correct.

Q. And the third meeting?

A. I lose Josh most of the meetings.

Q. And now about how many minutes into this meeting is it when this occurs?

A. Before I lose him totally or before I'll -- before I lose him on a topic?

Q. Before you lose him on the first topic?

A. That can range. Two, three, four minutes, and then maybe we can get back to it at a later time. He may shift off into something else, or I may, if he shifts off into something else, I may try to bring him around and discuss another topic.

Q. Okay. Now, it was clear to you that when Josh first showed up, that the topic that you were expected to address with Josh concerned this alleged sexual abuse by myself?

A. I'm not sure what the question is.

MS. QUAINTANCE: Objection. Expected by who? Clear to who?

THE COURT: Well, I think it says it was clear to you. You can answer, if you understand it.

(Whereupon, the previous question is read back by the court reporter.)

THE WITNESS: I can tell you what the

referral was when mom had called and scheduled the appointment. Other than when I asked what her concerns about Josh were, the first thing that came out of her mouth was a concern that he had been sexually abused.

BY MR. DANFORTH:

Q. And so, all right. Strike that.

Now, of these, there are five interviews, do you count?

A. Um-hum.

Q. And you say they were 20 to 30 minutes apiece?

A. Um-hum.

Q. What would you say this total time in all five interviews was then as near as you can recollect if you add it all up?

A. 100 to 130 minutes.

Q. And of that time, you'd indicated that perhaps within about two or three minutes after his arrival each time, you would lose him on the first topic?

A. I may, yes.

Q. Well, there is nothing about your recollection that indicates anything to the contrary, is there?

A. Uh-uh.

Q. Okay. Now, you'd indicated that Josh talks fast?

A. Correct.

Q. Okay. And I think, did you not also say at some point that he was physically animated, he moved around a lot?

A. Correct.

Q. And in these conversations that you had with him, is it not true that essentially either the first thing or one of the first few things out of his mouth every time that he would arrive would be these statements with reference to me, if he made any at all?

A. That's correct.

Q. And did it strike you that perhaps there might be some possibility that he had been told to address that?

MS. QUAINTANCE: Objection. Calls for a conclusion.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Where was the referral from?

A. I don't know. I'm assuming it's one of the doctors at the pediatric clinic base.

Q. At which pediatric clinic?

A. Where I'm located.

Q. Are you familiar with an outfit known as Corner House?

A. I'm sorry?

Q. Are you familiar with an outfit known as Corner

House?

A. Yes, I am.

Q. Do you ever get references from them?

A. No, I do not.

Q. Would you be surprised if somebody at Corner House had referred Terese to bring Joshua to you?

A. No.

Q. Isn't it generally true as a matter of professional psychology that it usually takes a long, established relationship between a therapist and a child patient to explore questions of sexual abuse of --

MS. QUAINTANCE: Objection.

(Whereupon, a discussion was held off the record at the bench.)

THE COURT: I assume the question is withdrawn?

MR. DANFORTH: Yeah.

THE COURT: Okay.

BY MR. DANFORTH:

Q. Did you have occasion in any of these conversations that you have had with Josh to encourage him to speak about the concept of Steve, et cetera?

A. Did I encourage him?

Q. Yes.

A. Perhaps the first session.

Q. And your testimony at least with regard to one of these sessions was that Josh announced that he wanted to go now, is that correct?
A. Sure.
Q. Did he make statements essentially to similar effects on other occasions?
A. He may have. He did not on the session of the 21st.
Q. However, in this session you indicated, did you not, that you also lost his attention span again, is that correct?
A. That's correct.
MR. DANFORTH: I have nothing further, Your Honor.
THE COURT: Miss Quaintance?
REDIRECT EXAMINATION
BY MS. QUAINTANCE:
Q. Just one question, Dr. Cotter. When you say that you encouraged Josh in that first session, what do you mean?
A. I would have probably said something, I understand you have some concerns about Steve.
Q. Anything beyond that?
A. No.
Q. Did you ever specify the nature of the

concerns?

A. No, I did not.

Q. Did you ever raise the issue of sexual abuse at all?

A. No, I did not.

MS. QUAINTANCE: I have nothing further.

MR. DANFORTH: Your Honor?

THE COURT: Mr. Danforth?

RECROSS-EXAMINATION

BY MR. DANFORTH:

Q. Did it occur to you as you were asking if he had any concerns regarding Steve, that that could be interpreted or received by Josh as if it was a que to talk about Steve?

A. Sure.

Q. Now, I take it that you didn't have any control over what the mother might have told the child ahead of time?

A. No, I would not.

Q. And you wouldn't really have had any knowledge of what --

MS. QUAINTANCE: Objection. Beyond the scope.

