**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# <u>TRANSCRIPT EXCERPT:</u>

## TRIAL TRANSCRIPT,

## (Unnumbered Volume)

## February 22, 1996

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

(Playing video tape.)

MR. DANFORTH: Your Honor, I'd like to object. May we approach the bench at this moment?

THE COURT: Will you turn it off for a second.

(Brief discussion held off the record.)

THE COURT: Why don't we turn it off at this point and take a quick morning recess. We'll see you in about ten minutes.

(Jury excused from courtroom and the following discussion was had:)

(Whereupon, a short recess was taken.)

MS. QUAINTANCE: I noticed that Officer Castilleja had flagged me from the back of the courtroom.

THE COURT: I noticed that too. I thought maybe that would be good time to --

MS. QUAINTANCE: What he has provided me with is his daily activity report for the dates 8-11, 2 -- I guess the date 8-11. And he advised me in the hallway that this log does indicate that

he went to 3633 Park, Number 4, also a crim. sex related call. His action taken note lists, advised with AR, meaning added remarks, and the time was 3:00 a.m. There from 3:00 a.m. to 3:15.

He advised me that earlier in the evening between the report to apartment number 3, which was the Story apartment, and this 3:00 a.m. call, he had picked up a partner.

And he has no specific recollection of any conversation at apartment number 4. He says maybe it was his partner who did the talking and that's why he doesn't remember it as well.

There is a way to get a printout of the added remarks which were typed into the computer. There's a phone number here, 348-7210. But he has been advised that it takes seven to ten days to get a hard copy of that printout.

THE COURT: Do you know who your partner was?

OFFICER CASTILLEJA: It was Officer Halverson.

THE COURT: Have you had a chance to chat with him about it at all?

OFFICER CASTILLEJA: No, Your Honor. He has since been transferred out of the precinct.

THE COURT: Yes.

(Brief discussion held off the record.)

THE COURT: I'll reserve my ruling on that one.

You have no further objection with respect to foundation other than what we've talked about?

MR. DANFORTH: No.

THE COURT: Okay.

Say, by the way, I've concluded the reading of this, maybe both of you should step up one more time.

(Brief discussion held off the record.)

THE COURT: Okay. State's Exhibit 13 is received subject to two deletions, which I've noted on the written transcript.

BY MS. QUAINTANCE:

Q. What I propose to do now, Investigator Roberts, is to play the tape of your interview with Mr. Danforth. And I believe the Court will attempt to stop the tape at the point the deletions are going

The answer, "Oh, God. Excuse me, I'm sorry."

The record should reflect that that part was excised.

(Jury returns to the courtroom and the tape was continued.)

Q. Well, this -- the kids said that this happened, like I, like I said, at the pool in Richfield. Okay. And that, um, he describes that there were three separate times that you performed oral sex on him
A. Oh, no. Jesus. Is this (inaudible) a bad dream or what? No. Oh, (laughter) never.
Q. And he also said, Joshua said that it happened in Steve's room once in, and by -- in Stephen's room he meant where you live in Wisconsin. You live in Prescott, right?
A. I live in Prescott. Never. No, no. What's going on here? (Background radio transmission) What -- did somebody hypnotize those kids or what, I don't know. No.
Q. Okay.
A. I'm sorry. None of this is true. Not one bit. And I, I --

Q. Do you feel the kids are making this up? I mean (inaudible) --
A. (Inaudible.)
Q. Ga -- Gary and Terese said that you're friends of theirs.
A. Absolutely.
Q. And that Gary said that you've been a friend with him for sixteen years.
A. Fifteen I'm sure.
Q. And, and he said that to -- he felt like you were a brother to him.
A. Yes.
Q. And he feels greatly betrayed by this. And that there was no fights, there was no, no falling out between the two of you. And he said he even asked you specifically, he said, "How do you deal with your cravings or obsessions with children?" And you said, "I don't have them anymore." And he said, "You'd never do that to any of my kids." And you promised him you'd never have any kind of sexual touch with his children. Does that sound like a familiar conversation?
A. Yes, it's a conversation more or less that we had just the other night.
Q. Okay.

THE COURT: Okay. Do you want to bring them in, Rachel.

(Jury returns to the courtroom.)

THE COURT: Was everybody able to hear, I understand say that -- I usually don't put my microphone on as well as I should, was everybody able to hear the last segment since you were out of the room last?

JUROR: It could have been a little louder.

THE COURT: But were you able to hear the content?

JUROR: Yeah.

THE COURT: Okay.

(Continuing with the tape.)

