**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## March 5, 1996 TRANSCRIPT

(See: Attachment D to Amended Petition.)

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth**,

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

# "POLLING" TRANSCRIPT

# March 6, 1996

THE COURT: Let the record reflect, Mr. Mahoney is here, Mr. Danforth is here, Ms. Quaintance is here and we are out of the presence of the jury.

Last night during the -- we all left and permitted the jurors, at their request, to watch Exhibit 1, the video of Cornerhouse, and as you all recall everybody agreed the time before, to watch videos, that they would waive their appearance while the jury watched videos alone in the courtroom and that was done.

During the course of that video, I received another note from the jury which has been marked as Court's Exhibit G, it reads, "Judge Solum, if we are to continue deliberations, we have to have a larger room with better air flow to deliberate in. One or two hours in the cramped and stuffy quarters of the jury room and I, for one, begin feeling noxious. If such a room is not available, I would like to be excused from further duty. Thank you for your attention in this matter, Kevin Larson. P.S. We are hopelessly deadlocked."

Sometime shortly after that, Deputy Daniels came into my office and said that he was fearful that there was going to be violence between a couple of jurors imminently and the juror that was identified as

being the one with the greatest degree of anger was juror Hall.

Very shortly after that, the deputy came back and indicated that juror Hall was either indicating that he was going to or in fact started to leave the premises to excuse himself by force and should he be restrained or held back or not. I indicated that at that time I think the video was about over, that I better talk with him and I sat in my office for about three, four minutes. Ms. Quaintance had just recently left the building, I knew I couldn't get her and I knew from earlier attempts that I couldn't get Mr. Mahoney and Mr. Danforth brought back from jail and I wasn't about to have conversations with just one and not everyone before I did something and I was not about to permit this to escalate into a situation where a juror was involved in some violent act with another juror, and I determined to come into the courtroom and on the record address Mr. Hall for purposes of seeing if I could calm the situation and I did that.

Essentially, Mr. Hall sat in his usual spot, I was here with the court reporter and I told Mr. Hall -- I repeated the circumstances that brought me to that point and that he was exceedingly angry. Evidenced a great deal of anger on his face and his affect and I

said I did not want to talk to him about the case or the deliberations, my purpose was only one and that was to see if I could calm the feelings that were existing to see if the process could continue in a peaceful manner, one in which good will could exist among the jurors to further deliberations.

It was essential that I indicated to him that while this was difficult work, that the time that had gone on while they were deliberating was not exceedingly long, given the fact that we were in trial for two weeks, and I asked him if he would be kind enough to see his way to continuing in a spirit of good will and cooperation and so on and so forth.

He blurted out a couple of times words to the effect that the defendant is clearly guilty, everybody can see that and there are some people back there that just won't agree, they will never agree, this will never end, this will never be over and why shouldn't I just leave, and words with similar meaning. He indicated that there were only two choices and this would go on forever. I said that there are not just two choices. We have a verdict form for a verdict of guilty and you have a verdict form for a verdict of not guilty. And at some point the jury will be indicating to me their position again tomorrow and at some point I

will have to make further determinations if a verdict cannot be reached. I said it's typical that jurors on the first day, or day and a half, are not in agreement and that's the process.

And I implored him again to see if he could conduct himself with good will. And finally he said he would do that, although it was quite begrudgingly. Then I determined that I should have the rest of the jurors come in rather than look like I punished him for being naughty or something like that, and I invited all of them in and I essentially said to them that I know that this is difficult work but I am asking them to continue on in a spirit of good will and that I am going to ask them to make a decision as to whether they want to leave the building now and go to the hotel or if they wish to stay and continue some deliberations, talk about the video, read the jury instructions or whatever they feel would be useful. They indicated that they wished to leave the building at that time. They didn't think anything fruitful could be accomplished that night and a couple of them wanted to have a little bit less restrictions by way of telephone to make some arrangements for today. I agreed to that, allowed that. One other juror wanted to know if they could get together and play cribbage back at the hotel

and I said no.

After they left, Sergeant Burke ~ called me, having heard from the deputies with the jury indicating once again the level of anger that was involved had risen, and they were once again fearful that he would either engage in some act of violence or excuse himself by force from the process. They wanted to know whether I wanted him taken into custody if either of those things happened or what should be done. I indicated to Sergeant Burke ~ that I would like him to tell the deputies in charge of the jury that if it looks like he is still in a state of stew at the end of the dinner, that I would like the deputy and juror Hall and myself to be on a phone where we were all able to hear the conversation and I would direct to him and order him as to how he is to behave himself so that he understood and that he was subject to an order with regard to his conduct. Sergeant Burke called me back about an hour later last night, this now probably being 9:00, 9:30 something like that, and indicated that after eating with the juror in question, apparently he settled down and felt better and he was able to retire to his room without incident and they were feeling that the need for further intervention might have subsided and they would get through the night. That's without -- sparing

you some of the details, that's essentially what I know.

Deputy Daniels, can you indicate anything you want to add to that or clarify or change?

DEPUTY DANIELS: I think I would probably want to say he didn't eat any dinner. He didn't want to eat any dinner last night, but he did seem to calm down enough. You know, quit looking at the door and that kind of stuff after 30 minutes or so.

We do know that he won't, unless it's required, stay in a particular area with the jurors that he feel are the problem. I think we articulated that in chambers. There seems to be a switch between the smokers, that kind of thing. And I noticed that in the van, we had to split to ride the elevator and that kind of thing, too.

THE COURT: Anything at all you want to add or correct or clarify in my recitation of the history of last night?

DEPUTY DANIELS: No. You're a very good historian, Judge.

DEPUTY DENMAN: Other than it was me you talked to -- I was the one that returned your call about the 9:30.

THE COURT: Oh, was it? Oh, I guess

that's right. I called Burke and asked him to radio -- or Burke, I guess, called me and asked if he wanted -- if I wanted him to radio you all and then I guess you got back to me directly.

MR. MAHONEY: And you were addressing?

DEPUTY DENMAN: Deputy Denman.

