**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# <u>TRANSCRIPT EXCERPT:</u>

## TRIAL TRANSCRIPT,

## Volume II

## February 16, 1996

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

Whereupon, the following proceedings were duly had on the 16th day of Febrary, 1996, and entered of record, to-wit:

THE COURT: Good morning everybody. I don't know who's got what, but it's got to be real quick because I want to start on time with these people.

MS. QUAINTANCE: Your Honor, what the State is requesting is an instruction to the jury to the effect that Joshua Story is unavailable. The instruction we're requesting really comes straight out of Lanum. The Court has determined that Joshua Story is unavailable to testify. No inferences are to be made concerning the determination of this witness' unavailability or his failure to testify.

THE COURT: Okay. Could I see it, and I'll consider it. I got Lanum up here, and I'll look at it.

Deputies, would you be kind enough to move the podium back over by the television?

MS. QUAINTANCE: I understand that I didn't give you much notice on this, but it would be my request that they be given this before we proceed since I told them the first witness was going to be Josh Story.

THE COURT: Do you have a viewpoint about this?

MR. DANFORTH: Well, yes, I do Your Honor. If I could just ask you to hold onto this, I'm going to actually have really a presentation on the whole larger picture of what happened yesterday afternoon in just a second here.

THE COURT: No. We're not going to do any larger picture because the jury's coming in right now. So tell me what position you have on this **.

MR. DANFORTH: I would hold off on my position.

THE COURT: Okay. Bring the jury in.

MR. DANFORTH: Your Honor, I do want to make an address to that, okay? My contention is that between Lanum and Scott, this is <u>State versus Scott</u> it's 501 Northwest Second.

THE COURT: Right.

MR. DANFORTH: 608.

THE COURT: I've got it.

MR. DANFORTH: Okay. That the bottom line here is that when there is a witness like Joshua Story, has been declared incompetent, there is a much stricter standard even for the admissibility of the tape, that the confrontation standard suddenly starts applying in full force. And that's what I'm going to be basically asking for, is a complete review of that question.

THE COURT: No. I've made my decision on the tape, Mr. Danforth.

MR. DANFORTH: All right.

THE COURT: Bring the jury in please.

MR. DANFORTH: Additionally, I need to ask that the Court consider a motion at this point to dismiss, in the alternative for a mistrial. And the basis for that motion is the sudden unavailability of Joshua Story as a witness.

THE COURT: Mr. Danforth, I'll let you make both those decisions, and whatever happens here won't be prejudicial to your motion to dismiss or mistrial because if either one of them are granted, nothing happens that happens in the next hour, neither will make any difference.

MR. DANFORTH: But, Your Honor, as far as the motion for the -- as far as the motion for the instruction, I think it's factually inaccurate in this case.

The Court had found yesterday that he was incompetent based on his ability to know truth from falsity and to speak in an accurate and truthful manner. Based on that specific kind of a finding of incompetency, I think that what we have a right to do since that tape is coming in is, having quite the contrary instruction, an instruction that

would basically be curative in that Josh was found incompetent. We have no problem with the instruction you have in front of you, but that is he is unavailable by virtue of that finding of incompetency. And he was found in that finding of incompetence not to know truth from the falsity. And Judge can consider this as fact from which they can consider inferences from with regard to considerations of statements on the tape and also in conjunction, generally speaking, with my guilt or innocence of the charge.

THE COURT: I'm not going to decide the issue right now. I'm denying the State's request to give the instruction that's been requested right now. And I'll address myself to it as we're moving through the proceedings this morning.

MR. DANFORTH: All right, Your Honor. I would also like to move that a transcript of Josh's competency hearing be made available to the jury on issues of competence.

THE COURT: That motion is denied, and I'm not going to hear any more motions, Mr. Danforth. We're going to start the trial, and you'll have an opportunity to make motions. We have kept this jury much, much too long yesterday. And we're keeping them now beyond the opening time period.

Bring them in please.

(Whereupon, the jury is seated in the courtroom.)

THE COURT: Please be seated everyone.

This reminds me of that film 10 years ago or so when all those people kept getting out of the Volkswagon. Remember? How many people can come out of that small room?

Good morning everyone, and welcome. We're having a little bit of change over in personnel downstairs with respect to coffee. And we used to be able to get our way a little bit better. This being government work, we have to struggle with even things like coffee for jurors, but we'll keeping working at it. You've got some now, as I understand it. And we'll keep making it by the installment plan back here and keep working on people downstairs to get you a larger batch of it.

Okay. Ms. Quaintance, you may proceed.

MS. QUAINTANCE: Thank you. State calls Debra Martinetti.

THE COURT: Miss Martinetti, if you want to step up here to the clerk and be sworn please?

DEBRA MARTINETTI,

having been first duly sworn, was examined and testified as follows:

THE COURT: Members of the jury, I'm

who have been witnesses to violent crimes or abused themselves.

Q. Now, what is your education and training to be an interviewer at Corner House?

A. My college education is that I have a Bachelor of Arts degree in psychology from Hamline University in Saint Paul.

From there, as far as my work history and training which leads me to be a child interview specialist, is I have approximately six years of experience as a Child Protection worker, both up in St. Louis County in northern Minnesota and also on the Fond du Lac Indian reservation in Cloquet.

I also have some experience working in residential treatment with young children. I've gone to many regional and national trainings involving child abuse, and most recently child sexual abuse.

In February of 1991, while I was doing Child Protection for St. Louis County, I took the Corner House interview training, which trained me to do interviews with the current model that I'm using right now.

I began to work at Corner House in July of 1993, already having been trained in using this model and having some more updated training. The training that I took at Corner House to learn how to do this model of interview was

a 40 hour, intensive, hands-on training. I also have regular supervision at Corner House right now with supervisors. And I guess that's it.

Q. Since July of 1993, approximately how many interviews have you done of children at Corner House?

And if it's easiest to estimate that by number per week or per month.

A. At Corner House since 1993 I've interviewed over 400 children.

Q. And prior to coming to Corner House, did you also interview children to make determinations regarding sexual abuse?

A. Yes, I did.

Q. And that was as a Child Protection worker?

A. Yes, it was.

Q. Are you able to say how many of those interviews that you did?

A. I interviewed children from approximately 300 families. Some of those families may have had one child, some of them may have had six children. So I haven't broken it down. I have it broken down as far as family.

