**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## TRIAL TRANSCRIPT,

## Volume III

## February 20, 1996

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

amount of weight to be assigned to those statements is every bit the center of this case. And because it is, that's why I maintain that there is error in that ruling.

And the business about not having this witness suddenly unavailable at the time that I made this, I mean, after the time that I made this opening statement to the jury, when in fact proper procedure would have been to assess this witness' credibility before we gave opening statements. And that I might add the chronology of this was done on the State's request, essentially as what she argued was an accommodation to her witnesses so they would only have to be here once, and on nothing more than that, I think that I was put in a position where there was a great surprise, great prejudicial effect by the sudden unavailability of the witness and way the jury was instructed about that. And that is the basis for my motion for mistrial.

THE COURT: Okay. Well, there was no objection by the defense with regard to that scheduling. And, indeed, the scheduling was in part to accommodate your request for some additional time to start, Mr. Danforth. And that was a decision I made in the afternoon, basically making it so as to try to provide some additional time because you wanted additional time to review those tapes, and so on. It was made in this courtroom off the record between you and Miss Quaintance and myself.

the mother that you suggested getting the doll, and she produced it, is that right?
A. Yes.
Q. Now, at that point that you brought Josh in to talk to him, how long a period of time was that that you were talking with him?
A. When I sat down with him in the kitchen?
Q. That's right.
A. Maybe five, ten minutes at the most.
Q. Okay. Is it your best recollection that it was closer to five or closer to ten minutes?
A. Closer to seven.
Q. Now, if you were investigating a serious felony crime that you would have in, like, would be something within the jurisdiction of the Minneapolis police department, wouldn't you typically take more time to interview a complainant witness than that?
A. I had received the background from the mother. I didn't feel necessary to question the six year old anymore than I needed to.
Q. Okay. How long were you talking with the mother then?
A. Ten minutes.
Q. So really the truth is that you had received all of the details and information from Terese. And

essentially all that you needed to talk to Josh for was to gain confirmation or corroboration of that, is that correct?

A. Basically, yes.

Q. Okay. Now, during that time that you were with Josh, did he seem like he was just kind of antsy, wanting to get it over with, go out and do something else?

A. No. As a matter of fact, he was quite interested in my uniform.

Q. Okay. And was he talkative during that interview?

A. He was more responsive. He wasn't -- he didn't initiate any type of comments or anything.

Q. Okay. Were his responses typically one word, yes, no, that sort of thing?

A. Brief sentences.

Q. Okay. Two, three, words, that sort of thing?

A. Sure.

Q. Okay. During the time that he was speaking with you, did he seem amused?

A. Amused?

Q. Um-hum.

A. As far as my uniform, yes, but when I asked him the questions about the incident, no, he didn't seem amused.

So then he says -- I says, "Well, what did Steve show you?" And he says, "He made me kiss his pee." And then again he pointed to the doll's vagina area. And then I said, "Is there anything else Steve showed you?" And he says, "Yeah." He grabbed the doll and flipped it over on its stomach. And I was observing this, and he goes, "He stuck his pee right there." (Indicating). And he pointed to the dolls's buttock area. And then I said, "Is there anything else?" And he says, "No."

And that was the end of my conversation with Josh.

Q. Okay. So it was very short, wasn't it? He did say that there was nothing else then, didn't he?

A. Yes.

Q. All right. And the method by which you gleaned the information to ask these questions that you've just told me all came from information that Terese told you, is that right?

MS. QUAINTANCE: Objection, asked and answered.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Now, particularly regarding the matter of the flipping of the doll over, was that a sudden move that Josh did?

A. He did it right after I asked him, "Is there

constant references to cunnilingus. That's not what what's been described.

THE COURT: Sustained. Why don't you rephrase the question, if you would, please, Mr. Danforth.

BY MR. DANFORTH:

Q. All right, Your Honor. What did Terese tell you about the time when this incident of kissing, we'll call it, had occurred?

A. Just prior to calling 911.

Q. Okay. Do you have in your notes when 911 was called?

A. I have the time it was dispatched, 2120 hours, which is 9:20 p.m. And whether that was a pending call, I'm not sure, but that's when I was dispatched.

Q. Okay. Explain what you mean by a pending call, please?

A. Our emergency calls are prioritized. Priority one is an incident where there is someone's immediate threat of physical harm is in progress compared to a priority 4 call, a burglary of a garage that occurred a week ago and somebody just got home from vacation.

