**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# <u>TRANSCRIPT EXCERPT:</u>

## TRIAL TRANSCRIPT,

## Volume IV

## February 21, 1996

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

A. Quite a lot. We went swimming a lot, and going to picnics you just, oh, watching movies.

Q. Okay. And I'm talking specifically about last summer?

A. Okay.

Q. The summer of 1995, this past summer, is that when you and your children did these activities with Mr. Danforth?

A. Yes.

Q. Was your husband present during some of those activities?

A. No.

Q. Okay. Is there somebody who's known to your family named Patti who has a pool or lives near a pool?

A. Yes.

Q. Who's that?

A. She is my sister-in-law.

Q. And what's her last name?

A. Wiemer.

Q. And where does she live?

A. She lives at 254 Penn Avenue South.

Q. Okay. And what -- is that near an intersection?

A. Yes.

Q. Where?

Q. Was there any particular reason why you left Mr. Danforth's?
A. Yes, there was.
Q. Why?
A. It's because Steve couldn't have us no longer there because of the landlord.
Q. Now, did there come a time last summer when your son Josh told you that something had happened to him, something sexual had happened to him?
A. Yes.
Q. Okay. When he told you that, what had happened immediately before he told you that?
A. Uhm, Kiana is the older sister, she came to me, okay.
Q. Okay. Who's Kiana and where does she live?
A. Kiana lives next door.
Q. Okay. All right. She came to you and what happened?
A. And she -- she had told me that Josh had kissed him on the, on the butt and on the front.
Q. Now, is Kiana a girl or a boy?
A. She is a girl.
Q. How old is she?
A. Five.
Q. And where did she live in relation to where you

Q. Okay. Tell me about that?
A. I wasn't too happy about it, okay.
Q. Okay. Okay .were you mad at Josh?
A. I -- my first initial reaction was, yes, I was mad.
Q. Okay. Did you talk to him about this?
A. Yes, I did.
Q. Okay. And what did he tell you about what had happened to him?
A. He, at first, wasn't really -- he wouldn't tell me at all. But, uhm, I kind -- I kind of had a suspicion about Steve.
Q. Okay.
MR. DANFORTH: Your Honor, I object and ask to have that struck as nonresponsive to that.
THE COURT: Overruled.
BY MS. QUAINTANCE:
Q. Mrs. Story, what did Josh tell you about what had happened to him?
A. He had told me that Steve put his mouth on Josh's pee pee. I'm --
Q. And what did Josh, what did Josh call his pee, what was he referring to?
A. His, uhm, his, uhm, his...
Q. I know this is embarrassing but it's okay to

say it here.

A. His, his, uhm, his penis. I'm sorry I wasn't --

Q. That's okay.

A. I'm frustrated right now.

Q. Did he tell you anything else that had happened to him with Steve?

A. Yes. He stuck his finger in his -- in his poopie butt.

Q. Okay. Who stuck whose finger in his butt?

A. Steve did.

Q. Steve stuck his finger?

A. Um-hum.

Q. Where?

A. In his poopie butt.

Q. Whose?

A. Josh's.

Q. And what did Josh use the term poopie butt to refer to?

A. His anus.

Q. Is there anyone else named Steve who's close to your family who the kids know?

A. No, there is not.

THE COURT: Just a moment.

(Pause in the proceedings.)

THE COURT: Okay.

MR. DANFORTH: Your Honor, I object to that as leading.

THE COURT: Well, why don't you rephrase this question. I was distracted by something else.

