**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth**,

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# <u>TRANSCRIPT EXCERPT:</u>

# TRIAL TRANSCRIPT,

## Volume V

## February 26, 1996

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

interview -- and for your information, Ms. Beitz, I watched both videos. I've seen the interjection in other cases where it's by telephone and the phone rings and the interviewer picks it up and listens to something that I assume is coming from a member of the team about a question or an area of inquiry. I did not see that happen here on either of these children. However, the lead investigator, Beth Roberts, indicated that she thought she recalled that there was a contact made into the Amanda interview.

I don't know the source of Mr. Danforth's information about some concern that this was contact that may be made without people being able to observe it on the video tape, because that's been my experience. Maybe they have changed their procedure, Mr. Danforth, I don't know, but that I think given that testimony of Miss Roberts, I think Mr. Danforth wants to understand whether that did or did not happen and what the nature of the contents of that contact was, if it happened. Am I reading you correctly, Mr. Danforth?

MR. DANFORTH: That's right. That's certainly one of my very strong concerns, Your Honor. Simply visually observing toward the rear end of the tape, and I think I did make a point of this in the brief, that I have suggested here that there is a point, in fact, a few points toward the rear end of that tape as they're getting

close to the end of the interview, certainly in that last Darlene sector you hear a number of instances there where a whispered voice is heard to precede a number of responses by Amanda. And the voice in at least a couple of instances is not at all compatible with the suggestion that Amanda herself is simply whispering or mouthing these things before she says them.

However, even if that were what was going on, as a matter of common, human experience, Your Honor, the reason why people tend to mouth words, especially children, prior to giving a response, is because they're doing so in response to some kind of prompting. Either way you look at it, it seems to me there is a fairly strong case that could be made out on the appearance of the tape itself that at that point there is some kind of prompting going on. And it's very conceivable that the whispered voice that one hears is in fact the voice of the prompter, although the identity --

THE COURT: Let's not get too far off on that, because really the issue right now is Ms. Wilson's role in this.

MR. DANFORTH: That's right. And I was simply explaining that all those that were present in the observation room, team room, whatever it's called, watching the interview real-time, and who were overtly capable of

affidavit to this Court indicating that she has no knowledge whatever of any of those three topics, I'm going to quash the subpoena. If she has knowledge about any of them, I would like her to come in and be examined outside of the hearing of the jury. I don't think it's going to take more than about 5, 6, 7 minutes. And she --

MS. BEITZ: May I seek some clarification on those, Judge?

THE COURT: Sure.

MS. BEITZ: Just to make sure I understand. The first is whether or not she observed any interaction between the interviewer and the children or had any interaction that is not on the tape.

The second is whether or not there was any contact with the interview room. And is that during the interrogation of Amanda?

THE COURT: Right. The only evidence we have right now is that there was some contact with the interrogation of Amanda.

MS. BEITZ: And the third, I guess I would like to be heard on that. I think the discussions that the prosecutor may have had with the interviewer prior to the interrogation is clearly work product as is contemplated by the Rules of Criminal Procedure.

It reveals, perhaps, the theories of the prosecutor

with respect to what he needs to be done or what needs to be pursued. And the rules do not limit the work product privilege to the prosecutorial stage. It's clear that they also apply to the investigative stage. And I would also submit that the reports that she made are protected by Subdivision 3(1)(b), and that specifically says that reports of the prosecution makes -- there is a distinction that is made when the prosecutor is the only person that interviews a witness and takes notes so that there are no other documents which would properly reflect what the witness said. And then they become statements which are disclosable under 901 Subdivision 1. But it seems to me that the discussions prior to the interrogation of the children is clearly work product of the prosecutor.

MR. DANFORTH: Well, Your Honor, if I could --

THE COURT: Just one second.

When you say "reports," I take it -- tell me what we're dealing with? Does she have some handwritten notes that the written material --

MS. BEITZ: Yes. Yes. She has handwritten notes pertaining to both of the interviews, some of which is basically demographic-type information; the age of the kids, who was there, which is presumably reproduced on a synopsis which counsel have. And the

either Debra Martinetti or Beth Roberts with respect to the conversation of the team, if you will, prior to the interview is incorrect or wanting?

MR. DANFORTH: I only have the -- well, at this point in terms of the state of evidence, all I have is internal inconsistencies between those two pieces of the testimony, Your Honor. We have Miss Roberts saying --

THE COURT: Well, no. I know what the record is, but is there anything else, any evidence that's not in the record that causes you to believe that there is some unknown or unavailable information that she would have with regard to the conversations conducted by the team prior to the interviews?

MR. DANFORTH: Well, Your Honor, only what we discussed so far. And as I say, you know, my awareness of the truth in the end and the fact that the tapes do not contain the truth. That's it.

THE COURT: Well, we do have 33 people, 206 of whom have been witnesses already and apparently one other that you have under subpoena, and we are dealing with, I think, delicate areas when in the very same way with the County Attorney would bring in here members of the public defender staff or their investigators and so on and try to probe all of the conversations that took place sort of in-house as part of the defense of the case, these are

sensitive areas where other available information becomes a fairly important factor.

So here's what I would like to get then, Ms. Beitz. I would like to have either an affidavit indicating that there is no such information, or I would like Carrie Wilson to appear. The two topics are, one, any contact or witnessing any communication or witnessing of communication by Ms. Wilson of herself or any other person with the children prior to the interviews.

And, two, any witnessing or knowledge she has as to a contact made into the interview room during the course of the interview.

(Mr. Mahoney enters the courtroom.)

MS. BEITZ: I assume with respect to the first one, we are talking only at Corner House and we're only talking about --

THE COURT: Well --

MS. BEITZ: -- the staff.

THE COURT: Well, I assume that she -- all I know about is that she had the only contact that she's had is at Corner House when, you know, she might have bumped into the kids or something upstairs during the course of this proceeding. I'm not talking about that. We're dealing with the interdisciplinary team is the

subject at issue here. But if for some reason she had some contact pre-interview away from Corner House where the kids made some statement, I think I need to know that.

MS. BEITZ: Yeah, I think with respect to Ms. Wilson, that's clear. I'm just trying to clarify what other persons you're concerned about.

THE COURT: I'm talking about the members of the interdisciplinary team.

MS. BEITZ: Okay.

THE COURT: So if you have an affidavit that there is no such facts within those subject matters, then that's that, and the subpoena will be quashed. If not, let me know and we'll arrange for time.

MS. BEITZ: I will do so.

Thank you.

(Ms. Quaintance enters the courtroom.)

MS. QUAINTANCE: Your Honor, I just wanted to get some clarification on the scope of the testimony with regard to one of the Spreigl witnesses, because I only just had the opportunity to speak with him right before court this morning.

I would propose to have him testify as the Court has already indicated is appropriate to how and when he met Mr. Danforth, what types of things they did, which were not

sexual in terms of spending time together and that kind of thing, who else was around, what kind of presents, trips, and so forth, the defendant took him on. The fact that he was paid money for being photographed in the nude, and that Mr. Danforth performed sexual acts, specifically oral sex on him, repeatedly over a period of time.

In talking to him, he indicates to me that threats were made to him and Mr. Bolinger in his hearing about what would happen to them if they told anybody about what was going on. I do think that's relevant. There's delayed reporting in this case, intimidation, and the reason why these children did these things with Mr. Danforth is an issue. And so I would like to have that come in.

Some of those threats involved some foul language on the part of the defendant. I think that should be allowed to come in. Mr. Danforth presents himself, obviously, one way here before the Court, and the jury's entitled to know how he behaved with these children and the language is at least arguably sexual in nature.

There is also an issue of the fact that Mr. Danforth provided these children with alcohol and allow -- and provided them with money which they used to buy drugs and then smoked marijuana in his presence in his apartment. At the time there were approximately 10 years old. Again, I think this is relevant to the grooming of these children.

