**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth**,

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## TRIAL TRANSCRIPT,

## Volume VI

## February 27, 1996

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

and witnesses.)

THE COURT: Okay. Let's talk about Officer Halverson first. Who is he, Mr. Danforth?

MR. DANFORTH: Officer Halvorson was a partner of Officer Castilleja on the night in question when Officer Castilleja responded to the Storys. He was not yet joined with Officer Castilleja, but he did join with him just a little bit later in the evening. Consequently, in the course of that evening, he went with Officer Castilleja out on a call to the apartment across the hall from the Storys. This is the one occupied by I believe it's pronounced Tounya Dahur and her daughter's two little, small girls, the smaller one of which is the one that Joshua had apparently had this sexual play with earlier in the afternoon slash evening.

THE COURT: Has he been the author of a police report or?

MR. DANFORTH: Frankly, at this point, Your Honor, I don't know. What I do know is that he was there, and he was apparently, according to Castilleja, the lead inquiring officer at that time in the conversation.

THE COURT: At the neighbors's house, you mean?

MR. DANFORTH: Yes. Diane Dahur, the grandmother.

THE COURT: But it's hearsay except as it's corroborative, isn't it?

MR. DANFORTH: Except as it's corroborative, yes, Your Honor.

THE COURT: Okay.

And then Pat Cotter?

MR. DANFORTH: Well, Your Honor, the history here is that a motion was made before Judge Burke way before this trial began for Dr. Cotter's records, and that motion was denied. And at this point --

THE COURT: But I heard a motion about Cotter, didn't I?

MS. QUAINTANCE: I think it was heard again by you. But Judge Burke initially heard it when Mr. Tamburino in a timely manner made that motion.

There has been no discovery with regard to Dr. Cotter. The State would, of course, be prejudiced by such discovery happening at this point in the trial.

It's my understanding that Joshua did see Dr. Cotter, although not on a regular basis, and has seen him up until the present date. In fact, last week Dr. Cotter made a diagnosis with regard to Josh which has not been previous -- not been previously made. And Josh saw him very sporadically. We have no discovery with regard to the nature of their conversation. I don't know if this

okay.

Now, Mary Jackson. What's the State's position on Mary Jackson?

MS. QUAINTANCE: The State's position is that anything she has to say is hearsay. This report is not authored by her. She had a conversation, apparently, with Terese Story. The fact that Terese Story consulted a domestic abuse center should not be in evidence in this case. It has no bearing on this case at all. All this does is corroborate Terese's testimony that she did report to somebody other than the police. I don't see we need it.

THE COURT: Okay. Deputy, can you have Officer Halvorson come in first please.

(Whereupon, Officer Halvorson enters the courtroom.)

THE COURT: Officer Halvorson, what phone numbers are you reachable at, sir?

MR. DANFORTH: I work with the Public Housing Unit right now. The phone number would be 342-1238. And I also have a digital pager if that's needed.

THE COURT: Okay. What's that?

OFFICER HALVORSON: 527-6185.

THE COURT: Okay. You're excused from the requirement of the subpoena till at least Thursday

morning. And you will be excused fully unless you talk -- you are talked to by myself or somebody that I authorize to talk to you. And you're leaving on Friday?

OFFICER HALVORSON: I'm sorry. It's possible I did not speak correctly, but I will be leaving on Thursday.

THE COURT: When Thursday?

OFFICER HALVORSON: I will be leaving Thursday morning at approximately 8 o'clock in the morning.

THE COURT: Do you know anything about this case other than what somebody's's told you?

OFFICER HALVORSON: No, I do not.

THE COURT: And name the people that you've talked to about this case?

OFFICER HALVORSON: Who have I talked to?

THE COURT: Um-hum.

OFFICER HALVORSON: I've talked to my supervisor about it because I attempted to locate information on it. However, I was not able to locate anything about it.

THE COURT: Do you recall answering a call at this address?

OFFICER HALVORSON: A call?

THE COURT: Yeah.

OFFICER HALVORSON: No. I do not even know what the address is.

THE COURT: Why don't you tell him the address, Mr. Danforth.

MR. DANFORTH: 3630 Park Avenue. 3633 Park. This is your log right here.

OFFICER HALVORSON: Yes. I recall now. Yes, that I recall.

THE COURT: Do you recall interviewing anybody there?

OFFICER HALVORSON: My partner was the one who was doing the speaking to the victim's mother. I believe it was the victim's grandmother. I did not do any interviewing at all.

MR. MAHONEY: Who was your partner?

OFFICER HALVORSON: Adam. Officer Adam Castilleja.

THE COURT: Okay. And you've -- so you didn't -- you were there listening to what was said, I take it?

OFFICER HALVORSON: Yes. That's correct.

THE COURT: Do you have any recollection of that interview?

OFFICER HALVORSON: Bits and pieces.

Terese that was explaining that this Darleen Zirul was a past or former girlfriend of mine?

A. Terese was the one that described her that way, right.

MR. DANFORTH: Okay. Thank you.

I have no further questions.

THE COURT: Miss Quaintance?

MS. QUAINTANCE: Nothing further.

THE COURT: You may step down Miss Jackson. You are released from any further obligation with us.

THE WITNESS: Oh, thank you.

(Whereupon, the jury is excused from the courtroom.)

