You're sort of soft-spoken, Mr. Hull, and in addition, you talk somewhat rapidly. Could you maybe repeat your answer and talk right into the microphone, if you would, sir.

THE WITNESS: I said that I didn't know what to do. Maybe she should wait for Gary to get home and then I said goodbye.

MR. DANFORTH: Okay. I think you can move the microphone a little bit, too, perhaps.

THE COURT: It's as close as it gets.

BY MR. DANFORTH:

Q. Okay. Now, did Terese at some point during the summertime talk to you, that is to say before August 11th, about any conduct on my part that she regarded as being suspicious or inappropriate with Josh?

A. No.

Q. And at some point prior to August 11th, though, did you hear about occasions when either Gary or Terese had talked to Josh about the possibility that I might try to do something of a sexual nature?

MS. QUAINTANCE: Objection, leading.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. At the beginning of August of this last year, before this call on August 11th, you had had some degree of

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

Q. Okay. What was told to you?
A. That you used to be gay.
Q. Okay. And who said that?
A. Gary.
Q. Okay. Now, when was that first said to you?
A. I don't remember.
Q. Okay. Was it a couple years ago, let's say, something like that?
A. Longer than that.
Q. Okay. Now, did Gary ever address the topic of my sexuality or anything having to do with the topic of sex and mentioning me in the same sentence?
THE COURT: Mr. Hull, before you answer that, some of the jurors are motioning to me that they're still having trouble hearing you. So talk right into that microphone, if you would, and speak up, if you can.
THE WITNESS: What did you say again?
BY MR. DANFORTH:
Q. Okay. I was saying after that initial comment to you, did Gary talk to you about this, again, at some later time?
A. Yeah.
Q. Okay. What was, what was said subsequently?
A. Just the same thing.
Q. Okay. Did he explain why he was saying that?

A. Yeah.

Q. Okay. What did he have to say about why he felt like he should say it to you?

A. Just so that nothing happened to me.

Q. Okay. Now, do you recall offhand a, maybe, how many times approximately he might have said this?

A. About two or three.

Q. Okay. Over the course of time since then, correct?

A. Yeah.

Q. Okay. Now, did you ever hear him give this similar kind of discussion or warning to Josh?

A. No.

Q. Okay. Now, over the time that I have known you, has there been any occasion that I've ever posed to you that we engage in any sex act together?

A. No.

Q. And, in fact, I have not even engaged in any sex act with you?

A. Nope.

Q. Okay. I have and you have had and you've not seen me engaging -- well, have you ever seen me engaging in any sex act with anyone?

A. No.

Q. And have you ever seen me engaging in any

THE COURT: That one is preliminary, but start asking non-leading questions, Mr. Danforth.

BY MR. DANFORTH:

Q. All right. What was your general impression about Josh's sense of familiarity with me?

MS. QUAINTANCE: Time period?

MR. DANFORTH: In 1995.

THE WITNESS: He liked to be around you.

MR. DANFORTH: Okay.

MR. MAHONEY: I'm sorry. You have to speak more clearly.

THE WITNESS: He liked to be around you.

BY MR. DANFORTH:

Q. We're both a little too soft spoken.

On the occasion that you are referring to at the Century Courts pool, the three occasions, was this still exactly the same case basically?

A. What?

Q. Well, was this same state of his liking to be around me still the same way it was?

A. Yeah.

Q. Okay. Did it seem like there was any difference in his reaction to me at that time?

A. No.

Q. Okay. Was there anything about his behavior or things he might have said or anything about him that would have indicated to you at that time that he had any fear whatsoever of me?

A. No.

Q. Okay. Was there anything about those things, his behavior, his speech, that he would have indicated that there was this kind of awkwardness or discomfort being in my presence?

A. No.

Q. Okay. Now, from the things that you saw me doing with Josh then and beforehand, at other times in 1995, how would you have sort of characterized the relationship between Josh and myself from what you saw?

A. He liked to be around you.

Q. Okay. Would it have been fair to say that it was a friendly relationship?

MS. QUAINTANCE: Objection. Leading, asked and answered.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. All right. I'll move on.

While we were at the pool on those occasions, did it seem to you -- well, just one second, Your Honor.

(Pause in the proceedings.)

could you hold on one second. There is just one other area of questioning here, you know, it's already really in issue about Josh's slowness and about the fact that this video of him was accompanied by Martinetti's testimony that he had difficulty tracking and sometimes answered questions three or four back.

I do plan on asking her a few questions relating to difficulties that she has noticed.

MS. QUAINTANCE: She is not a psychologist. This child since the beginning of this trial has been diagnosed A.D.D., but prior to that time there was no diagnosis. And she is not qualified to testify about that.

THE COURT: Yes. And we're getting into having people testify about -- I'm real firm about this, and I hope to be even-handed about it. I wouldn't let the State have people come in here, well, not even a psychologist, and tell what a quick wit he was and how great his memory was, and how great a recall he has. And it isn't going to happen. It's certainly not going to happen with a psychologist, and it's not going to happen with a lay person.

THE DEFENDANT: All right.

THE COURT: You can come on up here, if you would, and take a seat in the seat behind the

THE COURT: You guessed it, didn't you?

I should have known. Well, we're temporarily out of gas here. So we'll try to start, we'll try to hasten the afternoon witness. I mean, that's good and bad. The good part is we moved through more this morning than people thought. The bad news is we don't have anybody to fill the time. We'll try to push some people up into the one o'clock slot, so we can do a bit more. And then I will talk for a moment with the parties so that I can give you some information this afternoon about how close we are to you getting the case.

