**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

**<u>TRANSCRIPT EXCERPT:</u>**

**TRIAL TRANSCRIPT,**

**Volume VIII**

**February 29, 1996**

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

corners of the offer of proof that Dr. Underwager is going to be overcome. It's my understanding --

THE COURT: Yeah, well, of course, I haven't seen anything except a document that was produced to us a few days ago or several days ago now, I guess. And as indicated on the record two or three times throughout these proceedings, my decision was not made on the basis of who he is or what sense or what his attitudes or viewpoints are about pedophilia, but rather Minnesota Appellate case law that deals with the helpfulness of this kind of testimony, and any kind of expert testimony that essentially goes to trustworthiness or credibility of the witnesses from an expert basis.

And it was my view in looking at the offer of proof that the testimony, no matter how cut it was direct or indirect, by an expert psychologist on the credibility of the witnesses and/or was of the recitation in the form of expert testimony, things that were not helpful and was a matter of common experience of jurors that had a document and interview to be able to see, to be able to see and make their own judgment about, and a number of other reasons that I have put on the records and that will be in my memorandum, if we ultimately, if my decision is ultimately the same as it was the other day, and that is that I didn't see how it would be proper under Minnesota case law for Dr.

cross-examined her in his case about what she witnessed in the locker room, I see some linkage to that in the rebuttal question. So I just want both of you to know that. And I I'll just deal with it as it comes, I guess.

I'm going to have the boilerplate jury instruction that I generally use and I'll try to have those available to you at the end of the day. And then I would like any additional thoughts or requests with regard to the jury instructions provided to me today or to me sometime tomorrow. I may not have the instruction, only elements. I assume, we'll just be essentially using the JIG, fashioning the JIG to the elements, first degree criminal sexual conduct in connection with the age patterns of people, and so on.

And then with respect to Terese, Mr. Danforth, I just want to make sure we're clear. The question or limited questions are going to focus specifically on the question of whether she committed any sexual abuse of Josh, and again what was going on with child protection agents, what their determination was.

I'm not letting the State put into evidence that child protection determined this didn't happen. I'm not letting you put into evidence anything about how good or bad an investigation they did and physical abuse, all of that kind of stuff I think we have an understanding about. So this

is focused directly on whether or not she sexually abused her son without the collateral issues being involved.

MR. DANFORTH: Well, Your Honor, is that the end of the Court's the observations?

THE COURT: It is.

MR. DANFORTH: I just see that the witness from Wisconsin that I've been anticipating has come in. And because of unavailability by way of the phone, I have not had any contact with her. And I do need perhaps about five minutes.

THE COURT: Well, let's get this witness done. Can you tell Mahoney?

MS. QUAINTANCE: Can I just know who that is?

MR. DANFORTH: Yes. That is Cindy Laffin.

THE COURT: By the way, she did call my -- it was yesterday. I didn't know about it this morning. I re-placed the call, a male voice answered, and I asked for her to return the call. And they said she is on her way to court, so.

MS. QUAINTANCE: As I indicated yesterday, I think it would be appropriate for her to be able to see the video tape of her son before she testifies. I don't want to play that to her in front of the jury for

A. No.

MR. DANFORTH: Just one second, Your Honor.

(Off the record discussion between the defendant and stand-by counsel.)

MR. DANFORTH: No further questions, Your Honor.

THE COURT: Miss Quaintance?

MS. QUAINTANCE: Nothing further.

THE COURT: You may step down Miss story.

THE WITNESS: Thanks.

MR. DANFORTH: Your Honor, at this point I would like to call Patricia Story Weimer to the stand.

PATRICIA STORY-WEIMER,

after having been first duly sworn, was examined and testified as follows:

THE COURT: Tell us your full name please and spell your last name.

THE WITNESS: Patricia Diane Story-Weimer, W-e-i-m-e-r.

THE COURT: Okay. Mr. Danforth?

DIRECT EXAMINATION

A. Yes, she did.
Q. Okay. Do you recall when the first time that she did that was?
MS. QUAINTANCE: Objection, hearsay.
THE COURT: Overruled.
THE WITNESS: I don't recall exactly when. No. Couldn't be positive.
BY MR. DANFORTH:
Q. Okay. Shortly after that conversation, though, did she come to your place again to swim?
A. You know, I really couldn't say if that was after that, but I'd assume so, because she swam there all the way till the pool closed, which was Labor Day weekend.
Q. Okay. Do you recall occasions when she came to your place before Labor Day weekend when she spoke with you about that accusation in person?
A. Yes, I do.
Q. Okay. And was Joshua with her at the time that she spoke with you?
A. Yes, he was.
Q. Okay. Now, what was the manner in which she first spoke with you about the accusation at that time?
A. She just said that Joshua told her that certain specific things that happened.
Q. Okay. At that point was Joshua talking?