BY MR. DANFORTH:

MR. DANFORTH: No. Not hardly. There is an entry that indicates that she was contacted by Dakota County on June 28th, '95. And basically they asked her, you know, what her plans were at that time. Somehow they had apparently gotten wind of the fact that she was going to be moving, and so they called her up.

THE COURT: Okay. Well, I shouldn't -- let's get back to you. Tell me the conversation you had with her.

MR. DANFORTH: Sure. Okay. When I learned that she was moving into Hennepin County, and this is the most recent conversation that I can recall right off hand, anyway --

THE COURT: From Dakota County?

MR. DANFORTH: I asked her, you know, well, you recall that she bounced between my place and her mom's place, which was, of course, back in Dakota County. When I learned while she was still at my place that she wanted to, that she had an apartment set up. And I said, "Where is it?" "It's in Minneapolis." In fact, I think she had that actually arranged about on the 20th of June. It was just a matter of when.

And so at some point in those several days there, end of June, beginning of July, I said, you know, "How come you're going to go into South Minneapolis of all places?"

Because previously she had --

MR. MAHONEY: What did she say?

MR. DANFORTH: Okay. She said, "Well, I want to get out of Dakota County anyway and into Hennepin County." And I said, "Well, is that because of your probation agent being in Hennepin County?" And she said, "Well, it's partly that, but it's because of child protection down here."

THE COURT: Because what?

MR. DANFORTH: Well, and her exact words I was just trying to remember, something about this long experience she had had with child protection in Dakota County. Something to that effect.

MS. QUAINTANCE: This was when?

THE COURT: June, it sounds like, huh? '95?

MR. DANFORTH: I want to say it was already when they were in my place. I think it was probably June of '95, 4th, 5th, 6th.

THE COURT: Okay. The next most recent one?

MR. DANFORTH: Right. Moving back in time, this takes us to the time when there was this interview of her by someone, and her representations to me was that it was by child protection. This would be either

late March, I think it was late March.

THE COURT: Of what year?

MR. DANFORTH: Of '95. I'm sorry.

THE COURT: She said what?

MR. DANFORTH: This was in the context of when she was borrowing my microcassette recorder, and recorded that interview. And afterwards we talked about the fact that she had recorded the interview. I listened to a little snatch of it.

THE COURT: Interview of?

MR. DANFORTH: Of her and apparently of the children. And she told me that, you know, her reason for wanting to have that microcasette recorder there was that she was extremely aware of child protection authorities at that point in time. That's about it. I mean we didn't --

THE COURT: What was the recording of, just she making a recording of with the children or what?

MR. DANFORTH: Some kind of interview that she related to me at that time anyway as being by somebody from child protection of her and the children. And although she represented to me at that time that it was about this allegation against Darleen that did surface about that time, a little earlier, the only thing I seen in the records of child protection in that time frame now is

this incident regarding Josh getting his gum gashed.

THE COURT: But at any rate she told you it was about their allegation, an allegation that had been made against Darleen?

MR. DANFORTH: That's right. But, nevertheless, she still said that she was very wary of child protection and wanted to have it recorded because of that.

THE COURT: Okay. The next most recent one?

MR. DANFORTH: Okay. Not too terribly long after they moved into Rosemount, this is I think Gary testified December 15th, to the nearest of my recollection that's probably accurate, of '94.

So now this conversation here would have been probably just about maybe two, three, days after the start of the new year, January 2nd, 3rd, something like that, 4th maybe.

THE COURT: With Terese?

MR. DANFORTH: With Terese.

THE COURT: She says what?

MR. DANFORTH: She says, well, she says, "I was really surprised I got a call from child protection. And I have my ideas about how they found out I was here, but I'm upset about the fact that they're calling after me. I had thought we had shook them once and for

all."

Well, they moved to New Prague and, of course, that's what county? Is that Scott?

THE COURT: Next one.

MR. DANFORTH: Okay.

MS. QUAINTANCE: How far back are we going to go here?

THE COURT: Not too much further. I'll go on just a little bit more on my paper.

MR. DANFORTH: Lovely. that will be the limiting fact. There was some apprehensiveness about it by her not too long after they had gotten to New Prague. Now, they moved in there, I think, September 1st of '94. And the kids had immediately started school there. And the context of this was that there were a series of meetings that were called at the school regarding Josh. And at the beginning it was represented to me that this was simply about Josh's intellectual capacities and his school status. But the more I heard about this in succeeding conversations. I think by about the third time I heard about it, it was clear that there was some other focus going on by the school.

MS. QUAINTANCE: What did Terese say?

MR. DANFORTH: Right. And there was some comment there about, well, where do you think this is

going? Do you think this might have some ramifications with child protection? And she sounded very apprehensive about these school meetings.