Q. And she -- and she says that she even recalls walking in one time, and she says she saw your mouth on Joshua's penis.

A. No.

Q. So --

A. Not a bit of it.
Q. Okay.
A. I'm sorry. This is nonsense.
Q. Okay. That's all right. You can say that. But what I want you to think about though is if the parents aren't mad at you, and there's no vendetta against you, why are the kids saying this? Give me a reason as to why you think the kids might be saying this. Is there anything of any kind of touch, anything that they could construe as an inappropriate (inaudible)?
A. There's, there's nothing they could construe as inappropriate. And I don't know how this could have come about. Oh, my God.
Q. Okay. Is this a true statement?
A. A woman -- ah, um --
Q. Josh told his parents that he was sexually molested by a woman before?
A. Yes. A former girlfriend of Gary's.
Q. Okay.
A. Okay. And, you know, if he did something, I suppose it's possible that it was in somehow arising from that. I don't know. I do know that, you know, Amanda then later piped up to me personally, and said that that same thing had

happened by that same woman to her.
Q. Okay. We did talk to him about that woman, Darleen?
A. Yes, Darleen.
Q. Okay. Um, from what we could gather, there might have been some touching, but they said that that was with toilet paper. That's what Amanda said, in her genital area. What did Amanda say to you that ever happened to her by Darleen?
A. No. All she said to me was I was driving the car one day, and she and I think Josh, and if I've got her (inaudible) so, um, of course Terese were in the car too. And, ah, the subject had come up that Josh had said this to Terese about Darleen having done this.
Q. Do you know, do you know what specifically had been done, such as, what, like a touching, um, oral sex, what was done?
A. I don't know. It's my recollection that Terese said to me that it was oral sex that Darleen had performed on --
Q. On Joshua?
A. Yeah, that that's what he'd said to her. I -- and when the subject came up, apparently Amanda knew what was being talked about, and she leaned over

A. Precisely (inaudible).
Q. Okay.
A. (Beeping.) Excuse me.
Q. That's okay. And that --
A. (Inaudible.)
Q. That was between July 5th and the 17th in Prescott?
A. Yeah, I think so, or 18th maybe.
Q. Um, one morning, it was about nine-thirty, Gary said he had gotten up, and he saw that where Josh was usually was sleeping was empty, where they had made up a bed for him out in your living room. And then he went to the bathroom, and he saw Joshua coming out of your bedroom. And he said to Joshua, "What are you doing in there?" And Joshua kind of said, "Oh, watching TV." So did Joshua spend any time alone with you watching TV at all?
A. I don't recall if he did. I, see the thing with me is that the TV is in my room all right.
Q. Okay.
A. Okay. And, you know, I do recollect that the kids watched TV, and it typically would have been about the time that I would have gotten up. That would have been late.
Q. Okay.
A. In that time frame.

Q. All right.
A. Whether he was in there on his own or whether he was in with his sister, I don't know whether I was awake. I don't know and, you know, at this particular occasion, whatever this occasion is.
Q. Um, Terese said one thing that stuck out in her mind when they were with you at your apartment was she said that you took an awful lot of showers during the day, and that you were constantly in just your towel. And like you were walking around the apartment just in your towel a lot. And like in your room, and, ah, she thought that there was maybe access that way. That when you just had a towel on and nothing else, that maybe Joshua -- you were, um, there was more exposure at that time for Joshua to be alone with you, to be alone with you in your room. Do you recall that you took showers a lot?
A. Well, no, I don't take showers a lot. So that allegation is, ah, utterly incomprehensible. Um, you know, in the hot weather I might have taken a shower as much as once a day.
Q. Um-hmm.
A. But that's it.
Q. Okay.

MR. DANFORTH: Objection, Your Honor, hearsay.

THE COURT: No, it's not hearsay. Objection's overruled.

A. Fleet Farm.

BY MS. QUAINTANCE:

Q. And is there an entry in the memo section indicating what that was for?

A. It says, "Josh and Grae," Grae as in, G R A E, "presents."

Q. And what was the date of that entry?

A. 5-18.

Q. And turning your attention to the check carbons that remain in this checkbook, what is the date of the first one?

A. 5-22 of '95.

Q. In the search of Mr. Danforth's apartment, were any lubricants found?

MR. DANFORTH: Objection, Your Honor.

THE COURT: Sustained.

MS. QUAINTANCE: May we approach?

MR. DANFORTH: May I approach the bench?

(Brief discussion held off the record.)

THE COURT: Objection's sustained.

BY MS. QUAINTANCE:

Q. Was there one search of Mr. Danforth's apartment or more than one search?

A. There was more than one search.

Q. What was the reason for going back the second time?

A. Because information had come about from a friend of Mr. Danforth's, a Harley Milligan, and he came in to me at the Richfield police station, and he had a list that he had written down saying that Mr. Danforth had called him and told him to go to that apartment in Prescott.