MS. QUAINTANCE: Judge, at one point I understood that the anger of this juror was directed at a single person and that the threat was directed at a single person as opposed to a group; is that true or not true?

THE COURT: Well, I understood last night that the highest level of animosity was between juror Hall and juror Foster. But it was clear to me that juror Hall was angry at more than a singular person last night, but others, how many others he didn't indicate.

DEPUTY DANIELS: Well, just the fact that it was more than one.

THE COURT: So unless anybody has any questions of the deputies, they haven't slept last night, I think I will excuse them, then I will leave and let you talk -- you were going to think about some things overnight yourself, Mr. Danforth, and I would like to get the position of the parties here in ten

discussed with Mr. Danforth the fact that he has the right to have a jury of 12 persons, however he waives that right to have a jury of 11 and we move the Court to excuse the juror in question and have a jury of 11 rather than declaring a mistrial.

THE COURT: Ms. Quaintance?

MS. QUAINTANCE: The state is also of the mind that it is too early to declare a mistrial. I have talked to attorneys who have tried more cases than I have and it's not unusual for a jury to go out more than two nights. It's not unusual for there to be animosity within the jury, that's part of what people have to work out. There has been cases where these kinds of things have happened before and a verdict has still been reached. The state is of the mind at this point that the jury should continue as it is. And that there is not a deadlock now and it's too early to call that and that this group can proceed as they are at this point.

MR. MAHONEY: On the issue of proceeding, there are other requests that they be given someplace else to deliberate, this does not seem outrageous.

MS. QUAINTANCE: I am in agreement.

MR. MAHONEY: We should probably try to

find someplace else.

THE COURT: We are working on that now. Okay.

MS. QUAINTANCE: Your Honor, for the record I would just like to state because we have not made a record on this issue, I don't believe, the state is open to discussions of the negotiations, it was last night. There was some brief discussion at that time. We are still open to that possibility and I think Mr. Danforth should be aware that this is a high-priority case for our office. It has been handled by the major prosecution unit; if it needs to be retried, it will be retried by that same unit and possibly others also familiar with the case and with the history of Mr. Danforth including Ms. Johnston, who previously prosecuted him.

The fact that I will be on maternity leave will make no difference in how our office handles this case and we will proceed.

THE COURT: Okay. Well, we have talked a couple of times during trial where the parties are both heard as their desire that I participate in trying to assist the parties toward any possible agreements. I have done that in the past and I am willing to do that again and today, if the parties wish. Do you

still wish me to do that, Mr. Mahoney or Danforth?

MR. MAHONEY: He has authorized me to enter into plea negotiations.

THE COURT: I guess the state has indicated their position, so based on that, I have another hearing coming up here this morning that's supposed to start at 10:00 and I don't want to be too late for that, but I will talk to the parties just briefly on that topic of negotiation and then I will instruct the deputies to ask the jurors to keep going.

We are working on trying to find another room but I cannot avail them of this room right now, because I have other use for it. All of the other courtrooms on this floor are also being occupied, so we have checked with the tenth floor, they have much larger jury rooms and both of those jury rooms are also occupied.

MR. MAHONEY: How about JC, they have really nice jury rooms down in juvenile court?

THE COURT: Well, we are still working on it. The ideal is to find a courtroom and lock it off and use that for their deliberations.

MR. MAHONEY: I would ask the Court for a ruling on my motion.

THE COURT: Absent the stipulation with

the state, the motion is denied.

Can I see counsel then in the back, please?

(Short recess.)

THE COURT: I am making a record of Court's Exhibit H. I note that I am asking the deputies to bring it to the jury room. It reads, "I will be done with the hearing in this courtroom within the hour and will turn it into a deliberating room. Please continue your work in the jury room until then. I am sorry there were no other rooms available on this floor." Signed myself at 10:30 this morning, March 6, 1996.

(Short recess.)

THE COURT: Let the record reflect that we are here in the courtroom. Please be seated, Mr. Danforth. Thank you. And the Court received a message out at 1:50 this afternoon, dated, "Judge Solum, the jury has reached a decision unanimously," signed Sharon. I assume that is Sharon Schwenke ~ who is the foreperson of the jury. I chatted with counsel moments ago and I think we should make a record about that.

I inquired about the need for, the desire for a Schwartz ~ Hearing. Both parties indicated that they would desire a Schwartz Hearing. I indicated the Court's preference to do that now and not later, given

find out from the juror the number -- or whether that juror was influenced in any way by the tape and something to get at whether the curative measure that was taken reduced any prejudice resulting from the defendant by the admission -- or by the listening of that material.

In support of that, I cite State v. Diller, 355NW2d 167 MN Appeal's Court of 1984. Also, State v. Cox, 322NW2d 555 where it states the exposure of the jury to potentially prejudicial material creates a problem of a constitutional magnitude because it deprives a defendant of the right to an impartial jury and the right to confront and cross-examine the source and material.

Obviously, the jury listened to evidence that was not admitted and we need to try and make a record of that.

As to the effect of internal coercion, I would cite for the Court, State v. Scheerle, 285NW2d 686 MN 1979. The Court needs to get at whether there was any possibility of overt conduct by one of the jurors towards another and whether, if there was, that effected the decision-making process of the individual jurors. And I agree that it would be the Court's inquiry to make that determination.

influence, any fear, any coercion or anything of that nature that influenced your verdict in this case, resulting from the acrimony or the difficulty the jury was experiencing late yesterday afternoon and early evening?

A. No.

Q. This verdict that I have just read is your true and correct verdict?

A. Yes, it is.

Q. It was your voluntary judgment given in accordance with the jury instructions I read about how to go about deliberating your verdict?

A. Yes.

Q. You did nothing to do violence to your individual decision in this regard?

A. No.

Q. You also would recall that you all asked for a tape recorder after I had left to teach school the other night and were playing a tape of Mr. Danforth's statement to Detective Roberts.

A. (Juror nods head affirmatively.)

Q. It's my understanding from the deputy that you got to a point in that tape where you or some of you appreciated that you were hearing something that I might have excluded from evidence; is that correct,

ma'am?