Q. Now, you said that Corner House interviews are done around allegations of child sexual abuse. How and when do children get referred to Corner House or end up there?

There is a lamp and a table in there. There is a telephone so that people who are in the teaming room, which I'll explain in just a minute, have contact with us if they need to ask or to have us ask the children any questions.

We also have two doll containers. Basically what they look like is a toy box where we keep our anatomical dolls. There are no toys in the room at all, but we keep anatomical dolls in those boxes.

The second level of Corner House, you go up the stairs as any other normal house, and we have the offices for the employees there. And we also have what we call the teaming room, where members of the multi-disciplinary team -- and what I mean by that is law enforcement officers, Child Protection workers, there may be Guardian Ad Litems involved, doctors may be involved -- where we sit together and talk about the case.

And this is where the team sits and views the interview, because it's connected to the interview room via close-circuit television. And that's where we have the -- they have the telephone intercom system where they can get in touch with us as well during the interview.

Q. Is the child necessarily aware of who the other professionals are who are teaming the case?

A. No, they're not.

Q. And when you talk about teaming the case, can

usually can get an idea of what's going on. They can figure it out, and we don't want kids to feel tricked or deceived, so we let the kids that are over five know that there is a camera there, unless there is strong objection for some reason to not do that. Kids who are under five or six, we usually don't let them know that it's there, because they just can't understand that yet.

Q. Do the interviews follow any kind of a format or does that -- are they just free-formed depending on the case?

A. We have a format that we follow.

Q. Can you briefly describe what that format is?

A. The format consists of five stages of an interview. And the first stage of the interview process that we do with kids is what we call rapport. And basically what we're doing with that child in that first part is building rapport with them. And what we do in that stage is try to build what we call the three C's, and what that is is to make a child comfortable, to establish communication between the interviewer and the child, and also to allow the competence of the child for their abilities.

And there is certain means that we use during that rapport stage where we draw pictures with the child. We draw a picture of their face. And by that we're trying to

bring out the competence by finding out if they know what's on the face. We also talk about their family during that time.

The second stage of the interview is what we call, touch-touch inquiry observation. I'm sorry, anatomy identification. And during the anatomy identification phase we use what we call my body drawings, which are just two simple sketches of people with no clothes on. And what we do is we just go through both of the pictures, first of all, to find out if they can distinguish between the genders, male and female. And then what we do is try to find out what their terminology is for parts of the body, so that we can use the same words that the child does, so that we're not calling a certain body part the name we do and the child is not understanding. So we want to call -- we want to use the same words that the child does so that they're understanding and we're on the same wavelength when we're talking.

The third portion of the interview is what we call touch inquiry. And that portion of the interview is where we start introducing different kinds of touches to the children by asking if there are touches that they get that they like and touches that they get that they don't like.

And the two main points of touch inquiry that we want to attempt to establish with the child is who did something

to them, if something happened, and what that was. From there, what we do is go into what we call the abuse scenario where we try to get as much detail as we can about what happened to the child, if something did indeed happen to them, and/or if that child is able to talk about something that happened to them. So that's the part where we try to get as much detail as we can.

From there we go into what we call closure, which is basically the ending of the interview. And in this part of the interview, we give safety messages to the kids about if this were to happen to you or if this were to happen to you again, what could you do, who could you talk to, who could you tell. And just letting them know that it's not their fault that this happened, if they report something happened to them.

And then we end the interview, thank the kids for coming in, and end the interview.

Q. I would like to turn your attention to Joshua Story. Do you recall, did you have occasion to interview a young boy named Josh Story?

A. Yes, I did.

Q. Do you know the date that that interview occurred on?

A. I interviewed Joshua on August 23rd of 1995.

Q. How old was he at the time?

A. I believe he was 6 years old.

Q. Now, did you have any discussion with his mother before you interviewed him?

A. Yes, I did.

Q. What did you observe about her emotional state or her demeanor?

A. One thing that I recall observing about Joshua's mother is that she was feeling responsible, that she did something wrong, and that she was basically feeling kind of guilty for this happening to her children.

Q. Now, did you do a staffing before you interviewed Josh or a teaming as you call it?

A. Yes, I did.

Q. What information did you have going into the interview of Josh about what occurred, and what was the source of that information?

A. The source of the information came from the law enforcement officers that were present during the interview. They were Beth Roberts and, I believe, Pat Moriarity from Richfield police department.

And the information that I had received going into the interview was that Josh's mother had come into a room where Joshua and his four year old sister Amanda were playing. And the information that we found was that mom noticed that Joshua had had his mouth on Amanda's genital area.

And from that, what Josh had told his mother was that he did this to Steve in the swimming pool. And he also reported that Steve had put his penis into Joshua's anus that time. So that was the information that I had going into the interview.

Q. Now, after you get information like this regarding what has allegedly happened to a child, when you go in to interview that child, what do you do to ensure that you're not looking for specific answers that comply with what you've already heard about the case?

A. Okay. When we go into an interview with a child, there are certain things that we do with the child. It's an objective interview. And some of the things that we do with kids is that we don't presume that there are any right or wrong answers. What the child answers to us is okay. We don't say, no, that's right or, no, that's not right.

And as far as questioning children, what we do is we start with open-ended questions. By that just meaning very general questions to see if the child can give us as much information on their own. And that's going to vary from child to child depending upon their age and their ability.

And from there what we do with kids is we go on to gradually asking more direct questions to get more specific information from them.

Q. Now, do you recall, did you have any conversation at all with Josh Story before the video tape started rolling on the interview that we're about to see?

A. The only thing that I did was with Josh before, as I have already stated, is I introduced myself and let him know that I was an interviewer which means I talk to kids and I talk to lots of kids. And then I began to just let him know about the camera being behind the mirror.

Q. Now, you talked earlier about the fact that one of the things you look for in the interview is the child's ability to answer questions. What did you observe in the course of the interview about Josh's ability to understand and answer questions?

A. What I observed about Josh is that although he is six years old, he seemed to be somewhat delayed compared with other kids his age. And in checking with Josh and the way he responded to certain questions, he seemed to kind of be responding to questions as would be more typical of like a three or four year old child.

He was -- had a very difficult time tracking. His responses to questions were very slow. And what it appeared to me when I was talking with Josh was that it took him longer to process information than it would the normal, average child where he really had to think about it before coming up with an answer. And there are a couple,

couple occasions during the interview where he actually responded to a question that I had asked before like a couple of questions before, and all of a sudden he came out with it.