So I'm not sure what priority this call was, but sometimes they may hold them 10, 15 minutes because we're so busy, and they might continuously dispatch priority one calls. It depends how the evening is.

A. It's my standard procedure to notify a supervisor any time there is a rape situation regardless of the situation.

Q. Okay. And how did Terese refer to me by way of introductory explanation of who I was with regard to the family?

MS. QUAINTANCE: Objection, asked and answered.

THE COURT: No, overruled. You can answer.

THE WITNESS: I'm sorry. She said you were a friend of the family.

BY MR. DANFORTH:

Q. Okay. Did Terese make any reference to any time in that summer when this family had spent any time at my residence in Prescott, Wisconsin?

A. She never mentioned Wisconsin other than that's where you lived.

Q. Thank you. Okay. Did either Terese or Josh ever make any reference to any times prior to that evening when Josh had complained about any misconduct?

A. Just the swimming pool incident.

Q. Okay. But my point being is that the only time when any reference was made of anything improper having happened was not earlier but only just on the evening in

question before, just before you got there, is that right?

A. Yes.

MR. DANFORTH: All right. Your Honor, I have no further questions at this time.

THE COURT: Miss Quaintance?

REDIRECT EXAMINATION

BY MS. QUAINTANCE:

Q. To your knowledge, Officer Castilleja, is there a division of the Minneapolis Police Department which specifically investigates allegations of child abuse?

A. Yes.

Q. And is that where you believed your report would go?

A. Yes. If you have enough facts to see that this is worthy of procedure, you write in the remarks, "I recommend further investigation." And therefore it gets passed on to the investigation unit, yes.

Q. Okay. And is that what you expected to happen with this case?

A. Yes.

Q. Now, was any specific name mentioned with regard to this pool or who this pool belonged to or whose residence the pool was at?

A. Yes.

Q. What was that name?

A. I'd have to refer to my report.

Q. You may do so.

A. May I? The swimming pool belonged to a friend named Patti who is Josh's father's sister-in-law, I believe. And it's what the mother told me.

MS. QUAINTANCE: Thank you. I have nothing further.

THE COURT: Mr. Danforth?

MR. DANFORTH: Just a couple further questions, Your Honor, and that's it.

THE COURT: Okay.

RECROSS-EXAMINATION

BY MR. DANFORTH:

Q. You say the pool, from your notes, belonged to a friend named Patti?

A. Yes, the residence.

Q. Okay. All right. And did Terese give you any indication of how long she had lived in the Twin Cities area?

MS. QUAINTANCE: Objection, beyond the scope.

THE COURT: Sustained.

MR. DANFORTH: All right. That's all, Your Honor.

THE COURT: Miss Quaintance?

MS. QUAINTANCE: Nothing further.

THE COURT: You may step down, Officer. Thank you.

Members of the jury, when you were gone last, nobody but you took a break. And so we are going to take our morning break. We were here doing some work, also, we need to make arrangements to have another witness who's a child witness. That will probably take 10, 15 minutes to have that person brought in. So if you would give us 15 minutes, we'll come and gather you. And our apologies again for the delay.

(Whereupon, a brief recess was taken and proceedings continued.)

THE COURT: Do the parties have an objection to her staying from WATCH?

MS. QUAINTANCE: No.

THE COURT: Mr. Danforth?

MR. DANFORTH: Well, Your Honor, subject to whatever the Court feels about your order to close the testimony.

THE COURT: Well, as you can see, this morning I think we had about every high school student, and I think it's a day off.

And, by the way, with reference to your request this

morning, I do exclude tender-age children from the courtroom. I'm aware of the statute, and I probably would exclude even older children from certain parts of criminal sex cases. And as I observed these children, they looked to be high school age. And I wasn't going to get into a quiz of carding them or anything about how old they are.

Okay. Can we bring the jury in?

Oh, say, just one minute. I don't know how far we'll get here, Mr. Danforth. And I've marked, by the way, Court's Exhibit 19. The record should reflect I've marked as Court's Exhibit 17 the tape recording that Mr. Danforth's investigator gave me, and as Court's Exhibit 18 the interview notes or reports of the investigator, and also as Court's Exhibit 19, a quite voluminous document that I've just now tried to start to read. And I have to admit, Mr. Danforth, I've only basically perused it, but I can see some issues right away that I think I can give you some guidance on.