BY MS. QUAINTANCE:

Q. Okay. Other than Mr. Danforth, does your family have any close friends named Steve?

A. No, there is not.

Q. Do the children have any friends named Steve?

A. No, there is not.

Q. Any other relatives named Steve?

A. No, there -- no, there is not.

Q. Once Josh told you these things, what did you do?

A. At first I called my mom.

Q. Okay. Did you call anyone else?

A. Yes, I did.

Q. Who?

A. I called Larry.

Q. Okay. Did you call anyone else?

A. No, I did not.

Q. All right. Did you ever report this?

A. Yes, I did.

Q. When?

A. Shortly after.

Q. Same day?

A. Yes. There -- yes.

Q. And who did you report it to?

A. The cop. The cops. Minneapolis cops.

Q. And how did you do that? Did you call 911 or flag down a squad or what?

A. No. I called the 348-8345 number.

Q. And did a cop come to your address?

A. Yes.

Q. Did you ever report this matter to anybody else?

A. No.

Q. Did you ever talk to anybody at child protection about this?

A. Okay. Yeah.

Q. Now, before Josh told you this happened, did you ever see anything physical between Mr. Danforth and Josh that seemed unusual to you?

A. Yes. Yes, I did.

Q. What did you see?

A. I, uhm, there is this one time in the computer room.

Q. What computer room?

A. Steve's computer room.

Q. Where is that?

A. In Prescott. Prescott, Wisconsin.

Q. At his apartment?

A. Yes.

Q. Okay. What happened there?

A. It was just me, Steve and Josh sitting in the computer room or Steve and Josh were on the chair. Josh was on Steve's lap, and I was standing in kind of like in the room in between in the door.

Q. Um-hum.

A. And -- and Josh was kissing Steve on the cheek, like, like it was ab -- it was abnormal. It was kind of like a woman/man -- a woman kind of man kind of a woman kind of man kiss.

Q. And that seemed unusual to you?

A. Yes.

Q. And what about it was like a woman, man kiss and not like a kid kiss?

A. It was just more sensual.

Q. And what happened after Josh did that, did Steve do anything?

A. No. I right away said "Don't." "Don't touch" or "Don't kiss him like that, Josh." And Steve kind of like had a reaction like, like it's, you know, like it's

okay.

Q. Did Steve say anything?

A. Yes, he did.

Q. What did he say?

A. He said "It's okay Terese." And I said, "No, it's not Steve."

Q. Okay. Did Mr. Danforth ever make any comments about Josh's body to you?

A. Yes, he did.

Q. What happened?

A. This is -- this is like in -- I'm, I'm guessing. I'm guessing the time of the month, okay.

Q. Well, I don't mean for you to guess, but if you know what season or what month?

A. It's during the winter time.

Q. Winter?

A. Um-hum.

Q. Okay. First of all, let me just go back and ask you, this incident that happened at Steve's apartment in the computer room?

A. Um-hum.

Q. Was that while you were living at his apartment in July or a different time?

A. During the time that we were living there?

A. Okay.

you?

A. Yes.

Q. What was that?

A. We were living at 3725 Cedar Avenue South. And this, this is when Gary was not present at the time.

Q. You were separated?

A. No, I mean --

Q. Just wasn't there?

A. He just was not there at the time.

Q. Okay.

A. And I was taking Josh and Amanda a bath. And at the time when I was taking Josh and Amanda a bath, he had stepped into the bathroom and was sitting on the toilet seat. And I had a feeling that he had been looking at Josh. He was -- I was really, really uncomfortable that night. Really uncomfortable.

Q. Did he say anything?

A. No, he did not.

Q. Do you know why you felt so uncomfortable?

A. Because he was sitting right -- because the toilet seat is right really close to the bath tub, right there. And I just, I felt really very uncomfortable that night. Very uncomfortable.

Q. Okay. How old was Josh at that time or do you know what year it was? I'm just trying to figure out?

and something else. It -- it -- I don't know what you call it, bubble thing. Uhm.

Q. Oh, that you make the bubbles with the wand?

A. Yeah.

Q. Okay. So the go cart is the biggest present he ever gave Josh?

A. Yes.

Q. And when did he give him that, what birthday?

A. His fifth birthday.

Q. Did Mr. Danforth ever say anything to you about his own sexuality?

A. Yes, he did.

Q. What did he say about that?

A. He said that he doesn't have a high sex drive.

Q. He does not have a high sex drive?

A. Uh-huh.

Q. Anything else or was that it?

A. No. No. There was not anything else.

Q. Okay. When you went to the pool, do you ever recall -- do you -- was Amanda ever in the men's room with Steve and Josh?