He also had them stay at his house for a couple weeks even at that time, and had them skipping school and allowed them to skip school and that kind of thing.

And I'm simply providing this information to the court because the full extent of this was not known to me until I could talk to this witness who's in custody. And I want to have it out in the open before I question the witness so that there is not any problems later.

THE COURT: Okay. Well, you can argue after I talk, Mr. Danforth, to see if there is anything left here. The threats, no, not cannot be talked about. Paid for video, no.

MS. QUAINTANCE: Paid for photographs.

THE COURT: Paid for photographs, no. That's already in a snip it of a couple places in the statements that were read, because the photographing, I think, could not reasonably be taken away from the context there. And I think the photographing has to do with this case, given the Gray issue. But paying for photos, there is no evidence about that in this case. There is evidence of photographing in this case relative to Gray, but no evidence of paying for photographs.

The foul language, no, is out. And, again, there is already some of that where at least Mr. Danforth was present and permitting some pretty foul language, arguably

made to his custodial status or his own offenses.

THE COURT: That's right. That's right.

Okay. Are we ready?

MS. QUAINTANCE: Well, I believe that he needs to be seated before the jury comes in.

THE COURT: Oh, he's the first one?

MR. DANFORTH: So they don't know he's in custody?

THE COURT: Okay.

MS. QUAINTANCE: Is talking about Exhibit 3 --

THE COURT: Well, the way I feel about, frankly, I think it should await the issue of cross-examination. Actually, I think there is too many questions with me. So I'm going to reverse my ruling and I'll permit the defendant, if he takes the stand and it's impeachment material, because obviously I think the inquiry about whether he's been in locker rooms with children or children nearby is relevant inquiry if he's a witness. And I'll let it be used for impeachment, but I'm not going to permit it to be used in the direct part of the case. That's Exhibit 3, the video tape of the locker room.

(9:25 a.m., the jury is seated in the courtroom.)

A. We would -- are you talking about everything we would do there?

Q. Well, when you first met Mr. Danforth, before anything sexual happened, what kinds of things would you do at his house?

A. Listen to music, watch movies, play games, that sort of thing.

Q. Okay. When you were at his house, were you there alone or were some other kids there too?

A. There was other kids there too.

Q. Who would be there?

A. Joel Bolinger, Ricky Mack, Danny Mack, Jeff O'Neill.

Q. Okay. When -- did Mr. Danforth know your parents at all?

A. Yes, he did.

Q. Did he know them before he knew you or did he know you first and then met them?

A. He knew me first.

Q. Okay. So did he have any separate friendship with them, separate from his relationship with you?

A. No, I wouldn't say so.

Q. Did Mr. Danforth ever buy you any presents?

A. Yes, he did.

Q. What kind of things would he buy you?

A. Like Christmas presents, I believe, a Ninetendo I believe shoes, I think one time. I'm not sure exactly what it was, but, yes, he did.
Q. Now, did there there come a time when he took some photos of you?
A. Yes.
Q. Did he take photos of you in the nude?
A. Yes.
Q. How often did he do that?
A. I would say once every couple months.
Q. And when he took those photos, were you alone or with other people or what?
A. You mean, alone in the photo?
Q. In the photo, yeah?
A. Sometimes, yeah. Most of the time.
Q. Okay. Was there ever times when you were in the photos with other people?
A. Yes.
Q. And who were the other people?
A. Only Joel Bolinger.
Q. Okay. And in these photos, in addition to being naked, were you posed at all?
A. Yes.
Q. Where those sexual poses?
A. Yes.

Q. Can you just briefly describe for us what if anything you were doing in the photos?
A. There was no touching involved, it was just like you would see in a nude magazine, you know, that type of thing.
Q. Okay. Were you ever touching yourself in the photos?
A. Yes, I believe so.
Q. And did you have an erect penis in those photos?
A. Sometimes, yeah.
Q. And in the photos you were in with Joel, were those sexual poses?
A. Yes.
Q. And when he took photos, did he just take one picture or a lot or what?
A. Sometimes between two and four, five, rolls.
Q. And that would be once every couple of months he would take two to five rolls?
A. Yeah, not on a regular basis. It was, you know, kind of wherever he had money for the film, I guess. I'm not sure.
Q. Okay?
A. Or whenever he -- you know.
Q. Did you ever take any trips with Mr. Danforth?

Q. Okay. Roughly?
A. Yes.
Q. I guess what I'm driving at by all this is that your age at that time, if we do some arithmetic here, in March of '87, would you have been 12 by a couple months at that point?
A. Correct.
Q. Okay. And --
A. 13.
Q. Okay.
A. In '87?
Q. That's right. Now, looking back to the period just prior to that statement and my arrest, do you remember my living in a couple of addresses back over on the Hennepin County side. The last one would have been, would it not, an address way out in Champlin.

Do you recall an address there, an apartment complex with a pool?
A. Vaguely. Vaguely. I do remember a long drive out to the house, right.
Q. Did the apartment complex have a pool, is that correct?
A. Correct.
Q. And just prior to that I had lived in an apartment that was just off of Franklin Avenue, east of

Franklin Avenue in another ground floor apartment?

A. That one I don't recall, no.

Q. Okay. Well, let's see if we can refresh your memory about some rides that you and Ricky Mack and typically Joel, but not always, as well, had taken, unauthorized rides in my car?

A. I do believe we have done that on several occasions, yeah.

Q. Probably more than I knew. But there were a couple of occasions when you --

MS. QUAINTANCE: I'm going to object to inquiry as to prior bad acts -

THE COURT: Sustained.

MS. QUAINTANCE: -- of this witness.

THE COURT: Sustained.

MR. DANFORTH: The only reason I went into that --

MS. QUAINTANCE: Objection, explanation.

THE COURT: Why don't you go ahead.

MS. QUAINTANCE: Ask that it be stricken.

THE COURT: Go ahead and ask your next question, please, Mr. Danforth.

BY MR. DANFORTH:

Q. Does that refresh your recollection, however, as far as the address that I lived at not too far off of Franklin Avenue?

A. Somewhat, yeah.

Q. And then working back before that, wasn't it before that that I lived at Gibb Parkway at the apartment in Saint Paul that was not far from Porky's off of University Avenue?

A. I do believe that was the last place you were living before the arrest, I do believe. Lindhurst or somewhere around there.

Q. But these other two addresses were about contemporaneous now in the same time period, weren't they? A. No. I believe the one in Champlin was quite a bit before that, maybe. I'm not sure. You lived at a lot of places. I get confused as to when exactly they were, but I do remember the last place you were living is on Lindhurst over by Porky's diner, yeah.

Q. Well, what I'm driving at is your recollection as you knew me for about these last one-and-a-half years then before my arrest, was that it?

A. Maybe longer, yeah. At least one-and-a-half years.

Q. And so when the police sergeant came to see you at your school, you had just turned 13, you say?

A. Correct.

Q. Where specifically do you recollect that these sex acts occurred?

A. Specifically?

Q. Where?

A. Pleasant Avenue, Larpenter, the last place you lived, Lindhurst, or in the Midway Shopping Center apartment.

Q. These acts that always occurred in these -- these acts then always occurred in these apartments, is that right?

A. Correct.

Q. And where particularly in the apartment?

A. Bedroom.

Q. Okay. Invariably?

A. Excuse me?

Q. Always in the bedroom?

A. No. I don't believe so. I believe maybe in the living room once or twice.

Q. But always in the apartment?

A. Correct.

Q. Now, do you recall in any of these times that we were together did we ever go swimming anywhere?

A. No.

Q. Now, this is a little rear into the record, but

who else at this period of time was in this circle of relationships that were of this same nature?

A. Mostly Ricky Mack, Joel Bolinger and myself.

Q. Okay. And of these, which ones were you aware of that there was something going on also between me and them of a sexual nature?