(Out of the presence of the jury.)

THE COURT: Can I get your two names again, please?

THE WITNESS: I'm Wendy McMann from Dakota County.

THE WITNESS: Maggie Kielsa.

THE COURT: And I take it the only thing that you two know about this family dates back into the '93 time frame?

THE WITNESSES: That's correct.

THE COURT: Nothing later than that?

THE WITNESSES: (Shake heads.)

THE COURT: And you've had no contact with anybody about the identification of sexual abuse involving Mr. Danforth here?

THE WITNESSES: (Shake heads.)

THE COURT: I'm going to release you from the command of the subpoena at this time. That's not to say you may not be contacted again, depending on what other people whom have said things to you testify to here in court, if they do. But whether that happens or not is very iffy right now.

MR. DANFORTH: Your Honor, at least outside of the hearing of the jury could we have them lay the foundation that you're referring to?

THE COURT: No. Because if they come back, they're going to be doing that. And if they don't, there is not going to be any admission of the documents.

Miss McMann, can you be kind enough to give me where you're reachable during the days?

THE WITNESS: 891-3259.

THE COURT: And Miss Kelso (ph), Keilsa, how about you please?

THE WITNESS: I'm at 891-7339.

THE COURT: Thank you very much for coming down. Sorry to have taken your time here. And you

are released from the subpoena unless somebody from my staff calls you back.

THE COURT: Well, the record's real close here. Did you mark those two documents?

MR. MAHONEY: No.

THE COURT: Do you prefer to mark the two with trial markers or trial exhibits or?

MR. MAHONEY: I thought we would just mark them as Court's exhibits because it's an offer of proof.

THE COURT: Okay. Mark them 13A and 13B then. Here, let's do them with yellow because that's how we keep them straight.

MR. MAHONEY: These are the other things that we don't have offers for.

THE COURT: And, okay. The Court has marked as Exhibit 13A and 13B, Court's Exhibits 13A and 13B and 13C, three documents which came out of an in camera review, documents which have been earlier marked as Court's Exhibit 13.

MR. MAHONEY: There's going to be another one, the assessment itself.

THE COURT: Do you have that last one, Mr. Danforth? Is that the Diane Alder (ph) thing?

MR. DANFORTH: No. That's what it is,

the one he has.

THE COURT: I've got the assessment.

And these documents, 13A is an assessment dictation which appears to have been authored by the witness that was just here under subpoena, Wendy McMann.

13B is something called initial report assigned to Wendy McMann.

And 13C is a September 22nd, 1993 letter to New Richmond child protection services by Maggie Kelso (ph) or Keilsa.

And the Court has ruled that all of these documents are hearsay and would not be received. That they're potential relevance might be in impeachment or corroboration of the out-of-courts declarants. But as Mr. Danforth acknowledged, the out-of-court declarant is not here, has not been here, is under subpoena. It's questionable whether she will or will not appear, that being Darleen Zirul.

Okay. Anything further we need on the record on that before we bring in Mr. Story?

(No audible response.)

THE COURT: Okay. Do you prefer -- do you want to bring in Mr. Story then?

**DIRECT EXAMINATION OF GARY STORY CONTINUES**

THE COURT: And you continue to be

while visiting at, let's say, on a shorter basis, were there also times when Josh or Amanda were allowed to go along on that errand?

A. Yeah.

Q. And on some of these errands, in fact, either you nor Terese might be along on that occasion, is that also correct?

A. Sometimes, yeah.

Q. Now, was it a concern that you would have after these times when I would be alone with Josh, according to your testimony later, yesterday, rather, that you were concerned after those occasions that, about the topic of whether something might have happened or whether something could have happened?

A. Well, the only time that I here was concerned about it was when Terese had brought it to my attention or I had noticed some erratic behavior from the kids. Some things Terese would say to me.

Q. She sometimes brought it to your attention?

A. Yeah.

Q. Okay. And on those occasions, did you speak to Josh about it?

A. Some of them, yes, I did.

Q. Okay. What percentage of these occasions would you say that you asked Josh something along those lines?

MS. QUAINTANCE: I'm going to object. This was asked and answered yesterday.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Now, yesterday we were talking about certain swimming pool outings that we'd all taken. Now, your testimony yesterday, as I recall it, was that the earliest time we were doing that was over at the Marie Avenue apartment complex.

At that time or in that summer of '93, did we also swim a little other locations such as beaches or public pools?

A. Yeah, we did.

Q. Okay. Do you recall what some of them were?

A. I think we went down to Lake Harriet, I think, once. And I think we went to the Richfield pool, water slide, and various places to have summer fun.

Q. All right. And there were other places that we were in the ensuing summer, that being the summer of '94 as well, were there not?

A. Yeah.

Q. Okay. Do you recall what some of those other places that we might have gone at that time were?

A. We went down to Minnehaha Falls. We went to the river, went to some, lot of the parks, public pools,

pretty much so.

Q. Do you recall in the case of one or more of these public pools, whether they were indoor pools that had a Water slide?

MS. QUAINTANCE: Objection, relevance.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Do you recall the names of some of these public pools?

MS. QUAINTANCE: Objection, relevance.

THE COURT: Yes. Sustained.