So we'll see you about one o'clock.

(Whereupon, the jury is excused from the courtroom.)

(Whereupon, a discussion was held off the record.)

(Whereupon, a recess was taken and proceedings resumed out of the presence of the jury at 1:25 p.m.)

THE COURT: We're out of the presence of the jury, and when I came into the courtroom, Mr. Danforth asked me if I would talk to -- he's been using the telephone to talk to various witnesses, and asked if I would talk to two people. One was the father of a young

what exhibit number is this so I can refer to it by exhibit number?

MS. QUAINTANCE: 7.

MR. DANFORTH: In any event, in addition to what I've already described today, Exhibit 7 only contains an ever so slight amount of footage, otherwise, wherein some things that look like wooden locker doors or --

MS. QUAINTANCE: We have all seen the tape. I think we can avoid the description of it.

MR. DANFORTH: All right. In any event, it is clear that this video that's Exhibit 7 does not depict the men's locker room at Century Court. There are no children depicted in the video. At one point, although extremely far distant in the background, there are some voices that appear to be those of small children. It is clear from the character of those voices as they are heard that they are not the voices of Josh and Amanda Story. And this video therefore has no probative value towards establishing the --

MS. QUAINTANCE: It's not admitted as an exhibit. What's the point?

THE COURT: Well, let him finish.

MR. DANFORTH: Yeah. The point being that this video was identified by both Terese Story and

Beth Roberts as being with reference to the locker room in question, and as containing the voices of the children in question. And because of this, we need to have a curative instruction to the effect that, as I say, this does not depict the men's locker room at Century Courts, and no children are depicted. That the children's voices heard on the tape do not appear to be those of Joshua and Amanda Story. And that the video has no probative value towards establishing the charge alleged. And that by reason of the respective recall by the these two witnesses, Terese Story and Beth Roberts, of the supposed specific attributes of that locker room as being those shown on the video tape is a matter that goes to their credibility as witnesses.

MS. QUAINTANCE: May I respond?

THE COURT: (Nods.)

MS. QUAINTANCE: Roberts never testified that that was the Century Courts locker room. She testified that it was a locker room, because it had already been established at that point by the defense video tape that it was not the Century Courts apartment locker room.

The children's voices on the tape were identified by their mother, who's the person in the best position to identify their voices.

The exhibit is not in evidence at this point,

rules even though there is some law about constitutional rights maybe coming into tension with some of those predisclosure kind of obligations. But this case, it was the closest case I could find to the issue that we're talking about. And I can dig it out if I need to. But it had to do with the State, the State's request to require certain in limine kind of indications of what the defense was going to present. And the case holds that it's -- well, "holds" might be too strong a word, but there was some very disconcerting language in it about whether there was an inference with the constitutional rights to present a defense.

And when I looked at that, I thought that while it was the closest thing I could find to this, maybe you all have some law that gets closer. But I looked at it, that was the basis for me being concerned about doing it. Plus, there was some additional reasons that I thought were sort of practical ones. And, that is, I do get involved in making, essentially, making the State's objections and ruling on them without the State ever objecting, and finding myself sort of in the position of one of the parties kind of unwittingly. Because then it would, if you didn't get the question and didn't raise the objection, then it's sort of me against Mr. Danforth with regard to the inquiry. And so at that time I

thought if I set out the areas that would be verboten, that maybe that would ameliorate most of the concern. I too have concern by reason of this morning, and I don't quite know how to deal with it. But that case was troublesome to me, and maybe I should try to dig it out and share it with you because it's bothersome.

MS. JOHNSTON: I would be happy to look at that case. I think, I mean, you're presented with a very unusual set of circumstances. How many times does an accused pedophile seek to cross-examine his victims? I mean, it's a very unique situation. However, I would suggest to you that this is different from the motion in limine in one respect, and that is that a motion in limine presumes that both parties are going to be involved, that we would be arguing one side, he would be arguing the other side, and you would make the judgment about whether the evidence was admissible.

What we are saying to Your Honor is that based on his performance in pretrial issues as well as during the jury selection and his opening statement to the jury, that it is, it is overwhelmingly apparent that this is a man who will not follow your orders, that you can't simply give him areas to avoid and he will do it. He chooses not to do that, and then either acts confused or -- by the way, he is communicating with the jury. The

record should reflect that I watched his presentation this morning when you had, you had sustained an objection, he would be going like this (indicating) to the jury, for the record, raising both hands, kind of raising his eyebrows and then muttering under his breath, "Then what do I say." So he's even commenting on your rulings to the jury.

This is a man who desperately needs to be reigned in here, and it's not, I guess for the record, we should say that we'll object to any question that is repetitive. We'll object to any question that is argumentative. We'll object to cumulative testimony, and we'll object to obviously prejudicial areas of inquiry, and ask the Court to review his questions in camera for your review only. Whatever questions that you choose to permit him to ask could be sealed and made part of an appellate record so that the appellate court could review this.

I do know that the Supreme Court is concerned about this. I think this Court, obviously, is familiar with the gender fairness report that was issued. They are very concerned about the treatment of women and children in the Court and the duty of the Court to protect witnesses who are under your care and control.

THE COURT: What, in this methodology, what happens when answers go in a direction

that arguably are unforeseen and there is another question or question that the defendant would want to ask? Would that trigger a requirement that we recess so that the questions can be written out and --

MS. JOHNSTON: I think that would probably be too cumbersome. My take on it is that if the answer moves him in a different area, that you might have to play that by ear. You might have to see if he, I mean, he's going to have to adapt, obviously, to some answers. No lawyer or lay person could transcript testimony, but if it's questionable, I think Mr. Danforth ought to be on notice that it's his obligation to approach the bench and get a ruling before he starts talking about something that is totally and wholly inadmissible.