A. I don't know if he was talking at that moment.
Q. All right. But at that moment, he was not talking to you about the accusation, was he?
A. No.
Q. Then what did she have Josh do with regard to talking about that?
A. Excuse me?
Q. At that point then, what did Terese proceed to have Josh do in terms of talking to you about the accusation?
A. She asked Josh to tell me what he told her.
Q. Okay. In what manner did she ask that of Josh?
A. She just asked him that. He didn't say anything, and then she kind of, you know, would say, well, show her where he touched you, or something in that order. I can't be positive on exactly how it was worded.
Q. All right. In other words -- well, strike that.
At that beginning moment, did Josh narrate an accusation to you or not?
A. I don't think he just came out and spilled --said anything, direct, you know, when he was asked that, no.
Q. Okay. So then what did Terese do to elicit this from him?

MS. QUAINTANCE: Objection. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Excuse me?

BY MR. DANFORTH:

Q. What did Terese do in order to elicit this kind of series of statements from him?

A. She just, like I said, she said like, point out, you know, why don't you show Patti where, you know, like she tried to bring it out of him, I guess, however you'd word this.

Q. All right. So she was, is it your testimony that she was taking him through this sort of line by line?

A. I would say so.

Q. Did it seem to you at that time that she was essentially giving him things --

MS. QUAINTANCE: Objection, leading.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Could you describe for us how, how she would elicit each statement out of him?

THE COURT: It now has been asked and answered.

MR. DANFORTH: All right. Okay, Your Honor. Well, just one second.

(Whereupon, a discussion was held off the record stand-by counsel and the defendant.)

MR. DANFORTH: All right. I have nothing further. Thank you.

THE COURT: Miss Quaintance?

CROSS-EXAMINATION

BY MS. QUAINTANCE:

Q. Thank you. Mrs. Story-Weimer, you indicated that you remember Mr. Danforth being at your apartment two times?

A. Yes.

Q. And you don't remember seeing him at the pool anytime when he was at your apartment?

A. No.

Q. And the one time he came to your apartment, he and Terese and the kids were all together?

A. Yes.

Q. And the other time Terese stayed in your apartment, and he went alone with the kids to the pool?

A. Yes.

Q. And that didn't seem unusual?

A. Well, she just came in and gave me a hug and said, "Hi," and said they were there. And she went out the door, and when she went out the door, they were still going

down my hallway.

Q. So she just went ahead a little bit?

A. Yes.

Q. To your knowledge when they would come and use the pool, did they sometimes use the locker room?

A. You know, I wasn't there to see it.

Q. Okay. So you don't know?

A. I don't know.

Q. Okay. Now, when Terese and Josh had these conversations with you about these allegations, that was after it had been reported to the police, correct?

A. I do believe so.

Q. And so that would have been in late August or early September?

A. You know, I'm not sure.

Q. Okay. In any case, it was not the first time that Terese was hearing this?

A. When she talked to me about it at my apartment, it was the seconds time and the last time that she spoke of this to me. So the first time when was when she told me that Josh, that Joshua said that that had happened. And then she had come over -- that was over the phone. And then she had come over one time after that and -

Q. Okay. So the first time she told you she just told you on the phone?

establish that something had happened, and that I did it, did she give any you any idea of what that process involved?

A. Yes. Her exact words were that she was trying to coax it out of him that, she repeatedly kept asking him if you had done something.

Q. Okay. When you say that she repeatedly kept asking him, did you -- did she give you an idea of over what period of time this repetition went on?

A. No. She didn't say how long it took. She just kept asking him.

Q. Where there things in what she said that gave you an impression or left you with a suggestion or implication on her part of how long a process this was?

MS. QUAINTANCE: Objection to impression or implication.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Did she indicate that until this process was finished, before that, that Josh was not saying that anything had happened or that I had done it?

MS. QUAINTANCE: Objection, form of the question.

THE COURT: Sustained.

MR. DANFORTH: Okay. Just one second

Your Honor.

(Off the record discussion between the Defendant and stand-by counsel.)

MS. QUAINTANCE: I'm going to object to Mr. Danforth's arguing loudly.

MR. DANFORTH: Oh, excuse me.

(No audible response by the court.)

BY MR. DANFORTH:

Q. Other than saying to you that she was trying to coach it out of him --

MS. QUAINTANCE: Objection. The witness' testimony was coax.