MS. QUAINTANCE: She said ramifications?

MR. DANFORTH: No. That's my word. I'm obviously paraphrasing. She expressed concern. She seemed to have fear that child protection was going to get wind of this and get involved in their life again. That's what I'm saying.

MR. MAHONEY: Had she at some point asked you about whether moving out of the county would avoid child protection?

MR. DANFORTH: Sure.

MR. MAHONEY: When was that?

MR. DANFORTH: Okay. Now, that goes back to the '93 thing. See, they had been living in West Saint Paul.

MR. MAHONEY: That was in '93?

MR. DANFORTH: Um-hum. And then they moved to Hastings in Minnesota. I mean by Hudson, Wisconsin. Okay? And that move was preceded by conversations by both her and Gary with me about how can we get child protection off our tail? We're really sick and tired of them being involved in every little element of our

stuff.

So Terese in particular on this occasion now, this is the best guess of a date that I can put on this would be August 15th or so of '93, Terese in particular, I recall, called me up at my house and asked me repeatedly this very same inquiry over and over again. It was like four, five times.

MR. MAHONEY: What did she say?

MR. DANFORTH: And it was the same each time. It was like, you know, say Steve, as long as we're in the State of Minnesota, it's just a matter of time until they come an, you know, accost us again, no matter what county we go into. Because that was what I was telling them. I was trying to dissuade them from doing anything about it.

MR. MAHONEY: That's the extent of her conversation with you, though?

MR. DANFORTH: Well, no. What they then said specifically was then, "Are you trying to say to me, Steve, that if we move out of state, we could get away from them once and for all?"

And, I mean, well, "Terese, there is certainly no guarantee that you would get away from the whole regiment of interference by child protection in your life given that, you know, you have got some problems."

MR. MAHONEY: That doesn't matter. It's what Terese said to you.

MR. DANFORTH: Yeah. Anyway, it was right after that they moved to Hudson. So it's clear that's what they were doing.

MR. MAHONEY: I think that's the offer.

MS. QUAINTANCE: I'm sorry, but I fail to see any connection between a conversation in August OF '93 where Terese asks how to avoid child protection and the allegations in this case. It makes no sense. I don't see any connection.

MR. DANFORTH: Well, if I can digress from my role as witness here.

THE COURT: No. No. I understand what your -- I understand both your concerns. And, certainly, the connection gets far less as it gets attenuated in time. That's pretty clear. But at any rate, the ones that took place within a year of this incident are essentially December, January '95, March of '95, December '94, January '95, March of '95 and July of '95, sounds like?

MR. DANFORTH: Well, I was indicating that there's one more going back to New Prague. As I say, that would have been perhaps about October 15th, October 20th.

THE COURT: Of '94?

MR. DANFORTH: That was the one in which there were these school meetings. First maybe I have the date wrong.

MS. QUAINTANCE: Your Honor, he's arguing that she is moving around to avoid child protection. The lady called child protection immediately after this event. It doesn't make any sense. And he didn't have any of these conversations with her between the time Joshua abused the girl next door and the report of these allegations. So that argument that it was a way to avoid child protection coming after her makes no sense. Especially since child protection wouldn't come after her for that.

MR. DANFORTH: No. Your Honor, that's obfuscation.

THE COURT: The child protection file does reflect in the conclusion of child protection that the Storys were moving at least in part to change the jurisdiction with regard to child protection authorities.

MS. QUAINTANCE: That's prior bad acts. It has nothing to do with this case.

THE COURT: Well, Mr. Danforth's theory of the case assumed it or at least one of them is that there was a concern that she might be in trouble when this happened with regard to child protection issues. Because

move to?

A. What county? Hennepin County.

Q. And that surprised you?

A. Yeah, when I first heard it, it did.

Q. And did you ask Terese about it?

A. Um-hum.

Q. And did she respond? How did she respond?

A. Well --

Q. Did she give a particular reason?

A. Yes, she did.

Q. What was the reason?

A. She gave me a reason that she was really fed up with the repeated intercessions, I guess you call them, by child protection in Dakota County.

Q. In March of 1995, did you have a similar conversation with Terese Story regarding child protection?

A. Oh, yeah. Yeah. I see what you mean.

Q. Did you she ask to borrow something?

A. Yeah. That's the one she wanted to borrow my microcassette recorder.

Q. What's a microcassette recorder?

A. Well, it uses microcassettes. It's a palm recorder. It's a small, little portable tape recorder.

Q. Did she tell you why she wanted to use that?

A. Yes. Apparently there was some up coming

interview by somebody that she told me was from child protection.