MR. DANFORTH: Objection, Your Honor, hearsay.

THE COURT: Sustained.

MR. DANFORTH: I need to move to strike that as well, Your Honor.

THE COURT: It will be.

The jury will disregard the last question and the last answer.

I've had at any time. This was something that just -- because the search warrant was done under the authority of Pierce County, it was executed there, it was technically their search warrant. So I never received this paperwork.

Q. All right. Why don't you look at it anyway.

THE COURT: Well, no sense in looking at it if she's never seen it. The issue is whether it was seized at that location, Mr. Danforth.

MR. DANFORTH: I understand.

BY MR. DANFORTH:

Q. Do you usually make arrangements, Ms. Roberts, for the indications of things that you seized at various places?

A. You're going to have to speak up because I really can't hear you very well.

Q. I say, do you usually make some kind of indication somewhere in writing as to things that you have seized somewhere?

A. Yes.

Q. Where do you usually make that indication?

A. In the state of Minnesota we have a property receipt inventory sheet that we fill out when we do

at what point in the tape, the beginning, the middle, the end?

A. The middle.

Q. And given your experience as an investigator of sex crimes, did that have any significance for you?

MR. DANFORTH: Objection, Your Honor.

THE COURT: Sustained.

MS. QUAINTANCE: May we approach, Your Honor?

THE COURT: You may.

(Brief discussion held off the record.)

MS. QUAINTANCE: I have nothing further of this witness at this time.

THE COURT: You want to take a quick one and get some nourishment? See you about in about ten minutes.

(Brief recess taken.)

THE COURT: Okay. Mr. Danforth.

MR. DANFORTH: Thank you, Your Honor.

A. I really can't -- I'd have to look. I don't have it listed.
Q. Do you have a general idea of how many times it was after that that you spoke with her?
A. I would say it's been up to almost 20 to 25 times.
Q. How many of these have been contacts that you initiated, to the best of your recollection?
A. I'll guess about seven.
Q. Now, do you recall a statement that you took from Terese Story on September 29 with regard to this case?
A. I know I took a statement from her. I don't know if it was September 29.
Q. You only took one from her, is that not true?
A. One taped statement.
Q. Do you recall other statements that you took from her that you didn't record?
A. Right.
Q. How many were there?
A. I don't know.
Q. Do you have a rough idea how many there were?
A. I'd say about two or three.
Q. Okay. Referring to the one that was a taped statement, if I show you pages 3 and 4 of what appears to be transcript -- all right. Do you have

on the 15th or not?
A. No.
Q. Did you go to her apartment at any time?
A. No.
Q. When then was the first occasion on which you met Joshua Story?
A. When I met them at the Cornerhouse.
Q. This also holds true for Amanda Story?
A. That's correct.
Q. Had you spoken with either Joshua or Amanda by phone prior to the day at Cornerhouse?
A. No.
Q. Did you speak with either Josh or Amanda by phone at any time after of the Cornerhouse interview?
A. No.
Q. Did you ever speak with Joshua Story in person at any time?
A. Yes, at the Cornerhouse I said "hi" to him and introduced myself.
Q. Other than at Cornerhouse and saying "hi" and introducing yourself, did you ever speak with Joshua in person at any time?
A. Not before that, no.
Q. Did you speak with Amanda at any time in person before the Cornerhouse interview otherwise to say

hello and introduce yourself at the Cornerhouse interview?
A. No.
Q. After the Cornerhouse interview, have you ever spoken to Joshua Story in person?
A. I know directly after the interview I talked to Joshua and Amanda like to say "goodbye" at Cornerhouse. But I've never talked to them, that I can recall, after the interviews.
Q. Either one?
A. No.
Q. So in fact not having any contact in person or by phone, the fact is you haven't had any contact other than at Cornerhouse with Joshua or Amanda at all, have you?
A. Well, just -- I can say the one time -- I'll take that back. Terese came in a couple of times when she's come in and talked to me, and they've been there and they've waited in the lobby, and I've said "hello" to them then.
Q. But otherwise in saying "hello" on those couple or so occasions you have not, is that correct?
A. Right.
Q. How many times has Terese come in to the Richfield Public Safety Department to talk to you about this

Q. Now, you've indicated that you didn't speak with Josh at any time about this. Did Terese --

MR. DANFORTH: Excuse me a second, Your Honor.

(Brief discussion held off the record between defense counsel.)