A. Yes, it is.

Q. And can you tell me, did you come up -- did you or one of your colleagues detect that yourself?

A. Yes.

Q. How did that come about?

A. We were listening to the tape and following it on the script.

Q. On the transcript that is Exhibit 13A?

A. Yes. And we kept on looking over the transcript because what we were hearing on the tape we didn't see in the transcript, and that's it.

Q. And what you heard on the tape related to the young girl Amanda?

A. Yes.

Q. Did what you heard on that tape in any way influence your verdict in this case; that is, what you heard on the tape that was not on Exhibit 13A?

A. No.

Q. You can be confident of that?

A. Yes, I am confident.

Q. Did you have any further discussion with your fellow jurors about hearing something that maybe was excluded from the evidence?

A. You mean about the tape that we listened to?

Q. Yes, ma'am.

A. I think it did come up a couple of time and we had to go back over and say, we can't. That's inadmissible, but I think it did come up.

Q. Was it you or members of your jury that initiated some discussion with the deputy indicating that you were maybe listening to something you maybe shouldn't be listening to or words of similar meaning?

A. Yes. When we realized it, Sharon went to the deputy.

Q. Can you tell me what Sharon did?

A. Well, yes. As soon as we realized -- well, I think one of the jurors realized that -- that was when we went into the room, that we weren't supposed to hear. So as soon as we realized it, we took the tape out and then Sharon handed it to the deputy.

Q. Okay. Anything at all else you want to tell me, and you don't have to, and you cannot be examined about your deliberations apart from this, but anything at all other that's germane to the question of whether the acrimony played any role in this or whether that tape -- those excerpts from the tape played a role in your decision?

A. No. I don't think so.

Q. Okay.

was examined and testified as follows:

BY THE COURT:

Q. Mr. Koenigsfeld, I am asking jurors these questions because of the events or circumstances early yesterday evening.

A. Mm-hmm.

Q. And I would like to know from you whether there was any fear or coercion associated with that tension or that acrimony that played any role, however slight, in the verdict that you arrived at?

A. No.

Q. Did you observe that any fear or coercion involving that acrimony was playing a role in the discussion or deliberations of any of your colleagues?

A. No.

Q. You listened to a tape, Exhibit 13, a tape recording of the statement that Mr. Danforth gave to Detective Roberts. As I understand it, all of you detected -- or some of you detected that there was a passage or two on the tape that didn't conform with the written transcript?

A. Right.

Q. Can you tell me what was said at that time?

A. With my hearing, I didn't hear the tape. I couldn't understand what was going on.

Q. So when the tape was being --
A. I didn't really hear what the tape said.
Q. You didn't hear it back in the jury room?
A. Right. Right. There was other conversations going on at the same time. I didn't understand what was being said on the tape.
Q. Is the verdict that the jury rendered a few moments ago your true and correct verdict?
A. Yes, it is.
Q. If you want to step through that door, my clerk will show you back to my office.
THE COURT: Mr. Foster.
(Whereupon the next juror was escorted into the courtroom and seated in the jury box.)
THE COURT: Hi, Mr. Foster. Do you want to raise your right hand?

MR. FOSTER
having been duly sworn,
was examined and testified as follows:

BY THE COURT:
Q. Mr. Foster, in light of the circumstances last evening, I need to ask you about whether there was any fear or coercion arising from that acrimony or any tension that played any role, however slight, in the

Q. Now that I have reminded you of what the passage is, does that refresh you with respect to any conversation you and your colleagues had about it?

A. Only that it seemed -- is it possible that the accusations were true or not as a result of possibly having Amanda involved, too.

Q. Can you elaborate a little bit on that?

MR. MAHONEY: May we approach?

(Whereupon, sotto voce dialogue between the Court and counsel.)

MR. MAHONEY: Ask if what she heard about Amanda made it more likely or not that the defendant was guilty?

MS. QUAINTANCE: I don't think that's an appropriate question.

THE COURT: Well, I am not going to ask that exactly.

BY THE COURT:

Q. Now that I have refreshed you with respect to what it is, did that which you heard about the question that Detective Roberts asked about Amanda, again influence you in your determination of Mr. Danforth's guilt here?

A. No.

Q. And the verdict that the jury rendered a few

moments ago, that is your true and correct verdict?

A. Yes, it is.

Q. Okay. If you want to step through that door, I will see you in a few moments.

THE COURT: Ms. Idstrom.

(Whereupon, the next juror was escorted into the courtroom and seated in the jury box.)

THE COURT: I need to just ask you a few questions. Will you raise your right hand for me, please?

MS. IDSTROM

having been duly sworn,

was examined and testified as follows:

BY THE COURT:

Q. In light of the circumstances occurring last night and the acrimony or tension that apparently was involved, I would like to ask you if any element of coercion or fear influenced in any way your verdict in this case?

A. It did not.

Q. You listened to a tape recording of the statement that Mr. Danforth gave to Sergeant Roberts when he was arrested and, as I understand it from the bailiffs, detected that there was a portion of that

transcript -- or that tape that was different from the transcript; do you recall that?

A. Yes.

Q. Do you recall any discussions that you and others had about the excluded portion of that tape which dealt with the --

A. Yes, I do.

Q. Can you tell us what the discussion was?

A. It had to do with Amanda and the defendant apparently being excused by -- and I am not sure, it was a discussion of who, having had a sexual relationship with Amanda similar to the one with Josh.

Q. Anything else about the discussion that you can recall?

A. I recall that there was people looking at the transcript, and after listening to the tape, part of the tape and then stop and then this discussion occurred and other people were looking at the transcript and saying, it can't be the same in the discussion of the transcript and why it wasn't the same. And then a realization that parts of the tape had not been admitted into evidence and that was the -- and the tape that we listened to, shouldn't have been listened to. Then there was the discussion what to do about it and to tell someone or not tell someone and

**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## (Original) SENTENCING TRANSCRIPT

## May 13, 1996

**(See: Attachment E to Amended Petition.)**

**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# <u>TRANSCRIPT EXCERPT:</u>

# MOTION FOR RE-SENTENCING HEARING TRANSCRIPT

## May 27, 1998

that I make a finding based on a professional assessment that I do not have.