So it seemed like he was just not responding appropriately to certain questions that I asked because they would come or they were questions that I had asked before. So he appeared, you know, on an average just to be more delayed than the average six year old child.

Q. Did he seem to be able to report his experiences?

A. He seemed to be able to report his experiences in a manner that would be a little bit less than a six year old, as I said before, like a three or four year old.

Q. And in the course of the interview, did you notice anything about his attention span or his degree of engagement in the interview?

A. There were occasions during the interview where Joshua just did not seem to be engaged with me, where I'd ask him a question and he just seemed to be elsewhere.

MR. DANFORTH: Your Honor, I would like to object.

THE COURT: Objection sustained.

THE WITNESS: Where he just seemed to be elsewhere.

THE COURT: Excuse me. The objection was sustained.

THE WITNESS: Okay. Sorry.

BY MS. QUAINTANCE:

Q. Were there things that you directly observed about his engagement with you?

MR. DANFORTH: Objection, Your Honor.

THE COURT: The tape will speak for itself. The objection's sustained.

BY MS. QUAINTANCE:

Q. Miss Martinetti, I'm showing you what's been marked Exhibit 1, and I ask you if you recognize that?

A. Yes, I do.

Q. What is it?

A. It's a copy of the video taped interview I did with Joshua Story on August 23rd.

MS. QUAINTANCE: I'd move for the admission of Exhibit 1.

MR. DANFORTH: I object Your Honor.

THE COURT: Okay. Exhibit 1 is received. It's my custom, Mr. Danforth and Ms. Quaintance, to seek stipulation between counsel that the tape itself may be the best evidence and constitutes the record of the tape. Is that agreeable with everyone?

MS. QUAINTANCE: We'll agree.

MR. DANFORTH: In terms of the stipulation that the interview is the best evidence?

THE COURT: Simply that the tape itself will be the record. Basically, what this means is that Shellie doesn't have to type the sounds coming out of the video machine so that the record--

MR. DANFORTH: I can stipulate to that.

THE COURT: As far as the tape will be the tape?

MR. DANFORTH: Yes.

THE COURT: That's permissible? Okay. That will be ordered then. Exhibit 1 is received. And the tape will stand as the record.

MS. QUAINTANCE: I'll just take a moment to move the television set.

THE COURT: Members of the jury, I made a determination yesterday that Joshua Story is unavailable to testify before you. You should draw no inferences from that determination that I made.

Thank you.

Ms. Quaintance?

(Whereupon, Exhibit 1 is played for the jury.)

THE COURT: Members of the jury, we'll take our morning recess now, and we'll move the equipment

A. Yes.

Q. Okay. And there really is no other tier than between that and the executive director given the size of the organization, is that what you are saying?

A. Yes.

Q. You say your job, generally speaking, is to interview children who are deemed by someone, suspected by someone of being child abuse victims.

Is it simply sexual abuse every time or is it also physical abuse?

A. As I stated before, we interview children who have been, allegedly, been sexually abused. We also interview children who have been witnesses to some violent crime. And we also, on occasion, interview developmentally delayed adults.

Q. Okay. In a given year, let's say this year of 1995, which is just closed recently, how many cases total did Corner House handle in terms of interviews?

A. In 1995 as far as interviews goes, I don't know what the exact number is. And because '95 just, was just completed. I can venture to say it was approximately 400 interviews in '95.

Q. All right. Do you have exact numbers for '94?

A. I don't have those numbers with me, no. I can get those for you if you need them.

me, but I don't have a problem with that.

MR. DANFORTH: Would you, Your Honor, direct that that be turned over to the defense?

THE COURT: Why don't you deliver one to the Court, if you would, Ms. Martinetti.

THE WITNESS: Sure.

THE COURT: And if you want to fax it over here, you can fax it over here as well.

How many pages is it?

THE WITNESS: If he's talking about just the interview protocol, the method that we use, one page. I can have that faxed over. I can call the office and have that faxed over, if there is someone there to handle that. Because we do have training this week, so they are involved in training this week.

BY MR. DANFORTH:

Q. Let me rephrase it lest there be any misunderstanding. I was not talking about or referring to -- obviously, when you took your training with Corner House, you used certain materials, did you not?

A. Yes.

Q. All right. Okay. It's those materials I'm making reference to. Are those made available?

A. Those can't be made available from when I took the training in 1991. It's a whole training manual. It's

about this thick (indicating). I have since taken the training several times since then.

Q. What I was asking is if you could make available to us here in the court a copy of that manual?

MS. QUAINTANCE: We would object. This is a late discovery request.

THE COURT: Yes. We'll talk about the issue at a break. It's not here right now. So let's move on.

BY MR. DANFORTH:

Q. What are the sections of that training manual? I'm kind of curious, what does it cover?

A. Several things. I really, without having it here, I really can't comment from 1991 what was in that training manual.

Q. I guess I'm referring to the one in current use?

A. The one in current use? You know, again, I don't want to misquote. I don't have an agenda in front of me. I can certainly get you an agenda as far as what the topics either are. I can name some off the top of my head, but it's certainly not going to cover the whole training.

Q. All right. Do you bear these things in mind when you do these interviews?

A. Yes.

Q. I'm just a little perplexed why you're having difficulty explaining them to us.

A. I'm not having difficulty, but as far as the actual outline of training and what the topics are, I can give you some of them. But whether I'm going to cover them all, I may miss one or two or three.

Q. Well, what can you tell me?

A. I can tell you that we, first of all, have an introduction of Corner House, a tour of Corner House. We have some background information about child sexual abuse, dynamics of child sexual abuse, how kids experience child sexual abuse. There is information regarding the interview protocol and many subject categories of interview protocol. There is information in the training that includes suggestibility, children's memory, the CAS scale?

A. I'm sorry, the what scale?

A. The CAS. C-A-S. There are several. Abuse. They're five days' worth.

Information about from other outside sources regarding legal issues, regarding medical issues, regarding child development, regarding using age-appropriate questions about children. I mean, there is a whole gamut of information that we teach that I just couldn't tell you without actually showing you the agenda. But those are some of the things.

or mental retardation or, you know, whatever. The whole gamut.