I will allow you to ask by leading questions questions that pertain to the matters or testimony that was the scope of direct examination, and matters that relate directly to the credibility or bias of the witness. For instance, questions about whether she has talked to her mother about these events or testifying here or anything of that nature, I'll let you ask leading questions on.

Beyond that, I will not permit leading questions by either party except to the extent that I deem it necessary to deal with the child witness. And then they should be in the form of, can you tell us what you recall about X, with X not being a long, elaborate inclusive of the answer sort of script for.

With regard to sexual issues, prior to the time that there is any inquiry of this child about sexual issues that are beyond the reports contained in the child protection areas, I'm going to want a precise offer of what that's -- I see questions about the bathing practices of this girl, and who bathes with her, and what degree of clothing they have on, and things of that nature. All those questions with regard to sexual practices or sexual relationships of this child, except to the extent that they are specifically focused upon the child protection reports that I've provided to you, there is going to have to be a showing.

And even then I think that you're getting a fair amount of leeway under Rule 412 with regard to physical abuse, I've already indicated physical abuse will not be discussed or be the subject of any questioning until such time as is appears to me that there is proof that physical abuse has been used in urging or influencing the conversation of these children.

Now, that's very short, and I can't really give you

along here later on, you can do that, but I don't see anything that's focused my attention on any relationship between physical abuse and couching or even couching of this child.

MR. DANFORTH: Well, Your Honor, I guess I'd like to make an offer of proof right now, although, the witness is way down the pike. But as I made reference to her before, Becky Bennett is a witness of mine who clearly will come in here and testify exactly that the mother admitted to her that there had been a substantial amount of couching in both the cases of Josh and Amanda, particularly in the case of Josh.

MS. QUAINTANCE: Your Honor, the investigator's report references only to Josh. And Mr. Danforth continually mischaracterizes the content of his investigator's reports with regard to these witnesses.

THE COURT: Okay.

MR. DANFORTH: Actually, Your Honor, I think she is the one who's misreading my report.

THE COURT: Well, I've got it up here. I'll read it.

Bring the jury in please.

(Whereupon, the jury returns to the courtroom.)

THE COURT: Please be seated everyone.

Deputy, would you bar the door please?

Ms. Quaintance?

MS. QUAINTANCE: The State calls Amanda Story.

AMANDA STORY,

after having been first duly sworn, was examined and testified as follows:

THE COURT: Amanda, could you come right back here and come up and see me before we start?

How are you doing?

THE WITNESS: Fine.

THE COURT: Do you remember when we talked yesterday back in my office or last week?

THE WITNESS: Yeah.

THE COURT: Do you remember when we talked about telling the truth?

THE WITNESS: Yeah.

THE COURT: And you showed me how you were able to tell the truth with the animals on that card.

Do you remember that?

THE WITNESS: Yeah.

THE COURT: Today you're going to have to tell the truth, okay?

THE WITNESS: Um-hum.

THE COURT: Can you promise you'll do

that?

THE WITNESS: Um-hum.

THE COURT: Do you want to raise your right hand? That's what we do when we make promises.

Do you promise to tell the truth about everything that's asked of you today?

THE WITNESS: Uh-hum.

THE COURT: Because you're going to have to tell these nice people over here, these are jurors, and you're going to have to tell those nice people the truth, okay?

THE WITNESS: Um-hum.

THE COURT: What I'd like you to do is, see that seat right next to Shellie and right next to Connie, in between, can you go and sit down there?

You can sit back just a little bit away from it, Amanda. Right about there. That's good.

Miss Quaintance?

DIRECT EXAMINATION

(Connis Bowman, witness advocate present.)

BY MS. QUAINTANCE:

Q. Thank you. Good morning, Amanda.

A. Good morning.

Q. Can you tell us what your whole name is?

A. Yeah.
Q. What?
A. Amanda.
Q. What's your last name?
A. Amanda Story.
Q. Okay. How would are you Amanda?
A. Five.
Q. Do you go to school?
A. Yeah.
Q. Where do you go to school?
A. At the High Five.
Q. High five. Do you have one teacher or more than one teacher?
A. (Indicating.)
Q. How many is that?
A. Five.
Q. You have five teachers?
A. Yeah.
Q. And do you like school?
A. Yeah.
Q. What's your favorite part?
A. Paying attention to my teachers.
Q. Amanda, do you have brothers and sisters?
A. (Indicating.)
Q. Can you tell me the names of your brothers and

sisters?