A. Yes.

Q. Did that happen often or once or what?

A. Not very often, no. Uh-uh. Just, she went in there, it was me, Jeffrey and, and in the pool, and Amanda

had gotten out of the pool and went into the men's locker room to see what Josh was doing. And she was about in there for at least five minutes, I believe.

Q. Was Josh in there alone or with someone?

A. He was with Steve at the time.

Q. Okay. And so Amanda went in there for about five minutes?

A. Yes.

Q. And did she come back out?

A. Yes, she did.

Q. Did she say anything when she came back out?

A. No, she did not.

Q. Did Amanda ever on any occasion say anything about Josh touching Steve or Steve touching Josh?

A. Yes.

Q. When was that?

A. That was shortly after, like, the next day. The next day I had asked her.

Q. The next day after what?

A. After I had called the cops. I had asked Amanda if she had seen anything that Steve did. And she told me, she told me she saw Steve putting his mouth on Josh's, uhm, penis.

Q. Before Josh told you about the abuse, did Amanda ever say anything to you?

A. No.
Q. About -- about Steve touching Josh or Josh touching Steve?
A. No. Oh, I'm sorry. Yeah. There is. We were riding back from the Omni Theater.
Q. From the?
A. Omni Theater.
Q. Okay. And who was riding back?
A. Me, Steve, Jeffrey and Josh.
Q. Not Gary?
A. No.
Q. And whose car were you in?
A. Steve's.
Q. And do you know when this was?
A. About in April. I'm not really sure what month it was.
Q. Okay. Do you know what season it was?
A. About the beginning of spring.
Q. And was this 1995?
A. '94.
Q. Spring before Josh told you?
A. '94. '94. It was '94, the spring of '94.
Q. Where were you living at the time?
A. Shannon Parkway.
Q. I just want to get this straight, because you

said you moved to Shannon Parkway in December of 1994.

A. Right.

Q. So it was after that?

A. Yes.

Q. So would it have been the spring of 1995, the spring after December, 1994?

A. Yes.

Q. Okay. So you're riding back from the Omni, and what did you see there, do you remember?

A. As we were riding back?

Q. Excuse me. What did you see at the Omni?

A. Oh, okay. I'm sorry. I'm sorry.

Q. That's all right.

A. I call it the earth movie.

Q. Earth movie.

A. Yeah. I'm not really sure what it was called.

Q. Okay. What was it about?

A. Just basically about astronauts, and they showed pictures of Mars and --

Q. Space?

A. Yeah, space.

Q. Okay. So you're riding back in Steve's car and what happened?

A. It was pretty much quiet in the car at the time. And out of the blue Amanda goes "Josh" or I'm sorry,

"Steve, don't touch Josh."

Q. And after she said that, did Steve say anything?

A. No, he didn't.

Q. Did you say anything?

A. Yeah, I did.

Q. What did you say?

A. I grabbed Amanda's arm, not real -- I just grabbed her kind of like just I was kind of like shocked, shocked that she had said that.

Q. Okay. Did you ask her any questions about that or you just let it go?

A. I let it go.

Q. Now, you said you recognized Mr. Danforth before, and you pointed him out. Does he look any different now than he looked in the last summer?

A. Yes.

Q. What's different about the way he looks?

A. His hair is more grayer.

Q. Okay. What color was it last summer?

A. It was dark, dark brown.

Q. Totally dark brown or did it have some gray in it?

A. Totally dark brown. He colors his hair.

Q. How do you know that?

items number one and two on your exhibit, statements or cross-examination about the instances of alleged child abuse.

And I, again, I say alleged because whether we agree or disagree with the child protection authorities, their findings were that maltreatment did not occur. But in any event, there are reports that I've shared with Mr. Danforth about instances of physical contact between this witness and the children is a relatively isolated one, but nevertheless instances nonetheless. And I'm still going to preclude you, Mr. Danforth, from inquiring into those items, but I will allow you to ask questions about the degree to which there was any physical discipline or punishment or contact in reference to the instances in which Joshua or Amanda were telling their mother about the items that the mother testified to during the last hour, namely, Amanda's recitation that she witnessed this event at the Century Courts apartments and Josh's recitation about it to the mother as well.