A. All of us, yeah.

Q. But that was the group, was it not?

A. Correct. Most of the time there was Danny Mack, but he was wasn't around a lot.

Q. But you had mentioned that sometimes as well Jeff O'Neill would come and hang around with us?

A. But no sexual acts that I'm aware of.

Q. Okay. That's what I'm driving at.

And for that matter, there were others that occasionally hung around with us as well, were there not?

A. I do believe a couple, yes.

Q. Okay. But, again, the nature of these relationships was just that these would come and hang around, they would not involve in this sexual activity, is that correct?

A. That I'm aware of, yeah.

Q. And who were these others?

A. In can't recall. I do believe one guy was named Pete. That's I never saw those people much.

Q. Okay. But, for instance, you had yourself a couple of younger brothers, correct?
A. Correct.
Q. One was named Jimmy, wasn't he?
A. Correct.
Q. And one was named Mark, right?
A. Correct.
Q. Okay, now, is it not a fact that every now and then, although somewhat seldom, they also might have hung around with us?
A. Jimmy, yes, not Mark too much. Jimmy, couple times slept over , yeah.
Q. All right. It's the same situation with that, with Jimmy, though, was it not, as it was with Jeff O'Neill?
A. Correct.
Q. Just to hang around?
A. Correct.
Q. No sex, as near you knew?
A. Right.
Q. And do you as well recall what Jimmy's age is relative to you, how much younger than you is he?
A. He's about a year-and-a-half younger than me.
Q. By the way, where is he now?
A. He's --

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

MR. DANFORTH: We might have to approach the bench.

THE COURT: Come on up.

(Whereupon, a discussion was held off the record at the bench.)

BY MR. DANFORTH:

Q. And just to finish off that particular line of inquiry, I guess, Mark, your younger brother, how much younger than you was he?

A. I do believe he's about about two-and-a-half years younger than me.

Q. Now, you had indicated that on a couple of occasions they came along, do you recall why they came along?

A. No, I don't.

Q. It didn't particularly seem to you that I was trying to cultivate any particular relationship with them, did it?

A. No.

Q. Okay. Do you recall any other younger siblings of the Mack brothers?

A. I do believe so, yes.

Q. Okay.

A. I can't recall the name, though.
Q. All right. Would the names Randy and Troy sound familiar?
A. Yes.
Q. Okay. And did the same circumstance generally go on with regard to their involvement on the end of this group? Did they sometimes hang around?
A. Yeah.
Q. And once again, as near as you know, they weren't involved in any sexual activity, were they?
A. Correct.
Q. There was a younger boy on the edge of this group by the name of Lenny who appeared to have some degree of Native American extraction, was there not?
A. I'm not real sure.
Q. Okay. Do you recall living in the apartment on Chicago Avenue not too far from 28th?
A. Yes.
Q. At the time that you lived there, do you recall meeting such a neighbor boy of some Native American extraction?
A. Yes. Okay.
Q. Do you recall if his name might have been Lenny?
A. I'm not real sure.

Q. Do you recall if, occasionally, every now and then, and in particular, perhaps, at the time when I was living in the Lindhurst address behind Porky's on University when that boy might have been hanging around with the edge of the group, sometimes coming over?

A. I'm not real sure, no. I don't know.

Q. In preparation for your testimony today, have you viewed any video tape dating back from the time of --

A. No.

Q. Okay. As near as you know -- well, let me ask you this, what's the clearest point in time of your memory of these relationships and times?

MS. QUAINTANCE: Objection, vague.

THE COURT: Well, you can answer.

Do you understand what the question is?

THE WITNESS: Kind of, but it's --

THE COURT: Why don't you try it again then, Mr. Danforth, to make sure.

BY MR. DANFORTH:

Q. Sure. Is there some moment in time that is clear from this era with regard to your relationships with me and these other boys?

A. Yes and no. I mean, it's -- it's all kind of, you know, blurry with time; but probably the most -- the thing that I remember most is probably the trip to Florida.

That's fairly clear.

Q. Okay. Now, the trip to Florida, including Disney World, what car was that taken in, do you recall?

A. I believe a brown station wagon, I believe.

Q. Okay. And that brown station wagon was a car that was retained by me up until the time of my arrest as near as you recollect, was that correct?

A. Correct.

Q. And the vehicle that I had before that station wagon, would that have been a blue van?

A. Correct. That's what I learned to drive in.

Q. And in the case of the Florida vacation, then, do you recall -- strike that -- where I was living at the time of that vacation?

A. No, I don't.

Q. What time of year was that vacation?

A. Spring break.

Q. Okay. And then can you think forward from that point in time and recall was it about another year to the following spring when the police officer came to see you?

A. (Nods.)

Q. Does that sound correct?

A. Yeah, that does sound correct.

Q. Okay. Therefore, if we already know that the time of that was about March of 1987, working backward in

time from this year, the vacation to Florida, would you say, was about March of 1986?

A. Could possibly be, yes.

Q. Okay. It's significantly more likely in your mind that it was then than a year before that, say, when you'd only just met me?

A. Right. Yeah.

Q. You'd known me for quite some time long before we took this vacation to Florida, right?

A. Yeah.

Q. Okay. So if -- all right. Now that we've established that was, let's say, March of 1986, do you recall -- well, we know if you were born in '74, then March of '86 you were?

A. 12 -- 13.

Q. Right. At that moment in time, how old was Joel Bolinger?

A. I believe 13. He's a year older than me.

Q. Okay. And do you recall how old Danny Mack was with relationship to you or Joel?

A. No, I don't.

Q. Did it seem that he was at least as old as Joel

A. Yeah.

Q. Okay. So it's even possible in your mind that he could have been six months or so older than Joel, say?

A. Possible, yeah.
Q. And Danny's younger brother, Rick, now, how much -- was he the next younger brother of Danny?
A. Yes.
Q. Okay. And so he was older than Randy and Troy Mack, correct?
A. Correct.
Q. How much younger than Danny was he, as near as you recollect it, if you have one?
A. I'm not sure, maybe a few years, couple years.
Q. Well, did it seem that Ricky was essentially your same age?
A. No. I believe he was younger than me.
Q. Okay. Could it have been that he was within a year younger than you?
A. I'm not real sure, no.
Q. But he certainly wasn't three years younger than you, say, for instance?
A. No.
Q. And he wasn't like to have been two full years younger than you, was he?
A. Unlikely.
MR. DANFORTH: Okay. I have no further questions.
THE COURT: Miss Quaintance?

Q. Okay. And when you first went to his apartment, what kind of things did you do there?
A. Mainly just sleep at first, and then later on other things started happening.
Q. Okay. Now, when you would sleep over at his apartment, were you in school at the time?
A. Yes. During the summer, no, during the spring, yeah. Well, during school.
Q. When you first meet him, was that the summer or what was it?
A. I'm not really sure.
Q. Okay. Now, did he ever take you on any excursions or any trips or take you out anywhere around town?
A. Yeah, we'd go out around town, go to arcade and --
Q. What's the arcades, is that like pinball or video machines?
A. Yeah, Pop's Arcades in downtown Minneapolis.
Q. Okay. Where else?
A. Out to eat certain places, different places.
Q. Now, when you first met him and you were eight years old, was Joel or Danny or Ricky Mack around at that time?
A. No, they weren't.

Q. Okay. And when you stayed over at his house, you said at first nothing happened?

A. Yeah, like the first week or so, couple weeks wasn't, it wasn't a problem.

Q. How long after you met him did he start doing things to you?

A. Between three weeks and a month, I would guess.

Q. And what did he start doing?

A. Sucking my penis. And that's pretty much it.

Q. Okay. Did he ever want you to suck his penis?

A. No. He never said nothing like that.

Q. Okay. And when he did that, where would he do that?

A. In the bedroom.

Q. On the bed or somewhere else?

A. On the bed.

Q. So you were still eight at this time or were you older?

A. I was about eight, almost nine.

Q. Now, did there ever come a time when he started taking photos of you naked?

A. Yes, there was.

Q. Was that -- did that happen before or after he started having sex with you?

A. After.

Q. Okay. And were these photos of you alone or with anybody else or both?

A. Well, the photos didn't take place until he like started to move around. And at the time I had brought Danny and Ricky down there, and he had met them. And sometimes it was just me, sometimes it was me and Danny.