BY MR. DANFORTH:

Q. All right. On these occasions that we've been referring to when we all went swimming at various locations, did Josh usually dress in the men's room with yourself and myself?

A. Usually we were, we were pretty much together, and the kids were with Terese in the other room.

Q. Now, there were some occasions, however, when it went the other way, is that what you are saying?

A. That's right.

Q. Now, would there have been some occasions on those instances that we were just talking about when Josh and myself might have been alone in such a men's room or when you were there but when myself and Josh might have

been out of your presence in a men's room for any little while?

A. Well, the only time that ever happened was last year when our lines of trust were a little bit greater.

Q. All right. So, would this have been a moment of special concern to you regarding the prospect of possible sexual abuse of Josh?

A. The only time I heard of it was during the month of August, 1995. Probably the duration of that, most of that summer, I believe.

Q. So during that summer you were concerned about it, is that it?

A. More than anything, yeah. I started noticing behavior, different behavior patterns.

Q. All right. During that summer then when you were concerned about it, you, I take it, would have been sure to ask Josh afterwards whether anything sexual had happened then, is that right?

A. I asked him about three times that summer. I think I answered this yesterday, too, I believe.

Q. I'm sorry. In the summer that was?

A. Yeah, about, I asked him about three, three times over that period of time. But I think I answered this already yesterday.

Q. We'll go on.

Now, had you asked Terese to be told each time that Josh was alone with me?

A. No.

Q. Is it fair to say that in 1995 your fears or suspicions about the possibility of sexual abuse of Josh by me were greater than prior years?

A. That's correct.

MS. QUAINTANCE: Objection. Asked and answered.

THE COURT: Sustained. But the answer may stand.

BY MR. DANFORTH:

Q. Now, so, throughout '95, you would have been more certain or likely to ask such questions regarding --

MS. QUAINTANCE: Objection. Asked and answered.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Were you -- strike that.

To your knowledge, did I know that you and Terese were periodically asking Josh questions such as this?

MS. QUAINTANCE: Objection. Calls for speculation.

THE COURT: Well, if he knows, you can answer.

testimony is, Your Honor, but I'm specifically asking --

THE COURT: Let's not have -- the jury will disregard the comments of both counsel.

Just rephrase the question please.

BY MR. DANFORTH:

Q. Well, Josh then told you that nothing sexual had happened then to date, is that correct?

A. That is correct, but he wouldn't talk. He was pretty quiet. He wouldn't talk much about it. I think that there was something on his mind but he couldn't tell me.

Q. Did Terese indicate to you at that time that she had talked to Josh about this as well?

A. I don't know if she told me she talked about sexual abuse to him. But I know that she was trying to talk to him about something. I wasn't with her at that time, so I don't know.

Q. Okay. Now, talking about the August 1st move into the apartment on Park Avenue, did you request my assistance in that move?

A. Yeah. That's correct.

Q. And I did assist you?

A. Yeah, you did.

Q. Okay. Now, specifically, was I helping you in the morning hours to empty out a storage locker that you

Joshua that she had molested him at an earlier time?

A. I think it was late '94.

Q. Is it possible that it could have been the early months, like, say, January, February of '95?

A. I wasn't around much. January, February of '95 I wasn't around, around the family much. I didn't spend much time at home during those months. I was out doing my own thing, January, February, March of this -- that year.

Q. Is it fair to say that it could have been in anywhere between the end of '94, these early months of '95, and you're just not really sure?

MS. QUAINTANCE: I'm going to object. The witness has already testified it was late '94.

THE COURT: No. Overruled. You can answer.

THE WITNESS: The only thing I heard about it, the only thing I had heard about Darleen was from Terese telling me that he had said something about it, but we didn't think -- I didn't think anything of it. I didn't think anything was true, because I think while I was with Darleen, she was trying to manufacture thoughts into Josh's head about you and me and Terese and all that, and, you know, that situation.

So, you know, there is no question in my mind about that situation, because we had discussions about it

BY MR. DANFORTH:

Q. Who was that meeting held with?

MS. QUAINTANCE: May we approach?

(Whereupon, a discussion was held off the record at the bench.)

BY MR. DANFORTH:

Q. Do you recall whether part of that tape recorded meeting had to do with interviewing Josh about that allegation?

A. I can't recall exactly what it was about, but all I remember is that she borrowed the tape recorder because we were having problems with a certain social worker in Dakota County that was trying to --

MS. QUAINTANCE: I'm going to object to any further testimony along these lines.

THE COURT: Sustained.

Were you present when a tape recording was made of Josh on this subject matter?

THE WITNESS: No, I was not.

THE COURT: Okay. Mr. Danforth?

BY MR. DANFORTH:

Q. Did Terese or anyone at any time replay for you what was purported to be a recording of that meeting?

THE COURT: Of Josh?

MR. DANFORTH: Yes. Involving Josh.

did Josh ever use the women's room to dress?

A. Only when Terese took him. Only when Terese took him in there with her.

Q. But, otherwise, when you were present, usually it was the contrary, correct?

A. Right.

Q. Now, in fact, when you were present, is it a fact that Josh wanted to use the men's locker room with you?

A. Yeah.

Q. And you let him do so, including on occasions when I was using that locker room simultaneously with you, is that not correct also?