Mr. Danforth is a very bright man. You know, I have a lot of familiarity with Mr. Danforth. I prosecuted him myself in 1987. So I know his history. I know he is a bright man. I know he can understand this, and I believe that what is occurring here is a willful abuse of process that will absolutely damage these two children who are, who are really in your hands.

MS. QUAINTANCE: I think one of the problems, Your Honor, is that there are no sanctions here, as you pointed out this morning. There is no board

of professional responsibility for him to be accountable to. There is no real contempt --

THE COURT: Why is there not?

MS. QUAINTANCE: -- sanctions. Because he's already in jail. What possible, what possibly can you do to him that would would be a sanction that would be in any way meaningful? Therefore, he continues to flout the Court's orders. And even when the Court instructs him from the bench to wrap it up, he doesn't do it. When the Court instructed him that he's to limit his voir dire to 20 minutes, he goes on for 40. When the Court tells him that this is argumentative, he keeps doing it over and over again.

And we give him the benefit of the doubt, and we let it go on for a few days that, perhaps, he doesn't know better. But it seems to be blatantly obvious at this point that this is deliberate. And the Court has no way after the fact of sanctioning him if he deliberately disobeys rulings, which he has been doing this entire morning.

MS. JOHNSTON: The other problem, Your Honor, is that you assert the possibility of having to declare a mistrial because of his conduct being so terrible. You may find it a manifest necessity based on some of the things that he does, and that then will put

the children through having to do this all over again. It is critical that these kids be protected as they come to tell their story. And Mr. Danforth's right to confront and cross-examine these kids is in no way impeded by you reviewing the questions and crossing out ones he can't ask and preserving that for an appellate record.

It seems to me that public policy ought to dictate, and I believe the Constitution is not in any way -- constitutional rights are not in any way affected by this. Public policy ought to dictate that the Judge protect the kids who testify in a case like this and not allow them to be deliberately harassed, manipulated and treated poorly.

THE COURT: Well, I guess we don't know. I take it there is no case authority that you're familiar with?

MS. JOHNSTON: I haven't ever seen a situation where a convicted pedophile has cross-examined his victims, Your Honor.

THE COURT: Mr. Danforth?

MR. DANFORTH: Well, yes, in response to a number of things here, first off, Your Honor, I want to put it on the record that I'm not making an attempt to deliberately do anything that undermines the authority of

the Court.

In the case of the pre-written opening statement, which really started out as being a closing argument, quite frankly, and what it had to do was be immediately modified when it became my sense upon taking over myself representation that I was going to have to prepare and have on at that point an opening statement, I mean, immediately or sooner. So the only thing that it struck me that I could do is simply, I think, and make the substance of what eventually will, hopefully, be part of a substantial part of my closing argument into my opening statement.

As you know, I have on many occasions asked the Court for, you know, citations, authorities, various matters pertaining to courtroom procedure. But by the time I had even received the Minnesota Rules of Court book, that document was largely already written except for the last several pages, and it was not possible, given the time constraints on me, to go ahead with other matters, including this really flowery motion, as even the State has been referencing there, we have been going through, which has kept me busy night after night on other matters, to go back and re-work that from scratch. I didn't intend by delivering that --

THE COURT: Why don't we get by that.

And, you know, I appreciate their advocation in these proceedings, why don't we get to the question of your presumably submitting -- I know you've got these things written out, because I saw them across my desk when they went from Tamburino to you. And I know, well, at least I'm assuming because I've seen how you work, Mr. Danforth, that, I assume, you have a lot of questions written out for these youngsters. And what's your view about the motion of the State?

MR. DANFORTH: Well, I do oppose it, Your Honor, but I wanted to start my opposition by saying, having said that, I would hesitate to add the reality of the situation is, although I have quite a lot of potential questions written out as questions, I have a number of areas in which it's simply indicating the area, yet, and this is sort of like unfixed, descriptive questions, if you will, in that certain areas did not have time, once again, to be completed.

So I certainly simply had enumerated certain areas. In fact, I was literally doing that again down in the room downstairs in which I was having my lunch. So it is not a finished document. And even if the Court were to review questions at this moment, it's by no means a complete compendium of everything that I would envision asking the children about.

The reference to contempt power being ineffective, I guess that all sort of depends on how you see it. I've heard every turn in remarks by both of the counsel for the State here a very strong assumption that I'm going to be convicted and, therefore, that is the only basis upon which the statement about contempt of court having no effective power would have any meaning. Because, obviously, if I were acquitted, and if I remain in custody at that point solely on contempt of court, I would be suffering the burden, having failed to obey the Court's rulings. I'm well aware of that. I intend to get an acquittal here. And I intend, to the extent that I am able to and able to know them, obey the rules and the directives of the Court. I don't think that should be a problem or anything that should have any direct impact here.

And I would hasten to point out to the Court that this is really an issue revisited. My understanding is that we had already heard argument on this, and the only reason that I can understand from the remarks of Ms. Johnston that we are having this issue again at this point, more argument from the part of the State, is simply what they regard as being a display of behaviors on my part at this point. I just don't think that really changes anything.

I still have a constitutional right to present an effective defense. I take the position, as I believe the opinion by Justice Todd, and I don't have a name here either myself, but I also read it from sometime back, would have, I think, constituted some kind of violation of that constitutional right to present an effective defense.