BY MR. DANFORTH:

Q. I'm sorry. Did you use the word coax or coach?

A. Coax.

Q. Okay. Did you mean coax?

MS. QUAINTANCE: Objection.

THE COURT: Well, let's first -- c-o-a-x, is that what you said?

THE WITNESS: Yes.

THE COURT: Okay.

BY MR. DANFORTH:

Q. Okay. What did you mean by this process of

coax it out of him?

A. I guess she was trying to comfort him into saying that it was okay if you say that Steve did something to you.

Q. Okay. But your testimony is that she repeatedly continued to ask him to say that something had happened before he did, is that right?

A. Yes.

Q. Okay. Do you recall stating to the investigator that --

MS. QUAINTANCE: I'm going to object. May we approach the bench?

THE COURT: Um-hum.

(Whereupon, a discussion was held off the record at the bench.)

BY MR. DANFORTH:

Q. Was the substance of what you learned from Terese Story in that telephone conversation that you had with her that she had just kept on bugging Josh?

MS. QUAINTANCE: Objection.

THE COURT: Sustained. It's leading.

BY MR. DANFORTH:

Q. Would you have characterized it along those lines?

A. It was almost like she was trying to convince

me that the whole thing was true.

Q. I'm sorry. I didn't quite hear that. Could you --

A. From my phone conversation with Terese, it was like she was trying to convince me that the whole thing was true.

Q. Okay. But speaking specifically about this conversation that she had described to you that she'd had with Joshua okay, what was --

just a moment, Your Honor.

(Whereupon, a discussion was held off the record between the Defendant and stand-by counsel.)

BY MR. DANFORTH:

Q. Did she indicate to you that she was repeating questions to Joshua?

MS. QUAINTANCE: Objection, leading.

THE COURT: Well, finish the question.

BY MR. DANFORTH:

Q. That she was repeating questions to Joshua over and over?

THE COURT: Sustained.

THE WITNESS: Yes.

THE COURT: Sustained. It is leading.

MS. QUAINTANCE: Ask that it be

stricken.

THE COURT: It will be.

BY MR. DANFORTH:

Q. All right. What did she tell you then about her method of questioning Joshua?

A. She said that she had kept asking him. She just repeatedly kept asking him if it was true.

Q. Okay. In substance, what was your impression of this process in total?

MS. QUAINTANCE: Objection. Asked and answered.

THE COURT: Sustained.

Not on those grounds. Her impression is irrelevant.

MR. DANFORTH: Okay.

THE COURT: It's what Terese said.

BY MR. DANFORTH:

Q. All right. Approximately when was this conversation by phone with Terese that we've been talking about?

A. It was about a month after you were arrested.

Q. Did you have further conversations with Terese after that point?

A. After your arrest?

Q. After this conversation?

A. Yes, I did.

Q. Was Terese Story also aware of the fact that I had had this?

A. Oh, yes, she was.

Q. Okay. And what was her reaction to that?

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

Just so I'm being fair with you Mr. Danforth, it's this reaction. You can ask her about conversations, what Terese said about that topic, but the reaction...

BY MR. DANFORTH:

Q. All right. Do you recall what Terese might have said with reference to that?

A. No.

Q. Did she ever have any conversation with you in which she made any statements pertaining to concern for her children?

A. Yes, she did.

Q. Okay. Were some of those conversations prior to my arrest?

A. Yes.

Q. Okay. Do you recall what she said?

Or let me back that up. When was the first conversation that you had with her in which she made some kind of statements to that effect?

A. It was her first phone call that I received

from her after your arrest.

Q. But a moment ago did you indicate that there were some conversations that you'd had with her prior to my arrest in which the subject of concern about Joshua being with me came up?

A. Yes.

Q. Okay. Those earlier conversations, do you recall when the first of those that you remember might have been roughly in time, what year it was?

A. I don't remember.

Q. Okay. It was substantially a long time before my arrest?

A. Yes, it was.

Q. Okay. In that conversation do you recall what she might have said about that topic?

A. About her concern about her children?

Q. Yes. And in particular about Joshua?

A. Basically she just wanted to protect her kids.

Q. And how did she say that she planned to do that?

A. She said something about getting Josh in to see a counselor, same thing with Amanda.

Q. Do you recall conversations in which she spoke to you about her perception of a need to talk with Josh every now and then?

MS. QUAINTANCE: Objection, leading.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. In terms of these other conversations that occurred with Terese before I was arrested, do you recall whether she ever spoke to you about conversations she had with Josh about this?

A. No.

Q. In these earlier conversation before my arrest and with regard to Joshua, did she ever say anything other than this comment about counseling?