Q. And did you lend her the microcassette?

A. Um-hum.

Q. Yes?

A. Yes.

Q. Did she then come back and play the microcassette for you?

A. A snippet of it.

Q. And did she have anything to say regarding her attitude towards child protection services?

A. Well, she explained that the reason that she had wanted to use --

Q. Did she have anything to say regarding her views of child protection services?

A. Yeah.

Q. What did she say?

A. She said she was apprehensive about, you know, their approach and why they were always on her, and why they were after her this time.

Q. And you understood her to mean child protection services?

A. Oh, I'm sorry. Yeah. I'm paraphrasing, but she said child protection.

Q. In January of '94 when the Storys were living

at Rosemount, did you have a similar conversation with Terese Story about child protection services?

MS. QUAINTANCE: I think it's January '95.

BY MR. MAHONEY:

Q. I misspoke. January 2nd or 3rd of 1995?

A. Yeah. That would have been -- yeah. That was the conversation they had about or she had about the fact that they had moved into Rosemount.

Q. And what county is Rosemount in?

A. Still in Dakota County.

Q. And did she talk to you about a telephone call from child protection?

A. Yeah. Yeah.

Q. What exactly did she say?

A. Well, the first thing she said was that she was surprised that they contacted her. It was like, How do they know I'm here?"

Q. Did she say anything about her attitude toward child protection?

A. Yes. She was very dismayed that they had contacted her which, you know, clearly conveyed to me that she obviously didn't want them involved in her life.

Q. Did she give you any indication of whether or not she thought they would have contacted her there?

A. Typically upon release I sit down with all my offenders, defendants, and go through the conditions of release and answer questions such as clarification.

I testified that I didn't specifically say you may have contact with anyone or we're going to waive that condition.

MR. DANFORTH: I understand. Thank you.

THE WITNESS: Okay.

MR. DANFORTH: No more questions.

THE COURT: Miss Quaintance?

MS. QUAINTANCE: Nothing further.

THE COURT: You may step down, sir. Thank you.

MS. QUAINTANCE: State has nothing further.

THE COURT: Any sur rebuttal?

MR. MAHONEY: Not to that testimony, Your Honor.

THE COURT: Okay. The only thing that we have left open is the reservation on this one witness?

MR. MAHONEY: Yes, sir.

THE COURT: Okay. Subject to one ruling that I have to make, the evidence is closed.

So we're going to recess. You'll be getting the case on

Have a nice time.

MS. QUAINTANCE: Please don't discuss this.

(Juror Bartolick excused.)

THE COURT: And the record should reflect, just so it's all in one spot, that Mr. Bartolick has at least provisionally been excused at this point in time subject to recall if we have a problem.

MR. MAHONEY: And that's been with the consent of both parties.

THE COURT: Okay.

* * *

(Whereupon, proceedings concluded and resumed on March 4, 1996.)

**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth**,

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## TRIAL TRANSCRIPT,

## Volume X

## March 4, 1996

many reasons, and we have asked more of you in terms of your time and your attention and your patience than is often asked of jurors. And I want to thank you for sticking with us.

When I talked to you at the beginning of the trial, I predicted that your opinion by the end might differ from your first impression of Mr. Danforth. You know now that he has a legal education, that he graduated from the University of Wisconsin law school at Madison. You also have lots of information about the way that he forms relationships and cultivates and ultimately exploits those relationships. "We were friends," he said of the Storys. What are friends for? In Mr. Danforth's case we know that the friendship of the Story family and the Laffin family were about exploitation and manipulation, and in Josh's case, abuse.

As I indicated to you at the outset, I now have the opportunity to discuss with you the evidence that you have heard in the context of the law which the Judge will give you at the end of these statements. But before I get into that, I would like to talk briefly about the chronology of this case. What are the facts we know about when things happened in this case? They have come in through a lot of different witnesses, and so I would like just to collect that information for a moment now.

We know that in September of 1992 to January of 1993 Gary was living with Darlene Zirul. She also testified that between September and October the children were there. And then she testified that from the end of January, 1993, to June, 1993, the children were also there It's unclear how the children were there, even though Gary apparently was not, but that was in fact her testimony.

And that on June 13th, 1993, Josh made the statements that he made to her in the course of this back rub where she said, "What do you want me to do, put my tongue on your back?" And then he made some statements, "I want you to put it on my poopie." That happened in 1993.

We know that in the summer of 1993 the Storys were living at Marie Avenue in West Saint Paul. That's the entire summer there. And that in the fall they moved to Cedar Avenue. And that's where the incident happened involving Mr. Danforth watching the children in the bathtub, which made Terese very uncomfortable. You'll remember her testimony about that.

Then that same fall after apparently a very short amount of time, they moved to New Prague, which is where the Defendant took the photos of Josh, including this photo in the underwear with his legs split, which is the one you recall that he didn't give to the Story family. You saw that exhibit. It was passed among you.