BY MR. DANFORTH:

Q. What did Terese tell you was disturbing about Josh's behavior at that point?

A. She said she was concerned because Josh was showing sexual behavior with his sister Amanda.

Q. On the 15th when you first spoke with Terese, did she mention me by name at that time?

A. Yes.

Q. Okay. How did she describe me in terms of being her friend, say, or as Gary's friend?

A. I think she pretty much put you in the context that you were -- both she and Gary were your friend.

Q. Did she indicate to you whether or not Gary was along with us on these expeditions to the pool that she was describing in July of '95?

A. No, he was working.

A. I'm still not clear. You want to know exactly what she said to me?
Q. Regarding the conduct, yes.
A. Okay. She basically told me that her son exhibited sexual behavior with his sister. She was very concerned about it. And she called Minneapolis police department and they took the initial report. And she said, when I had talked to her, she told me you, gave me your name, the relationship you had with the family.
Q. Right. But I guess -- let me confine my question to this: You still have Officer Castilleja's report in front of you, don't you?
A. Right.
Q. Looking at that report, do you see an indication of the specific items of conduct that Officer Castilleja indicates that he was told about?
A. Do you want to know, I mean, I guess I'm not very clear as to how you're phrasing things. So if you could ask me a specific, I can answer it.
Q. Look at the report of Officer Castilleja please. And do you see anywhere in that report any indication of what specific elements of conduct are indicated there that is supposed to have happened between Josh and myself, sexual conduct?

about any sex abuse of him?

A. No.

Q. However, upon the Cornerhouse interview, once that emerged, did you take any action to investigate that?

A. Yes, I did.

Q. Okay. What action did you take?

A. I found Darleen Zirul and I went to her place of employment and talked with her.

Q. And she denied this, did she not?

A. She described to me when Gary Story and Josh and Amanda were staying with her, and how she had taken care of the children, and that there was no sexual contact between her and the children.

Q. What else did she say happened in that time period?

A. She said the children had lived with her along with Gary for a few months.

Q. And, I'm sorry, did you say that she denied anything had happened?

A. That's right.

Q. Okay. What more did you do to investigate it at that time?

A. That was it.

MR. DANFORTH: Your Honor, I'd like to

A. I didn't push it any farther because Joshua seemed in the tape, and by talking it over with the people there, that he is obviously very upset about describing it. We felt it would be very hard for Josh to talk about it more at length.

Q. The answer is you didn't do anything further.

A. No, the answer is is that I did not ask him any more because I believe that Joshua had had a very hard time talking about it. And I felt it would be very hard for another person to keep questioning him about having performed oral sex.

Q. Then your answer is that same, I take it, that you did nothing further in terms of talking to Josh about the fact that --

A. I made the decision not to ask him any further questions.

THE COURT: Excuse me. Were you finished, Mr. Danforth? I was just wondering if you were finished with your question.

MR. DANFORTH: That's fine, Your Honor, I'll go on.

THE COURT: Okay.

MR. DANFORTH: I think I've gained the response that I was looking for.

A. Right.
Q. What is this date?
A. 9-22 of '95.
Q. And I would draw your attention to the fact that there seems to be only two discrepancies between those reports. One is very close to the top where it has apparently your number, 134, versus something about EE?
A. Uh-huh.
Q. Could you explain to me what this differential means?
A. The first one, the 3, it's supposed to be a pound sign. That's just a misprint or a typo. And the EE stands for Elaine Ellson (ph.) one of our typists in our police department, showing that she typed that.
Q. All right. Are these word processed?
A. Right.
Q. Okay. Files are kept once they are typed into the computer, is that correct?
A. Right.
Q. The other differential is at the foot of the document, the second from the bottom line on one version you'll see that that does not appear in the other version. What does that line say?

A. "Joshua is currently seeing Dr. Cotter at the Pace Clinic in West St. Paul, Number 451-8050."
Q. All right. Thank you.
What is your best recollection about why that line appears in the one version and not the other?
A. Because I typed it in on the first report, and the second report I was asked to delete it for purposes of the trial.
Q. Who asked you to delete it?
A. I believe our prosecutor just said to leave it out.
Q. Have you ever gone out to the pool area at Century Court's Apartments at 7600 Penn?
A. Yes.
Q. What did you do there?
A. I looked at the pool area inside and out; the locker room, both men's and women; and the sauna.
Q. Now, did you speak to anyone while you were there?
A. I spoke to the woman behind the counter, and I don't recall her name, but she's the manager.
Q. When did you make this trip?
A. I believe it was last week, probably Monday or Tuesday.
Q. Now, you indicate that you went into the interior of the men's locker room, is that correct?
A. That's correct.