Now, that raises the question of whether the law says that if I do not have it by reason, at least part of it, by reason of the offender's own actions, I can dispense with it in its entirety. I don't think Barber says that I can dispense with it in its entirety. And I don't think the statute says that. Because Barber was a different case. And the only words that relate to this in Barber, again, are "Given Barber's refusal to submit to another evaluation, we agree with the trial Court's conclusion." That's a far cry from saying number three can be dispensed with. And the Legislature seemed to deal with that refusal.

But I do have to say that if the order that comes out of this is that a qualified examiner is going to look at whatever data is available, then my order would be to the qualified examiner that the qualified examiner should imply or infer negative findings would come out of a mental status examination if the offender refuses to submit to one. Because I think that has to be the implication of the statute.

If the statute of the Legislature says we can dispense with that, and that's an integral part of an assessor's finding, then if the assessor needs to know that, my order

would be that the assessor must assume the worst with regard to a mental status examination. Otherwise, an offender again would have the ability of avoiding the statute simply by refusing to have a mental examination, to submit to a mental examination. And if that examination was an integral part of that finding, then the finding could never be made. And that I don't think should be permitted.

So I guess that raises the question again Mr. Norris with respect to your client. And I'm not sure where I come out on this, but if that's the result of this, then the order would require whoever that qualified person was to make that inference if it was necessary in making the conclusion one way or the other that the current mental status circumstances be taken into account. And I don't know how that cuts with the position of your client, but it seems to me that this statute at least requires that I pay some attention to that third prong which the Court of Appeals maybe assumed I paid complete attention to but all of us know I didn't. Because we all had my letter that followed shortly after the sentencing where we discussed this very issue.

And in taking and paying attention to it, it can't be that the offender could refuse a certain part of it and therefore disable a finding that may inure to his

detriment. So I don't know what all that means, but it probably means Mr. Danforth has to consider that in his viewpoint with regard to whether he submits to a mental status examination.

Mr. Norris?

THE COURT: Mr. Norris?

MR. NORRIS: Your Honor, I think you're suggesting that all of this be submitted to make it so that the record can be made for the findings or the not findings. If that's the case, I just spoke to my client, he certainly has no objection to that if that's the Court's pleasure?

THE COURT: What does that say if anything about his submission to a mental status examination?

MR. NORRIS: He continues to refuse. I think that's the phrase that Mr. Danforth used is a continuing refusal.

THE COURT: Okay. And with the understanding then that any disability in a professional qualified as the statute requires in making this determination that is raised by reason of his refusal, then to that extent I will and I do conclude that the statutory language and the language in State versus Barber would permit the negative inference. So to the extent that that

is wanting and that disables finding one way or the other, then I will make the finding under prong three.

MR. NORRIS: Do you understand that?

THE DEFENDANT: I understand it Your Honor. If that's your call, that's your call. Of course, that's not something to which I'm under an obligation or am I, you know, acquiescing but it's just the way it's going to be I guess.

THE COURT: I appreciate that.

Okay. Anything else with respect to these issues?

(No audible response.)

THE COURT: I'm going to enter an order then today that I will get out today that's going to order the court psychologist to identify a person qualified under the statute, and for that person to gather all of the data that we have available for this purpose within the judicial records or the probationary records or psychological records of Mr. Danforth, and to do that as promptly as possible. And then to advise the Court as to whether a finding under prong three can be made either way without more.

If the examiner says the examiner can make such a finding without more, then I'll take that finding. And if that requires the necessity of a re-hearing on sentencing, I'll do that sometime within the next few weeks. If the

examiner says that he or she can't make the finding without a mental status examination, then the finding will be this: the finding of this Court will be that prong 3 has been met. And I'll re-schedule a sentencing accordingly.

If the examiner concludes that on the basis of all the material, absent the mental status examination, that Mr. Danforth does not need long-term treatment beyond the period of incarceration and specified release, then I will enter an order that the sentence remains as it exists today, and there will be no need for any further hearing.

Everybody understand what I'm doing then?

THE DEFENDANT: Yes, Your Honor. And I just ask that you make it clear with the deputies that I should be transported back to Stillwater.

THE COURT: Right. He should be.

Okay. We're adjourned. I would like the State, the State and the defendant, to the extent either you have knowledge about information that would be relevant to this kind of assessment, can you let me know as soon as possible and I'll include that.

MS. QUAINTANCE: Probably the whole transcript would be helpful.

* * *

**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## RE-SENTENCING TRANSCRIPT

## August 4, 1998

Prentky matter, I believe is -- first, I would cite the citation for that, and that's Prentky, R., Knight, R., & Lee, A. "Risk Factors Associated with Recidivism Among Extrafamilial Child Molesters", and it refers to a sample, and in at least one instance the sample itself has been challenged as being an inaccurate sample of persons fitting Mr. Danforth's profile. Give me just a moment, Your Honor. (Brief pause.)

Your Honor, I would also renew each of the arguments in my motion that Judge Solum -- I don't know that he actually ruled on it, but I made a motion regarding the preparation of this report. And I think that motion was made in June regarding the applicability of State v. Barber to this matter. The motion essentially spoke to the factual differences between this case and the Barber case, and I would renew those as part of this larger matter.

Finally, Your Honor, I would note for the record that I don't believe that the Court of Appeals opinion requires you to sentence along the lines of a pattern sex offender. I believe that the Opinion said, if the Court made the three-prong findings, that then it was a mandatory matter, but had real questions about whether Judge Solum had in fact made those findings. They suggested that he did, but in fact there were no

explicit findings.

The sentencing record, if I remember, was full of a great deal of musing, a great deal of what ifs. But the Judge was clearly uncomfortable with doing that. And when the State appealed, I think that the firm holding of the decision in that case was, if a Court finds those three prongs of the pattern sex offender statute, then it must sentence in accordance with that statute. But I don't think that the Court required this Court to sentence in accordance with that statute.