Q. Attention Deficit disorder is sometimes usually acronyized as A.D.D., is that right?

A. Or A.D.H.

Q. And the H. in that case stands for what?

A. Hyperactivity.

Q. All right. Essentially those two phenoms, hyperactivity and attention deficit, are seen as essentially the same things or different facets --

MS. QUAINTANCE: Objection, relevance.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. All right. Let me put it to you this way, what were your observations in the abilities category vis-a-vis Joshua Story here?

MS. QUAINTANCE: Objection. The tape speaks for itself.

THE COURT: Rachel, would the jurors excuse us for just a couple moments please?

(Whereupon, the jury is excused from the courtroom.)

(Out of the presence of the jury.)

THE COURT: Mr. Danforth, I'm asked by

Shellie to ask you if you could -- I think it's not only a function of you getting softer as you trail into the ends of a sentence, but it comes quite rapidly. And I think there is difficulties at this side of the room of hearing you, sir.

I don't know where this is going, but let me tell you what my view is about it. I didn't -- I sustained a couple of objections that you made to Ms. Quaintance asking about observations, and so on, of things that were on that tape.

You're now getting in -- and I would not have let Ms. Quaintance ask this witness for her determination, I would have sustained any objection. I think she probably understood that from my comments quite some time ago.

You're now starting to open a door right -- I don't know if it's a door you want to open or not. But if you get into her analysis and evaluation of all this, you're pretty soon going to have the possibility of her testifying to this jury as to what, if any, determination she made about whether sexual abuse occurred and whether this young man was honest in his reporting of it.

So I don't -- maybe you need to tell me where you're going with this.

In addition, there is foundation issues and scope of direct examination issues that are involved here. This witness did not come and give expert testimony about

Q. Could you explain the common thread theory?
A. The common thread theory is when an interviewer will ask a child similar questions in different means and look for consistency between those different means.
Q. I'm sorry. I may not have heard you. Asking?
A. I'm sorry. Asking a child similar questions by different means.
Q. How do you mean by that?
A. One way that we may ask a question may be to verbally ask the child. And when I'm talking about a question, I'm talking about -- or when I'm checking for consistency, I'm checking for consistency with the core element of abuse. Not every single question is asked. So we may ask a child to explain what happened to them verbally. Another way that we may ask a child to explain what happened to them is to have them demonstrate with an anatomical doll. We may, on occasion with a younger child, ask them to show on their own child. And another way that we may check for consistency is to ask the child if they told someone else about the abuse or and what they told that person.
Q. Before you went into this interview, you had certain conversations with other people, did you not, about Joshua Story and about the circumstance that brought him to Corner House, is that correct?

about them at the foot of the day today.

MR. DANFORTH: Let me just scan my notes here for a second, Your Honor, and I can answer that one.

I think one thing that I should take care of right now is that I was making reference to articles by Dr. Underwager. And as a matter of furnishing discovery, I would like to have an opportunity to give these cites. This will only take a second. There is an article entitled Techniques for Interviewing Children in Sexual Abuse Cases.

THE COURT: Do you have these articles --

MR. DANFORTH: Yes, I do.

THE COURT: -- themselves?

MR. DANFORTH: But as I was indicating previously, Your Honor, these are the ones that I have marked up with all sorts of work product. They're commonly available in any library that has even basic things about psychology.

MS. QUAINTANCE: Where is this article from?

MR. DANFORTH: Journal of Forensic Psychology, Volume 1989, which might alternatively have Volume Number 7 on it, and pages 43 through 69.

There is additionally an article called Sexual Abuse

Allegations in Divorce and Custody Disputes. That is apt because it concentrates on questions of created allegations. It is located in -- by Behavioral Sciences and the Law. Everybody knows that one. Volume 9, page 451.

THE COURT: You know, again, on this kind of stuff, Mr. Danforth, I don't think Ms. Quaintance is going to be able to read any of these books from now until the end of the day anyway. So if you wish to, and you trust Rachel with this, maybe Rachel could take that and just copy the citations down, give you the pad back, give the citations to Ms. Quaintance, and we have got it done without taking a lot of court time.

MR. DANFORTH: I just have one more, Your Honor.

THE COURT: Oh, okay.

MR. DANFORTH: I'm sorry. If I may finish that Behavioral Sciences in Law, Volume 9, page 451, et cetera. And then the last one is actually a chapter in a book, and the book is entitled Coping with Psychiatric and Psychological Testimony. It is by J. Ziskin, located in Volume Two of that work, at Pages 13, 15 and following. It is the substance of Chapter 23, entitled Special Problems of Sexual Abuse Cases.

All of these things were authored by Dr. Underwager.

there is that although you called that topic consistency, it really is sort of internal consistency, isn't it?

A. That's correct.

Q. It only just has to do with what's going on within the story line as narrated to you right there and then?

A. Within the interview, right.

Q. Okay. Thank you. It does not have any implications towards whether that's consistent with external things?

A. That's right.

Q. Now, you'd also gone -- we left that topic and you were talking about your conversation with Miss Terese Story, the mother. You indicated that was very brief, under five minutes. And mostly I think you were trying to say that you were telling Terese about the the Corner House process.

MS. QUAINTANCE: I'm going to object. This is not a question, this is a narrative.

MR. DANFORTH: No. No. I'm coming to it right now, Your Honor. I was about to ask what Terese may have had said to you in that period of time?

THE WITNESS: I don't recall what Terese said to me. I recall in my conversation with Terese that she appeared to feel responsible for what had happened

falls in there because we need to talk about business days and not weekend days. Corner House isn't open on the weekends.

Q. Okay. I understand that. If I were to tell you that your intake form tells us that the interview date is Wednesday, August 23rd, 1995, does that assist you?

A. Well, if I can add fast. It would be easier to look at a calendar.

Q. Well, of course. Eight days hence would have been--

THE COURT: Why don't we assume the jury knows, can backtrack from Wednesday eight days.

MR. DANFORTH: Yes.

THE WITNESS: I can give you our intake procedure as to how we schedule interviews if that would be helpful.

BY MR. DANFORTH:

Q. Yes. Please tell me about that?

A. What we like to do at Corner House, our procedure is that we attempt to schedule an interview first of all at the first available appointment date. And there is also other factors that come into play there with the family availability or the referent availability. Because we do attempt to do the multi-disciplinary team so that we want to get all of the players involved at one time.

So if for some reason the referents or the family cannot show up on that first available date, we make every attempt to schedule it, you know, as soon as possible which is convenient for the parties.