A. Um-hum.

Q. What are they?

A. Josh and Jeffrey and me and Jessica.

Q. Okay. Is Josh older than you or younger than you?

A. He's older than me.

Q. Okay. How old is Josh?

A. He's going to be six.

Q. Okay. Do you know somebody named Steve?

A. Yeah.

Q. How do you know Steve?

A. I know him from his house.

Q. Okay.

A. It's -- it's the brown one.

Q. You've been to his house?

A. Yeah.

Q. Okay. Is he a nice guy or what?

A. A bad guy.

Q. Okay. Why is he bad?

A. Because he did something to my brother.

Q. Which brother did he do something to?

A. Uhm, my -- my -- Josh.

Q. Okay. What did he do to Josh?

A. He put his mouth on Josh.

Q. Where did he put his mouth on Josh, what part of Josh?
A. On his pee pee. On his private.
Q. Oh. Where did that happen, Amanda?
A. In his -- in his -- in that bathroom.
Q. Okay. What bathroom? Where was the bathroom that it happened in?
A. In that -- in that -- in that --
Q. Amanda. Can you sit up so I can see you?
A. That where -- where -- where we was sitting down.
Q. Okay. Where was the bathroom?
A. And there was --
Q. Was it at your house?
A. And there was a bath and a shower in there.
Q. Okay. That was at somebody's house or where was that?
A. It was Patty's house.
Q. Okay. And was the bathroom in her house or was it someplace else?
A. It was someplace else. It was the boys' room.
Q. Okay. The boys' room by what?
A. By -- by that -- that desk.
Q. Okay. What were you doing when you went to Patty's house?

A. I was checking downstairs what they was doing.
Q. Okay. And did you see that or did you hear about it?
A. I saw it.
Q. Okay. Did Josh have his clothes on or off when that happened?
A. He took his clothes off.
Q. Okay. What was he wearing before he took his clothes off?
A. On that deck.
Q. On the deck?
A. On that deck where you sit.
Q. Okay. Where is the deck? Is it in a room?
A. Where you sit like this.
Q. Okay. And what room was that in?
A. Like this (indicating), like that.
Q. Okay. Where was the room?
A. The room was at -- in -- by that chair.
Q. Okay. When you went to Patty's house?
A. Uh-huh.
Q. Did you ever go swimming there?
A. Yeah.
Q. Okay. Does she have a pool?
A. Yeah.
Q. Okay. Now, when this happened, what you saw

happened to Josh, was that in Patty's house or by the pool or what?

A. By the pool.

Q. Okay. Now, you said it was in the men's room?

A. (Nods.)

Q. Where was the men's room? Was that by the pool or in her house?

A. In the house.

Q. Okay. The room where this happened, is there a name for that room?

A. (Shakes head.)

Q. Okay.

A. It's Patty's room.

Q. Oh, okay.

Now, did Steve do anything else to Josh or just what you told us?

A. Just what I told you guess.

Q. Okay. So were you in the men's room when that happened?

A. Yeah.

Q. How did you get in there?

A. It just happened.

Q. Okay. Did Josh and Steve see you or do you know?

A. They saw me come down there.

Q. Okay. Was anybody else in that room when that happened?

A. Yeah -- no.

Q. Which is it, yes or no?

A. No.

Q. Okay. Where was your mom when that happened?

A. She was upstairs.

Q. Okay. And where was your Dad?

A. My Dad was outside.

Q. Okay. Did Josh say anything when that happened?

A. Yeah, they was talking.

Q. Oh, who was talking?

A. My -- Steve and Josh.

Q. Okay. Now, do you see Steve here today?

A. (Shakes head.)

Q. Is he here today?

A. (Nods.)

Q. Can you show me where he is?

A. In jail.

Q. Okay. Do you see him in this room today?

A. No.

Q. Okay. How did it make you feel when you saw that happen to Josh?

A. It made me cry.

MS. QUAINTANCE: Okay. I don't have any more questions, Amanda.

THE COURT: Mr. Danforth?

MR. DANFORTH: Thank you. Could I have a second with stand-by counsel, Your Honor?