And depending on what that evidence is, I'll be continuing to see the relevancy versus probative value of the cross-examination of the mother with respect to these other isolated instances of alleged physical abuse or contact.

With respect to what Amanda told the mother here, I

A. Um-hum.

Q. I'm asking you at what time did you call them, if you recall?

A. At night. I called them at night.

Q. Okay. Do you have any idea what time it was?

A. No, I don't.

Q. But it was dark out?

A. Yes, it was.

Q. Now, your testimony is that before Josh told you anything regarding alleged sex acts supposedly by myself with him, you had observed --

A. Yes.

Q. -- Josh and Amanda doing something, is that correct?

A. Oh, no. No. Uh-uh. No. Nope.

Q. That's not your testimony?

Okay. Well, before the call to the Minneapolis police, then, did you observe Josh and Amanda doing anything?

A. Nope, not at all.

Q. Okay. Did you observe Josh kissing Amanda?

A. Just normal brother and sister love.

Q. Now, had you ever seen them otherwise in any other acts or behaviors with anyone else of a sexual nature?

A. Nope.

Q. You had indicated that at that point you wanted to react how a normal mother would react, you said. And is it your testimony -- I think you said before that your first reaction was that you were angry?

A. Yes. I was very angry. I was angry, but then I -- I -- I had to sit and think about why, why would Josh do this.

Q. Okay. Now, you said you talked to Josh. When did you hear about this incident from Kiana, about what time of the evening or afternoon, when was that?

A. I don't know. I didn't look at the clock.

Q. Okay. Well, was the sun still out?

A. Nope, it was at night. It was in the evening.

Q. Okay. Once again, the sun had already set and it was going on dark, right?

A. It was in the evening, in the evening time. I'm not really sure, but it was in the evening, I know that for a fact.

Q. Had the sun set?

A. That was in the evening.

Q. Well, I'm just trying to pin that down a little more closely, if you recall, I mean?

MS. QUAINTANCE: I think the question has been asked and answered.

Q. Okay. Now, these are all the people that you talked with, however, other than this Kiana before you called the police, is that right?

A. Um-hum.

Q. Okay. Now, you indicated that in your conversation with Josh you talked to him for some time, do you recall about how long it was that you talked to him?

A. No, I don't.

Q. Okay.

A. I don't.

Q. In your conversation with Josh, did you by chance use anything in the way of dolls or drawings?

A. Yes, I did.

Q. Okay. What kind of a doll did you use at that point?

A. I used one of Amanda's dolls.

Q. Okay. Could you describe it?

A. It was -- it's got -- it has blonde hair and and it's stuffed, a stuffed doll.

Q. Okay. What's the apparent gender of the doll?

A. Gender? A female.

Q. It's female?

A. Yes.

Q. Okay. And when you produced this doll to talk to Josh, what did you say about the doll and ask him about

it?

A. I said that he doesn't -- doesn't understand. I told this to the cop that he doesn't understand what he's, you know, asking him these questions to him, he don't understand. Because I never really, I've never really talked about sex with Josh before. So I knew that he wouldn't understand. And I never even showed him on T.V. or anything. I never, because I was always very protective of him not looking at things on T.V., you know sexual acts and, you know, kissing, even kissing.

Q. All right. So then what you are saying, if I understand you correctly, is that when the policeman showed up, you had this talk with the policeman before Josh talked to the police, the policeman, is that correct?

A. Uh-hum.

Q. And in this prior conversation with the policeman that you had, you're now saying that's when you told the policeman that Josh wouldn't understand it, correct?

A. Right.

Q. All right. At that point, then, is it your testimony that to assist Josh's understanding of what was being talked about, that a doll should be used? Is that what you're saying?

A. Hum?

Q. That you suggested that a doll should be used, is that correct?

A. Can you rephrase that a little bit better than that?

Q. Yeah. When the policeman arrived and you spoke with the policeman before he interviewed Josh, you suggested that the policeman should use a doll to assist Josh in understanding, is that what you said?