Q. And what about Scott, was he there yet?

A. Yeah. Not at that time. He came after a while.

Q. Okay. How did you know Danny and Ricky?

A. I used to live like two blocks away from them.

Q. Okay. Now, did you ever see him have sex with any other of these boys?

A. Only when he was sucking their penis.

Q. Excuse me?

A. Only when he was sucking their penis.

Q. Okay.

A. And that was like Danny.

Q. Okay. You saw him suck Danny's penis, anybody else's?

A. Nope.

THE COURT: Would both of you approach for just a moment, please?

(Whereupon, a discussion was held off the record at the bench.)

BY MS. QUAINTANCE:

Q. Now, you said you saw the defendant have sex with, only with Danny of these other boys?

A. Yeah. Well, if it was, it was dark and, you know, I did not see it.

Q. Okay. Did you hear anything?

A. Sometimes, yeah. Sometimes, no.

Q. Okay. And would he sometimes be in this room with another kid and you would hear something?

A. No.

Q. Okay. So when you say if it was dark, if it did happen it was dark?

A. Yeah.

Q. What do you mean?

A. Like getting ready to go to sleep, and it would happen that night, and the lights would be out, and it would be three people in bed. And it would happen like that.

Q. Okay. So you would all be in the same bed?

A. Yeah, it's only done that like a few times. I think -- I mean, that's pretty much with Danny.

Q. And that's pretty much with Danny?

Now, did he ever attempt to have any other kind of sex with you other than oral?

A. Yeah. One time he tried to having anal, but it

didn't work, so.

Q. When you say "it didn't work," why?

A. Uhm, I don't know if you say it didn't go in or it pretty much started to hurt, so nothing like that ever happened.

Q. Okay. Now, when he had sex with you, how often did that happen?

A. Mainly weekends, sometimes during the week, if I had school off.

Q. Now, how often would you stay over there?

A. I'd probably be over there almost every weekend, every other weekend.

Q. And you'd stay over?

A. Yep.

Q. What about during the week?

A. During the week only if I didn't have school. And after a period of time, I started like missing school and --

Q. When you started missing school, did he know that?

A. Yes, he did.

Q. So when you missed school, were you at his house during the day or somewhere else?

A. I would be at his house for like half the day, and I'd get dropped off at home.

Q. Who dropped you off?
A. Steve would.
Q. And how did you get from where you lived to where he lived
A. His automobile.
Q. So he would come and pick you up?
A. Yep.
Q. Did he know your parents at all?
A. Yeah. He knew my mom.
Q. How well did he know your mom?
A. They were pretty good friends at the time.
Q. Okay. So he was friends with her separate and apart from you?
A. Uhm, yeah, you would say it would be like that.
Q. Okay. Did he know her first or you first?
A. It was me first.
Q. And was your Dad living home at the time?
A. No, he wasn't.
Q. Now, did he ever take you on any trips out, out of town?
A. Yes, he did at one time.
Q. Where?
A. Well, a couple different times, uhm, we went to Walt Disneyland or Walt Disneyworld.
Q. It one in Florida?

A. Yeah. And I think I went out to Wisconsin once with him.
Q. Okay. Who went to Disneyworld?
A. It was me and Scott.
Q. Okay. And who went to Wisconsin?
A. I know I went. And I can't remember if -- I think it was probably just me at that time.
Q. Where in Wisconsin did you go?
A. Madison, Wisconsin.
Q. And what did you do there?
A. I think he visited his parents. And that was pretty much it.
Q. Did you meet them?
A. No, I never met his parents.
Q. So when you went there, did you stay over?
A. Yes, we did. Motel room.
Q. And did you have sex with him on that trip?
A. Yes, we probably did.
Q. Did he ever give you any presents?
A. Yes. He would do that at birthday time, out of the blue sometimes.
Q. What kind of things?
A. Normal stuff for a little kid.
Q. Like, what, do you remember?
A. No. Not --

Q. Okay. Do you remember anything about a dirt bike?

A. Yes, a BMX dirt bike at one time.

Q. Where did that come from?

A. Steve bought it.

Q. Do you know where he bought it?

A. I think K-Mart.

Q. Who was that for?

A. Me.

Q. Just you or all the kids or what was it?

A. Just for me.

Q. Okay. And do you remember him having a video camera?

A. Yeah, I do.

Q. Did you kids take videos with it?

A. Yeah. We'd take videos. He would record us having like, what do you call it, just fund regarding like group events and stuff.

Q. Just hang out?

A. Yeah.

Q. Okay. Do you remember where you were when you were doing that? What apartment?

A. I think that was, I think that was on Gar -- no, it was like South Minneapolis, 27th and something. I don't remember the address.

Q. Do you remember Mr. Danforth living at a Saint Paul address, Lindhurst at all?

A. That would be right off, what is that main street in Saint Paul? Yeah, I do. I just, it's like right off Washington, I think. I think that's Washington.

Q. Okay. Did you have the video camera there at all, do you remember?

A. No, not at that time I don't think.

Q. Okay. Do you ever remember an occasion where you had some kind of a dragon drawn on your back?

A. Yeah, I do.

Q. How did that get on your back?

A. Steve had drew it on my back.

Q. Okay. What was -- why did you have that? What was going on there?

A. Well, I just wanted like something like a design on my back at the time he did that, and he drew a dragon.

Q. Okay. You wanted him to do that?

A. Yeah.

Q. How long did you know him for?

A. I would say about four years, almost five.

Q. And once he started having sex with you, and you told us about that, did he continue to have sex with you for the rest of those four or five years?

A. Yes, he did.
Q. How often?
A. Every time I like pretty much stayed over there, every other weekend.
Q. Okay. And what about the photos that he took, did he keep doing that all that time?
A. Every now and then. It wasn't like it was too big of a deal.
Q. Okay. And when he took photos, I mean, I'm talking about the naked photos?
A. Um-hum.
Q. Were you doing sexual stuff at all?
A. Just laying there, standing.
Q. Would you be touching yourself or holding yourself ever?
A. Sometimes, yeah.
Q. And would you have erections ever?
A. Yes, we would.
Q. And when he took photos, did he just like take one or what?
A. No, it would be like two rolls, three rolls.
Q. Now, do you remember when he was arrested?
A. Vaguely.
Q. Okay. Do you have any idea how old you were at that time?

A. I was about either 12, 13, years old.

Q. And you were how old when he started having sex with you?

A. I would say about eight, almost nine.

MR. DANFORTH: Asked and answered, Your Honor.

THE COURT: Sustained.

MS. QUAINTANCE: I have nothing further.

THE COURT: Mr. Danforth?

CROSS-EXAMINATION

BY MR. DANFORTH:

Q. Do you have any recollection of what year it was that I was arrested?

A. About '83, '82, '83.

Q. I'm sorry. I asked the year of my arrest?

A. '82, '83, '83, somewhere in that.

Q. Okay. I --

A. I'm really not sure. I don't remember years back.

Q. Do you remember where I was living at the time of my arrest?

A. I think that was like out towards Fridley, it was.

Q. Does the name Champlin sound like a familiar

location?

A. Yeah. Wait, no. Champlin? I would -- no, it was like north. I don't remember the name but I know I've been by there a few times.