A. That is too.

Q. And let's -- Now, isn't it also a fact that at no time prior to August 11th, did you ever hear anything from Amanda about allegedly having seen anything happen at the Century Courts pool of a sexual nature between myself and Josh?

A. No. I wasn't -- no. I didn't hear. I didn't see anything or hear anything, but --

Q. Okay.

A. Only from Terese. Little things from Terese.

Q. Okay. Now, do you recall an occasion when you and I and Josh were in that locker room together when

Q. All right. To your awareness, what was Terese's attitude towards Don Wickstrom at that time?

MS. QUAINTANCE: Objection.

THE COURT: No. No. Come on up here please.

(Whereupon, a discussion was held off the record at the bench.)

BY MR. DANFORTH:

Q. Did you have occasion at any time while you and Terese were staying at my place in Prescott in July of 1995 to speak with Terese about her state of feelings with regard to myself?

A. I can't recall talking to her about you.

Q. Okay. Do you recall, do you recall an incident when upon arriving at my place, Terese placed the kids and a few belongings in the car and asked you to leave with her?

A. Oh, yeah. Now I remember. You and her were kind of at each other's throats there I think for a little bit. You were kind of, I don't know what was happening. I missed it, you know what I mean. Terese was upset about something that had went down between and you him -- between you and her. And she told me to take them and put her in the car and leave. She wanted to go.

Q. Where did you --

A. Yeah.
Q. Okay. About when was that?
A. Fall of '94.
Q. Okay. At that time did Josh enroll in kindergarten out there?
A. Yeah. And we put him in kindergarten out there.
Q. Was it long after that -- well, strike that.
Did either one of you become dissatisfied with living in New Prague?
A. Yeah, we both did.
Q. Okay. When did you move out of New Prague then?
A. 15th of December of 1994.
Q. Now, do you remember attending Thanksgiving dinner in 1994 at Terese's mother's place?
This is Diane Conner.
A. Yeah.
Q. Do you recall my stopping by?
A. Yeah, you came over.
Q. Okay. Do you recall asking me to step out to your car for a private conversation?
A. Yeah. I think we had a talk that day.
Q. Okay. Now, in that conversation in the car, did you tell me something to the effect of never to take

pornographic pictures of your children?

A. We talked in lingo about that kind of thing. And because it was always in the back of my mind. And I did have a line of trust with you. So I just wanted you to know that, yeah, I point blank told you the situation, you know.

Q. Okay. Now, in addition to it always being in the back of your mind, was there something that had just recently occurred or something that you had just recently been told that prompted this to the surface of your mind?

A. Well, Terese and I had gotten into a discussion about your past. And Terese was, you know, being suspicious about certain behavior patterns and certain things like that. So I decided that I'd have a talk with you about it, just to point blank let you know the situation, you know, that I wouldn't tolerate that. Because now that I have children, see, because before I didn't have the kids. I started having kids in '89. And when we met, we never, you know, I mean, when you were in your trouble, I didn't have any kids when you got into trouble back, back in the late '80's. We didn't have children at the time.

But when I had children, we had a discussion. We discussed a lot of that even, even when you were, even when you were writing us letters and everything from the big

house, you know. You were telling, you know, we were trying to tell you. I told you the situation there too.

So you and I had always had conversations about that off and on through, through the time that you've been, since the time you have been released until the present day.

Q. You're saying that we had, we have relatively frequent conversations to the effect that you were making warnings of various sorts to me, correct?

A. That's right. That I just hope and pray for the sake of our friendship and the sake of our relationship that you don't go back into your old behavior patterns that you were in before and one, you know, to what you did. And that's basically what the whole situation was about.

Q. All right. Do you recall anything specific, however, as I say, that occurred or had been said that would have prompted you to give that warning to me that night in the car at the Thanksgiving dinner at Diane Connors'?

A. Yeah. Terese told me you took some pictures when we were living out in New Prague.

Q. All right.

A. Uhm, and I know how you like the camera. And I know how much you like to use the camera. And I remember what -- I recalled what happened with it, and all that, and

Q. Now, the fact is is that this set of pictures that I gave to you was given to you subsequently, that's to say, after the night of that conversation at the Thanksgiving dinner out in the car, were they not?

A. Yeah.

Q. Now, roughly at the same time that that Thanksgiving dinner was had, that same frame of time, did you have occasion to ask Josh whether there had been any taking of pornographic pictures?

A. I can't recall that.

Q. Did this become the subject of a warning that you gave to him at that time?

A. What are you talking about?

Q. I'm talking about --

A. Are you -- refresh my memory here, because I --

Q. Yeah. I'm talking about in the rough area of the time around Thanksgiving of 1994, you know, after which you had been told by Terese that there were these pictures taken that you had this conversation with me warning me not to. I'm asking you, did you similarly have a talk with Josh about this?

A. No, I didn't talk to Josh about it.

Oh, wait. Wait. Wait. Bring that back. Yeah. Yeah, I did. I did tell Josh, yeah, I did ask Josh to tell me if anybody wanted to take his pictures with his clothes

Q. All right. Now, more particularly, had you discussed this with anybody at the Park Avenue apartment between the time you moved in there on August 1st and the time that the accusation arose on August 11th?