I think that your concern that you are in a position of essentially having to make the State's objections for and anticipate what those objections would be, essentially, in one side of your mind advocate for them, and then on the other side of your mind decide them, essentially puts Your Honor in essentially very much too much of an advocate position and departure from the neutral Magistrate. And I think that the question of the possibility of differing areas that might have to be gone into depending on how responses have, again, from a practical standpoint and also from a constitutional standpoint, would create either a stymying of the purposes of this in the first place or else, alternatively, a stymying at ever turn of my constitutional rights. Also, the State might raise an objection or might have to go, you know, off the record. I mean, not off of the record, but rather out of the presence of the jury and have bar discussion about

each given new area.

The State has already had the benefit of a ruling, a sweeping ruling that, as I understand it, forbids me to go into any instances, for instance, of physical abuse in this case, even though the question of the repetitiousness of physical abuse in the spring and summertime just preceding this accusation are at the very heart and core of my theory of events that that was part of a leverage exerted by the mother to extract this accusation, and I maintain that it is a false one, by the use of both physical abuse and intimidation.

I'm already half hamstrung, Your Honor, by the fact that that's so sweeping. And I, you know, would like very much to know just exactly what I could do in that regard in terms of asking the children, you know, any questions that the Court might deem -- that just might happen to dredge up accidentally the child saying something. I mean, how broad is this going to get, you know? Is the Court going to sensor my questions because there might be the slim, remote possibility that in answer to the question or possibly a misunderstanding of the question of the -- children are famed for misunderstandings. That, you know, the Court will anticipate what might be a misunderstanding, say, well, if the child, not necessarily a reasonable child, could

mistake what you mean here, Mr. Danforth. I won't let you inquire into this.

THE COURT: But, Mr. Danforth, do you have the topics, the kind of specific issues you want to cover with these kids written out? Is that what I heard you say?

MR. DANFORTH: Only in the case of areas. I have not constructed physical questions on it as of yet, Your Honor. That's a relatively small pile of topics. Although, of course, you know, whenever you're writing up a question outline and then proceed to make questions from it, it flows some with each topic, of course. I can only say it looks to me like I probably have questions in excess of, well, in excess of half of what I'm going to ask these children.

THE COURT: By topic, you mean?

MR. DANFORTH: Yes. Already constructed, I mean, as questions.

THE COURT: Well, why don't you make sure that those topics are set out as specifically as you can. And then let me think about this a bit as we proceed to the competency hearing. And I'd also like to take a look at that case, again, and maybe do some more looking. I'm nervous about the position that a Court gets put in, frankly, in looking at a question and then

ruling on objections. I mean, I don't quite know how a Court does that. I don't --

MS. JOHNSTON: Your Honor, I would represent to you that you do that all the time anyway. The only difference is that the question actually gets stated, you hear the objection, and then you get the ruling. And, of course, you would have the right to on your own sua sponte make a ruling and prevent an objectionable question from being asked in any court proceeding.

THE COURT: Why wouldn't that be a better method, though?

MS. JOHNSTON: Because we have very vulnerable children who are ages five and six, who have extremely limited attention spans, who wouldn't make it. Your Honor, they'll not make it through this. They'll be seriously damaged as a result of their having been here in court. So what will happen is that not only will the alleged abuse have worked its damage, but the continued abuse under the direction of the Court, where they are supposed to feel safe, will compound their problem.

I would urge the Court to look at the gender fairness report again, because it does address itself to some of these policy issues which I think you are faced with. And I'd be happy to take a look at the case, if

the Court has it handy, where Justice Todd makes his, it sounds like dicta. And I'll also do some further research this afternoon while you folks are doing the rest of the procedural business here. But I think that it's critical that this ruling be made before these kids take the witness stand, because their attention span is very limited.

It's already a major problem they have been in the building as long as they have. It's going to be -- it's going to be very difficult. And so I would ask that you please consider taking care of these kids. It doesn't do anything to his constitutional rights for you to protect these kids. And I think the Court has a duty to do so.

MR. DANFORTH: May I be heard one more time in response to that, Your Honor?

Again, Ms. Johnston's remarks essentially start from the presumption of my guilt, which still appalls me. That's my first objection to them.

The second problem that I have with the things that she said is that it's obviously, patently clear that little children do not have any concepts of law and certainly not of objectionable as opposed to non objectionable testimony and questioning. That is not the concern of the children. And the children really won't, you know, be any more impacted by an inadmissible

question than they would be by an admissible question just in terms of the hearing of it.

If what Miss Johnson is saying is that they'll be somehow impacted by the fact that the State has to say, "I object, Your Honor," and get a ruling from the Court on an objection, I find that to be frivolous. It's just not what impacts children in any kind of remotely arguable sense.

If what Miss Johnston is saying is that the children are going to be impacted by having to stay on the stand or, you know, with breaks get on and off the stand over an extended period of time, well, I am sorry, Your Honor, but to a certain extent, that's the nature of the American justice system.

I need to have effective cross-examination of these children because this is a situation in which my defense is based on my contention that there is lying and conspiratory lying going on here. That's why we have the other witnesses sequestered out right now. You know, this is a case in which only through cross-examination do I have even a hope of being able to get at the core of my defense and make it and, hopefully, you know break through this wall that's been created by the way these children have been prepared. And now Ms. Johnston is here and also Ms. Quaintance argued to the Court that I

shouldn't even be allowed to make that attempt.