A. No, she didn't.

Q. And your indication was that the reason that she was looking toward counseling at that time --

MS. QUAINTANCE: Objection, speculation.

THE COURT: Sustained.

It's leading.

MR. DANFORTH: Oh. All right.

THE COURT: And her impressions are not relevant. It's what Teresa said about sexual abuse of Joshua respecting you.

BY MR. DANFORTH:

Q. Do you recall any occasions obviously prior to my arrest when I would have been in the company of Joshua

or Amanda while you were there?

A. No.

Q. Okay. Is that because when you and I met, it was usually on these -- well, it's leading.

You were never in the Story household at a time when I was, is that correct?

MS. QUAINTANCE: Objection, leading.

THE COURT: Well, it's preliminary. You may answer that.

THE WITNESS: What was the question?

BY MR. DANFORTH:

Q. The question is whether or not you were ever in the Story household at a time when I was there as well?

A. Yes.

Q. Okay. When would that have been?

A. I couldn't tell you.

MR. DANFORTH: Your Honor, can I approach the bench on this one?

THE COURT: Um-hum.

(Whereupon, a discussion was held off the record at the bench.)

MR. DANFORTH: All right. Your Honor, I have nothing further.

THE COURT: Miss Quaintance?

CROSS-EXAMINATION

BY MS. QUAINTANCE:

Q. Miss Bennett, I have a few questions. My name is Kathryn Quaintance, and I'm the prosecutor here.

Is it fair to say that your relationship with Terese was kind of up and down, sometimes you were good friends, sometimes you weren't so good friends?

A. That's true.

Q. Okay. And would it be fair to say that after these allegations surfaced, you noticed a change in Terese's attitude towards Mr. Danforth?

A. Her attitude was changed.

MR. DANFORTH: Objection, Your Honor.

THE COURT: Well, I think the objection is sustained. There is no foundation to it.

BY MS. QUAINTANCE:

Q. Well, you indicated that you talked to Terese from time to time?

A. Yes.

Q. And you talked about this case and these allegations and Mr. Danforth, right?

A. Sometimes, yes.

Q. And before she found out about the abuse of Josh, Mr. Danforth was her friend, right?

A. Yes, he was.

Q. And afterwards, she was kind of angry at him,

right?

A. Yes, she was.

Q. Now, you weren't there when she questioned Josh, right?

A. No, I wasn't.

Q. She just told you that she had questioned him, right?

A. Yes, she did.

Q. So you don't know how many times she asked him anything. You just know what she told you, right?

A. That's correct.

Q. Okay. And what she told you was that she asked him questions about Mr. Danforth, right?

A. Yes.

Q. And she wanted him to know it was okay for Josh to tell her what happened, right?

MR. DANFORTH: Objection, Your Honor.

THE COURT: She can testify as to what she said, what Amanda [sic] said to her. So if it's phrased in that form.

MS. QUAINTANCE: What Terese said to her.

THE COURT: What Terese said to her.

BY MS. QUAINTANCE:

Q. And Terese told you that she wanted Josh to

know it was okay for Josh to tell her whatever happened, right?

MR. DANFORTH: Objection, Your Honor.

THE COURT: That's what she said?

The objection is?

MR. DANFORTH: Well, it's leading for one thing.

THE COURT: But it's cross-examination. She's entitled to lead. And this witness was your witness, Mr. Danforth.

MR. DANFORTH: Mischaracterizing it.

THE COURT: Objection overruled.

BY MS. QUAINTANCE:

Q. Did you answer that question? I'm sorry. Do you need me to repeat it?

A. Yes, she did tell him that.

Q. Okay. She told Josh that?

A. She told him that it was okay to say whatever it is he wanted to say.

Q. Okay. Now, you said she was trying to convince you that this whole thing was true?

A. Yes, she was.

Q. Was that because you didn't believe it?

A. I'm kind of in a neutral, I don't believe either party.

Q. Okay.
A. I'm just here to tell the truth.
Q. Okay. Now, you've had a couple of conversations with Mr. Danforth since all this came out, right?
A. We had a few conversations.
Q. Okay. Did he talk to you about your testimony here in court?
A. We talked a little bit about it.
Q. And what did he say to you about that?
A. He just basically told me some of the questions that he might be asking.
Q. Okay. And you said that he talked to you about his offenses back in the 1980's, right?
A. We talked a little bit about it, not a lot.
Q. What did he say about that?
MR. DANFORTH: Objection, Your Honor.
THE COURT: Sustained.
MS. QUAINTANCE: May we approach?
THE COURT: Um-hum.
(Whereupon, a discussion was held off the record at the bench.)
(Objection sustained at the bench.)
BY MS. QUAINTANCE:

Q. You said that Teresa was concerned about her children, right?

A. Yes.

Q. And she wanted to make sure they were protected, correct?

A. Yes.

MS. QUAINTANCE: Thank you. I don't have any further questions.