THE COURT: Ms. Quaintance, did you want to respond to any of the arguments made by Mr. Norris?

MS. QUAINTANCE: Well, the Barber issue was discussed at great length. That case, to my mind, stands for the proposition that if somebody refuses to participate in a sex offender assessment, then they can be found to be a pattern sex offender; that their refusal to participate, as in Mr. Danforth's case, does not necessitate a finding that they are not a pattern sex offender, and does not preclude a finding that they are one. And therefore, I don't think that Barber represents any obstacles in this case to a finding that Mr. Danforth is a pattern sex offender. It was my opinion that such a finding could be made based upon the existing record.

effort to stamp out child abuse. Unfortunately, the Judge's role in this prosecutorial team is to bend over backward to allow even the most wildly unfair evidence and tactics by prosecutors, while restraining a sex abuse defendant from virtually any useful avenue of attack on the accusation."

THE COURT: Mr. Danforth, I think I'm going to stop you now. You have exceeded the limits I set for you, and I'm going to ask you to sit down now.

THE DEFENDANT: I just ask you to remember today that you are sentencing an innocent man.

THE COURT: I understand what you are saying.

I have considered the arguments of counsel here today. I do find that the report of Dr. Panciera is helpful to the Court on the issue that Judge Solum ordered it on.

In response to some of the allegations in here, there was a reference to the Prentky materials and whether or not they are appropriate. But when I read Dr. Panciera's report, I took that as more or less authority on the proposition that it's appropriate to make recommendations and reach a conclusion without having the benefit of an evaluation of the subject, which is the precise situation we have here, and in fact seems to be

treatment would require long-term sex offender treatment, it's certainly confirmed by the comments here today.

It's clear to me that Mr. Danforth does not accept the judgment of the jury, does not accept the previous sentence of the Court and the comments that accompanied the sentencing, those facts by themselves justify me in concluding that the possibility of success in any setting would be pretty low. But if it was to be successful, it would certainly require long-term treatment. Therefore, his original conclusion that long-term treatment and extended supervised release was appropriate seems justified to me.

Having thus reviewed the file, the record of Dr. Panciera, which is accepted and relied upon by the Court, the Court is able to confirm what I believe to be the previous findings by Judge Solum with respect to the pattern sex offender statute. Number one, the Court is imposing an executed sentence, as required by the sentencing guidelines.

Number two, that the defendant is a danger to the public safety, as evidenced by his prior conduct, including convictions, and that the defendant needs long-term treatment and supervision beyond the presumptive term of imprisonment and supervised release.

Those three standards having been met, the Court

A. Because he was -- the way he reacted.
Q. How did he react?
A. The way that he presented himself to me, he was sad.
Q. Okay. How did he present himself to you?
A. He looked down at the floor, and, and he was -- he was -- he was basically looking at the floor and telling me, and he was sad. He was sad. I know, I'm his mother. He was sad.
Q. Okay. That's fine.
A. Okay.
Q. What I wanted to ask was going into the interview with the police officer, while the police officer was there, and is it then your testimony that the same reaction then and appearance was the same throughout that interview?
A. Yes. Yes. He was sad.
Q. Now, do you recall if the officer had asked him about any prior conduct that he might have had with somebody else?
A. No.
Q. Okay. Was there any point in the interview at which Josh laughed?
A. Nope, not at all.
Q. And you were with him or at least were able to

hear him during the entire course of the officer's conversation?

A. No. He expressed sadness.

Q. Okay. You were sitting in the next room in the living room, did you actually see him during this time or did you just hear him?

A. I was glancing at him, yes.

Q. Glancing, okay. So you were able to see him from the living room?

A. Yes.

Q. Through to the dining room. Okay. And, although, we'll get back to draw this diagram, why were you able to see him from the living room to the dining room?

A. Because it's open.

Q. Okay.

A. It's open. It's an open space.

Q. In the wall between the kitchen, I mean, between the living room and dining room there is an open space.

Q. So if you're at least sitting in a certain portion of the living room, you can clearly and easily see into the dining room table area, correct?

A. Yes.

Q. And that's what you did do, correct?

A. Um-hum.

telling him. Do you recall whether or not you would have told him that it was north or south?

A. No.

Q. Okay. Now, at that point when you were trying to describe who I was to the family, did you identify me at that time as being more Gary's friend or as more yourself?

A. No. You were more my friend than Gary.

Q. And that's what you said to the officer?

A. Yes.

Q. All right. Now, you mentioned that earlier this year you had regarded me essentially as a brother, is that correct?

A. Yes, it is.

Q. Okay. Now, before that evening of August 11th when you had the officer, and it was Officer Castilleja, by the way that came over, was it not?

A. I'm not really good with names either.

Q. All right. But you do remember what he looked like?

A. Yes. I do remember what he looked like.

Q. Sure. So what I'm asking you is had you ever talked with that particular police officer any time before that evening?

A. Nope, not at all.

Q. Okay. Now, did you ever talk with him again at

The thing I found probative about the individuals testifying is the opportunity and the relationships that were associated, some of which I've seen and in some detail on the tape that I reviewed actually early this morning.

I understand one of them, from the comments of Miss Quaintance, is an inmate. And if that person testifies, he would not be permitted to testify in clothes that indicate he's an inmate. And there would not be any testimony provided by or evidence of the fact that he's incarcerated or that he has been charged with or arrested for or convicted for a sexual offense.

So that's a general idea. I'll elaborate on that more in a memo that I'm going to be filing, but I wanted you to have the advance knowledge of that because that may bear on your cross-examination with this witness vis-a-vis the reason she had to suspect you, and that kind of thing, Mr. Danforth.

MS. QUAINTANCE: Just a couple of things.

THE COURT: And, again, by the way, I have also concluded again that I will not be allowing evidence with regard to the 1970 Spreigl, at least with respect to anything in the State's case in chief.

Okay. Miss Quaintance, I'm sorry.