Q. Okay. And you're telling me in this particular case there is nothing in the records that would indicate, of the records you possess there, as to why this was eight days out, is that correct?

MS. QUAINTANCE: Objection, asked and answered.

THE COURT: Well, I'm not sure. You can answer the question.

THE WITNESS: That's correct.

BY MR. DANFORTH:

Q. Okay. And in other words, it might have been the unavailability of the police officer at a prior date?

MS. QUAINTANCE: Objection, asked and answered.

THE COURT: Sustained. Lacks foundation.

BY MR. DANFORTH:

Q. And the description of the presenting problem here that's on this form, that would have been one that would have been provided to you by the person who called and referred this case, Investigator Roberts?

A. At Corner House.

Q. Now, the usual method of doing business as this intake form is prepared is to immediately set that interview date, is that correct?

A. Excuse me?

Q. I say about the interview date setting, that's done at the time this intake form is prepared, is that correct?

A. That's correct.

Q. Okay. So that was done also by Miss Mary Hunt?

A. Yes.

MR. DANFORTH: Okay. I'd move for admission, Your Honor.

MS. QUAINTANCE: We would object. It contains hearsay, and there is a foundation issue as well.

THE COURT: The objection's sustained. It's hearsay.

(Whereupon, a discussion was held off the record between defendant and stand-by counsel.)

MR. DANFORTH: Your Honor, I realize it's a little unusual, but just for the sake of efficiency, I'm wondering if Ms. Quaintance and I could approach the bench on this issue?

THE COURT: All right.

Q. But the second question is the one I want you to answer.

A. Okay. Okay. Statistically, interviews that are done at Corner House with a finding of abuse did not occur would range in the 10 to probably 10 to 15 percent of the total cases of child sexual abuse. We also have two other findings.

Q. Well, you've piqued my interest. What are the two other findings?

A. Abuse occurred and inconclusive.

Q. Uh-hum. What is the percentage of inconclusive?

A. Percentage for inconclusive, this varies. Generally, it ranges from about 20 to 25 percent.

Q. Now, certainly you have familiarity with your own particular cases that you handled last year. Would you say that there is any differentiation between the statistics you've just cited that would be worth mentioning and your own personal running box score on this?

A. My own personal statistics fall within that same range.

Q. You mentioned that most of the intake at Corner House is from referral agencies, typically law enforcement officers and Child Protection agents, is that correct?

A. That's correct.

Q. Another identification, who's Carrie Wilson, is that correct?

A. Carrie Wilson is an Assistant County Attorney with Hennepin County.

Q. Now, I believe that there was reference in the papers regarding Corner House's interview to the presence of Mr. or Miss -- who's Carrie?

A. Carrie is a female.

Q. Miss Wilson was present, I take it, at the staffing?

A. Yes. That's correct.

Q. Does Miss Wilson have an on-going role at Corner House?

A. Miss Wilson was the County Attorney who was assigned to Corner House for a short period of time. She is no longer with Corner House at this time.

Q. Okay. Now, at the time of this interview on the 23rd, I take it from your comment then is it accurate to say that the Hennepin County Attorney's office had a regular liaison-type person, be it Carrie Wilson or some other person on a regular basis?

A. That's correct.

Q. That County Attorney person literally being located at Corner House?

A. That person technically is located at the

County Attorney's Office. However, they come to Corner House to sit in on the multi-disciplinary team.

Q. Okay. Do they do this in every case that Corner House has?

A. In most cases, yes.

Q. Okay. So the rate of upwards of 400 cases every year, I suppose that means a fair amount of presence, correct?

A. That's correct.

Q. And it's typically the same one except when they rotate out, is that also correct?

A. That's typically correct.

Q. How long was Miss Wilson your liaison with the County Attorney's Office for?

MS. QUAINTANCE: Objection, relevance.

THE COURT: Overruled.

THE WITNESS: I'm not certain of her time. I would estimate about six months.

BY MR. DANFORTH:

Q. Okay. Do you know what the rationale for having a County Attorney representative at Corner House in these team meetings was?

A. The purpose of the multi-disciplinary team is or, actually, the persons involved in the multi-disciplinary team are those that are involved in the

A. The questioning techniques that we use we call the process of inquiry where we begin by asking children general, open-ended questions and proceed to more focused, direct questions.

Q. Could you give me an example of a general question?

MS. QUAINTANCE: Objection. The tape speaks for itself.

MR. DANFORTH: It doesn't speak for itself as to what is a general question.

THE COURT: Overruled.

THE WITNESS: What happened --

BY MR. DANFORTH:

Q. Okay. Thank you.

A. -- would be one.

Q. What would be an example, on the other hand, of a more focused, direct question?

A. Did he touch you on the clothes or the skin.

Q. Okay. Would it be another question that would be considered to be focused over direct such as one from the, I wouldn't call this a transcript, but my notes include quotes, a quote from the tape to the effect of, "How did Steve's mouth get to your poopie?"

A. I don't know. Where is the transcript? I'm sorry.

Q. We don't have a transcript. I'm just quoting.

A. Can you repeat the question?

Q. The question was whether or not -- well, my question or the question I just quoted?

A. Both.

Q. Okay. The question I just quoted from the tape was --

MS. QUAINTANCE: I'm going to object to this. It's the jurors' job to decide what's on the tape not --

THE COURT: The objection is sustained.

MR. DANFORTH: Your Honor, I categorized the question.

THE COURT: The tape is in evidence, Mr. Danforth.

BY MR. DANFORTH:

Q. All right.

The final phase of this protocol or process of the interview called the closure phase has to do with things that are called safety messages and assurances that something is not the fault of the kid, the child, and expression of thanks for coming in, I take it.

It's not your contention, is it, that any of those kinds of things have really anything to do with an exploration of the facts in a given case, is it?

A. The purpose of it is not for that, no.
Q. Now, what is the purpose, speaking of purposes, of the explanation, if you want to call it that, by the investigating officer at this team staffing prior to the interview?
A. I'm sorry. Can you repeat that? What is the purpose of?
Q. What is the purpose of being informed or advised by the investigating officer just prior to the interview. What function does that serve?
A. The function that it serves is so that I have an idea of what the allegation is.
Q. Okay. Why would you need that?
A. To be able to allow the child to tell of their experience.
Q. Okay. In what way does it assist in that regard?
A. The way it assists in that regard is that most children, if you do not ask the question, they'll not give you the information. So in order to get the appropriate -- or in order to allow the child to tell of what their experience, you need to at least somehow before they walk out of the room ask the question.
Q. The information --
A. Children aren't able to just respond to what

In your direct testimony earlier, you had made reference to Josh's ability to understand questions. And you made some observations in that regard. You had indicated, for instance, that you thought his response pattern was more in the nature of a 3 to 4 year old. And then you went on to say that you thought he had difficulty tracking.