(Whereupon, a discussion was held off the record between the defendant and stand-by counsel.)

MS. QUAINTANCE: You just have to wait a minute, okay?

THE WITNESS: Why is a cop sitting over there?

MR. MAHONEY: May we approach?

THE COURT: Um-hum.

(Whereupon, a discussion was held off the record at the bench.)

THE WITNESS: What is that guy --

MS. QUAINTANCE: Just a minute. Do you want some water?

THE WITNESS: Um-hum.

MS. QUAINTANCE: Amanda, we just need to sit and wait for a minute, okay?

THE COURT: Mr. Danforth, any questions?

MR. DANFORTH: Your Honor, if you could

just give me one second again?

(Off the record discussion between defendant and stand-by counsel.)

THE WITNESS: How come they talk? How come they talk?

THE COURT: That's all we do here is talk, a lot of talk.

MR. DANFORTH: No, Your Honor. I don't have any questions of this witness at this time. I would like to reserve my rights to bring her in as a witness in my case.

THE COURT: Okay. Amanda, you may step down and go with Connie. Thanks for coming in.

Are you prepared with any other witnesses?

MS. QUAINTANCE: We have no additional witnesses before lunch.

THE COURT: This morning, okay.

Well, we're going to break for lunch.

Can we come back a little bit early? Why don't you return to us about 1:00. We'll try to start shortly thereafter. Have a nice lunch.

(Whereupon, the jury is excused from the courtroom.)

(Out of the presence of the jury.)

MR. MAHONEY: May I approach the bench

would say here.

The only thing I've gotten from you is something discussing what instrument he might use on an adverse psychological examination. I've read that and reviewed it and thought about that issue. And as indicated to you, I'm denying any opportunity for any adverse psychological examination of either of these children for reasons that I indicated earlier will also be set out in a memorandum that I'll file sometime in the next day or two.

MR. DANFORTH: All right, Your Honor. I will have Dr. Underwager prepare something in the way of a report letter and have it faxed to the Court.

Let's see. I guess on this issue, the only other thing I would like to submit for the Court's consideration is distinctions from the case State versus Sullivan, 360 N.W.2d 418. In particular, one I was noting from that case is that because we don't have here, this is from page 422, any indication that the child had reviewed the video tape before trial, because we don't have the use of the tape to refresh the child's memory, because, as Sullivan pointed out, the inherent suggestible nature of children, we have a situation where the tape is prejudicial because it isn't possible to cross-examine the tape, unlike it would be with a child.

THE COURT: This is the same argument,

MR. DANFORTH: Sure. I would like to have a motion that the transcript of Josh's competency hearing be deemed to be admissible to the jury.

THE COURT: You made that motion and I denied it. That motion was made the other morning along with the motion that I tell them that he was incompetent, which I denied. And then you revealed to the jury that I made the decision.

MR. DANFORTH: Well, Your Honor, for the record, I would just like to move for a curative instruction that Josh was found not to know the truth from falsity, and that the jury can consider that as fact. If you're denying that, I just need it on the record.

THE COURT: It was denied. I will tell you, however, I'll read to you in two sentences a potential curative instruction that I was going to offer to both of you with regard to what happened here on Friday.

It reads, "As indicated earlier, on the first day of this trial the Court made a determination that six year old Joshua Story was unavailable as a witness at this trial. While such a determination is made in a so-called competency hearing held by myself with the child and the parties, but outside of your hearing, the determination made should not be regarded by you as one necessarily respecting mental competency. The determination is based

on many factors, some of which relate to the child's then-existing capability to be a witness in a trial such as this given all of the surrounding circumstances.

As indicated earlier, you should not draw any inferences from my determination that resulted in Joshua Story being unavailable to appear before you in this trial."

And that again was something that was as vanilla as I could make it so they don't think he didn't come because he was scared to death of you or didn't come because I found that he was a lying, little kid or anything in between. As those determinations were not made by me. We all know the reason for my determination. We were all there at the hearing, and we know what his capability at that particular time was or was not.

MS. QUAINTANCE: Your Honor, for the record, the State would oppose such an instruction. It gives the jury far more information than is necessary for them, or appropriate for them to have.

That issue and the word competence would not have come before this jury but for Mr. Danforth's blurt in direct violation of a court order. To draw further attention to it at this time the State believes is prejudicial to its case, and such drawing of attention to it should not be the result of Mr. Danforth's direct violation of the court

order.