A. Yes.

Q. Okay. Before the policeman arrived, though, what I was trying to get at, was in your own personal conversation with Josh, did you at that point use a doll with Josh as well?

A. No, I did not. No, I did not.

Q. Okay. Did you use something in the way of drawings to show Josh what you were doing?

A. No, I did not.

Q. Did you essentially tell Josh about your suspicions that you've indicated in your testimony that you had?

A. Suspicions?

Can you rephrase that question please?

Q. Yes. When you were talking to Josh before the policeman arrived, did you have occasion to tell Josh that you had suspected things were going on or that you had

suspicions that something had been going on in the way of sex between Josh and I?

A. Yes.

Q. And did you say something along the lines of, for instance, that you'd already talked to me about this, and I told you these things were going on?

A. Will you please rephrase that question?

Q. Well, I say, in your conversation with Josh, in addition to telling him that you had these suspicions of something having been going on, did you in fact tell Josh that you'd spoken to me about this and that I had already said that these things were going on?

A. No, that is no. No.

Q. You didn't say that?

Do you recall more or less what you did say to Josh along the lines of the fact that you had had suspicions that this sort of thing was going on?

A. No.

Q. You don't recall what you said?

A. (No audible response.)

Q. Do you recall how long of a conversation this might have been with Josh that you had before the policeman arrived?

A. No, I don't.

Q. You don't recall?

A. Nope.

Q. When you had this conversation with Josh, who else was present?

A. Just me and Josh.

Q. Okay. Where was Amanda during the time of this?

A. In the other room playing.

Q. I'm sorry? She was where?

A. She is in -- she is in the other room playing.

Q. Okay.

A. Playing with her toys.

Q. All right. Which other room would that have been?

A. I'm not real -- I wasn't paying too much attention.

Q. All right.

A. I just know that she was playing in the other room.

Q. Okay. What room were you in talking to Josh?

A. I was on the couch with him. I was sitting on the -- towards the door.

Q. Okay. This is referring to the living room now?

A. Um-hum.

Q. Now, when the officer arrived that evening, do

you recall whether at any time during his presence he ever talked privately with Josh outside of your presence?

A. Nope.

Q. He was always in your presence?

A. Yes.

Q. Okay. Now, why don't you just describe in your own words what the process was in terms of once the officer arrived what happened and who talked to who when?

A. The officer came in, sat down at the the -- we have a table in the dining room. He sat on the left side, and I sat on the right side. And he was telling me, asking, he was asking me what had happened. And I had told him that Josh was sexually abused by Steve.

Q. Okay. Now, I'd like to have you take a piece of paper, and I'll provide it for purposes here and have you draw a little layout if you would please of, have you draw the layout of your apartment if you could please, if you could do that for us?

A. Yes, I can.

MR. MAHONEY: May I approach the witness Your Honor?

THE COURT: You may.

THE COURT: Do you want to mark it?

(Exhibit 6 is marked for identification.)

BY MR. DANFORTH:

Q. Okay. Why don't you show on there, if you would please, first off, the front end of the apartment with your living room and even to the front of that your bedroom?

A. Right. Okay.

Q. And then show the entrance door from the hallway into that living room. And if you could then go on to show the dining room, and don't forget to include the two bedrooms and the kitchen area, entry.

THE COURT: Do you want to start over?

MR. DANFORTH: Yeah. We could give you another paper.

THE COURT: Why don't you get up, stretch. Why don't up put that aside for now and we'll do that at a break.

MR. DANFORTH: I'd just like to say before, you remember during that break when you do make that drawing, now that I think about it, I'd also like to have you show the landing, that is to say the hallway area out in front of the apartment door, and then the back landing out at the top of the steps out behind your apartment door, okay?

THE WITNESS: Okay.

BY MR. DANFORTH:

Q. For now we'll go on.

Now, you've talked to us about this initial conversation that you had with the police officer in the dining room. And at that point what happened?