Q. Okay. But you were in that apartment on a number of occasions, were you not?

A. Yes, I was.

Q. Okay. Do you remember, did that apartment complex have a swimming pool?

A. Yes, it did.

Q. Your description of this incident of near or attempted anal sex, did that occur at that location?

A. Yes, I believe so.

Q. Okay. Do you recall how long I was at that address before my arrest?

A. I would say about a couple months. Few months.

Q. Not considerably longer, was it?

A. Huh?

Q. It was not considerably longer than that, was it?

A. It might have been. Not too much longer.

Q. Okay. And you had said that your recollection was at the time of my arrest, you were either 12 or 13 years old?

A. Yes.

Q. How old would you have been in April of 19 -- or, excuse me, March of 1987?

A. I would be 10 years old.

Q. All right. Sorry. What is your date of birth again?

A. 9-8-73. Oh, I would be 14 years old.

Q. Okay. Okay, now to the nearest of your knowledge, in any event, the group of boys that were regularly together with us was Daniel Mack, sometimes Ricky Mack and Scott Swenson, is that correct?

A. Yes, it is.

Q. Okay. I think just a minute ago you testified that you had seen some fellatio of Dan, and that you were present in the bed in the darkness with the other two from time to time.

And if I understand you correctly, was it your testimony that you thought that there was something going on with those other two from time to time as well?

A. I knew there was something going on from time to time.

Q. All right. But other than this, that is the extent of it, is that not right? I mean, that is to say it was these boys?

A. Yes, I believe so, except for the time we took the trip out to Florida.

Q. Okay. You're saying on that trip there wasn't any sex, is that correct?
A. There was. And I believe there was another person there that you might have known. And I don't recollect his name, but he also had a young boy with him at the time.
Q. Then, now, Dan Mack, was he a little older than you?
A. He might be. I'm not really sure.
Q. He certainly wasn't any younger than you, correct?
A. No. He's about the same age as I am.
Q. Okay. And his younger brother Rick Mack, do you recall how much younger he was than Dan?
A. I would say about a four year difference, three, four, years.
Q. Well?
A. If -- I believe so. He's like 18, 19 years old at this time.
Wait. My fault. Two years apart.
Q. There about, two years apart. Okay.
And do you recall Scott Swenson, right?
A. Yes, I do.
Q. Okay. And he was about your age, was he?
A. Yeah, I think he's like right about our age.

Q. Okay. All right.

Now, you had indicated that you were the first person?

A. Yes, I would believe so, but from what I hear from Dan, I might not have been.

Q. Okay. I think by that you mean that you're uncertain as to whether it was you or Dan, is that correct?

A. I don't know about Dan. I have no clue. To me, I think I was the first, yes.

Q. Okay. Do you have any recollection of -- well, strike that.

These sex acts, where did they occur?

A. Pretty much either in bed, sometimes maybe the living room.

Q. But it was always in these various apartments?

A. Yeah.

MR. DANFORTH: There really isn't anything else I need to ask.

THE COURT: Miss Quaintance?

MS. QUAINTANCE: I have nothing further.

THE COURT: You may step down, sir. Thank you.

MS. QUAINTANCE: Your Honor, at this time I would like to play some footage from Exhibit 15 which has been previously introduced into evidence and

testified to by Investigator Roberts.

THE COURT: You may.

Can we have the normal stipulation with regard to the tape constituting the record?

MR. DANFORTH: Yes, Your Honor.

THE COURT: Okay.

(Whereupon, Exhibit 15 is played for the jury.)

MS. QUAINTANCE: The first segment, for the record, is of the Story family at an outdoor pool previously identified by the witness as being at the Century Court apartment complex.

I'm going too fast forward to a portion that's been previously identified as taking place at the indoor pool at the same location.

MR. DANFORTH: Your Honor, I would like the record to reflect that Miss Quaintance stopped while Josh was addressing me and before the signal was finished.

THE COURT: Okay. Of course, if you want to play any other portion of that tape, you may, Mr. Danforth, in your case.

MS. QUAINTANCE: At this time, Your Honor, I would like to play for the jury the exhibit which is an eight millimeter video tape which is has previously been identified by Investigator Roberts and includes the

And I would, you know, simply offer by way of my own testimony that I had no idea what was on those tapes, including the footage here of Gray. That was a bit of a surprise to me that it existed.

THE COURT: Well, again, it seems like the tape within itself has you filming the footage. So I'm going to ask the Deputy to take custody of this microcassette recorder that has the tape in it of the Hennepin County social worker so that at some point in the break, Mr. Danforth, you might listen to it, if you wish to do so.

I also should note to Mr. Danforth that with respect to Exhibit 29, which is the material from the Wilder Foundation, I noticed a few things, three of which were simply for my own edification, dealing with vulnerability of Terese and her psychological evaluation, which was confirming of the material in the other social services files with regard to her mental capacity, and so on.

But the reference bears -- that relates to this case, Mr. Danforth, is a reference in a memorandum authored by Judy LeMay of the Wilder Child Guideance Center. It has the date July 12, 1993. It's a three or four page handwritten document. The reference that I found that had relevance and that I wanted to disclose to Mr. Danforth is as follows: "The day after Terese's court appearance with

the jury. There is clear evidence where this took place, that it took place at an address in Richfield, and that that's in Hennepin County.

There is clear evidence that the defendant was more than three years older than the victim, and that the victim was under 13 at the time. The only real element in question is whether or not Mr. Danforth did this. It makes no difference whether it was anal penetration, whether Josh committed it on Mr. Danforth or whether Mr. Danforth committed it on Josh. It's all sexual penetration.

And I would submit that the testimony's not inconsistent because Josh was specifically asked on the Corner House video tape if it would be too hard to talk about it if he had touched Mr. Danforth, and he said that it would. It is very possible that all of these things happened. And there is not necessarily any inconsistency at all.

With regard to the contradictions between Castilleja and the mother, that does not go specifically to the elements of the crime, and goes to the weight to be afforded that testimony, not whether or not this should go to the jury or not.

We have Josh's clear statement in the video tape and Amanda's clear statement of what she witnessed. The testimony of the mother is that there was no other person

although the crime might be in terms --

THE COURT: Let me help you out a little bit. I have decided, Mr. Danforth, that there will only be one out-of-court statement of Joshua will be allowed for substantive evidence. And that's the Corner House video. So they may not convict you on Josh's testimony respecting any other issue than those acts identified on the Corner House video.

And I will be instructing the jury that those other two out-of-court statements are to be used for essentially consistent or inconsistent kind of appreciation by the panel and nothing more.

And it strikes me that Amanda being the only other witness to this, subject only to your decision about testifying and what you say, that that would be some additional evidence that relates to this act upon which you could be convicted. But you can't be convicted on -- you will not be able to be convicted on these other statements, because they're not going to be allowed to be for substantive evidence.

I've wrastled with the identification issue as we have moved through the trial. And I thought about it quite a bit. And I don't know whether there is much in the way of law that relates to this issue. It is an identification that's a little bit different than what we normally see in

foundation, no.

BY MR. MAHONEY:

Q. Showing you what's been marked for identification as Exhibit 22, do you recognize that?

A. Yes, I do.

Q. Do you recognize the handwriting on that?

A. Yes, I do. That's mine.

Q. And what do you believe the contents of this show?

A. Pool and the locker room and the sauna area of 7620 Penn Avenue South in Richfield, Minnesota.

Q. On what date?

A. February 12th, 1996.

THE COURT: The stickers that are relevant to you all are white ones, okay. Ignore the yellow ones.

Do you want to publish this?

Any objection Miss Quaintance to the exhibit?

MS. QUAINTANCE: No.

THE COURT: Exhibit 22 is received. And you may publish it.

MR. MAHONEY: Does it begin at the beginning or?

THE WITNESS: You have to rewind it.

MR. DANFORTH: Your Honor, in addition

to publishing it to the jury at this point, in order to save time, I thought I'd ask as we go along through this video tape questions that would essentially have Mr. Lagace sort of narrating our progress, is that all right?