A. It never, it never surfaced until after everything went down. Nobody knew anything about nothing until after it all went down because people were coming up to me and asking what the cops were doing over here. And the neighbors came up to me and was giving me, you know, asking what the heck was going on with the little girl next door. And, you know, I had to tell them the scoop.

Q. Had you mentioned this to any neighbors at the Rosemount townhouse where you were living up through June '95?

A. Nope.

Q. Now, had you mentioned anything regarding my sex crimes' past to your son Larry, Larry Hall?

A. Yeah, Larry knew about you.

Q. And what in particular did you say to Larry?

MS. QUAINTANCE: Objection, relevance.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Larry lives how far from where you live right now?

A. Up the block, around the corner and down the

BY MR. DANFORTH:

Q. Did I have a discussion with you about your mood while you were at my place?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. To the best of your recollection, did I allow Joshua and Amanda at that time to play computer games on one of my computers at my apartment during that stay?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

MR. DANFORTH: Your Honor, may I approach?

THE COURT: You may.

(Off the record discussion at the bench.)

BY MR. DANFORTH:

Q. Did you have any feelings one way or another about the fact that Joshua and Amanda were allowed to play computer games on my computer?

A. No, I thought it was pretty neat.

Q. All right. Did Terese ever evince any feeling about that to you in your presence?

A. Only in contrary about some behavior that you were expelling towards Josh in the computer room.

Q. Okay. Is that with reference to that thing that we may call the cheek kissing episode?
A. No, the back rubbing. I wasn't there, but she did mention about the kissing too, but we already discussed this earlier.
Q. Yes. But you indicated that also on occasion when you were not there then that Terese made some statement to you about some episode when someone's back got rubbed?
A. Yeah. Terese told me that you were massaging his back in a certain way.
Q. And this was supposed to have happened in the computer for room?
A. When you were doing -- when Josh was playing on the computer, yeah.
Q. Now, at some time during the course of that stay, did Terese tell you that she basically kind of got fed up with me during that stay or words to that effect
A. Well, probably. That's what that argument that you and her apparently had. She was pissed about something.
Pardon my language to the court.
Q. All right. But it's clear that she had grown to dislike me during that stay, is that correct?
A. Yeah, kind of, sort of got cabin fever with

you. Besides, it was hot, too, you know, it was real hot and humid too during those days.

Q. All right. And also I think you're suggesting, are you not, that things such as this computer room set of incidents that she was citing to you, that there was a heightened suspicion in her mind against me at that time during that stay?

A. Yeah.

Q. Now, at some point during that stay, do you recall ever getting a call at some location in Minneapolis or other parts of the Twin Cities from Terese out at the Prescott apartment where Terese had asked you to come back out to Prescott immediately as you talked to her to remove her from the premises?

MS. QUAINTANCE: Objection. We have been through this.

THE COURT: Well, is this the same incident, Mr. Danforth?

MR. DANFORTH: Well, Your Honor, yes, it is, actually. This is precedent to the -- sorry. I'm out of order. I'll withdraw the question.

THE COURT: Okay.

BY MR. DANFORTH:

Q. Was there another occasion during this summer of 1995 when at some point either near the door of some

THE WITNESS: Yeah. She -- I do. Now, that I think about it, I do recall Terese having a little tizzy about that she was offended. And I can't remember exactly what event that went down on when that occurred, but I remember Terese giving you some linguistics about it.

BY MR. DANFORTH:

Q. On the day that you had left my place and the landlord had showed up in the process of your leaving, did you have a suspicion that I had something to do with the landlord showing up?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Now, in total, as you yourself were leaving my place in the middle of July, were you feeling less friendly toward me than when the stay had started?

A. No, not at all.

Q. Okay. But from some of the things you had heard, did you feel more suspicious at that point with regard to my intent as to Josh when you left as opposed to when you got there?

A. I didn't notice a change in your behavior until that year, until that summer, pretty much spring and summer of that year, I started noticing a change in your behavior and in Josh's.

Q. Okay. So at the end of the stay at my place, you're saying that you felt more suspicious about me, is that correct?

A. Well, I just had my guards up, put it that way.

Q. Now, as you and Teresa stayed at Diane Connors' townhouse in Eagan the rest of the month of July, did you hear Terese make any comment about me at that time period?

A. Yeah, she was discussing some things with me.

Q. What things?

A. Things about the computer room and this thing when you guys went to the Omni Theater about Amanda yelling out to you in the car, "Don't touch Josh."

And there were incidents on wanting to have a discussion with her about that Terese brought that to my attention during that time, and you were insistent.

Q. So Terese, when she mentioned these things that we'll call the Omni Theater incident, that in reality it happened in my car, did she -- it's your testimony then that we had a discussion, she and I, at that point about it, correct?

A. Well, that's what Terese told me, that you wanted to discuss it with her, but she just wanted just to go back home and just drop the situation and leave it alone. That's what she told me anyway.

Q. What did she want to drop as a topic of

THE COURT: Sustained.

BY MR. DANFORTH:

Q. At that time did you have an opinion as to what ought to be done?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

MR. DANFORTH: Just one second.

(Pause in the proceedings.)

BY MR. DANFORTH:

Q. To your awareness, had I at some point during the stay of you people at my place in Prescott read some long article to Terese having to do with commitments of former sex offenders?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Given your state of mind at the end of July, did you find it very easy to believe that I would be capable of doing something with your children at that point in time?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Did you ever had a conversation with Terese in which you talked about her being manipulated by me in some

manner?