This is at the very core of this case, and if you deprive me of that by disemboweling my question list and cutting it in half or something, not because of the fact that any given question might have some clear objectionability, but simply because you think the total welter of the questions is too much, then I have a problem with it, especially, if there isn't cumulativeness, repetitiveness. I have done my best in this question list to avoid that. The only potential at this point that I see for that is by virtue of the fact that I have had to go at such a pal mal speed in creating these questions, that there might be some inadvertent repetition, but I could catch that along the way.

I think the only real area where that's likely to be a problem is the fact that, as I say, I have this half committed down to actual questions in format, the remaining part of it, perhaps, more than -- I mean, less than half, perhaps, only about a third left is simply in topic areas. Well, of course, if I have a topic and don't have specific questions printed out. You can't quite foresee whether or not a given question you might think to ask and not have it written down may be repetitive until maybe it falls from your mouth. But I will do my best, if time permits and I get my chance, to

finish this question list.

I do have one final thing to say. Ms. Quaintance says she expects her entire direct examination of Josh Story to last 10 minutes. I don't see how it's anything other than a frivolous argument to say starting from such a zero ground of the total burden of proof with the witness, she intends to impose how the burden of my cross-examination is going to be onerous. Does she thinks it's going on for days? It's not.

MS. JOHNSTON: Your Honor, if he's got effective cross-examination, we're doing nothing to prevent effective cross-examination. I just wanted to remind the Court that Mr. Danforth, for all of his protestations, is a very bright man. He could have avoided repetition this morning in his opening statement. He chose not to. We believe that this performance indicated what he will do when he cross-examines these children. And, of course, you have to know and he has to admit from his prior record that he's a proven, very skilled manipulator of children. And this Court should protect its witnesses from that plight.

THE COURT: Well, let me tell you something, frankly, that is a little distasteful with respect to this, you know, I've got a job to do here. Whatever ruling I make about this will not be because I'm

insensitive to the children that you say are within my protection and control. I appreciate that. Nor will it be insensitive to the rights of the accused. It's a tough job. This is going to be a tough case.

And why don't you all just assume I appreciate those things and let's just deal with legal argument. I'll take a look at some cases. I'll try to get you, Judy, the name of the case of Justice Todd. If there is specific issues in the Gender Task Force Report, I'm happy to look at it. I share chaired the diversity committee of the bar for a couple years, and I don't recall specifics dealing with child witnesses with pro se defendants. Maybe there is something in there.

MS. JOHNSTON: It's child witnesses, generally.

THE COURT: Okay. If you want to direct my attention to that material, I would be happy to take a look at that, and then I'll make a decision on it.

MS. JOHNSTON: Okay. Thank you Your Honor.

MR. DANFORTH: Your Honor I would like to bring to the Court's attention that I haven't had a chance to get a hold of Walt Powers. And I desperately need to do that now if he's even going to have a remote chance of getting up here this afternoon.

THE COURT: I think what we need to do is probably talk about how you want this set up back here.

Could we all come back to my office? That's still where we want to have it?

MS. QUAINTANCE: Yes. Why don't we go back.

(Whereupon, the following proceedings were held in chambers, out of the presence of the jury.)

* * *

THE COURT: The only person that will talk in this proceeding will be the child and myself. Okay.

(County Attorney Victim/ Witness Advocate Connie Bauman is present.)

MS. BAUMAN: Could I just -- I can introduce you to him and I can talk --

THE COURT: Yes, you can do that.

When this youngster comes in, deputy, maybe you could stand between him and Mr. Danforth as he walks in.

The record should reflect, Shellie, that we're in chambers and Mr. Krieger is here and Ms. Quaintance is

THE COURT: Oh. Then when a tooth falls out, do you do anything with it?

THE WITNESS: I don't remember.

THE COURT: Did you ever hear about putting a tooth under your pillow or putting it in a glass of water?

THE WITNESS: Uh-uh.

THE COURT: So a fairy gives you something for it?

THE WITNESS: No.

THE COURT: That's what they did when I was a kid. Maybe that's too long ago.

THE WITNESS: What's your name?

THE COURT: The fairy? Well, I think they have all sorts of names.

THE WITNESS: Oh. What time is it?

THE COURT: It's about 2:20. Why? Do you have something going on this afternoon you need to leave?

THE WITNESS: I don't know what time we go at home. We got to sleep when it's dark.

THE COURT: Did you get out of school today?

THE WITNESS: Yeah.

THE COURT: That's a good deal.

Were you at school yesterday?

THE WITNESS: I don't know.

THE COURT: Did you go to school yesterday?

THE WITNESS: Yeah.

THE COURT: Where do you go to school?

THE WITNESS: Hiawatha.

THE COURT: Hiawatha?

THE WITNESS: Yeah.

THE COURT: Do you have lots of teachers or just one teacher?

THE WITNESS: One teacher and two teachers. And I don't know where she goes.

THE COURT: What's your teacher's name?

THE WITNESS: Miss Metzger.

THE COURT: Metzger?

THE WITNESS: Yeah.

THE COURT: Was she in school yesterday?

THE WITNESS: Yeah.

THE COURT: What did you do in school yesterday?

THE WITNESS: I was, what was it?

Uh, I don't know.

THE COURT: Do you remember anything that happened yesterday in school?

THE WITNESS: Well, I don't know.

THE COURT: What were you doing this morning?

THE WITNESS: Just doing my handwriting and stuff.

THE COURT: Did you -- who did you come down here with today?

THE WITNESS: Connie Bauman.

THE COURT: Connie Bauman?

THE WITNESS: Right here.

THE COURT: Right here?