THE COURT: Mr. Danforth?

MR. DANFORTH: Just one second Your Honor.

(Off the record discussion between the defendant and stand-by counsel.)

MR. DANFORTH: All right. Your Honor, I don't have any further questions.

THE COURT: You may step down Miss Bennett. Thank you for coming in.

MR. DANFORTH: Your Honor, I would like to talk to -- I mean, I would like to call, rather, Diana Daher at this point.

THE COURT: Okay.

DIANA DAHER,

after having been first duly sworn, was examined and testified as follows:

THE COURT: Miss Daher, if you would move up and be about six inches away from that microphone, that works best. And then if you would be kind enough to tell us your full name and spell your last name, please?

THE WITNESS: My full name is Diana Mary Daher, D-a-h-e-r.

THE COURT: Okay. You're kind of soft spoken, so get a little bit closer to the microphone.

Thanks. Mr. Danforth?

DIRECT EXAMINATION

BY MR. DANFORTH:

Q. Thank you. Ms. Daher, do you remember having a conversation with someone who identified themselves as being from Powers investigations?

A. You mean Duke?

Q. Pardon me?

A. Duke, yeah.

Q. Do you remember?

A. Yeah, I did. Yes, I do.

Q. And would that conversation have been with a gentleman who identified himself as Jim Decossie?

A. No, just Duke.

Q. Oh, Duke, he called himself. Okay. And was that approximately on or about February 14th, would you say?

A. No, it was before that.
Q. Okay. Day or two or three?
A. Maybe three days ago or so. Before Valentines Day.
Q. Okay. Which was the 14th. Okay.
But you do recall the conversation, correct?
A. Yeah, but, see, the conversation him and I had was not concerned about this man. See, what happened to my granddaughter between -
MR. MAHONEY: Your Honor --
THE COURT: Excuse me. Miss Daher, this is sort of a regulated process we're in in the courtroom.
THE WITNESS: Yeah.
THE COURT: What you have to do is listen to the questions. Both parties will have the right to ask questions of you, Mr. Danforth first and then Miss Quaintance.
THE WITNESS: Okay.
THE COURT: You've got to listen very carefully to the question because in this setting you just answer the questions.
Can you do that for me please?
THE WITNESS: Uh-hum.
THE COURT: Okay. Mr. Danforth?

BY MR. DANFORTH:

Q. That's right. And do you recall what he talked to you about with regard to your granddaughter and a little neighbor child by the name of Joshua Story?

A. Yeah, I do.

Q. Okay. Now, this conversation that you had with this Duke from Powers Investigations, it pertained, did it not, to an incident --

MS. QUAINTANCE: Objection.

THE COURT: That's sustained. The conversations with Duke are not before us. And the question is what happened back on August 11th.

BY MR. DANFORTH:

Q. All right. Do you recall the incident that happened between your daughter and this little neighbor child, Joshua Story?

A. Yes, I do.

Q. Okay. In your own words, why don't you just tell us what you you recall.

A. I was called on the stand about -- see, what happened was that Josh and my granddaughter was having a thing, you know, like grown people do. And I seen it. And when I came up the stairs, he said -- that's when he jumped up off of my daughter -- my granddaughter. And I asked him what he was doing. He said "Nothing."

And then my other granddaughter went and told his mom what happened. And then she came and started asking me questions then that night when it happened. She called the police. And I thought that she was going to have my granddaughter go to jail because of what happened between her son and my granddaughter.

Q. Okay. Could we stop right there.

And now let's talk about, first off, at what time of day was it that you discovered this little neighbor child, Joshua Story, doing something that was of a sexual nature then with your daughter?

A. It was in the afternoon. I had just came from downstairs because I went down there for this lady wanted to talk to me about something. And my granddaughter and/or Josh was in the hallway. His mom was across the hall.

Q. Okay.

A. And my daughter was sleeping. She didn't want anything to bother her.

Q. Okay. If we could stop a minute and sort of sort out some details please.

First off, what is your daughter's name?