MS. QUAINTANCE: On the issue of

testimony by the police officer, there is significant authority for the fact that a Spriegl may be proved by testimony of a police officer, and that includes State v. Alt, 529 N.W.2d 727, Minnesota Court of Appeals 1995; State v. Crocker, 530 N.W.2d, 191.

THE COURT: Well, the nature of these acts that are similar in terms of the actual sexual contact are spelled out without equivocation in Mr. Danforth's admissions before Judge McCarr, and the photographing of these boys is spelled out in his admissions before Judge McCarr. And it's the Court's view that that handles the actual sexual act part of this. You know, if you have some evidence that you think a police officer can offer beyond that, I'll listen to what it is and make some ruling. My greatest concern about the similarity here has to do with the opportunity that that is demonstrated on this tape. And that is demonstrated in the words of some of the youngsters with regard to going on rides and delivering pizza, and all of those kinds of things that are becoming part of the fabric of this case, both in Mr. Danforth's opening statement and in some of the inquiry in his cross-examination and arguments that we've heard.

MS. QUAINTANCE: The other issue that I think is very important, and the reason which I want to be able to prove it up, is the age of the kids at the time

A. Uhm, he -- I have a great -- I just -- I just remembered what kinds of specific things that Josh -- he was with his, you know, he helped him with his reading, you know, with with his letters, things like that.

Q. Okay. Okay. Mrs. Story, you said that you never observed Josh and Amanda doing anything sexual with each other?

A. That is correct.

Q. Did you ever tell the police officer who came to your house that you saw Josh and Amanda doing anything together?

A. No.

Q. Did you tell him about Josh doing anything sexual to any other child?

A. Say that one more time.

Q. Did you tell the officer who came to your house --

A. Okay.

Q. Did you tell him anything about Josh being sexual with any other kid?

A. No.

Q. So you didn't tell him about the girl across the hall?

A. Oh, I'm sorry. I'm sorry. Yes. Yes, there is. I told that Josh had kissed Kianna, but...

Q. Okay. Maybe you could move that microphone in front of you.

A. Okay.

Q. Because I think people can hear you better then.

A. Okay.

Q. Did you tell him you saw Josh kiss her front part too?

A. Yes.

Q. Now, when Mr. Danforth was asking you questions, you said that you had second thoughts about calling the cops after Josh told you?

A. Yes, Ma'am. That is correct.

Q. Because, what happened, because you were so close, did you mean, to Mr. Danforth?

A. Yes.

Q. Can you explain to me why that made you have second thoughts about calling the cops?

A. Because I was, I was really, really close to him. And I, I felt so close. And I just -- I -- I didn't -- I did, but I didn't want to, you know. I was kind of like in lingo [sic] with myself. I kind of knew, I knew what to do, but I was -- I was really, really close to him.

Q. Okay. To Steve Danforth?

A. Steve, yes.

759

A. Amanda was in the room, yes.
Q. And Josh and Steve?
A. Yes.
Q. And was the door closed?
A. Yes, it was.
Q. And that's when you noticed it was silent?
A. Uh-huh. Yes. That is correct.
Q. And that's what you were thinking about when you said "I kind of figured something was going on?"
A. Yes. That is correct.
Q. Did you tell Josh what you were thinking about?
A. Yes, I did.
Q. You told him about the room?
A. Yes. I -- I asked him, "Did Steve do this in" -- "it in your" -- "in his room?" And I said, "Yes."
I'm sorry. I'm sorry. I'm getting --
Q. That's all right. Take your time.
A. Okay. Okay.
Q. What did you ask?
A. I goofed it up. I'm sorry.
Q. Okay. Okay. We'll straighten it out here maybe.
What did you ask Josh about that?
A. I asked Josh --
THE COURT: Can we have a time on this

about when she is asking Josh what?

BY MS. QUAINTANCE:

Q. Okay. Good idea.

Before the cop came, after Josh told you that Steve had abused him, what did you say to Josh about this business at Steve's apartment in the room?

A. I asked him specifically, "Did Steve do this in his room?" And Josh said, "Yes."

MR. DANFORTH: Objection, Your Honor.

THE COURT: Why don't you both come up for just a minute please.

(Whereupon, a discussion was held off the record at the bench.)

(Out of the hearing of the jury.)

MS. QUAINTANCE: I really strongly feel, and I want it to be part of the record, that I have a right to clarify what he on cross-examined on. He opened the door. It makes it sound as if she coached this kid, and I have a right to clear it up.

THE COURT: Well 403 is creeping in here all of the time.

MS. QUAINTANCE: Well, that may be, but the prejudice outweighs it, Your Honor. For him to muddy this up and take advantage of a vulnerable witness by putting words in her mouth and then not allowing her to --

THE COURT: No. Step back please.

(Whereupon, a discussion was held off the record at the bench.)

THE COURT: You can only answer questions from them. Okay? Unless it's something, you know, related to this. Do you need anything or?

THE WITNESS: I don't need anything. I just wanted to --

THE COURT: Would you like to talk to Miss Quaintance for a moment?

THE WITNESS: Uhm. She -- she already knows that I have a hard time expressing myself.

THE COURT: Well, we appreciate that.

THE WITNESS: Okay.

THE COURT: Members of the jury, with respect to the last question and answer, I'm letting that answer stand for purposes of you considering and appreciating the relationship and attitude of this witness with respect to her conduct with and conversations with Joshua, and not for purposes of whether or not that statement that Joshua allegedly made was true.

Josh was not her to be examined about that statement, so you should disregard the statement for that purpose. And it's being allowed to be heard by you only for your consideration with respect to the attitude and viewpoints

MS. QUAINTANCE: You know that this is the same one that you saw that had your kids voices on it?

THE WITNESS: Right.

MS. QUAINTANCE: Okay?

THE WITNESS: Yes.

MS. QUAINTANCE: I would move for the admission of this exhibit.

THE WITNESS: That is correct.

THE COURT: Mr. Danforth?

MR. DANFORTH: Well, Your Honor, I continue my objection. Miss Quaintance is essentially asserting that this is a video taken within the locker room and in particular within the -- sorry -- in a room of the locker room, as I understand it, of the Century Court's indoor pool area downstairs in the men's locker room.