What do you mean by that term?

A. What I mean by that term is that he had difficulty processing questions. And as far as if I ask a question and whether he was with me and what I mean by that, whether he was understanding what I was saying or whether his mind set was elsewhere at the time.

Q. Okay.

THE COURT: Excuse me, Mr. Danforth. During the break the jury indicated or jurors indicated to Rachel that they were having trouble from time to time hearing you and also me. It doesn't matter if you can hear me. Nobody pays attention to me anyway. But with regard to yourself, Mr. Danforth, if you could continue to speak up please.

MR. DANFORTH: Yes, indeed. Thank you, Your Honor.

BY MR. DANFORTH:

Q. All right. That's difficulty tracking. You

their experiences. That's not what you meant?

A. When I put that in Josh's synopsis, that's particular to Josh, that he appeared to be able to report his experiences.

Q. Experiences in general? All experiences?

A. No.

Q. Okay. You're then using the words experiences to talk about accusations of sexual abuse?

A. Repeat that.

Q. What kind of experiences are you talking about when you say that someone who comes to Corner House is observed to be able to report his or her experiences?

A. What I'm referring to there by saying that Josh is able to report his experiences, are that the statements that Josh made during the interview appear to be reliable and credible.

Q. All right.

A. Appear to accurately reflect his experiences.

Q. Well, that subsumes a great deal more. But let me just ask you this: let me give you a hypothetical. Let's suppose that I make the statement I went fishing yesterday, would you make the observations that because I was able to tell you that, I was able to report my experiences to you?

MS. QUAINTANCE: I'm going to object.

A. No, it did not.

Q. Okay. Okay. Very shortly after that there was a portion of the interview in which you asked if it would be hard to talk about touches, and you assure that it's okay to. And you follow that up by essentially questions in the nature of, as I understand it, of what you call a safety message, what would you do if someone touched your poopie and pee, I think is the way you put it.

Being that that's a safety message, what was your purpose in putting it at that point in the interview?

A. I'm not sure which point you're referring to.

Q. And it's right before you directly ask the question for the first time, "Did somebody touch these parts?"

MS. QUAINTANCE: I'm going to object to relevance of what her purposes was.

THE COURT: Well, can you answer the question?

THE WITNESS: Only if I understand where exactly he's talking about. If you're talking about right before disclosure was made, common practice that I do with children, if I ask a question about whether they had been touched in those places they don't like or that's not okay, and they say no, I typically ask children what would you do if that happened or words similar to that, and see

what their response is.

And sometimes children will say I would tell someone. Then I would ask who did you tell and/or who would you tell. And if they were to -- this is just hypothetical now. If they were to respond that they would tell their mother or somebody, I would ask the child, did you ever have to or want to tell your mom about touches to those areas. And if they say yes, I will say what did you want to tell your mother about those touches. It's an attempt to get a disclosure out of the child.

BY MR. DANFORTH:

Q. It is an attempt to get a disclosure?

A. Yes.

Q. And I take it it's a choice that you do because you found that it tends to maximize the potential of getting statements to that effect?

A. That's true, to an extent. And it also is a less interrogating way to talk with children instead of continuously asking them questions about whether they were touched.

Q. Okay. Now, I'm wondering if you paid much attention when Josh said quote, "Amanda called it a hot room." Did that, in any event, in any way alter how you --

MS. QUAINTANCE: I'm going to object. I'm not sure that's a proper characterization of what was

THE COURT: Okay. And is it the date upon which you made the report or the time upon which you made the report the time in which you took the statement from Josh?

THE WITNESS: Yes, I did.

THE COURT: Who else was present?

THE WITNESS: The mother and the little sister.

THE COURT: And Josh and yourself?

THE WITNESS: Yes.

THE COURT: Was any other law enforcement officer there?

THE WITNESS: No. I was by myself.

THE COURT: And was the statement taken from Josh when all of you were in the same room?

THE WITNESS: That's correct.

THE COURT: Prior to you asking any questions or taking any statement from Josh, did the mother or the sister say anything about the incident?

THE COURT: The mother and I spoke before speaking with Josh.

THE COURT: Was that within or without the hearing of Josh?

THE WITNESS: Without.

THE COURT: Do you know of any

conversations that anybody had with Josh prior to you taking his statement?

THE WITNESS: No, I do not.

THE COURT: Did anybody tell you that they had had any conversation with Josh prior to you getting there?

THE WITNESS: No.

THE COURT: I mean, I assume somebody did have some conversations with him prior to you getting there because there was a report to law enforcement, but you're not familiar with the contents or the surroundings of those conversations?

THE WITNESS: Other than him and his mother, no.

THE COURT: You, with respect to him and his mother talking, are you familiar with the surroundings of him and his mother talking before you got there?

THE WITNESS: Yes I am.

THE COURT: Who did you get that information from?

THE WITNESS: From the mother.

THE COURT: What did she tell you about that?

THE WITNESS: She said that Josh and

his little sister were playing, and that she observed some activity. And then she confronted Josh, and he had told her that there is an incident that occurred. And then that's when she called the police and gave me that information.

THE COURT: Is that all that you recall about the conversation wherein the mother was telling you about the conversation she had with Josh?

THE WITNESS: As far as, you mean, as far as going into the facts of what actually occurred?

THE COURT: What I'm talking about is you were informed that there had been some previous conversation, by previous, prior to you getting there, between the mother and Josh?

THE WITNESS: No. Other than the conversation between the mother and Josh, no.

THE COURT: Okay. All right. And you've now told me everything that you can recall being told about the conversation between the mother and Josh?

THE WITNESS: Yes.

THE COURT: Okay. Now, when you talked with Josh, as best as you can recall, what did you say to him and what did he say to you?

THE WITNESS: Well, first, I got permission from the mother asking if I could use a doll.