The fact that the State would then have to have an instruction which it never wanted in the first place because Mr. Danforth blurted something out and therefore but gained some benefit by it, is not appropriate at all. And we would -- we're extremely opposed to that kind of instruction. And I would look for further authority on that, but the issue of competence is not one that should come before the jury at all.

THE COURT: Okay. The other items that you had Mr. Danforth?

MR. DANFORTH: All right. There is no chance that I can respond to that, I suppose?

THE COURT: Well, I've listened to her. She said it before. Now you both said it a couple of times what your view is on some additional instruction also.

MS. QUAINTANCE: Well, I think the record will reflect the amount of time that I have taken as opposed to the amount of time that Mr. Danforth has taken.

THE COURT: All right.

MR. DANFORTH: I'll move on, Your Honor.

In light of the fact that this has gone on with Josh being incompetent, I'd like to renew a motion, but it will be different than it was before, this time for a

psychological exam of just Joshua Story to show that his incompetent condition is not the product of something said but in fact is a chronic thing that would have in fact affected his competence at the time he gave his statements to Corner House.

THE COURT: That motion is denied.

I'm not going to have somebody shrinking this little kid to determine what we all saw on the Corner House tape. And they will have to make a decision as to whether or not when he made that tape whether he was capable of recalling things and communicating them.

MR. DANFORTH: All right. Moving on Your Honor to the next motion. I would like to move for a recess of a couple days to reconstruct the kind of cross-examination and direct examination of all other witnesses that are going to be in this case, both prosecution and defense, in an attempt to cover as much of the testimony that I've already described to you earlier, and will not now re-relate to the Court, but just and by this reference as is possible. This is a crucial testimony to me. It's not presently built into my direct or cross-examination scriptings of other witnesses. It is necessary for me to try to build it into other witness' testimony to try to take up as much of the slack and fill up as much of the hole as is left by the unavailability of

proof with regard to deceiving other agencies of government or other institutions as is described in certain enumerated items in that submission you made to me which I described to you several days ago but I've now forgotten, I'd hear that and make a ruling on it.

MR. DANFORTH: All right. Otherwise government, your saying is --

THE COURT: I didn't say government only the other day, I didn't say government only today. You had three or four or five instances of alleged deceits on governmental agencies or other entities other than getting into an argument between you and Gary Story about whether you cheated him out of some grocery money or whether you conspired with him to steal his kids, and all of the rest of it, we're not going to get involved in things that aren't clearly deceit and that wouldn't clearly be helpful and probative on his honesty, and it's just subject of another lawsuit between you and him.

MR. DANFORTH: All right, Your Honor. I think that clarifies it. Let's see just a second. I would like to move, and I won't make these arguments now because this is a lengthy set of arguments, I would like to move for an in camera review of the records at Hiawatha school in reference to Joshua Story.

THE COURT: That motion has been made

and ruled on by another judge. I'm not going to upset another judges's ruling.

MR. DANFORTH: Well, Your Honor, no, Your Honor, actually what my understanding of that prior ruling was was references to other entities, not particularly schools. And insofar as --

THE COURT: No. The motion is very clear, it's in the file. It is wanting an in camera review of all of the school records of, I think both of these children, but certainly Joshua. And my understanding is was that motion was denied. And we focused indirectly on that material which would be the most likely productive of these kinds of issues, notwithstanding the fact that it's very private and confidential information about which children and parents have the right to have protected.

And I've gone through about a two-inch sheaf of papers and delivered to you 20, 20 some papers from it outlining every instance that relates to the sex abuse or child abuse. There is reporting act requirements in this state that would obligate teachers and others in the school system to report that to the appropriate agencies. So it's the Court's view that the discovery necessary to ferret out any sexual abuse kind of issues involving these children which would be germane to the issues here has been done.

MR. DANFORTH: Actually, Your Honor,

that wasn't what I was driving at at this point. It's a different motion entirely, really. What I'm driving at is it's impossible for us to really have to ascertain without a psychological examination of Joshua to determine what his psychological and developmental status was in any way at any time reasonably close to the date of the Corner House interview, August 23rd, 1995. It's my supposition that upon entering school, either at that time or shortly thereafter, there would have probably been an observation about Josh's --

THE COURT: Your suppositions aren't going to require this Court to order a psychological evaluation of this youngster. I've seen the youngster, I've read State v. Kane (ph), that looks to me like the outer limit of when a psychological examination, adverse psychological examination should be imposed on children. And virtually none of the factors that existed in Kane that were the subject matter of broadcast by Dr. Underwager are existent here.