A. What happened? After I told him, I -- I said, you know, I told the cop, "Would you like to talk to him?"

THE COURT: Miss Story, if you wish, you can move that microphone a little closer to you. It's gotten so it's not direct to you.

THE WITNESS: Okay.

THE COURT: There you go. I think that will be better. You're kind of soft spoken. Sometimes it's hard to hear you.

THE WITNESS: I'm sorry.

THE COURT: Don't worry about that.

THE WITNESS: I'm nervous.

BY MR. DANFORTH:

Q. What was happening then at that point?

A. I -- I -- I did ask the cop to talk to Josh.

Q. Okay.

A. And I called Josh in, and he sat beside the cop, the chair that I sat in. And I did go in the other room, the living room. The living room and the dining room are kind of like in the same area, but it's like the table is --

Q. That's okay. We'll get to the drawing later. That's fine.
A. Okay.
Q. But, in any event, then your testimony is that at that point when you asked if the policeman would like to talk to Josh, he indicated he would. You brought Josh into the dining room. And now I believe am I correct that you are testifying that you went into the living room?
A. Yes.
Q. And you remained there while he talked to Josh in the dining room, is that right?
A. Yes, I did.
Q. Okay. And before that, before that business about the doll that was in use when the policeman talked to Josh, who brought up about the doll? Let's -- I think you said you suggested using a doll, didn't you?
A. I suggested it, yes.
Q. And at that point once Josh came into the dining room, is that when you went to get a doll?
A. No. No, I didn't.
Q. Okay. When did you go get the doll?
A. After he talked a little bit. He asked the questions to Josh, and I knew that he wouldn't understand these questions that he was asking him. So what I did, I went in the other -- I told the cop that he doesn't

understand these questions. And I went in the other room and got the doll and brought it, brought it in front of him so that he could, so that he can understand what, you know, and so that he could show exactly, you know, where, uhm, you know, where he was touched at.

Q. Okay. So let me get the chronology straight one more time. We're just trying to get the time line here.

You were saying then that the police officer started talking to Josh. This went on for how many minutes before your suggestion of a doll?

A. About a few minutes.

Q. A few?

A. About a few minutes.

Q. Okay. It wasn't just like 30 seconds, it was more or less a few minutes, correct?

A. Um-hum.

Q. Okay. Now, during that few minutes, that was when you were out in the living room or were you still present with them in the dining room during that few minutes?

A. I was in the living room.

Q. Okay. But you could still basically hear because of the side-by-side nature of the bedrooms what was going on there, right?

I mean, that's why you knew that the doll was needed, right?

A. Right.

Q. And you knew that because you were hearing the conversation going on between Josh and the policeman?

A. Yes.

Q. Okay. And the policeman's conversation with Josh at that point until you suggested bringing out the doll had not resulted so far in Josh making any particular statement about anything having happened, is that correct?

A. Um-hum.

Q. Okay. That was a yes?

A. Yes.

Q. Okay. Thank you.

And that's why you went and got the dolls, is that correct, or a doll, correct?

A. Yes.

Q. Okay. Now, this doll, was this a stuffed doll that you are talking about?

A. Right.

Q. Okay. It was a little --

A. Yes. Yes.

Q. A little girl doll, correct?

A. Yes.

Q. It was because the policeman had not had any

progress with Josh up till that point that you explained to the policeman that Josh quote "wouldn't understand without the use of a doll," is that right?

A. Yes.

Q. Okay. Oh, other than that doll, were any other props or other, you know, things used in this illustration to Josh?

A. No.

Q. Okay. Just this doll, right?

A. Yes.

Q. Okay. Now, at that point when you brought back the doll for the police officer to use, did you stay in the room or did you --

A. No, I went in the other room so that I could not pay very much attention to what was said.

Q. Okay.

A. Because --

Q. What did you think that would accomplish?

A. I wanted Josh to express so that he wouldn't get nervous by me being in the room next to him.

Q. So that he could express to the cop what was going -- what had happened between you and Josh?

A. (No audible response.)

Q. All right. Obviously, you've had many close conversations in your life with your son Josh, haven't you?

A. Yeah.

Q. Okay. And has he ever exhibited any nervousness in talking to you in the past about anything?

A. He's really hard at expressing himself to people because he has -- he's -- he gets -- he knows what to say but he can't say it.