THE COURT: I have no objection if he wants to narrate what's being depicted on the tape as he moves along. And I think he can do that without you asking questions to do so, Mr. Danforth.

MR. DANFORTH: That's fine.

Mr. Lagace, will you narrate us through this tape as we go?

THE COURT: Same stipulation, by the way, with respect to the video stands as the record?

MR. DANFORTH: Yep.

MS. QUAINTANCE: Yes.

BY MR. DANFORTH:

Q. Mr. Lagace, is this the beginning of the tape that you got?

A. This is the beginning of the tape. I shot it from the west side of the building. It shows the outside pool area.

Q. Is this a fence we see in the foreground Mr. Lagace?

A. Yes, an iron fence.

Q. Are there are locked gates on that fence?

A. Farther on down they were not locked the day I was there, however. I was standing on the sidewalk. The sidewalk comes from the parking lot area.

Okay. Now back up here just a second. Okay. That's looking toward the gate. That is -- this is after the -- I came through the gate, turned around and shot back toward the gate.

Q. I see.

A. Okay. And turning toward the entrance onto 7620 Penn. And this is on the west side of the building. That building houses the rental office and the pool area. As you go through the door, there is a reception -- a desk area. If you take a left, go through a door, and you'll come to another office area. And the pool is on the left-hand side.

Q. Now, Mr. Lagace, if I could interrupt and ask you to back up for clarity here. If you could please back the tape up to the point where you were outside and looking at the other door further back. The one that was visible with the gates and the wrought iron fence.

Okay. Stop please. And then proceed forward.

And I would like to have you do a freeze frame at the point at which you're looking directly at these other doors with the wrought iron gate. Right there please. Okay. Now, you see, do you not, two doors there?

A. There are two fences there, I believe. There is one that goes into the pool area, but there is a fence that would be on the left-hand side, and a fence on the right-hand side, okay, with locked doors on either side. So it's like a little hallway, I believe, from this building into the pool area.

Q. Okay. Now, the doorway that we're looking at on the building of the right most of the two doorways, that's right, the doorway you just pointed to, where does that doorway go into, do you know?

A. That I don't know. It was locked the date I was there.

Q. Okay. Well, we'll go forward.

Now stop, please.

Okay. This then is looking back up that same sidewalk from the other side of the wrought iron fence?

A. Right. Previously, I was over on this side (indicating), came through the gate, turned around and shot video tape on this side.

Q. Okay. Now really, essentially, what we have here is intersecting sidewalks that we're looking at here the intersection of all these sidewalks?

MS. QUAINTANCE: Objection. All these questions are leading.

THE COURT: They are. Why don't you

ask him in a nonleading way, if you would please, Mr. Danforth.

MR. DANFORTH: Your Honor, your right. I'm sorry, Your Honor.

Is there an intersecting sidewalk going from right to left or vice versa in this frame between those wrought iron fences?

THE WITNESS: Yes, there is. There is a sidewalk that comes back here through this way (indicating), and a sidewalk that intersects from the building out toward the pool.

BY MR. DANFORTH:

Q. Okay. And is it your testimony that the sidewalk in this frame proceeding to the right from the junction of the sidewalks at this point toward the building is going between the two wrought iron fences?

A. That's correct.

Q. Okay. And does that sidewalk then lead to the right most of those two doors on the sides of the building that we were just looking at, and I was just asking about?

A. Yes, it does.

Q. Okay. Thank you.

Let's go forward please.

Now, where is this, Mr. Lagace?

A. Okay. After going through the door that had

7620 on it, the garage door, going in that door and took a left, there was a wall on my left, and the rental office desk and reception area on my right. And then I went through a set of glass doors. There was another desk in the same rental office, and on my left was a glass door that went into the pool area.

And this video that I'm taking right now, I went through the glass door, was standing in the corner of the pool area, and I panned the whole pool area. And you'll see that.

Q. For clarity, Mr. Lagace, when you say you were standing in the corner of the pool area, do you mean the corner closest to the rental office door?

A. Right. Actually, I went through the door and stopped, let the door close behind me.

Q. So that's where you're at this point right now?

A. Panning from the right to the left.

Q. If I could have you freeze frame this right there. Yes. Okay. The area of glass panel windows, and to the left of it the door, do you know what area is behind that set of glass windows and door?

A. It was an empty office when I was there.

Q. Okay. Thank you.

Go ahead.

A. Okay. The previous video was taken from the

corner that we're looking at here. And I moved down to this other corner.

Q. Before you go on, Mr. Lagace, the doorway that's straight ahead, literally, at the edge of the pool there, what is that doorway?

A. That is for the women's locker and sauna.

Q. Okay. Thank you.

It has a sauna inside there as well?

A. Yes, it does.

Q. Now, where are you standing here, Mr. Lagace?

A. At the corner, kitty-corner from the door where I first came in.

Q. All right.

A. That's looking back toward the rental office door that I came through and then stopped. There again is the women's sauna.

Q. Now, if I could have you freeze this, please. Okay. We're looking along the one side of the pool down adjacent to the windows next to that empty office at this point, correct?

A. That's correct.

Q. Okay. What do you see in the foreground by those windows?

A. Tables and chairs.

Q. Okay. And behind that in the background, what

is that in the recessed area in the corner?

A. A set of stairs going down, and a set of stairs that go up.

Q. Okay. The stairs that go down, where do those lead?

A. Down to the men's locker room. And as I understand --

Q. Okay. Go ahead, please.

Go ahead, Mr. Lagace, what you would like to say?

A. I'm going, next, I'm going to walk down the steps, the camera will be off. Okay. What I did, I shut the camera off, walked down the steps, got to the bottom of the steps and shot back up toward the sign that we had seen previously.

Okay. That shows the steps coming down.

Q. What is this, Mr. Lagace?

A. That is the women's locker room, and as it says, for the tennis club members only.

Q. All right. Did you learn during your visit whether that has been currently in use or not?

A. What I learned in talking with the people there is that the tennis club used to be run by Northwest Pool and Racquet. They closed their operation, I believe that they said, in June of '95.

MS. QUAINTANCE: I'm going to object.

This is hearsay.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. I'm sorry. Let's go forward, Mr. Lagace.

There. All right. At this point are we looking at a doorway to the right of the foot of the stairs that you come down?

A. That's correct.

Q. Okay. Go ahead.

And what is this room?

A. Men's tennis locker room that was also for members only.

Now I'm going to be going through that door. When I get in, I will turn, you'll see, down the main hallway. And then I will turn to the right, and I'll go into the restroom area.

Q. I'll ask you to freeze again please, Mr. Lagace. All right. Now we are looking into this locker room. And along the left, it's clear that you see lockers, is that not correct?

A. That's correct.

Q. On the left there do not appear to be any lockers. And was that the meaning of your comment when you suggested that your diagram that was originally drawn was inaccurate?

A. You mean on my --

Q. On your right. I'm sorry.

A. That's correct. That would correspond with along there, that wall, there were no lockers. That's what I changed on the diagram.

Q. All right. And can you tell us, Mr. Lagace, whether there are any benches visible anywhere in this locker room?

A. I don't see any. I believe there is a chair there, but...

Q. Go ahead and restart it

A. There are little stools.

This is going into a wash room area. The lavatory's there. To my right is the urinal and commode. I didn't show that on video, but there are.

Q. To our left off the frame?

A. Immediately to my left.

We're going to go through this little hallway, and there is going to be the shower and shower room over on the left-hand side. I'll point the video into there in just a second.

Q. All right. Is this the shower alcove that you were referring to?

A. That's this shower alcove.

Q. All right. Go ahead and restart it please.

A. Just on the other side of this wall is a hallway that goes back to the main hallway you saw when we first went in.

There is the door to the sauna. I will open up the door.