A. Yeah. She said something to me about that she felt that you did that with her.

Q. Did you have any such conversation with her prior to August 11th?

A. Yeah.

Q. Okay. When was the latest occasion when you had such a conversation that you recall prior to August 11th?

A. Well, she talked about that incident between you and her at your place, about not wanting me around and stuff, other things. Like, she complained to me one time --

Q. All right. Let's not get into other things.

Do you recall when this discussion was with her about her supposedly being manipulated by me prior to August 11th?

A. It was soon after we moved into our new place.

Q. At that time did you give her some advice about what to do or to do a better job of?

A. Yeah, I gave her my opinion.

Q. All right.

A. She asked me for it.

Q. And what was that?

MS. QUAINTANCE: Objection.

THE COURT: Overruled.

THE WITNESS: I basically told her that sometimes people will make you feel like they take advantage of you, but sometimes they don't really mean it. And I told her not to put herself into that position, and to keep her awarenesses up. That sometimes people will do that. And if you feel that way, you know, don't let it bother you. Because Terese lets lots of things bother her, a lot of little things. She sometimes has a hard time understanding people's behavior.

BY MR. DANFORTH:

Q. So, in essence, you were telling her to keep her suspicions up, is that correct?

A. Keep her guard up, yep.

Q. And this was just shortly after you arrived at the new place?

A. Yep.

Q. Now, at any point did you have a conversation, in '95, did you have a conversation at any point with Terese in which you told Terese that I didn't like her or that I was saying derogatory things about her.

MS. QUAINTANCE: Objection.

THE COURT: Overruled.

MR. DANFORTH: -- at one point in '95?

THE WITNESS: No. She never really said anything negative about you saying things bad about her. Because, again, Terese had at that time a real close relationship with you, and she would confide in you a lot about things and dump things in your lap about things that she couldn't talk to me about.

MR. DANFORTH: Your Honor, this is unresponsive.

THE COURT: Ask your next question, Mr. Danforth.

MS. QUAINTANCE: I'm having trouble hearing Mr. Story. Could you move the microphone towards your face?

THE WITNESS: Can you hear me now?

MS. QUAINTANCE: Yes. Thank you.

BY MR. DANFORTH:

Q. My question is at some point in '95 in talking to Terese, did you tell her something to the effect that I didn't really like her?

A. No, I never told her that.

Q. Okay. Since, well, at some point after May 1st, '95, have you had contact with a Becky Bennett?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

MR. DANFORTH: Okay. And the basis,

Did you talk to one investigator or two?
A. Two.
Q. Okay. If I were to give you the names Dave Boudreau and Beth Roberts, would that sound familiar?
A. Yes.
Q. Okay. And that when you spoke to them, where were you?
A. My employment.
Q. Okay. And did you deny the allegation to them?
A. I denied any allegation also of with me being involved with any kind of --
Q. Okay. And it's your testimony today here in court that that is not true, is that correct?
A. That's true.
Q. Now, you have never been in a girlfriend/boyfriend relationship with me, have you, Miss Zirul?
A. No, I have not.
Q. If anyone said you had, they would be making a misstatement of fact?
A. That's right. I barely know you.
Q. How did I meet you?
A. Gary and Terese Story moved into the apartment up above me when I lived on Garcia Way in Apple Valley. You I had seen more often at first than I did Gary when you

(Whereupon, the previous question is read back by the court reporter.)

THE WITNESS: Did he do acts, no.

BY MR. DANFORTH:

Q. Did you see him touching himself at any time in what might be regarded as an inappropriate or sexual manner?

A. No.

Q. Did you ever hear Josh make any request of you that startled you?

A. Yes.

Q. Okay. What kind of a request was that?

A. I was trying to put him to sleep one night, and I was rubbing his back. And he kept sticking out his tongue and telling me to move my hand. And I asked him what was wrong with his tongue. And he indicated to my tongue. And I said, "What? There is nothing wrong with my tongue."

And he kept on sticking his tongue out and moving it back and forth, and pointed to my tongue again. And I asked him if he wanted -- "What? You want me to rub my tongue on your back?" And he said, "No. On my poopie." And I said, "No way." I says, "Has somebody done that to you Josh?" And his answer --

MS. QUAINTANCE: Objection. Nonresponsive.

THE COURT: Ask your next question.

BY MR. DANFORTH:

Q. All right. What was his response at that point?

A. I said, I asked him if anybody had done anything like that to him.

Q. And what did he respond?

A. His response was, "Yes. His sister, his mother, his father, his brother.

At that time --

Q. What was your reaction to this?

MS. QUAINTANCE: Objection.

THE WITNESS: I couldn't believe what I was hearing.

THE COURT: Objection sustained.

MS. QUAINTANCE: Objection. Ask that it be stricken?

THE COURT: It will be stricken.

BY MR. DANFORTH:

Q. Did you ask him anything about any time?

A. Well, I asked him if --

THE COURT: You mean, beyond what she said?

BY MR. DANFORTH:

Q. Yeah. Let me rephrase that.

Did he describe in more particulars what each of these persons apparently did along these lines with him?