THE WITNESS: Yep.

THE COURT: Do you know Connie Bauman? Have you met her before?

THE WITNESS: It's on her office, right.

THE COURT: Did you know her before? You had met her before?

THE WITNESS: Uh-hum.

THE COURT: How long ago did you meet her before?

THE WITNESS: My mom, we went here

on, what time, Connie? I don't remember.

MS. BAUMAN: You tell the Judge what you remember.

THE WITNESS: I think it was dark outside.

THE COURT: So your birthday is what day?

THE WITNESS: May 19th.

THE COURT: May 19th?

THE WITNESS: Yeah.

THE COURT: So you have got one coming up pretty soon?

THE WITNESS: I'm going to go -- I'm going to be seven.

THE COURT: Are you?

THE WITNESS: Yeah.

THE COURT: Do you remember Christmas this last year?

THE WITNESS: I don't know.

THE COURT: Do you remember what you got for Christmas?

THE WITNESS: I got a race cart. I don't know what it is.

THE COURT: Do you still have it?

THE WITNESS: Yeah.

THE COURT: And where did you have Christmas, at home?

THE WITNESS: Yeah.

THE COURT: Did you have a Christmas tree?

THE WITNESS: Yeah, we have a Christmas tree. We had one, and then it got small and stuff.

THE WITNESS: The Christmas tree got small?

THE WITNESS: Uh-huh.

THE COURT: How did it get small?

THE WITNESS: Me, me and Dad did, and Larry and Amanda was home. And then we on -- on -- we did the Christmas tree. And then it will fall and then, and then, and then, then we put water in the bucket. And then it got small.

THE WITNESS: The Christmas tree got small?

THE WITNESS: Uh-hum.

THE COURT: Kind of shriveled up?

THE WITNESS: Yeah.

THE COURT: Did you have a Christmas tree?

THE WITNESS: Yeah.

THE COURT: Our Christmas tree -- we don't water it very good, and then the needles get real hard.

THE WITNESS: Oh.

THE COURT: And if you touch it, it kind of pricks your finger a little bit. Has that ever happened to you?

THE WITNESS: No.

THE COURT: Did you water your Christmas tree?

THE WITNESS: Yeah.

THE COURT: A lot.

THE WITNESS: Yeah.

THE COURT: Who was at Christmas this year? Who did you spend it with?

THE WITNESS: I don't know. I got -- I'm going to get a train and then a bus and then a little, a little dump truck. And then that's all.

THE COURT: Is that what you got last Christmas or is that what you're going to get?

THE WITNESS: I'm going to get them because we didn't hardly get something.

THE COURT: So last Christmas, what did you get for Christmas last Christmas?

THE WITNESS: I don't know.

You know what my sister's named? Amanda.

THE COURT: Amanda?

THE WITNESS: Yeah. A-m-a-n-d-a.

THE COURT: Right. That's great.

Now, what did you say your teacher's name was again?

THE WITNESS: Mrs. Metzger.

THE COURT: Miss Metzger?

THE WITNESS: Uh-hum.

THE COURT: And the school you go to, it is called what?

THE WITNESS: Hiawatha.

THE COURT: Uh-hum.

THE WITNESS: My name is J-o-s-h-u-a.

THE COURT: Joshua. I know.

THE WITNESS: Is that all?

THE COURT: You know during the summertime when the weather gets warm and you don't have to go to school?

THE WITNESS: I don't know.

THE COURT: What do you do in the summertime when it gets warm?

THE WITNESS: We can go to school when it's warmer.

THE COURT: When it's warm outside, what kind of things do you like to do in the summer?

THE WITNESS: Summertime? What is summertime? When is summertime?

THE COURT: You know, when it gets warm outside and you don't have to go to school?

THE WITNESS: Hhm. We can't go out, it's summertime but a little bit colder outside.

THE COURT: That tooth that fell out, do you know how that one fell out?

THE WITNESS: We went to the dentist.

THE COURT: Did you go to the dentist?

THE WITNESS: Uh-hum.

THE COURT: How long ago was that?

THE WITNESS: Quite a few times.

THE COURT: Quite a few times?

THE WITNESS: Uh-huh.

THE COURT: Do you remember the last time you went to the dentist?

THE WITNESS: I don't know. I can't remember.

THE COURT: Do you remember when you went to school yesterday?

THE WITNESS: Uh-huh.

THE COURT: What did you do?

THE WITNESS: I go -- I go -- this

time I go to school at -- wait a minute. What is it again?

THE COURT: What time do you go to school?

THE WITNESS: I don't know.

THE COURT: So can you tell me who was at Christmas last year again?

THE WITNESS: Amanda and me and Larry and Amanda and daddy.

THE COURT: Uh-hum.

THE WITNESS: That's all.

THE COURT: That's all, huh?

THE WITNESS: But my mom and Jeffrey went to someplace, I don't know. I think they went to the store.

THE COURT: Let me ask you another question.

THE WITNESS: Uh-hum.

THE COURT: Have you ever been inside a courtroom before?

THE WITNESS: Yeah, with her right there (indicating), and Connie Bowman. Yeah.

THE COURT: How long ago was that that you went in a courtroom?

THE WITNESS: I don't know what time

again. Do you know?

MS. BAUMAN: The Judge was wanting to hear from you. So I'll let you --

THE WITNESS: I don't know. I don't remember the date.

MS. BAUMAN: He wanted to see if you remembered.

THE COURT: Did you go in the courtroom on this trip or did you go in a courtroom last time you were here?

THE WITNESS: Last time we were here.