A. My granddaughter?

Q. No, your daughter?

A. My daughter's name is Tounya.

Q. Okay. And where is it that Tounya lives?

A. At 3633 Park, apartment four.
Q. Apartment 4. All right.
Do you recall, well, do you know what apartment it is that the Story's live in?
A. Terese and them live in?
Q. Yes.
A. Yeah, they live in 3, across the hall.
Q. Is it directly across the hall?
A. Yep.
Q. Is that on the first or second floor?
A. Second.
Q. Okay. Now, your first indication was that prior to this point in the afternoon you had stepped downstairs, had you?
A. (Nods.)
Q. Was that to one of the apartments down there?
A. Yeah. See, they were upstairs playing. They was fine. And then when I went downstairs, then when I came upstairs, he had jumped off my granddaughter. Then I asked him what he was doing, and he said "Nothing." And then he went into the house.
Q. All right. Just briefly, could you describe with some degree of particularity what you saw when you came up the stairs?
A. Well, what I seen was that he was on top of my

daughter and she was telling him, "No." And my other granddaughter told me that he had been doing something.

MS. QUAINTANCE: Objection, hearsay.

THE COURT: Sustained.

BY MR. DANFORTH:

Q. Yeah, Your Honor, that's --

Let's just talk for now, but we'll get back to that.

When you encountered Josh in this position with your daughter --

MS. QUAINTANCE: Objection. It's granddaughter.

BY MR. DANFORTH:

Q. Excuse me. I'm sorry. I misspoke. Your granddaughter. Which granddaughter are we speaking of?

A. The four year old.

Q. Okay, what is her name?

A. Kashel.

Q. Okay. How do you spell that?

A. K-a-s-h-e-l.

Q. Okay. And you have another granddaughter, do you?

A. Yeah. Kiona.

Q. Okay. How old is Kiona?

A. She is 7.

Q. I'm sorry. Could you also spell Kianna for the

record?

A. K-i-o-n-a.

Q. Okay. When you encountered them, was that at the top of the landing of the front stairs of the apartment building?

A. It was in front. It was in the hallway, yes.

Q. Okay.

A. Between both of the apartments.

Q. Okay. Are the stairways in your apartment building carpeted?

A. Yeah, they are.

Q. Okay. So it fair to say, isn't it, that you weren't making very much noise as you walked up the stairs?

A. No. All I seen is when I walked up to the top step, he had jumped out of the -- off my granddaughter, and he went into his mom's house.

Q. Okay.

A. And then my granddaughter went over there and told him, told his mom what happened.

Q. Excuse me. We'll get back to that.

But at the moment that you first laid eyes on Josh in this position on top of your daughter --

A. Granddaughter.

Q. Granddaughter. Let's call her Kashel, what was the state of his clothes?

A. His father said he was acting out only --

MS. QUAINTANCE: Objection.

MR. DANFORTH: Your Honor, I guess I didn't --

THE COURT: Miss Daher, the question was, "What was the state of his," I take it, his --

MR. DANFORTH: Josh.

THE COURT: Joshua's clothes?

THE WITNESS: Oh, his clothe was --

THE COURT: But let me, before you continue, you are able to testify to what you saw on this incident or to what Joshua or Terese Story told you. Nothing more.

THE WITNESS: Not what my granddaughter told me?

THE COURT: Just a minute. You just can't testify as to what anybody told you except for two people, Joshua or his mother. And you can testify as to what you saw, okay?

THE WITNESS: I did. I told him that. All right.

THE COURT: Okay. Next question, Mr. Danforth.

MR. DANFORTH: Well, really, we need to have the question read back about the state of Josh's

clothes.

I'll just ask it again.

What was, how were his clothes when you first laid eyes on him on this posture on top of your daughter?

THE WITNESS: His clothes was down.

BY MR. DANFORTH:

Q. What do you mean down?

A. His clothes was down, you know, and, uhm, he had gone into my daughter, granddaughter.

Q. Are you referring to his pants being down?

A. Yeah. Well, his pants exactly wasn't down, but his zipper was down. And that's when he jumped up off of her.

Q. Okay. All right.

And what particular act did it appear that he was doing to your daughter?

MS. QUAINTANCE: Objection. Calls for a conclusion.

THE COURT: You can testify as to what you saw.

Tell us what you saw.

THE WITNESS: What I saw is what I just said, that his zipper was down, and he had stuck it in my granddaughter. Then he got up. He was scared, and he was frightened, and he ran into his house. And my

granddaughter was also frightened.

BY MR. DANFORTH:

Q. Okay. Thank you. By "it" in that sentence just a couple sentences ago, you were talking about Josh's penis, were you?

A. Yeah.

Q. Okay. You saw that?

A. (Nods.)

Q. Okay.

MR. MAHONEY: Could you --

BY MR. DANFORTH:

Q. Could you say yes for the record?

A. Yes. Yes, I did.

Q. All right.

Now, at that time, about what time in the afternoon was this at this point?