It is my assertion as a matter of fact and a fact that we can easily distinguish and prove here right in the Court's own possession that that is -- that's not the case. What I'm referring to is that you now possess a video tape by Walt Powers having gone down and shot the interior of that very locker room and that very sauna. And if you simply match it up with what you saw there, you'll find it doesn't match at all.

THE COURT: Well, you're talking about this tape here (indicating), which I haven't looked at yet

THE COURT: Well, as I say, I blamed the defendant for things when I thought he was blameworthy. This one is, if anybody's fault, my fault. I'll take the blame for it.

MS. QUAINTANCE: I'm requesting the sanction of suppression of that tape because it was not given to me. It's late discovery.

MR. DANFORTH: Your Honor, do I need to address that?

THE COURT: Not right now. It hasn't been offered right now. So we'll address it when it comes.

Let me just, when we were with the witness and the jury, there was another objection made with regard to a hearsay statement that Josh was -- Joshua Story made to his mother respecting an incident in Wisconsin. I did not strike that statement or sustain the objection, but rather gave a cautionary instruction with regard to the use of it. While my view was that it came somewhat out of the blue, I'm not so sure it came that much out of the blue in that the mother's statement that Josh had alleged sexual abuse at Wisconsin is a part of the record. It's something that I made known to Mr. Danforth with regard to the child protection records, and gave him a copy of. So it is a statement that she did make a long time ago. So there is a prior consistent statement with respect to the mother's

comment, because it's one with which I agree.

(Whereupon, a discussion was held off the record.)

Okay. Are we ready to go?

Okay. The record should reflect we're in open court and the defendant is here. Mr. Mahoney is here. Miss Quaintance is here. We're out of the presence of the jury. We've all been talking in chambers where we could look at some law books about the next witness' testimony and some of the hearsay issues and also the issue involving the tape that was the subject matter of Terese Story's testimony. As I've indicated to counsel, that if the tape of the locker room scene, even though there may now be some question about whether that is the exact same location where this event took place, if that tape is offered, the court would receive it on the basis of the evidence that the voices on the tape belong to the Story children and Mr. Danforth, and on the assumption that the evidence is going to show that which has been indicated to the Court throughout these proceedings, and that is this tape was seized from Mr. Danforth's home or car, whichever it was.

MS. QUAINTANCE: I would like to address the issue of Commander Mcginn's testimony. I had her come over here on five minutes' notice this afternoon to testify, that offer of proof about her testimony having

previously been made in the course of the Spriegl arguments. I informed the Court that with regard to two of the Spriegl's testimony would be presented through an officer who did the investigation at the time.

This morning the Court talked about limitations on what that officer could testify to. I specifically have in my notes the officer can't elaborate on the nature and extent of the abuse beyond just simply what happened. That to me implied that this officer would be allowed to testify.

She is now here and prepared to testify within the parameters of what was my understanding of what the Court said this morning, that she could testify to the nature of the abuse, meaning, the kind of sexual abuse it was, how these Spriegl victims met the defendant, which is what the Spreigl victim's would be allowed to testify to if they were here themselves, how long he knew them, and what age they were when he met them. Which are things that were reported to her in the course of her investigation, which if, which in this case she would be allowed to testify to, and it would not be hearsay.

I also believe that the authority of State v. Alt, 529 Northwest Second 727, a Minnesota Court of Appeals case from 1995, indicates that a victim's statement to the police is admissible. Therefore, her

testimony about the victim's statement to the police should be admissible if the statement itself is admissible. And at the very least she should be allowed to admit the statement of the victim to her at that time under that case.

Now the Court has advised me that I cannot put in Spriegl evidence through an investigator. I am limited to the plea transcript and the certified copy of the conviction, which does not give me the opportunity to present motive or intent or modus operandi evidence, which is admissible under Spriegl, and is admissible under State v. Alt where the conviction and the victim's statement to the police were both admissible.

This evidence does not create a hearsay problem because a judgment of previous conviction is recognized as a hearsay exception as cited from the Crocker case. And I have previously admitted Spriegl evidence in this manner. And I don't think there is anything in the law that precludes it. I will over night look for additional authority, but it was my clear understanding that the Court was well aware that she was to be a witness. And I brought her over here, and we're here now ready to proceed.

THE COURT: Mr. Danforth?

MR. DANFORTH: Well, if you would like me to respond at this time, Your Honor, rather than

waiting, I certainly will.

THE COURT: Well, I don't, you know, maybe I can cut through this. The Alt case seems to me to stand for the proposition that where there has been a conviction, the statement of the child or of the victim and the probable cause statement of the complaint may be introduced without violating the hearsay rule. How the Court gets to that through its analysis, you can't really discern from the opinion, but I assume it's something to the effect that these things have some inherent trustworthiness because they have been determined to be an adjudication of guilt. But that's different than a police officer getting on the stand and testifying, with all due respect to the officer, with his or her own recapitulation of what the statement was. The best evidence of the statement is the statement.

Now, if this officer wants to get on the witness stand and mark the statement and she wants to read the statement of the Mack people, not the other two because the other two are redundant because they're going to testify here --

MS. QUAINTANCE: Fine.

THE COURT: -- then we can do that. And because Alt seems to say that that's permissible.

MS. QUAINTANCE: Fine.

THE COURT: But for her to get on the

witness stand and basically testify as to what the investigation was, and so on, I mean, the statement, is it different than her statement of the statement? Because the statement is a transcribed, verbatim recounting by the people that lived it.

So if you want to do that, that's permissible. Then we'll go from there.

MS. QUAINTANCE: That's what we'll do.

THE COURT: I don't know what time you're going to put the convictions in but, obviously, they're going to have to be advised some time fairly soon, because that's part of the mosaic of Alt, that there was a conviction on the offense that this officer investigated, and that the statements were given in connection with.

MS. QUAINTANCE: Well, the officer can testify that they were convictions. And I'll put the documents in, you know, within the next day.

MR. DANFORTH: Your Honor --

THE COURT: Um-hum.