And she consented. And we sat down together at a table, and he said that -- I asked him where had you learned how to kiss your sister the way mother had seen you do it. And he says, "I learned it from" John or Mr. Danforth. Who later is the mother told me --

THE COURT: Mr. Danforth's name is Steve.

THE WITNESS: Steve. I'm sorry. Steve Danforth.

Basically what I did is I put the doll down on the table and I says, "Where did you just kiss your sister?" And he says, he pointed to the doll's groin area. And then I says, "Where did you learn that?" And he says -- later, I found out it was Mr. Danforth from the mother.

I says, "What made you do that?" And he says, "I kissed him before in the swimming pool area." And I says, "Did you have your clothes on?" He says, "No," he says. I said, "Did you have any swim trunks on?" He says, "No." He said he was naked. He said, then he said he made -- he flipped the doll over on the table, and then he says that he stuck his pee, and he pointed to the buttocks of the doll.

THE COURT: Now, tell me the surroundings in which you learned or there was any discussion of Mr. Danforth?

THE WITNESS: I'm sorry?

THE COURT: When did you first learn or when did Josh first identify Mr. Danforth in this conversation?

THE WITNESS: He says that he was a friend of the family's, basically. When he said that he made, he made, he pointed to the groin area, and he said -- I don't remember specifically what he called them, what he referred to them, but the mother --

THE COURT: From the time that you arrived at the house until you, until Josh first had some conversation about Mr. Danforth, did anyone else in the room mention Mr. Danforth or Steve, the name Steve or the name Mr. Danforth?

THE WITNESS: No.

THE COURT: Was the first time that the name either Steve or Mr. Danforth came out in conversation when Josh identified the name?

THE WITNESS: It was the mother.

THE COURT: Okay. How did that come about? How did the mother identify him?

THE WITNESS: Basically, before my contact with Josh, she had explained to me some 4th of July gathering, and then it was a friend of the family that lived in Wisconsin. And she said it was Danforth.

Terese supplied?

A. No when I sat down with the victim, I asked him where he learned that, and he said "Steve showed me at the swimming pool." And that was before the doll. And then I had asked the mother previously if I could use the doll. And at the time that I sat down with the little boy, his mother never said a word. And he specifically stated you, which I later learned from the mother, your last name, that you lived in Wisconsin, you're 45 years old, et cetera.

Q. All right. In other words, what the child said was the name Steve and without a last name?

A. That's correct.

Q. Okay. And really there wasn't any other identifying information supplied by the child in terms of living in Wisconsin or any other identifying information?

A. No.

Q. The rest was supplied by mother?

A. Exactly.

MR. DANFORTH: I have no further questions.

THE COURT: Ms. Quaintance, anything?

MS. QUAINTANCE: Your Honor, I think that it's clear from the officer's testimony that he has a specific recollection of the events. There is no indication that there was any undue suggestion in the

had her children stay on the living room couch, and they were watching T.V.

Q. And what did she tell you?

A. She told me that she had observed her little son, I mean, and her little daughter playing, the daughter being two years younger. And she says that she had turned the corner, and they were in the living room. And the girl was on the couch. And that she observed Josh kissing her in her vagina area with his clothes -- with her clothes on.

Q. And did she say whether she had inquired of the boy at all about that?

A. I'm sorry?

Q. Did she tell you whether the mother had asked the boy any questions about that?

A. Yes.

Q. What did she say about that?

A. She says, "Josh, where did you learn that from?" And he says, "I learned it from Steve." Going further, she said that they had been at a swimming pool area a month prior, and that's where she learned it.

Q. That's were she learned it or that's where it happened?

A. That's where he learned it.

Q. Oh, okay. Did you learn from her anything about who this Steve person might be?

priority three calls, which this then was a report, so this was dispatched to me as a CSCR. And basically the remark stated that mother had called stating that she had, that her son had been raped, and she wanted to see a squad.

Q. Okay. That gave you, essentially, the priority position to take this case. And that's --

A. Yes. I was given the address.

Q. And your understanding of these processes, the police --

A. It was my duty to respond to calls, yes.

Q. Oh, quite clearly, but, I mean, the process by which it ended up being your assignment, I'm asking you, is simply that you were driving alone and that gave you sort of a higher priority to take this kind of assignment?

A. Yes.

Q. Now I understand.

It's not, is it the case, that any other factors were involved in that, such as any experience on your part with this kind of case, for instance, or anything else?

A. Nope.

Q. Okay. Now, as near as you know, had either Terese or Gary Story previously contacted any Minneapolis police department staff at any time for any reason?

A. Not to my knowledge.

Q. Would this have been something that could have

been easily investigated by you, just a radio call or something?

MS. QUAINTANCE: Objection, relevance of prior calls.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. All right. Then was this the very first occasion that you had occasion to speak with either Gary or Terese Story, or for that matter their children, Josh and Amanda?

A. Yes, this was my first contact.

Q. Okay. There is also another son of just Gary Story and his name is Larry Story or Larry Dumbros (ph). And I'm not sure which, does either of the those sound familiar as somebody you've had contact with?

MS. QUAINTANCE: Objection, relevance.

THE COURT: Well, did you have any contact with such a person that night?

THE WITNESS: No, just the two children and the mother, Your Honor.

BY MR. DANFORTH:

Q. Evidently, if I understand your accounting right here, it seems that you really didn't speak any words directly with Amanda at all, is that correct?

A. I'm sorry. Amanda is the sister?

Q. I'm sorry, yes. Amanda is the little boy's little sister.
A No, I never spoke with her.
Q. She was the one who was also in the living room. And you're saying then that you never spoken with that little girl?
A. That is correct.
MS. QUAINTANCE: Objection, asked and answered.
BY MR. DANFORTH:
Q. It was clear from the explanation, however, of the mother, Terese Story, it was not, that reference to an incident of cunnilingus that she found Josh in was an incident that she was stating unequivocally was an incident that he had engaged in with Amanda, his sister, the one sitting there, is that correct?
A. Yes. She observed it.
Q. That's what she said?
A. Yes.
Q. When you -- okay. You were greeted, is that true, by Terese at the door when you arrived at the Story's apartment?
A. That is correct.
Q. Okay. And when she answered the door, the three of them were in the living room, is that right?

A. The two children were by her side.

Q. Okay. At that moment, as you observed Josh from the moment of the greeting forward, what is your impression regarding his mood and mental state at that time?