MR. DANFORTH: All right. Then I would like to move along to a motion for an in camera review of any records of the Phelps neighborhood center, located at the 3900 block of Columbus Avenue South as to these things: either, one, enrollment of Josh, the question of whether Josh was in fact enrolled at any time between July 15th and

A. No. There is nothing else that I noted at the time.

Q. Did you question Josh or talk with him at all about the abuse in the course of your exam?

A. No, I did not.

Q. Do you have any kind of a policy about that?

A. Our general policy is that we do not interview the children and, therefore, we don't attempt to do a partial interview by asking casual questions. So in general, we do not ask questions of the children. If they offer information, then we might clarify or pursue any comment that is made. That happens rarely in my experience.

Q. And did that happen in this case?

A. No, it did not.

Q. Did you note anything unusual about the general physical exam of Josh's body? Did you exam his body?

A. Yes. We do a general physical exam to, obviously, look for any abnormalities and to put the child at ease as much as possible.

Q. And was there anything of note there?

A. No.

Q. Did you do a genital exam as well?

A. Yes, I did.

Q. Was there anything of note about the genital

exam of Josh?

A. No, it was a normal examination.

Q. Now, you noted in the assessment portion of your report that there were normal physical findings.

A. Correct.

Q. But that this exam was consistent with the history given of penile/anal contact and oral/anal, oral/penile contact, is that correct?

A. That's correct.

Q. Why was an exam that had no -- or physical findings -- or normal physical findings consistent with the abuse reported by this child?

MR. DANFORTH: Excuse me, Your Honor. Objection, Your Honor. Where does it say that?

MS. QUAINTANCE: In the assessment portion of the exam.

MR. DANFORTH: What page?

MS. QUAINTANCE: Six.

MR. DANFORTH: May I see your copy of this exam?

THE COURT: Why don't both of you approach for just a second and bring whatever you've got.

(Whereupon, a discussion was held off the record at the bench.)

BY MS. QUAINTANCE:

ruled on that issue, but that's where I am in my case. I can bring Roberts in tomorrow and have her stay overnight. And I need to put her on at the end my case not before my last witness.

That's where I'm at. And she is not available tomorrow in any case because tomorrow is the day she flies, she has another flight.

THE COURT: So you would anticipate being done Thursday or Friday?

MS. QUAINTANCE: Depending on the Spriegls, yes.

THE COURT: Well, maybe we better argue the Spreigl at this point now then.

MR. MAHONEY: No.

THE COURT: What do you mean "No"?

MR. MAHONEY: It's going take more than 10 minutes. It's 4:20.

THE COURT: Well, every minute helps in this deal. And I'm trying to squeeze every second of time we can get out of everybody, because everybody's got these other commitments. And I know Mr. Danforth, you want time to argue these issues. I can tell you, you don't need to argue at this point the Spreigl relating to the Wisconsin convictions. I can tell you they're not going to be admitted. They're too remote in time.

THE COURT: Well, I'm real familiar with the allegations of this case, Mr. Danforth, but what you're apparently going to show and what's the State's alleging, and I've got to look at the similarities with respect to what evidence has been laid out to me in police reports and in the complaint and in the evidence so far and through the close of the State's case when these Spreigls are offered. So I understand that leg of it. And I --

MR. DANFORTH: I guess --

MS. QUAINTANCE: Your Honor --

MR. DANFORTH: I'm sorry. Go ahead.

MS. QUAINTANCE: May I respond briefly, Your Honor, with regard to the age issue?

The reason that the State needs to present further evidence than the plea itself is that by the time of the plea, the children were older. But when Mr. Danforth made the acquaintance of Scott Swenson and Joel Bolger and the Macks, they were significantly younger. That's why I included the police reports and the statements of those children in the materials I provided the court with. Because by the time of the conviction, this had been going on for numerous years. And both the video tapes and the police -- the video, the '80's video tape and the police reports show the youth of those boys at the time that they were first involved with Mr. Danforth. And it was