Q. All right. Can you give me some illustrations in the past of times when he has known what to say but he hasn't been able to say it?

MS. QUAINTANCE: Objection, relevance.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. All right. Let me rephrase that more closely, can you think of any instances in the past when the topic was matters regarding sex when Josh had not been able to express himself adequately on the first try?

MS. QUAINTANCE: Same objection.

THE COURT: You can answer if you can recall.

THE WITNESS: In the past, meaning before, before the incident?

BY MR. DANFORTH:

Q. At any time before that evening, yeah?

A. Nope.

Q. Okay. So since he hadn't had any trouble even

on that topic in the past, I'm wondering what would have made you think right then and there that he was going to have trouble talking in your presence?

A. Because he's really, he's really hard at -- he's really --

Q. Yes. Okay?

A. It's hard for him to talk with a stranger, a total stranger.

Q. Okay. So you're saying that it would have been easier than for him to talk with a stranger without you being present?

A. Uh-huh.

Q. Yes?

A. Yes. I'm sorry. Yes.

Q. All right. When Josh had been talking to you beforehand, before the police officer arrived, was it your impression that he was having difficulty talking about this topic and expressing himself to you?

A. Yes. Because he -- he wasn't -- he wasn't talking. He was just sitting there. And -- and first he said "Steve," your name, "Steve." And --

Q. I see. All right. You're saying that he had trouble talking to you during that prior conversation that you had with him before you called the police officer, correct?

A. Yes. That's correct.

Q. Remembering that fact, now, does that assist you in remembering approximately how long your conversation with Josh was at that point?

A. We talked about...

Q. I think you have no answer or you don't know?

A. No, I don't know. No, I don't.

Q. Let me ask you it this way, and maybe we can get at it a little bit more conveniently. Was this television on during the time that you were speaking with him?

A. No.

Q. Was the radio on?

A. No.

Q. Okay. It was really essentially just a quiet room at that point?

A. Um-hum.

Q. You and he were talking?

A. Um-hum.

Q. Is there anything otherwise that would have given you any clue as to the passage of time? Did you have a clock or anything?

A. No.

MS. QUAINTANCE: Objection, asked and answered.

THE COURT: It has been. The answer can stand, but it has been asked and answered.

Let's move on.

BY MR. DANFORTH:

Q. Let's -- going back to the interview that the officer had with him, then, you stayed out in the living room until the officer was done talking to him, is that correct?

A. That is correct.

Q. Okay. Then what happened?

A. Then after they, when they were done talking, he, the officer said, "Thank you." And that was it.

Q. Okay. Did the officer ask to borrow or to use your phone or do anything while he was there?

A. Okay. Yeah. I'm sorry. Forgive me for not remembering. Okay. Yes. Yes, he did.

Q. Okay. Do you recall why he said he had to use the phone?

A. I wasn't really -- I wasn't paying very much attention to his phone call at all.

Q. All right. Do you recall whether there in the last several minutes of the time that he was there, during the time when he made that phone call but just before it, whether or not he might have discussed with you some suggestion or the possible need for a medical exam?

MS. QUAINTANCE: Objection, hearsay.

THE COURT: Overruled.

THE WITNESS: Nope.

BY MR. DANFORTH:

Q. Did you talk with him about the possible need for a medical exam?

A. Uh-uh. No.

Q. Okay.

A. Because at the time I was not thinking about a medical exam. I was thinking mostly about Josh and his -- and his -- and his feeling, and his feeling about what had happened to him.

Q. Okay. Well, let's talk about that. Let's talk about your sense, impressions about how Josh appeared during the time that he was talking with the police officer while the police officer was there?

A. I'm sorry. Ask that one more time.

Q. Sure. What was your impression about Josh's emotional state as he talked with the police officer?

A. He was sad.

Q. He was what?

A. He was sad.

Q. He was sad?

A. Yes.

Q. How did you know he was sad?