Q. Was this the hallway you were just referring to?

A. That's correct.

Q. And this is the sauna door?

A. That's the sauna door.

Q. What type of wood did that appear to be?

A. That appeared to me to be cedar.

Q. Okay.

A. There is a bench in the sauna.

As you go through, out the door, immediately to the left on the bottom is the heater for the sauna that you pour the water on, and so forth.

Q. Go ahead.

Now, is that video -- I'm sorry. Could you back that up just a bit.

And if you would stop right about there.

Is the general depiction of the light low level in this sauna more or less comparative to what it was when you saw it?

I mean, does the video reflect the ambient light in

there?

A. Yes, it does.

Q. Okay. What color would you call that wood? Is the color rendition on this video tape accurate to the best of your recollection?

A. Yes. It's kind of like a Mahogany color, dark, dark reddish-colored wood.

Q. So reddish brown would you say?

A. Right.

Q. Thank you. Continue.

And if you would stop that there please.

Okay. Once again, the color of the locker front in this particular case, would you describe that as being sort of a medium dark brown?

A. That's correct.

Q. Okay. Thank you. And that's what it was when you were?

A. (No audible response.)

Q. Thank you. Go ahead.

Q. All right. Now, that is this doorway?

A. It says "Maintenance only."

Q. Do you read the words on there that says, "Not an exit?"

A. "Not an exit," but there was also another sign that said "Employees only."

BY MR. DANFORTH:

Q. Between that --

A. Yep.

Q. -- and the tennis club office?

MS. QUAINTANCE: Objection, leading.

THE COURT: Sustained, but it can stand. Why don't you try to keep them direct questions, Mr. Danforth.

BY MR. DANFORTH:

Q. What is the area in the, more or less, white part in the center of the picture, Mr. Bandy?

A. That's the tennis club desk. The office.

Q. Okay. I'm sorry. What did you say the type of desk that was?

A. It was like when the tennis players came in to play, they would also have to check in there, you know, show their membership and --

Q. At times when this office was opened, did people make access to the pool through that office?

A. Well, they -- either way. When they did go in there, they were pretty strict on, you know, making them sign in their building and name and apartment number.

Q. Okay. Let me back that up just a bit.

What was the process for a resident of the apartment to use the pool when entering through the tennis club

office also?

A. There was a guy there at all times. And when a resident from the place come walking in, they just stopped, signed their name and then go through.

Q. Okay. What else did they have to put down on this register besides their name?

A. If they had company with them, then they had to, you know, put down their name too.

Q. Did they also have to indicate their apartment number and their building number?

A. Yep.

MS. QUAINTANCE: Objection, leading.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. And this procedure -- strike that.

What were the hours of operation stated to be of the tennis court, was it just evenings or?

MS. QUAINTANCE: Can we clarify what time we're talking about, what year, what time of year, when?

BY MR. DANFORTH:

Q. I'm sorry. Let's say as we we're going into last summer, what was the times of operation of this tennis court part?

A. Uhm, I believe, I believe they were still open

Q. Was thee a lifeguard or somebody functioning somewhat like a lifeguard at the outdoor pool in July of '95?
A. Not that I can recall.
Q. Do you recall whether or not there was somebody that was designated as a pool monitor?
A. Yeah, they had it at one time but, you know, I just seen them there for a couple of days and then he was gone. So I don't know if it was like a trial by basis type deal or...
Q. Now, you had spoken with an investigator from Powers Investigations prior to your testimony, is that not correct?
A. Yes.
Q. Okay. Did the subject come up about the sign-in log that you'd referred to that the tennis club kept for its members and for residents to sign in?
A. Yeah. He asked me about it, and what they did with it. I don't know.
Q. Okay. Upon his request you tried to find out what happened to that?
A. Yeah. Yeah.
Q. What did you learn?
A. I couldn't find nothing. You know, I don't know if somebody from Northwest Racket took it or I don't

it.

Q. So if Terese had called her or contacted Miss Roberts or Investigator Roberts anymore than that, it's outside of your knowledge, is that your testimony?

A. That's correct.

Q. Do you know who Mary Jackson is?

A. Don't have the foggiest idea.

Q. Okay. Do you know what Lewis House is?

A. Yes, I do.

Q. To your knowledge, did Terese ever contact anybody at Lewis House with regard to the facts of this case?

A. I don't know anything about the case, if she went there on the case, but she has been there on occasion.

Q. To your knowledge has Terese ever in talking to you about the facts of this case referred to Darlene Zirul as a girlfriend of mine?

A. No, not at all.

Q. All right. At any point before August 11th of '95, to your knowledge, did Terese ever ask Josh, your son, about the question of whether or not there had been any sex with me?

A. I don't really remember the dates too well. I'm pretty foggy on the dates, but the situation is that, yeah, she mentioned it to me after the fact.

Q. Okay. That prior to August 11th, she had occasionally inquired of Josh about this?

A. No, it wasn't until after the fact, until after it was reported to the police.

Q. Okay. When did Terese tell you about the fact of this allegation of sexual conduct involving myself and Josh?

A. Well, I recall coming home from work, and I was approached by my 16 year old son, and he told me. And then I went home and Terese was in shame, and she told me what happened and what she had to do.

Q. Do you recall what day this was?

A. It was early in August. I can't remember the exact date. It was early August, right after we had moved into this apartment.

Q. So your testimony is that you first learned of it through Larry, Larry Howell (ph) your son?

A. Yep.

Q. You went to his house at that point?

A. No, I went straight home. And he was there, there I was in passing on the street, he was driving -- his mom was driving his van, and I was driving the car. And she pulled over and rolled her window down. And he told me what was going on.

Q. What hour of the evening was this?

A. It was pretty late. It was probably about 12:30, quarter to 1:00.

Q. Okay. And you said subsequently you arrived at home and you talked with Terese about it?

A. That's correct.

Q. At that time whom did Terese tell you about as the people that she had spoken with about it up till the time that she -- up till the time that the Minneapolis police officer arrived?

A. Well, I remember, I recall her telling me when I got home that my little boy Josh was play acting with the neighbor's child, sexual acts and sexual maneuvers to this child. My wife took him off, told him to go to his room, and went to his room and talked to him.

And he, after a little bit, he finally told her what was going on. And then she waited approximately an hour to an hour-and-a-half, maybe a little while, she waited a little while, because she was really emotionally shook up about it. And then she finally had broke down and made a report to the police. And I didn't get much sleep that night.

Q. All right. Specifically, though, to answer the question that I asked, do you recall Terese telling you that she spoke with anybody about this before she called the police?

the neighbor child?

A. Well, they -- well, she told Josh to go to his room. And then she was thinking about what he was doing. So then she finally went in there and figured out something was wrong.

So she went in there and talked to him about it. And Josh was all -- she told me that he was all scared and everything and didn't know what to do. And then she finally had convinced him that it wasn't that it was wrong to do that, and she wanted to learn how, where he learned it from.

And he said to Terese that Steve, he learned it from Steve. And then she gave him a doll and had Josh show her on a doll what Steve did. And I guess, apparently, she broke down in tears.

Q. Okay. But focusing for a little while, if you will, on this period prior to going into Josh's room and talking to him about it, this period in which you said that she retired, if I understand you correctly, to your room, her room, to think about this, did she tell you what her mental processes were during that time?

A. Kind of, sort of. She told me that she didn't know if it was innocent child play or if it was something that she learned from somebody else. She -- it took her a little while to get Josh to tell her, but Josh finally

you correctly, on August 15th.

Let me back up. Did you in fact talk with her on August 15th?

A. I can't remember the dates. I spoke to her once, made an interview with her and spoke to her. I spoke to the woman a couple of times. Actually, I spoke to her about three times. I spoke to her twice on the phone and once in person. And it was all during the month of August.

Q. Now, at the time of the Corner House interview on August 23rd, this would have been the morning hours of August 23rd, where were you?

A. I didn't go with her, just Terese and the kids went.

Q. Okay. Were you at home, is that it?

MS. QUAINTANCE: Objection, relevance of where he was.