A. Not at that time, but a week later he did to his father.

Q. Were you present for that conversation that he had with his father?

A. Yes, I was.

Q. What did Josh say about it to his father in your presence at that time?

A. Well, Josh, we were on our way back from picking up Gary's oldest son --

MS. QUAINTANCE: I'm going to object to this as nonresponsive.

THE COURT: Yep. The question just is what was said by Josh to his father in your presence.

THE WITNESS: Josh, I -- I -- Gary asked Josh who got poopie on his tongue. Josh said, "Mom. Mommy. Mommy do," is what Josh said.

BY MR. DANFORTH:

Q. I'm sorry?

A. Gary asked if mommy had put her tongue on his poopie. His response was My pee pee too."

Q. Have there been any incidents prior to this

involving Josh taking off his clothes and making something that you thought might have been sexual gestures to Amanda?

A. I did not see it, but my daughter did.

Q. I guess I can't ask you about your daughter.

Now, did you mention these types of conduct or all of this to Detective or Investigator Roberts?

A. Yes, I did. I also turned it over to the child protection agency in June of '93.

Q. The statements -- did you ask Josh anything more about this? Did you get any detail about this?

A. That's about all of the detail I had gotten.

Q. All right. The State --

A. I --

Q. I'm sorry?

A. I don't feel that I'm qualified to determine whether or not it happened. So I turned it over to the child protection agency, which I thought I should do.

Q. Okay. Jumping ahead in time now to the time that you were talking to Investigators Boudreau and Beth Roberts, did either one of them ask you any questions about this particular part of things, these revelations by Josh back then?

MS. QUAINTANCE: Objection. Calls for hearsay.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. All right. Did they get any more detail from you?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. The statements that Josh had made to you of this nature, were they much before the June 22nd, 19 --

A. June 13th and June 20, is it?

MS. QUAINTANCE: 1992?

THE WITNESS: '93.

BY MR. DANFORTH:

Q. And you reported this to Dakota County child protection services at that time?

A. Yes, I did.

Q. Okay. Did they make an effort to set up an interview with you?

A. Yes. It was set up for June 22nd. I took off work, went home, got the kids ready, told Gary to get ready. We were on our way there --

MS. QUAINTANCE: Objection. Nonresponsive.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Along the way, what transpired of any note?

MS. QUAINTANCE: Objection.

THE COURT: Objection sustained on relevance grounds, Mr. Danforth.

BY MR. DANFORTH:

Q. Were you able to make that appointment?

A. No.

THE COURT: Same ruling, Mr. Danforth. The issue as we've discussed is what Joshua said to her on this topic or in her presence?

MR. DANFORTH: All right. If I could have a moment with stand-by counsel?

THE COURT: Um-hum.

(Whereupon, a discussion was held off the record between the defendant and stand-by counsel.)

BY MR. DANFORTH:

Q. At that point in time was that when your relationship with Gary Story ended?

A. Yes.

Q. Did you just have one interview then with Investigators Boudreau and Roberts in '95?

A. Yes.

Q. Okay. Were there any follow-up telephone calls?

THE COURT: Mr. Danforth, the issue is

reassured you on quite a number of occasions over the previous three years that that was not my intent?

A. Yep.

Q. Okay. Now, in fact, on the evening of August 23rd, '95, when you met with me, did you not also ask me again, in general, about my feelings towards boys, not particularly just towards Josh?

A. Yeah. I used a general statement.

Q. Okay. And you've already testified as to the fact that I, in answer, was speaking that I had diminished feelings, something along those lines?

A. Well, the answer to the question is that I hadn't reported my son. I talked to Beth Roberts. Something went down at the Corner House --

MR. DANFORTH: Okay. Your Honor, this is nonresponsive.

THE COURT: Right, it is.

BY MR. DANFORTH:

Q. We just need to keep it right to what it was. Did I not respond in that fashion that I just described?

A. Yeah, you did.

Q. Okay. Now, at that moment, well, generally speaking, wasn't that answer as well in keeping with other answers that I had previously given on this topic in the preceding three years?

A. Yeah, kind of stayed a year.
Q. That was nothing new to it either, was it?
A. (Shakes head.)
Q. Okay. All right. As far as you have any reason to believe on the evening of August 23rd, I had no idea that I was about to be arrested, did I?
A. No. Neither did I.
Q. Okay. However, as long as we're talking about that topic, you did make an appointment at the behest of Investigator Roberts to meet with me, I believe it was going to be the following Saturday, for coffee at a Perkins, was that right?
A. Yeah, but I backed out.
Q. Well, obviously, it never happened. I was arrested before that. But my question to you was you did make that at her request in the event that it would facilitate my arrest?
A. She wanted me to help.
Q. And you certainly did cooperate with her at that point, didn't you?
A. Yeah, I did, for a little bit.
Q. So as we sat there in that car that evening of Wednesday night, August 23rd, with that appointment already made for the ensuing Saturday, you knew something that I didn't know, namely, that I was going to be arrested,

didn't you?

A. I didn't know you were going to be arrested, no. I didn't make the appointment until after we had our talk with her. She didn't call me on the phone until the following day. She talked to me the following day. I believe that's when she called me.

Q. Now, in any event, because I had no reason to be aware that I was about to be arrested, I wouldn't have had a reason to suddenly vary that tenor of that conversation that I had with you repeatedly over time, would I?