THE COURT: Do you know in courtrooms people come into courtrooms and talk to other people?

THE WITNESS: Uh-huh.

THE COURT: Kind of like we're talking here?

THE WITNESS: Yeah.

THE COURT: But in a courtroom they raise their hands kind of like this (indicating). Did you ever see that on TV, and they promise to tell the truth?

THE WITNESS: Yeah.

THE COURT: Do you know what that means?

THE WITNESS: Mom said I got to tell

the truth. I can tell the truth.

THE COURT: Do you know what telling the truth means?

THE WITNESS: No. Do you know?

THE COURT: Well, I'm trying to figure out if you know.

THE WITNESS: Uhm. Uhm.

THE COURT: If I say I've got one finger up here (indicating), am I telling the truth?

THE WITNESS: Yeah.

THE COURT: How about if I say these are two fingers (indicating), am I telling the truth?

THE WITNESS: (No audible response.)

THE COURT: If I said you went to school this morning, is that the truth?

THE WITNESS: Yeah.

THE COURT: Do you know what a lie is?

THE WITNESS: No.

THE COURT: I'm trying to figure out --

THE WITNESS: Trying to figure out?

THE COURT: Yeah.

THE WITNESS: I don't know what it's called. Sometimes Larry, Larry lies.

THE COURT: Sometimes Larry lies?

THE WITNESS: Yeah.

THE COURT: How does he lie?

THE WITNESS: By something with her mom. That's all.

THE COURT: Can you tell me how Larry lies sometimes?

THE WITNESS: No. I don't know. I don't know.

THE COURT: If I said you lived in Wisconsin, is that a lie?

THE WITNESS: No. It's the truth.

THE COURT: That's the truth?

THE WITNESS: Yeah.

THE COURT: Do you live in Wisconsin?

THE WITNESS: We're going to go to Dakota County again. We're going to live in Dakato County.

THE COURT: Did you live in Wisconsin sometime before?

THE WITNESS: Yeah, but it's -- it's off. I tell the truth about eating and on -- I don't know what the rest of the stuff is. And mom tells me to tell the truth.

THE COURT: Yeah. What do you think

she means when she tells you that?

THE WITNESS: I don't know. I don't know.

THE COURT: So did you see Connie this morning before lunch?

THE WITNESS: Connie Bauman?

THE COURT: Connie Bauman?

THE WITNESS: She is right here.

THE COURT: But did you see her before lunch today?

THE WITNESS: Nah. Did I?

MS. BAUMAN: The Judge is asking you, not me.

THE WITNESS: Nope.

THE COURT: When did your mom tell you to tell the truth?

THE WITNESS: When we were at home next Friday.

THE COURT: What city do you live in now?

THE WITNESS: Minneapolis Park.

THE COURT: Minneapolis park?

THE WITNESS: Yeah. It's a brown house.

THE COURT: A brown house?

THE WITNESS: Yeah.

THE COURT: And who lives there with you now?

THE WITNESS: Mom, Dad, me, and Jeffrey, and that's all. And when we go at Larry's house, and we go somewhere.

THE COURT: Do you remember your 6th birthday when you turned 6 years old?

THE WITNESS: Uh-huh. I was --

THE COURT: Did you have --

THE WITNESS: -- Five.

THE COURT: Did you have a birthday party when you got to be 6?

THE WITNESS: Yeah.

THE COURT: Do you remember who was there?

THE WITNESS: No.

THE COURT: Huh?

THE WITNESS: I don't know.

THE COURT: It's tough to remember, huh?

THE WITNESS: I can't remember

THE COURT: Your first day of school of this year, were you in the first grade or second grade? First grade?

THE WITNESS: Yeah, first grade.

THE COURT: Are you in first grade now?

THE WITNESS: Yeah.

THE COURT: Do you remember your first day of school?

THE WITNESS: On one, one, one.

THE COURT: Is that your school?

THE WITNESS: And a one, and a one, and a one.

THE COURT: Is that the room of your school?

THE WITNESS: Uh-hum.

THE COURT: Do you remember the first day of school this year when you first met your teacher?

THE WITNESS: I always see my teacher. I always --

THE COURT: But do you remember meeting her for the first time --

THE WITNESS: Yeah.

THE COURT: -- at school.

Josh, do you remember when you hurt your mouth up here (indicating) a long time ago?

THE WITNESS: Uh-huh.

THE COURT: Do you remember that?

THE WITNESS: Did you see it?

THE COURT: I didn't see it, but somebody told me about it I think. Do you remember it?

THE WITNESS: No. It was an owie.

THE COURT: It was an owie?

THE WITNESS: Yeah.

THE COURT: Do you remember where you got hurt?

THE WITNESS: No.

THE COURT: How do you feel about being downtown here?

THE WITNESS: We want to live at downtown. They always have a house. Do they, or not?

THE COURT: Do who?

THE WITNESS: Minneapolis town. I don't know.

THE COURT: Do you like it downtown? Do you like to come down to this building?

THE WITNESS: Yeah.

THE COURT: Hhm?

THE WITNESS: Yeah.

THE COURT: Did you know what you were going to do today when you came downtown?

THE WITNESS: Uh-huh. I don't know. I don't know.

THE COURT: Are you having fun talking to me or not so much fun?

THE WITNESS: Fun.

THE COURT: Fun?

THE WITNESS: Yeah. Sometimes my ear hurts.

THE COURT: Does it?

THE WITNESS: Yeah. I tell mom that it hurts.

THE COURT: Did you ever live with your Dad at any other location anyplace else?