A. It was around four o'clock, 4:05, something around there.

Q. It certainly was no later than 5 o'clock?

A. No.

Q. Okay.

A. It was also in the summertime when it happened.

Q. Okay. Now, do you recall specifically the date August 11th?

A. Yeah.

Q. Okay. And this was the day on which considerably later in the evening you saw the police arrive?

A. Yes, I did.

Q. Okay. And you saw them go into Terese's apartment at that point?

A. Yes, I did.

Q. Now, you indicated that there was a prior incident. What was that?

A. The prior incident? Could you repeat the question? What prior incidents are you talking about?

Q. Well, you had made reference to this prior incident?

A. No. See, what happened was she had called the police, and I thought she was calling on my granddaughter.

Q. Okay. Why would you have thought that?

A. Because they had that -- they -- the detective told me that they got a call saying there was two juveniles having sex inside a house. That's what I was told by the private investigator.

Q. Okay. But I was referring to a statement that you made not long after?

A. Well, see, the statement that I'm saying is that I called the police that same night, and they came over. And I explained that to them, and I told them that I

A. I think it was before we moved to Florida. I think it might have been when Steve came for Gray's birthday. And his birthday is May 29th. And we moved on June 11th. And Steve came to visit right before we moved to Florida.

Q. Would that be right before his 5th birthday then?

A. Yes.

Q. So he's four, almost five?

A. Yeah.

Q. Okay. And, well, now, you've seen that tape of Gray?

A. Right. I didn't know it existed.

Q. And when did you first hear about that tape?

A. Monday.

Q. And who did you first hear about it from?

A. Steve's mom.

Q. Now, Gray's currently in school, right?

A. Yes.

MR. DANFORTH: Objection, Your Honor. This is beyond the scope.

THE COURT: Overruled.

BY MS. QUAINTANCE:

Q. And he's having some problems in school, right?

A. Yes.

Q. He's wetting his pants?
A. (Nods.)
Q. And defecating in his pants, right?
A. Yes.
Q. And he's seven-and-a-half?
A. Yes.
Q. The school social workers are very concerned, right?
MR. DANFORTH: Objection, Your Honor.
THE COURT: Sustained.
BY MS. QUAINTANCE:
Q. There is currently an investigation --
MR. DANFORTH: Objection.
MS. QUAINTANCE: -- pending, correct?
THE COURT: Sustained.
MS. QUAINTANCE: Your Honor, may we approach?
(Whereupon, a discussion was held off the record at the bench.)
BY MS. QUAINTANCE:
Q. Miss Laffin, do you currently have any reason to believe that something may have happened to one or more of your children back when you were living in Wisconsin?
MR. DANFORTH: Objection, Your Honor.
THE COURT: No. Overruled.

MR. DANFORTH: Fine.

THE WITNESS: Well, I never knew that tape existed. And Steve never told me about it. So, uhm, I don't really know what the truth of -- what's the truth. But there are social workers in Wisconsin that are looking into it.

BY MS. QUAINTANCE:

Q. What do you think, Mrs. Laffin, now that you've seen that tape about your son's relationship with Mr. Danforth?

MR. DANFORTH: Objection.

THE COURT: Objection sustained.

BY MS. QUAINTANCE:

Q. Now that you've seen that tape of 1993, Mrs. Laffin, you testified previously that you, up until you saw that tape, you had no reason to believe that anything had ever happened to your children with Mr. Danforth?

A. Right.

Q. Now that you have seen that tape, has your opinion changed at all?

MR. DANFORTH: Objection, Your Honor.

THE COURT: Well, overruled. She can answer.

THE WITNESS: Uhm, I don't know what to think. Uhm, I'm not happy about that tape, and I wouldn't

let my kids stay over night.

MS. QUAINTANCE: Thank you. I have nothing further.

THE COURT: Mr. Danforth?

MR. DANFORTH: Well, I have nothing further, Your Honor.

THE COURT: You may step down, ma'am. Thank you for coming.

Mr. Danforth?

MR. DANFORTH: All right, Your Honor.

MR. MAHONEY: Your Honor, the defendant calls Stephen Danforth to the stand.

STEPHEN DANFORTH,

after having been first duly sworn, was examined and testified as follows:

THE COURT: It's D-a-n-f-o-r-t-h.

MR. MAHONEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. MAHONEY:

Q. When did you first meet Gary Story?
A. I believe at the end of 1980.
Q. Have you been friends with him ever since then?
A. Yes, with the exception of what just happened here.
Q. When did you meet Terese?