MS. QUAINTANCE: It seems to me that the entire statement is a whole lot more prejudicial than what I was intending to go over. I thought I was limiting what I was offering by not offering the entire statement.

MR. DANFORTH: Well, first off --

MS. QUAINTANCE: They're 20 pages long

apiece.

THE COURT: Well, maybe Mr. Danforth isn't objecting.

MR. DANFORTH: Well, Your Honor, first off, I am objecting. And the very first thing that I would offer the Court for consideration is that we're out of step here. The whole idea of Spriegl evidence comes in at the close of the prosecution's case. We haven't even heard what the investigating officer in this principle case says, so we are ahead of time. And I think we can postpone a decision on these things. And I think that's the first thing.

Secondly, this is a matter of, you know, not having any contention on the record at this point that the brothers' Mack, either Daniel or Richard, are unavailable at this time. And so from a very essence of fairness and my right to confrontation, I would submit that they have to really be here to make this testimony.

Now, the business about drawing in statements simply because they weren't currently on the State's witness list or they're not being actually called to testify, although they are, you know, I guess that's of no constitutional consequence. The fact still remains I have a right to confrontation, and I should have the opportunity to exercise it when we're talking about any kind of matters

outside of the four corners of the conviction, Your Honor.

Now, Alt assumed -- it was a case that involved a victim's statement that was given literally right at the scene and time of the crime, and regarding the actual, essentially, facts contained in the crime. And if it had anything to do with anything else, apparently, that wasn't relevant to the use of it in Alt as Spriegl.

So, you know, I submit that Alt is not authority for simply allowing carte blanche victim's statements regardless of what the contact is. You know, I might in a victim statement to a police officer say that Joe Smith punched me, and that was the offense that Joe Smith eventually pled guilty for and was convicted of, and then later was in use in a Spriegl in some case involving some violence, let's say. But I might ramble on as a victim in that statement and tell all sorts of other deleterious things about Joe Smith, or I might say things about my relationship and, you know, the length of my relationship, the nature of my relationship, how it came to be that I was there getting punched in the nose by Joe Smith that night. None of this stuff is part and parcel of what constitutes the essence of conviction as it is pled for.

I might say that Joe Smith punched me in the noes before. That's not what I was convicted of. You know, those kinds of things in a victim's statement are, in my

understanding, beyond the value of a Spriegl that's based on a conviction. And that's what we here today have, Spreigls based on a conviction. That's what I think the limits are.

I also think that when it comes down to having a police officer come and testify, you know, essentially, the horror of the record, what we have, what we have is the problem of lack of personal knowledge, except for the hearsay. And when it comes down to hearsay, it problem with it is that it is not excerpted from the definition of hearsay under the exceptions at 801(d)(1)(a) or (b). And if you'd give me just a second, Your Honor, I'll scramble down the actual text of that. It's right here at hand. That is --

THE COURT: Those provisions don't have anything to do with this, Mr. Danforth.

MS. QUAINTANCE: Your Honor, in a plea petition when entering a plea of guilty, the Defendant waives the right to cross-examine the witnesses against him. It's right there in the plea petition. There is no revised right to cross-examine his accusers with regard to something he's been convicted of.

MR. DANFORTH: Within the confines of conviction, yes, Your Honor, but that's the point here, it's quite clear that Miss Quaintance is going outside of

victim's statements, as I stay, were with specific reference to the crime as charged and as pled to and as was the subject of the conviction. What we have here in the paper statements --

THE COURT: Now, where do you see that information, Mr. Danforth? I'm trying to --

MR. DANFORTH: Because of the quote that you were reading to me from, and in chambers, Your Honor, we were talking about the fact that the victim's statement was pertinent to the time of the crime regarding the crime.

THE COURT: Well, I mean, the problem with it is it really didn't flush out exactly what the statement was.

MR. DANFORTH: Well, that may be so, Your Honor, but if it were alleging things that were occurring prior to the time period in which the complaint was framed and to which it was pled, can you not see how that would create a problem?

MS. QUAINTANCE: The Court has the statements of these two victims. There is not -- if anything, they minimize what happened to them in these statements.

THE COURT: Yes. I'm going to allow the statements. I think Alt stands for the proposition

that the statement can be allowed. I have read the statement. I've reviewed and watched the video tape. And there has been guilty pleas to them. The statements are in many respects, in fact I think in a couple respects one or more of them, these one or both of these youngsters is even denying that anything happened until it's kind of talked and talked and talked about at some length. The rest of it has to do with the relationship of having fun and goofing around and messing around, and so on, and words of that nature, which is the truth of that or corroboration of it is easily demonstrated by the tape that I looked at this morning.

And Alt seems to say that the statements that give rise to a crime of conviction are admittable for purposes of proving of the Spriegl. It doesn't say anything about whether the person has to be available or unavailable as a witness.

MS. QUAINTANCE: Now, my offer was to do that in a much more abbreviated version, through the testimony of Commander McGinn. If the Defendant is saying he prefers to have the entire statement read into the record rather than to have McGinn testify in a very short manner about the nature of the offense, I --

THE COURT: Well, why don't you make a real quick specific offer of what that proof would be. You

listen to it, Mr. Danforth, and see if that would be something that you would prefer to do in the interest of economy of time, and so on.

MR. DANFORTH: Your Honor, I can immediately tell you to save this Court time, Your Honor, that I would not be in any position to acquiesce to that. You know, I can already tell you that I would expect that there would be all sorts of nuances of delivery passed in here that would convey all sorts of suggestions about the facts that are not within the statements' confines themselves.

(Off the record discussion.)

(Whereupon, the jury returns to the courtroom.)

THE COURT: Please be seated everyone.

THE COURT: Miss Quaintance?

MS. QUAINTANCE: The State calls Commander McGinn.

COMMANDER LISA M. MILLAR-MCGINN,

after having been first duly sworn, was examined and testified as follows:

THE COURT: Can you tell us your full name please, and spell your last name?

THE WITNESS: It's Lisa Marie Millar, M-i-l-l-a-r, McGinn, M-c, capital, G-i-n-n.