A. He seemed like a normal six year old boy. It would be nothing out of the ordinary.

Q. As far as mood and mental state?

A. Exactly.

Q. And, likewise, with regard to Amanda at that point, what were your impressions about her mood and mental state at that point?

A. She seemed like a normal four year old little girl.

Q. Okay. Did you make any observations more specifically about whether or not there seemed to be anything that could have passed for an expression of embarrassment?

A. On whose part?

Q. I'm sorry, on the little girl's part?

A. No.

Q. How about on the little boy's part?

A. Other than seeing an uniformed officer there in the home, which I'm sure they haven't seen, no.

Q. Okay. What -- what seemed to be the way they

were expressing or reacting to that?

A. Well, as I was speaking with the mother, they were both standing around me pointing to various pieces of equipment on my duty belt.

Q. Let's talk a little bit more about that interview that you had with Josh. After Terese had given this sort of summary statement to you in advance of what she had found Amanda and what she said that she had heard from Josh, what exactly happened next?

A. Basically, it was my idea to use the doll. And I asked her permission and she gave her consent. And I asked her, "Please don't say anything while I speak with Josh." And I called him over from the living room. And the mother, Josh and I sat at the kitchen table.

Q. Okay. If I could just ask you to pause in that regard at this point and ask you what it was, if anything, in your experience or knowledge basis that gave you the idea to use a doll at that point?

A. Just came from the top of my head.

Q. Okay. It's not the subject of any training or anything, it's not official police procedure then, I take it, is that right?

A. No.

Q. Okay. So at that point you had sat at the table, and what was the very next thing that happened?

A. I looked at Josh and I says, "Hi, Josh. Can I ask you some questions?" And as a little boy, you know, he said, "Yeah." And he had the -- I had the doll in my hand. I put the doll down and I says, "You were playing with your sister too." And he goes, "Yeah, I was." And I says, "Where were you at?" And he pointed to the living room where they were both sitting watching T.V. when I was speaking with mother.

And I says, "Mommy says you were kissing your sister." And he laughed, and he says, "Yeah." And then I says, "Well, can you show me where you were kissing your sister?" And he pointed to -- he used his finger and pointed to the doll, which was laying face up, on the doll's groin area.

Q. And by the way, did you use any kind of audio or videotaping during any of this interview?

A. No.

Q. And another question that's kind of related to that, did you have at any time occasion to make any notes about this other than what we see in that report?

A. No.

Q. So, literally, this was all verbal until you wrote your report later, is that correct?

A. That's correct. I, as far as the specific information about your address and your name and your date of birth and her name and her date of birth and Josh, I

that you found him unavailable. And, as you said, you didn't tell the jury this. And my apologies, it was a mistake, although, I guess I can see that it wasn't a very careful one, but, in any event, I thought you had at the last minute added that to the explanation. My apologizes again.

In any event, whatever you said to the jury, it's clear that basis included here is a finding by the Court of incompetency. And I would just request that, Your Honor, put that on the record at this point.

THE COURT: Well, I don't know exactly what the term means. I indicated yesterday that absent further evidence of the child's capability of being a witness, as that competence term is used as a rule of evidence, not as rule of mental health --

MR. DANFORTH: Okay.

THE COURT: -- that I would not allow him to testify. And that should not be misread into being some either a mental health sort of pronouncement, which was not done, nor a pronouncement as to how -- what his capability may have been on other occasions.

I made that decision on the basis, primarily on the basis of his failure to indicate to me an ability to understand the meaning, the intellectual meaning as we were talking of truth. And that doesn't mean that I concluded

he doesn't know what the truth is or he's incapable of recounting things truthfully. But at that particular time yesterday when I raised a couple two -- three, fingers and asked him, "I've got two fingers up, is that true," and he said "Yes," and when I asked him to explain the concept of truth to me, and he was obviously disengaged from the conversation I was having with him, he was unable to establish to my satisfaction enough understanding of that term to go forward.

I reflected on the fact that in these other encounters he was not sworn to tell the truth like he would be in a courtroom. And I don't find any relationship between the fact that he at that moment couldn't explain the concept to me and his inability to recount things truthfully.

And so that leg of it, however, wasn't shown in the hearing. We were on the record with a hearing, and whatever the evidence is, is the evidence that I have to make a decision on.

Secondly, in terms of his ability then to recall events and communicate them back to me, he did not have that ability sufficient in my view to warrant him being a competent witness. Because when asked about what he did for lunch and what he had for lunch and what he did that morning and what he did yesterday at school and so on, he

videotape as part of discovery.

THE COURT: Could you consult with Mr. Powers about that, Mr. Danforth, and see if that can be arranged over the weekend?

MR. DANFORTH: Yes, I will certainly do everything in my power to make that arrangement.

THE COURT: Maybe the record should reflect real quickly the issue on Josh Story's tape, and it's the same with respect to Amanda Story's tape. And I'm mindful of the issues about the need not to suggest answers and not to lead children, and the need at times to obtain information from children that have various difficulties in providing it on these subject matters. But in light of that understanding, and in light of what the literature provided with respect to that, I found the responses of the children in both tapes to be spontaneous, indeed, considerably spontaneous with respect to their engagement with the person that was asking the questions and their other activities as they were moving about the room.

I found there to be a relative want of leading or directed questions that seemed to be suggestive of any answer. I was not aware of any apparent motivation for these children to fabricate at that point in time. I appreciate, Mr. Danforth, and I have to tell you I had not thought about it until today, the issue of some concern

about a child maybe receiving the displeasure of their parent because they have been involved in essentially acting out with a child. I was not considering that motivation. I quite frankly doubt in terms of how I've now gotten to know Josh and how I watched the tape that I would have thought there was much motivation like that going on in that room at that time.

And with regard to the use of adult words, I did consider the fact that there may have been some sexual acting out, and there may be a source of knowledge about this that may or may not be related to any allegations respecting you. And I'm understanding your concern about the words pee and poopie, and so on, not being adult words. I agree with you.

I don't think that's necessarily the test. I think the test is not only the use of words but also the recounting of events that would not necessarily be adult-like/child-like events that they would not likely be recounting but for some transactional activity, sexual transactional activity that they have had in their past.

So when I looked at all of those things and also reflected on Josh yesterday, and in some kind of a way I have to tell you that my meeting with Josh yesterday made me more convinced of the resistance to suggestibility that this young boy probably possesses from time to time. So