THE COURT: Sustained.

I'm not sure. Overruled. You can answer the question.

THE WITNESS: I think I went out to work that day, that morning.

BY MR. DANFORTH:

Q. Now, prior to August 11th, '95, did you have occasion on occasion to ask either Josh or Amanda whether

or not I had done anything sexual with either of them?

A. There was a few times that I was suspicious of some acts. I didn't know for sure, but I did bring it up with Josh that if anybody were to touch him in spots where he didn't feel touched [sic], he was to tell me no matter what.

Q. Sort of a warning then, was it?

A. No, it was basically asking him to be honest with me and tell me the truth about anything that happens. That was the discussion I had with him about it.

Q. And what were those occasions that you had become suspicious on on those occasions, do you recall?

A. Yeah, it's like when we were out swimming or when he went into the restroom without me there. Basically, when he was alone with you for a period of time, I was suspicious of it because --

Q. And it was on those occasions that you would ask him to tell you if something happened?

A. Yeah. That was -- it was prior to last July. And I recall that there was a lot of times that I had had a lot of suspicions, but nothing ever panned out because, because I trusted my best friend. And I didn't, you know, I had discussions with him, too, about it. And he swore up and down nothing was happening. So I believed him.

Q. This is myself you were referring to?

A. It's you. Yep.
Q. Okay. Now, when was the most recent occasion when you would have had occasion to talk to Josh along those lines prior to March 11 -- August 11th?
A. Uhm, I remember having a discussion with him back when I was living in Rosemount. And I had a discussion with you about it, too, when I was working on your car that one day, and just basically left it at that.
Q. Do you recall what it was that set off your state of suspiciousness to the point where you felt motivated to ask on that occasion?
A. Yeah. Terese told me some things that were kind of fishy.
Q. What did she say?
MS. QUAINTANCE: Objection. Calls for hearsay.
THE COURT: Overruled.
MR. MAHONEY: You can answer.
THE WITNESS: Okay.
When you were over there with her, and you guys went somewhere, I think you went to the Y or something, you went somewhere with the kids, and Terese wanted to take Josh and Amanda down into the -- I think you went swimming. I think. I could be wrong, but I think you went somewhere where you guys had to separate and go in your own places.

And Terese wanted to take him into the restroom. And you blurted out to Terese, tell her, "Well, Josh needs his gender." And he went in there with you. He went into that restroom with you, into that room with you.

And when she told me that, it kind of raised an eyebrow to me. And I brought it up to your attention. And I asked Josh too. Josh didn't say anything to me, but...

Q. By that you mean to say that you asked him if something had happened, and he didn't say that anything did?

A. He didn't say anything. He didn't say a word.

Q. All right. Well, if you were suspicious and that's what he said, wouldn't you have asked more questions at that time?

A. Yeah, but I kind of left it at that, because I didn't know, you know, I can't read the kids's mind.

Q. Now, you had said that you remembered at least a few occasions of this. Do you remember what some of the other ones were about?

A. 3725 Cedar Avenue when I was living there, I wasn't home at the time, I was working. And Terese told me that you went up into the restroom or in the bathroom and you were staring at Josh and Amanda in the bathtub, sitting there with Terese. And it made Terese feel uncomfortable.

And next time I saw you, I brought that to your

attention. You came over, the next time I saw you when you came over, I mentioned it to you.

Q. I guess what I'm driving at is did you speak with Josh about that at that time?

A. Uh-uh.

Q. What I'm talking about is some times when you spoke to Josh. Do you recall other times that you spoke to Josh?

A. There was only about three, four times that I had mentioned to him about the wrongness of people touching him in the the wrong spot, and that he needs to tell me and his mom regardless of any intimidation or fear that they may put into him. That it's wrong for somebody to touch him in the spots where he's not supposed to be touched or don't feel comfortable.

Q. Do you remember roughly the time period in which these three or four times were that you gave this kind of warning to Josh?

A. Well, when he was five years old a couple times. And when he was six years old a couple times.

Q. And Josh turned six in May of 1995, did he?

A. Right.

Q. So these two times after he turned six would have been between the later part of May and the first part of August?

A. I spoke to him in July when we were staying with you. And I spoke to him about it in May right after his birthday.

Q. The incident in July, what prompted you to make that remark to him at that time?

A. Well, just things that Terese was telling me, and my suspiciousness, you know, I was being suspicious because of your past. And I wanted to make sure that, you know, nothing was going on. Because also, on the other hand, you know, I was hoping and praying that nothing was happening because of our friendship and how long we've known each other.

Q. Where were you when Terese told you some things that concerned you that caused you to say these things in July?

A. Well, I wasn't around. About maybe 30 percent of the time, I wasn't there. And during those times that I weren't around, things were happening that I can't put a finger on, but Terese could. And Terese knows more about that than I would.

Q. What did Terese tell you?

A. Well, I do recall one day I was real suspicious. I had been sleeping on your living room on the floor. And I woke up at about 8:30. Josh wasn't in laying down on the floor like he normally is. He was in your room

Terese didn't like that too much. And neither did I because you knew how I felt about the situation. But when I wasn't around, I couldn't put my finger on it. I couldn't do anything if I wasn't there.

Q. Did Terese tell you that she had inquired of Josh at that time as to whether or not whether anything was going on?

A. I don't know. You'd have to ask her.

Q. When prior to August 11th was the last time when you asked Josh whether anything sexual had happened between he and I?

A. It was back in July. I didn't -- I never used you in any of the conversations at all. I just kind of like when I talked to Josh, it was always in a generalization if anybody, not just you, but anybody, would touch him in a spot where he doesn't feel comfortable being touched.

Q. But the last time that you spoke with him about this?

A. It was in July. I believe it was in July.

Q. And do you recall where you were when you had that conversation with him?

A. No. All I know is I had a talk with him about it when I was alone with him. I think it might have been that day that I was out doing your timing belt in your

suggestive techniques that are all based on psychology. And it is so well-known and almost, in fact, it is beyond any question, that psychologists throughout the country are regularly going in and talking about the ability of these kinds of approaches on the witness stand throughout the country.

As I say, Your Honor, again, in the specific, narrow confines of Dr. Underwager talking about the science behind that interviewing technique and whether or not it creates statements that are connected with reality or whether in contrast it creates statements that are simply the product of suggestion, that I think is a very valid question for an expert in the field of psychology to come at. It's clear that Dr. Underwager has been studying these things for some time. He's indeed the ultimate expert about this particular --

THE COURT: No. No. He's far from the ultimate expert, sir. He quotes in his materials an expert that I'm -- whose writings I'm pretty familiar with, a Professor named C.C. And you'll look hard and wide in C.C's materials to do anything but be relatively supportive of the technique that was involved in this tape.

So that's not evidence. That's just me, you know, looking at stuff. And, but I've got, I'll tell you, for everything you can find on one side, you'd find something

on the other side of this. And I think ultimately having people like this come in and testify to these kinds of matters recounts to the significant detriment of the accused persons because the people with the currency in this area are going to be treating therapists of children, and they're not going to be pro-defense. And they're going to bring a lot more currency into the courtroom, because they have got a long-term relationship with a child as opposed to being a hired gun for trial looking at a Corner House tape or even getting an adverse psychological, which our Supreme Court has indicated is something or Appellate Court, at any rate, has indicated something that should be done with extreme caution.

So we may disagree on this. And if we do, it won't be the first time we've disagreed, Mr. Danforth. But I don't think the legal system has come to the point where this kind of stuff is helpful. And I think it intrudes on the province of the fact finder. And I'm not likely to do it.

MR. DANFORTH: May I ask Your Honor that we could at least forestall or hold on this until we get to the time of his testimony, and I could offer a formal offer of proof with Dr. Underwager?

THE COURT: Well, I've got the offer of proof right here. That's what I asked for.

MR. DANFORTH: And that's what I asked