A. I don't know.

Q. Now, in that conversation, that was of the topic that was raised by you, was to it this business about behaviors, isn't that your testimony, that we got together in this car and you brought this up, is that not right?

A. Yep. That's right. I did.

Q. All right. And in particular while that topic was up, did I not only reassure you that nothing had happened, but also that nothing was going to happen between myself and Josh?

A. But at that time I had a different opinion.

Q. Be that as it may, at least that's what I said to you, isn't it?

A. That's what you said to me, but I didn't

believe you.

Q. All right. In any event, that is essentially the same conversation and the same language that we had again over the preceding three years, wasn't it?

A. That's correct.

Q. Now, do you recall at that point whether I had made a blanket assurance as to any other boys at that time or not?

A. I can't remember.

Q. Okay.

A. We were basically talking in generalizations of bad behavior.

Q. All right. But at that point you gave me a warning about conduct with other boys, did you not?

A. Yeah. I said there were going to be consequences.

Q. Okay.

A. If the behavior doesn't change.

Q. And you were making reference to any boys, all boys?

A. Anybody.

Q. Now, you knew the four boys who were the victims of the sex crimes in the 1980's with whom I was involved, right?

MS. QUAINTANCE: Objection. Beyond the

scope.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. What was your feeling at the beginning of August, before August 11th, regarding the fact that in that prior crime I had only been sentenced to an 80 month sentence?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

MR. DANFORTH: The nature of that is scope?

THE COURT: It's outside the scope of recross of cross-examination.

BY MR. DANFORTH:

Q. Now, you had testified in your cross-examination before the break that we had spoke about matters pertaining to Darleen Zirul at the time when you were living at 3725 Cedar, is that correct?

MS. QUAINTANCE: Objection.

THE COURT: Come on up a minute.

(Whereupon, a discussion was held off the record at the bench.)

BY MR. DANFORTH:

Q. All right. Let's change to a different topic. Going back to the locker room in question, in your

cross-examination by Miss Quaintance before the break, you were speaking about how you found Amanda in the locker room on one occasion when you and I and Joshua were in there.

Do you recall when did you first see her at this point?

A. It was right when I was starting to come out.

Q. Okay. Where were you exactly when you say you were starting to come out?

A. I was in the bathroom, and I came around the corner as she came in in the first part of the locker room there. She was walking by the bench.

Q. She was walking by the bench in the locker room?

A. There was a bench in the front of the locker room.

Q. There was a bench in the front of the locker room?

A. I think there was a bench there. Yeah, I believe there was a bench there. I walked to that door, there was a door, and if I can remember correctly, went around the corner. There was two stalls and a urinal, and then there was a shower. I think it was two showers and then the sauna.

Q. And at that point you saw Amanda already standing essentially in the locker room, is that correct?

A. Yes. She was in the front part of it. And I told her to go back into the other one.
Q. And at that point did you open the door for her and sort of usher her out?
A. Yeah, I shooed her out of there.
Q. Okay. So now you laid eyes on her. And at that point she was already in the locker room. You didn't then literally see her coming through the door, did you?
A. No. I didn't see her come through the door, no. She was already in there.
Q. All right. So it's feasible that somebody else could have opened the door for her, is that correct?
MS. QUAINTANCE: Objection, calls for speculation.
THE COURT: Sustained.
BY MR. DANFORTH:
Q. And you indicated that you've not been in contact with the investigating officers about this case, is that correct?
A. Not ever since the arrest.
Q. Okay. What about the prosecuting attorney, Miss Quaintance, have you been in contact with her?
A. Just set up court times.
Q. Okay. Were you in contact with her about this court time?

MS. QUAINTANCE: Beyond the scope.

THE COURT: Overruled.

THE WITNESS: Yeah.

BY MR. DANFORTH:

Q. And did you have occasion to talk with her about what you anticipated the examination would be?

A. No. They were just concerned about the dates on the subpoena, and what time I was to appear if I were to appear because I was subpoenaed by them too.

MR. DANFORTH: Just one second, Your Honor, if I could.

(Pause in the proceedings.)

MR. DANFORTH: I have nothing further then, Your Honor.

THE COURT: Miss Quaintance?

MS. QUAINTANCE: Nothing further. Thank you.

THE COURT: You may step down, Mr. Story. You're excused, sir.

I'm going to try to do some analysis of where we are by about noon tomorrow, so that I can try to share that with you. And so it's an on-going process of talking with the parties about witnesses and whose coming and approximately how long it will take.

I know you are mindful of your schedule and your

**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

# TRIAL TRANSCRIPT,

## Volume VII

## February 28, 1996

A. Oh, she said that Josh was outside and did something to a kid. And that they asked him where he learned it from. And he said that "Steve told him -- taught him." And asked me what she should do. And I told her, "I don't know."

Q. And were you a little surprised that she would ask you about advice on that, I mean, as opposed to someone else?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. What was your reaction to being contacted on this?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

MR. MAHONEY: You don't have to answer the question.

BY MR. DANFORTH:

Q. No.

How did that phone call end?

A. I just told her, "I don't know what to do. Maybe wait for Gary to get home." And then she said, "All right." And we said goodbye.

THE COURT: Was everybody able to hear him jurors? Not clearly?