THE WITNESS: No.

THE COURT: Hhm?

THE WITNESS: Nah. The only -- that's it.

THE COURT: His name is Mike. I don't know. He might be eight years old or something there. And his name is Tom. He's maybe 6. And that's my wife. That's their mom. Her name is Nancy.

What's your mom's name?

THE WITNESS: Terese.

THE COURT: And your dad's name is what?

THE WITNESS: Gary.

What's your name?

THE COURT: Her name?

THE WITNESS: Your name.

THE COURT: My name is Rick.

THE WITNESS: Oh.

THE COURT: R-i-c-k.

THE WITNESS: And that's all?

THE COURT: That's all. Huh?

THE WITNESS: Yeah.

THE COURT: Where did you go to lunch today?

THE WITNESS: Hiawatha.

THE COURT: What did you have for lunch, do you remember?

THE WITNESS: No. Some pizza.

THE COURT: Some pizza?

THE WITNESS: Yeah.

THE COURT: Who did you go to lunch with?

THE WITNESS: Nobody but my friend. That's Emily B., and Josh, and what's her name again?

THE COURT: But today did you have some lunch today?

THE WITNESS: Yeah.

THE COURT: Who did you have lunch with today?

THE WITNESS: Somebody. I think I ate pizza. I did.

THE COURT: But you don't remember who you went to lunch with?

THE WITNESS: No, I don't know but only Emily B.

THE COURT: Emily B.?

THE WITNESS: She is my friend.

THE COURT: Oh.

THE WITNESS: And I said --

THE COURT: Is she a girl or is she a lady?

THE WITNESS: A girl.

THE COURT: Oh.

THE WITNESS: She plays with me.

THE COURT: You know, maybe I'll have Connie take you back for just a few minutes, and then maybe I can have you come back and visit with me a little bit more. Would that be okay?

THE WITNESS: Okay.

THE COURT: Okay. See you in a minute.

MS. BAUMAN: Should I just take him out of here?

THE COURT: Yes. Would you please?

(Whereupon, the child witness is escorted out of chambers.)

MS. QUAINTANCE: He's completely fried.

THE COURT: Any thoughts?

MS. QUAINTANCE: They're completely fried. I don't know if you want to try again in the morning or what. You could observe the attention span, and they have been in this building since 10:30 this morning, and we started this at 2:30.

THE COURT: Is he Attention Deficit, do you know?

MS. QUAINTANCE: I have no idea, but I don't think there is any point in going any longer this afternoon. This was beyond the length that was profitable, I think so.

THE COURT: Mr. Danforth?

MR. DANFORTH: Well, Your Honor, I guess, anything I say under the circumstances might take as being scrutinized, but in any event, I must say that it looks like we are dealing with an incompetent witness at this point from the display we had. And although we can come back tomorrow morning and do it again, the fact is, is that based on the display this afternoon, there is always going to be a question, certainly a very

proceed?

MS. QUAINTANCE: Well, we can't put Josh on the witness stand today because he's not competent. And I can't put anybody on before him, so that's where I'm at.

THE COURT: You wouldn't want to put the tape on today?

MS. QUAINTANCE: I don't have the witness to provide the --

THE COURT: Oh. Who was the one that did Josh?

MS. QUAINTANCE: Martinetti.

I mean, this clearly rearranges everything. And I'm going to have to scramble.

THE COURT: Well, we might as well send the jury home.

MS. QUAINTANCE: There is a finding then of him being incompetent, and we're going to leave it at that?

THE COURT: Well, again, I'm willing to see him again tomorrow, if you think there is a better chance that he would be with it. But if I had to make the decision now, if I don't see him again, I'm not going to let him testify.

MS. QUAINTANCE: Okay. Well, I'll

live with that, I guess.

MR. DANFORTH: Then the finding is incompetence, Your Honor?

THE COURT: Pardon me?

MR. DANFORTH: As to Josh, the finding is incompetence?

THE COURT: Yeah. Right now on the basis of what I've seen, I will not permit him to testify. I don't believe he is a competent witness. And, again, I'm willing to entertain the thought this might be momentary burnout and see him again. But absent seeing him again in a different capacity, I would not permit him to testify.

MR. DANFORTH: All right. I guess I stated my position. I won't reiterate.

THE COURT: Well, why don't we excuse the jury and --

MR. DANFORTH: May I attempt to call my investigator?

THE COURT: Should we excuse them in the presence of everybody or should I just have Rachel let them go?

MS. QUAINTANCE: Oh, they can just go as far as I'm concerned.

* * *

are pretty vulnerable, young kids, for whatever reason. And that's not to say that I don't think especially with what Amanda did back in chambers, that she doesn't have an ability to recall some things and pretty much stick to that recall and communicate it.

How far back that goes and, you know, what kind of detail, is more the subject of weight than competence. And she also seemed to understand truthfulness, the response. So those issues were considerably better than Josh. But notwithstanding that, long-term, repetitious questions on subject matters that would be outside the purview of admissibility, I'm going to be pretty careful about. So what I would like you to do is to set out with some detail the precise topics that you are going to inquire about with Amanda. If the State doesn't bring -- and Josh, I guess, but the State may not bring Josh back. And if that's the case, then there won't be any cross-examination of him.

MR. DANFORTH: Are you saying that you would want a listing of areas, you mean?

THE COURT: Yeah, but pretty precise areas. And then I'll take a look at them right away.

I guess, deputies, if you could have Mr. Danforth brought over by 9:00 tomorrow, and maybe you could be prepared to give those to me. I won't share them with