A. Well, yeah.

MS. QUAINTANCE: Objection.

THE COURT: Sustained.

BY MR. MAHONEY:

Q. Was Gary Story at any time made aware of your arrest and incarceration?

A. Oh, yes.

Q. Do you think that that -- strike that.

Did he give any reason to you that would change his view of you from that arrest?

MS. QUAINTANCE: Objection. Form of the question.

THE COURT: I don't know that I understand it.

BY MR. MAHONEY:

Q. You were arrested for criminal sexual conduct in the mid '80's with young boys, is that true?

A. That's right. And he knew that.

Q. And did his friendship with you change in some way because of that?

A. Yes, it did. He was never quite the same with me after that. It had to do with his attitude.

Q. What do you mean by that?

A. Well, Gary, and I had known this before my arrest in 1987, had a very strong homophobic streak as to

that I would say he was the kind of guy who really had a very strong objection to homosexual conduct or even homosexual orientation.

Q. How do you know he had that feeling?

A. We discussed it. He feels quite repulsed by the concept of beholding it.

Q. Wee you a homosexual at that time?

A. I would say so.

Q. Did he know that?

A. Yes. Well, at that time?

Q. Before your arrest?

A. No. I don't think he really did.

Q. So that was some information that was knew to him about that?

A. Oh, yes.

Q. And did that cause -- did that particular aspect of his personality cause the change in your friendship?

A. Yes, it did. It was a little broader than that. He also had had, you know, an extremely strong, far more than usual, repulsion to the concept of, the deviant sexual conduct involving minors, particularly boys.

And so, you know, it was far beyond his repulsion to homosexuals in general. It was really quite a strong reaction that he had about that particular kind of deviancy

A. I see what you're saying. Yes, she did.
Q. How did she seem suspicious about you when you were out of prison?
A. Well, the very first thing that manifested itself was quite a strong watchfulness.
Q. What do you mean by watchfulness?
A. Well, when I was around, it seemed that she went out of her way to be literally present at every available moment.
Q. Well, how old were her children?
A. Well, that's what makes this is a little unreasonable, they were like two, three, and on up from there.
Q. Only one of us can talk at a time.
Did you think it was unusual that a mother of a two year old would not constantly be present anyway, I mean?
A. No. No.
Q. Why would that seem suspicious of you?
A. Well, what was -- I guess the reason the conduct was not consistent with that was because, you know, she would not ever step out of the room for a minute or two. I mean, she just literally wanted to be present at every moment that I was there.
A. That was how it was then for a while.
Q. Of --

false accusation against me. One of the two threats, as I've tried before to say, are the fact that she has this extreme fear. And I haven't been able to show this to the jury because you have time and time again said we can't get into physical abuse. We can't get into reports to child protection. We can't just talk about anything except the fact that Josh, out of Josh's lips, flies an accusation saying way back in the '92 his mommy having done something with him in terms of a sexual act.

But what happened in this larger picture that we're not in front of the jury now, Your Honor, I just wanted to say this, is that there are a series of about three episodes from '93 through '95 in June that show that Terese had a deadly fear that if she was either accosted by child protection again for any reason, they were likely to take her kids away. Okay? She was going to prevent that by any means necessary. This is because, you know, she is not just a mother, she has one of these obsessions about her role as a mother and being the most important thing in her life. But, in any event, that's threat one, and that's that Terese was terribly afraid and it had reached into a state of high fear, okay, at the moment when this incident happened between Josh and the neighbor girl, little neighbor girl.

Against that as a backdrop, if you will, but rather

is, the July 20th. If you want to testify that she said, "I continue to be troubled," or whatever she said says about your role in the children being in Gary's custody or something when they were separated or words of similar import without engrandizing beyond that, and without dragging in all of the domestic relationship issues between them at that time, pretty, I think, quick, essentially, the one that provoked your view that she was angry at you, you can do that.

On the July 10th to 12th, the bickering thing, you can testify to that, "Come on kids." And she got to the door and said to you, "Were not kids." And her demeanor was upset or mad or whatever it was.

And on the business about trying to get a hold of you on your pager and you accusing her of calling repeatedly and her denying it and appearing to be upset with you or whatever, you can testify to that.

Some of these things have to have some balance somewhere. My very arbitrary balance is 90 days. You gave me everything you thought about Mr. Danforth, and I'm going to let you testify to it in the manner we talked about.

MR. DANFORTH: Your Honor, I had a few other things that transpired toward the close of the time we were together in terms of conversation. This is like a laundry list of things. Basically, what transpired is