heard about it from Larry after it was reported to the police.

Now, after that report to the police on August 11th, this is the chronology of the investigation. August 23rd was the Corner House interview. And you remember from Detective Roberts that that was the first available time that they could get such an interview. August 25th, after that interview, after probable cause was established for arrest, as Detective Roberts told you, the Defendant was arrested. And the following day his automobile, his apartment and his mailbox were searched by the police.

It was on August 15th that Beth Roberts first contacted Corner House after she spoke to Gary and Terese, remember, to set up the interview. And the medical exam as well as the interviews were performed on August 23rd. That's also the day that the Gary confronted the Defendant outside of Burnett Realty, remember, they had that conversation in the car, Gary gave him one last chance to come clean. And the Defendant again told him "Oh, I'd never do such a thing. I'm over all that. I'm beyond all that." And at that point Gary decided to cooperate with Investigator Roberts in arranging for the Defendant's arrest after he had given the Defendant the time to come clean one last time. So that is essentially the chronology of events that occurred in connection with this case.

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

Patti's pool. And Amanda said it happened downstairs at the pool. We know from Gary and Terese and the Defendant that they were swimming as a group at a pool during this month of July. The Defendant said he didn't swim in May or June because of his pneumonia. So we know that in order for him to be changing in the locker room, it had to be after the end of June, June 20th, I think he said he recovered from that pneumonia.

We know from him and his testimony that he was there two times during the period of early to mid-July when the Storys were staying with him at his house. So that places them there two times in July of 1995. And Gary remembers that time in July when Josh came out of the locker room shortly followed by the Defendant. And it was in July that Terese remembers the time that Amanda ran down to the locker room. So we know that this occurred in July of 1995.

How do we know that this occurred in Hennepin County? Well, Patti's pool is in Richfield at 76th and Penn. And Detective Roberts told us that that's in Hennepin County.

There has been other conduct referred to in Prescott, Wisconsin, but that is not the conduct that we're talking about here in this charge. We're talking here about what happened at Patti's pool in Hennepin County, Minnesota. You may consider that other information about Prescott as

it corroborates Josh's statements about what happened at Patti's pool. So we know that this occurred on or about July, 1995 in Hennepin County.

How do you know that the Defendant sexually penetrated Josh? Well, there are two questions left. Was there sexual penetration of Josh and did Mr. Danforth do it. The law is, and the Judge will give you this, that any contact between the lips of one person and the genitals of another, whether or not anything goes inside, so a mouth on a penis, whether or not the penis goes inside the mouth, is sexual penetration under the law. Licking, kissing, and so forth is still sexual penetration under the law.

What do you know with about this? What was Josh's statement at Corner House? Do you remember? He talked about how he didn't like touches on his pee or his poopie. His pee was his penis. His poopie was his rear end. And the interviewer then asked him, "Did you ever get touches on your pee or your poopie?" And Josh said, "I didn't like it." And then she said, "Did something happen to your pee and poopie that you didn't like?" And he said, "I didn't like doing nothing." She said, "What would you do if it happened?" And he said, "I don't like doing nothing with my pee and my poopie."

Then he said "A guy named Steve touched my pee with his mouth." And the interviewer said "Where did that

happen?" And he said, "From the pool." Amanda called it a hot room, hot room being the sauna. He was asked if he ever saw Steve's penis, and he said "Yes, it's big and it has a color like mine." And he was asked when he saw Steve's penis, and he said "From his house and the pool." He was asked some more questions, and he said "Steve pulled my swim suit on and did something to my pee."

Then you remember the point in the interview where the interviewer had the doll there and said, Show me where Steve touched you." He said "Right here" indicating the doll's penis. And then he said it happened, she said, on the skin or on the clothes, and he said "On the skin." And she said, "Show me." And he said, "He put his mouth on me, on my pee pee." And he said it happened more than three times. She asked again where he was when that happened, and he said "Downstairs in the pool, Patti's pool." And she said, "Who's Patti?" "Daddy's sister, Patti" who we know is Patti Story, who testified here.

She said, "How old were you at the time?" And he said, "Still 6." She said, "Were you in the pool?" And he said, "No, I was outside the pool." She asked him if anyone else was at the pool and he said "Mommy and Daddy and Jeffrey." And she had asked, "Did anyone see?" And he said, "I don't know." She said, "Did he do anything else you didn't like?" And he said, "He did it to my poopie,

put his mouth on me." And he said, "You can't do this. I hate it." And when Josh said "You can't do this, I hate it," he was referring to his response to the Defendant's doing that.

And when he was asked how he knew this Steve, he said "He's an uncle, I think." And he was asked "Did he want you to touch him?" And he said "I didn't want him to do that." The interviewer tried again with that question but Josh said it would be too hard to talk about it if Steve had asked Josh to touch him. She again asked, "Did Steve want you to touch him?" And he said "I didn't like that he put his mouth on me. So we know from Josh himself that the Defendant put his mouth on Josh's penis constituting sexual penetration.

Now, Mr. Danforth wants you to believe that the Corner House interviewer was overtly or subtly or subliminally coaching Josh. But as you heard, the tape speaks for itself, ladies and gentlemen. You heard the questions and the answers of the interviewer and Josh. It's up to you to decide whether those statements were spontaneous or not, but there is no evidence on that tape of coaching. In fact, the interviewer had to ask a lot of questions more than once in order to get an answer. This kid didn't just come in there and start reciting some tail that he had been coached into. He had to be asked a lot of questions to get

back by the court reporter to
the parties in open court.)

* *

(Whereupon, the jury returns
to the courtroom.)

THE COURT: Please be seated everyone.

Miss Quaintance?

MS. QUAINTANCE: We know from Josh's statements to Corner House that the Defendant sexually penetrated him. That statement is corroborated. And we know that that statement at Corner House is true because it is corroborated by Josh's statements to Dr. Cotter. And you remember Dr. Cotter testified that on the 6th of September Josh said he didn't like Steve, that Steve was a bad guy. On the 20th of September Josh brought the topic up again, said, "Do you want to know about Steve? He put his mouth on me. He was in the shower looking at me." Again, the shower is in the locker room.

On the 16th of October Josh brought it up again with Dr. Cotter, said he didn't want to deal with it but that he had told his mom and dad about what Steve did. On the 30th of October Josh asked to talk about Steve, said I don't even want to deal with him or watch T.V. on with him. He put his mouth on me. And he said that only Steve did that. Then on the 21st of February, Josh asked again to talk

about Steve. "Steve put his mouth on my pee pee. It was warm when it happened." And Josh said he felt sad about it.

So we know that the statements made at Corner House are true because they're corroborated by these statements to Dr. Cotter in which, again, Josh says that the Defendant put his mouth on his penis, which is sexual penetration. Again, we know Josh was not coached. He didn't discuss this in any detail. He said he did not want to deal with it. He used only a small amount of his sessions with Dr. Cotter to talk about it. Josh brought it up each time. Dr. Cotter did not bring it up. I submit it's natural for this child to bring this up with this psychologist, it's of concern to him. It's part of the reason he's there. It's appropriate for Terese to send her child to a child psychologist or a therapist when abuse has occurred, especially by such a close and trusted person.

Now, I expect Mr. Danforth to argue that there are contradictions and inconsistencies in what Josh has said about this abuse because of the testimony of Officer Castilleja. Castilleja, you remember, understood that Josh had acted out on Amanda, not the neighbor girl. Well, what about that? We all know if was the neighbor girl because everybody including her grandmother came in here to tell us it was her. So there was some miscommunication between

Terese and Castilleja. It's perfectly possible that Terese Story wasn't entirely clear with that police officer when he got there. She was probably in an emotional state. She had and she has a difficult time making herself understood occasionally. You heard her testify. She gets a little hyper and upset when she is trying to make herself clear in stressful situations.

So Mr. Danforth may argue that Josh told Castilleja that the Defendant put his penis in Josh's mouth, and that that's an inconsistency. Well, ladies and gentlemen, they are not necessarily inconsistent. It is possible that more than one thing happened to Josh. And you remember when he was asked about it in Corner House if he was ever asked to touch the Defendant, he said that would be too hard to talk about.

We also know that Josh's testimony is corroborated by his report of rectal pain in July while he was staying at the Defendant's house. And we also know that the medical exam corroborates him. I expect Mr. Danforth to make a big, huge deal about the fact there is no medical testimony, no physical findings that sexual abuse occurred. But think about it ladies and gentlemen, what physical findings are you going to have if somebody performs oral sex on another person? It doesn't leave any medical evidence. There aren't any injuries. You can't test for

somebody's saliva on somebody else's penis when it's reported after it fact. So there is no medical -- there is no medical specific findings. There is only the testimony of Dr. Fifield that he found what he would expect to find given what the reported abuse was.

How else do we know that Josh is telling the truth? Amanda. Amanda's statements corroborate Josh. She saw this happen, ladies and gentlemen. And it's not often that there is an eye witness to this kind of abuse. And her testimony is corroborated too by his, and testimony about her comment in the car. "Don't touch Josh." Why would she have said to the Defendant "Don't touch Josh" unless she had seen something and knew something was happening even before the incident at the pool?

Josh is also corroborated in his statements at Corner House by the statements that he made to his mother describing what had happened to him. And I won't go through those in detail. I'm sure you remember what they were, but he told his mother what he said at Corner House. The Defendant put his mouth on Josh's penis. So we know that there was sexual penetration of Josh.

Now, how do we know that the Defendant is the one who did it? Well, we've already been through Josh's Corner House testimony. He says the Defendant is the one that did it. Amanda says that Steve is the one that did it. The

Now I'm going to play footage from the beginning of the same tape on which Josh appears.

(Video exhibit published to the jury.)

MS. QUAINTANCE: What do we have? We have exactly the same footage from the tape on which Gray appears transferred onto video tape by the Defendant. You'll remember I asked him if the footage appears on this tape, Exhibit 15, that is in existence on this 8 millimeter video, which is the exhibit on which Gray appears, does that mean that you transferred it off of that tape? And he said "Yes. Which means he knows what the contents of this 8 millimeter exhibit were. And, ladies and gentlemen, it means he wasn't telling the truth about that.

I'm now fast forwarding to the segment involving Gray.

This is the brief Twister part that Cindy Laffin identified as also being her family that precedes the Gray portion. Now, I want you to watch this. It's your decision whether this was accidentally filmed or not. Look at this little boy. He knows he's being filmed. He's trying to cover himself up. The Defendant may want him to believe the camera is off. The sound disappears. The camera is moved around, clothes are rearranged by the Defendant. The sweat pants are taken away. And now the camera focuses on this child's penis. Defendant's hands

move the child's legs out of the way. The child gets up to move, the camera follows.

He stands up and the camera follows that same portion of his body and re-focuses back on his penis. This is not accidental ladies and gentlemen. Re-focuses again as the child sits back down. The child stands up and the camera re-focuses again. And the Defendant wants you to believe that that is somehow accidentally taken footage. And yet he also tells you that now the way he gets his sexual gratification is by looking at pictures of naked boys as well. That's precisely what this was ladies and gentlemen. He kept it. He kept it in the middle of a tape full of other things hoping it would never be discovered.

How else do we know that the Defendant did this and that he intentionally did it to Josh? We have the photos of Josh which show the Defendant's interest and intent with regard to this child. The fact that he kept these from the parents is further evidence that he knew there was something the matter with them. The fact that he said it looked as if Josh was trying to be salacious or sexy shows you the workings of his mind and what he projects into these children.

How else do we know of his sexual interest in Josh? Remember ladies and gentlemen, his demeanor as he watched the videos of these children. You saw him and the

intensity with which he watched the video tapes, the repetitive video tapes of these children.

Now, I want to talk a little bit about credibility of the witnesses. The Judge will give you an instruction which you heard at the beginning of this case, I believe, about the factors you are to look at when you judge what witnesses are credible and why. And the things you are supposed to look at are their interest or lack of interest in the outcome of the case, their relationship to the parties. Their frankness and sincerity or lack thereof. The reasonableness or unreasonableness of their testimony in light of all the other evidence in the case.

For example, is it reasonable to testify that this tape was taken accidentally in light of all the other evidence in this case? Those are some of the factors that the Judge will give you.

Let's look alternate Josh's credibility. Is he a credible witness? His statements are spontaneous. His statements are corroborated by the actions of the Defendant, including the photos taken, the kiss in the computer room, the comment about his long legs. We also know that this same Defendant was in some other locker room with some children, the voices of which Terese has identified as being her own children. But we certainly know that he was in a locker room with a concealed video

camera with some children, because we saw that tape. What was he doing in that locker room with a video camera running inside of a gym bag?

Josh has no motive to lie. This man was a very important person in his life. This man was virtually an uncle to him. He spent a tremendous amount of time with this man. And, as I've mentioned before, Josh is not the kind of kid that it would be easy or even possible to coach.

What about the credibility of Amanda? Now, I expect the Defendant's going to make a big deal about the fact that she did not identify him in court. What about that? Well, there is no question that the person who did this was Steve and that Steve was Steve Danforth. Terese told you there were no other close family friends named Steve. We know that the Defendant looks significantly different than he did in the summer of 1995. One of the reasons we know that is because you remember the video tape he showed us of Gray at the breach in the summer of '95, and his face appeared on that video. He had dark brown hair. He was considerably heavier. His face had a different shape to it, and he wasn't wearing glasses. He looked a lot different. Patti Story who came in here, who was an adult, who had seen him on numerous occasions, she couldn't even recognize him.

Roberts. Investigator Roberts and Terese both told us his looks had changed since the time of his arrest. There is no issue of who the children were talking about here, ladies and gentlemen, who did this.

The Defendant wants you to think that Amanda couldn't have gotten into the locker room to see what she said she saw because the door is too heavy. But we know that's not true either, because Larry told us that Josh went down there to go to the bathroom by himself and opened that door without any problem at all. That door could be opened by children.

What about Terese? This is the woman who's supposed to be the mastermind behind this conspiracy to frame an innocent man, but she told you she loved him like a brother. She hesitated to call the police after the report of the abuse because she was so torn emotionally. Her family spent half of July with him while she was supposedly concocting this plot. We've seen, the Defendant showed us videos of these family excursions that happened in July of '95 while she supposedly was harboring this vendetta, and she shows no animosity. Terese Story is guileless, and that was clear from her testimony. Remember the Terese Story that you saw in court, and compare her and your knowledge of her with the Defendant's portrait of this vengeful, plotting soap opera queen. It doesn't match.

What about Gary? He's also clearly emotionally devastated by this. Had a very difficult time testifying. This is his friend of 16, 17 years. You could hear it in his voice how broken up he was when he realized that this man had betrayed him and abused his own children. Now, remember he gave the Defendant that one last chance to come clean before he assisted the police in the arrest. His testimony was direct and straight forward. He was a very credible witness.

Now, as I said at the outset, ladies and gentlemen, this couple and this family is not without problems. You now know that they have some kind of a child protection history. It is possible that Josh was exposed to abuse at the hands of Darlene before all this ever happened. But these are the things, ladies and gentlemen, that made this family vulnerable to this predator.

And you could not help but notice that the folks whom the Defendant surrounded himself with are all vulnerable. Joel and Scott were living on the street, practically urchins when the Defendant picked them up. Cindy Laffin is a woman with three past marriages and six children who's clearly overwhelmed by her life. This is a woman who even after viewing this video tape of her son still is not capable of taking the necessary steps to protect her children. Linda Sperberg is another example, a woman with

a disability. All of them are obvious victims of the manipulation of this man. And these are the people he picks to be around because they are needy and he senses that. And none of these relationships are equal.

We were friends, he said of the Storys. What are friends for? Well, in the Defendant's case friends are there to be exploited and manipulated and ultimately abused.

Law enforcement witnesses and Dr. Cotter are professionals who were doing their job. Their credibility is unimpeached. They have no axe to grind. What about Joel and Scott? Well, it may have appeared strange to you that these two young men come in here and appear to have no animosity and no anger towards this man who abused them repeatedly and over a long period of time back in the '80's. Ladies and gentlemen, what you are seeing is what abuse does to the human spirit. They're 20 year old young men. You can't expect them to come in here with their hearts on their sleeves. They called it like it was. There were things they liked about the Defendant, things that he did for them that nobody else did for them. And that's how he worked his way into their lives.

Let's talk about the credibility of the defense witnesses. I've talked about Linda Sperberg and Cindy Laffin, vulnerable people. They had nothing to add. They

couldn't tell us whether the Defendant sexually abused Josh or not. They don't know anything about that.

Diana Daher also didn't have anything new to add. She corroborated what we already knew, that her daughter was acted out on by Josh. Patti Story and Miss Bennett, well, they heard from Terese that she had to coax it out of Josh what had happened to him. The Defendant wanted you to hear coached, but those were not the words said. Miss Bennett said that Terese said she had to coax it out of Josh. Becky Bennett said, "I said that Terese wanted Josh to know that he had permission to tell her what happened." And we knew that, because Terese told us that, that he was very hesitant and very reluctant to tell her what had happened. Why? Because this is the closest friend his parents have. It's pretty hard to accuse a member of your family of this kind of act.

And the conversation with Patti story where she talked about repeated questioning, that clearly happened after the report to the police because Terese told you she reported to the police immediately on finding out of this. And remember that these two people did not see or hear any of this first hand. They are telling you their understanding of what Terese Story said to them six or eight months ago about her conversations with Josh.

What did Patrick and Jimmy have to offer us? They are

two boys that Mr. Danforth didn't abuse. Although, in Mr. Marcus' case, he didn't seem too sure. So what, the Defendant didn't abuse two boys. What does that tell us?

Now, let's talk about Mr. Danforth. Who in this case has the greatest motive to fabricate? This man. Who do you know from these video tapes has told you something that was not the truth? This man. Who do you know concocted some story about how his parole officer said it was okay for him to be around kids when he was on parole, which we found out was also an untruth? He's been caught straight out, ladies and gentlemen, straight out in lies. And he engages in character assassination of Terese Story, of a vulnerable person whom he clearly cultivated as a friend, and now he trashes her, and tries to portray her as some evil, manipulator who's abusing the justice system to get vengeance on him. Is it her who's doing that or is it him? Who's really abusing the justice system here? Who's the actor, the manipulator, the con artist?

Do you remember that letter from the University professor extolling the virtues of Mr. Danforth's paper? And he conned that University professor. That man didn't know that he was in prison at the time for sex offenses. That man thought he was living in Wisconsin, which is where he addressed the letter to. That professor was not going to suggest that a convicted sex offender go into adolescent

treatment. That was a con job, and he's trying to pull off another one here.

He tried to con Investigator Roberts. Do you remember those protestations of shock when he heard the allegations? Do you recall his tone of voice? "Oh, no, Ma'am. Never." Did that sound real to you and ladies and gentlemen? He's trying to con you with his performance from the witness stand, turning on the charm. And even at one point Terese. He wants you to believe that he accidentally taped this child when the camera is clearly focused on this little boy's penis. He wants you to believe that he had this self-cure in prison without any treatment. And now he just uses photos of children for sexual release. And he wants you to believe that that's okay.

Now, ladies and gentlemen, the State of Minnesota argues first in these cases. And it's very unusual for me to have any opportunity to come back and address whatever Mr. Danforth says. So I have to try to figure out ahead of time some things that he's going to argue. I have to ask you and rely on you to test his arguments as well as mine with the evidence as you remember it.

He's going to argue that Joshua was coached. Well, as I said, we have a reluctance to report. We have Terese, who's not a terribly intelligent person who gets confused herself with dates and times. How could she coach anybody?

We have Josh who has an attention problem and probably couldn't be coached. And we have a video tape that clearly shows a kid who hasn't been coached.

He will argue that Terese and Gary put Josh up to this because they constantly warned him to be careful of the Defendant. Well, so. Why isn't that appropriate? If somebody who's a convicted child abuser has access to your children, wouldn't any parent tell their child to be careful? They told Larry, Larry Story, to look out for the Defendant. That didn't cause him to make up any false allegations. That argument doesn't make any sense either.

He wants you to believe that there was coaching at Corner House, but the tape doesn't bear it out. And, ladies and gentlemen, who is the person who asked leading questions of children here? Do you remember when Patrick was on the witness stand, the young fellow? Every question the Defendant asked was a leading question.

MR. MAHONEY: Objection.

THE COURT: Sustained.

MS. QUAINTANCE: He wants you to believe that Josh somehow has him confused with Darlene Zirul, because she abused him and the Defendant didn't, and somehow Josh has transposed all this. Does that make any sense? The kids knew Darlene in '92 to '93. And he wants you to believe that Josh confused a woman he met years

Do these arguments, ladies and gentlemen, raise a reasonable doubt? I'm confident that no last-minute argument that Mr. Danforth can make will raise a reasonable doubt. You have heard and seen the evidence. This is a man who takes advantage of vulnerable people. This is a man who thinks he can get away with it because he thinks you will believe him and not a child, that you will somehow overlook the testimony of Amanda.

When I asked her, "Is he a nice guy or what?"

"He's a bad guy."

"Okay. Why is he bad?'

"Because he did something to my brother."

"Which brother did he do something to?"

"Josh."

"What did he do to Josh?"

"He put his mouth on Josh."

"Where did he put his mouth on Josh, what part of Josh?"

"On his pee pee. On his private."

"Oh, where did that happen Amanda?"

"In that bathroom."

"Okay. What bathroom? Where was the bathroom that it happened in?"

She said it happened where he was sitting down and there was a bath and a shower in there. That this was at

Patti's house, and it's a boys' room. And she said, "I was checking downstairs what they were doing."

And I asked her, "Did you see that or did you hear about it?" And she said, "I saw it."

"Did Josh have his clothes on or off when that happened?" I asked. And she said, "He took his clothes off." And she said, "It happened on that deck."

And I said, "On the deck?"

"On that deck where you sit."

Now, remember, ladies and gentlemen, the testimony of the defense Investigator Mr. Legace, I think his name was, and he testified that that bench in that sauna was a slatted bench, like a deck. Amanda knows what she saw, but he thinks he can convince you that you should believe him and not her. And he's a different man than the one who abused Scott and Joel and Danny and Ricky over a four to five year period. He thinks he can convince you that he didn't film that child's penis deliberately, and didn't know anything about the tape even though he dubbed off of it. He thinks he can convince you he didn't make that locker room video that you saw, and didn't save it for his archives. Thinks he can convince you that he's the victim and Terese Story is the perpetrator.

Stephen Danforth, ladies and gentlemen, worked his way into the trust and the hearts of Josh's family. He groomed

THE COURT: Please be seated everyone.

(Out of the presence of
the jury.)

THE COURT: Rachel, why don't you give 13A to each party. And absent objection, what I'll do is tell them that 13A has been received as a transcript of the tape recorded statement. And that it has the redaction done on page three and page six.

MR. DANFORTH: All right, Your Honor.

THE COURT: Mr. Danforth, let me just say something to you, sir. I watched you and at times listened to you during Ms. Quaintance's closing. I couldn't detect the contents of the words, but I heard your voice and observed a lot of gesturing of disagreement and looking over the top of your glasses and rolling of the eyes and the shaking of the head, and so on. I came close to interrupting and dealing with it spontaneously, but more importantly it gives me pause as to what might be in the offing.

I think, you know, you can't be doing that. And so with regard to this closing, I want to remind you we've carved out areas that are not within this case. I've tried to draw some lines with regard to probative and prejudice on both sides. I appreciate that the location of those lines may be a location about which we don't always agree,

but they are the lines in this trial.

I've found you in contempt of court twice. As you probably know, the penalty for contempt of court is six months in prison. And I don't mean to find you in contempt again. So don't go beyond, don't go into the areas that we've held to not be permissible.

The other area here and, of course, is that you, because you're a party as well as acting as counsel, have personal knowledge of various things. Your personal knowledge with respect to your closing here is irrelevant. It was relevant when you were sworn as a witness testifying, but if it's not within the evidence, and gets into things that are completely tangential to the evidence, as a for instance, I saw you kind of shaking your head in agreement with Ms. Quaintance's observations that the sound went off during Gray's -- the depiction of Gray, as if you had something to say about that. I haven't heard anything in the evidence about anything about the sound going off. So don't go taking liberties because you have some personal knowledge. The jury knows you have personal knowledge. That makes it all the more inappropriate for you to start putting in your personal knowledge that hasn't been sworn testimony here.

MR. DANFORTH: Well, Your Honor, if I could -- well, excuse me. Go ahead.

know anything about the case. The investigator. She never even investigated it. She turned it all over to Corner House. Here. You make a tape. That's all I need.

Geez, I can't re-interview these kids because it's done. She already knew there was inconsistency between version one and version two. Why wouldn't she --

THE COURT: Mr. Danforth.

MR. DANFORTH: Am I done? Well, there is no further way that I can go into anything else. I'd just like to tell you to consider all of the witnesses, and consider all these other things.

I wish I had more time to tell you the whole story.

THE COURT: Thank you, sir.

Members of the jury, there is a piece of evidence, Exhibit 13, which is a tape recording of the statement that Mr. Danforth provided to Officer Roberts. The parties have agreed that I would mark and receive into evidence 13A, which is a transcript, so that you can read what that those questions and answers are. And I'm doing that now. And it's now in evidence.

In addition to the various exhibits that you'll have in the jury room, you'll have two exhibits from myself. You need not write much of this down, because pretty much everything I'm going to say I'm going to give to you in written form.

As discussed at the beginning of the trial, you are the sole judges of whether a witness is to be believed and the weight to be given the testimony of each. There are no hard and fast rules to guide you in this respect. In determining believability and weight, you should take into consideration as to the witnesses the following factors: one, the witness' interest or lack of interest in the outcome of the case. Two, the witness' relationship to the parties. Three, the witness' ability and opportunity to know, remember and relate the facts. Four, the witness' manner and appearance. Five, the witness' age and experience. Six, the witness' frankness and sincerity or lack thereof. Seven, the reasonableness or unreasonableness of the witness' testimony in light of all of the other evidence in the case. And, eight, any other reasons that bear on or factors that bear on believability. You should, in the final analysis, rely on your own experience, good judgment and common sense.

In deciding the believability and weight to be given the testimony of a witness, you may consider evidence of or conduct by the witness on some prior occasion which you found to be inconsistent or consistent with the witness' testimony here at trial. Among the prior statements about which there has been evidence here at trial have been various statements by Joshua Story respecting the act or

acts charged here, including among these statements were Josh Story's video taped statement to Deb Martinetti as well as statements to Officer Castilleja, Terese Story, and Dr. Cotter.

You may consider the video taped statement of Joshua Story to Deb Martinetti for all purposes. The statements to Officer Castilleja, Terese Story and Dr. Cotter, however, may be considered by you only for the purpose of evaluating the believability and the weight of Joshua Story's video taped statement to Debra Martinetti.

Similarly, evidence of statements of a witness on some prior occasion outside of trial should be considered by you only for purposes of evaluating the believability and weight of that witness' testimony here at trial.

In the case of the Defendant, however, evidence of any statement which they may have made may be considered by you for all purposes.

The State has introduced evidence of occurrences in the 1980's involving four boys, as well as evidence involving a boy named Gray Laffin. As I indicated at the time this evidence was introduced, it was admitted for the limited purpose of assisting you in determining whether Defendant committed the crime with which he is charged in the complaint here respecting Joshua Story.

You also heard evidence respecting charges of

occurrences made against the Defendant in Wisconsin in the 1970's. This evidence was admitted for the limited purpose of assisting you in evaluating certain testimony of the Defendant during his cross-examination, and should not be otherwise considered by you.

Defendant is not being tried for and may not be convicted of any crime other than crime charged in the complaint here respecting Joshua Story. You are instructed specifically that you are not to convict Defendant on the basis of any other occurrences not involving Joshua Story. To do so might result in unjust, double punishment.

Now, let's turn our attention to the offense charged here. The statutes of Minnesota provide that whoever engages in sexual penetration with another person who is under the age of 13 when that person is more than 36 months older than the other person is guilty of criminal sexual conduct in the first degree. The State is not required to prove that the sexual penetration was coerced.

The statutes define sexual penetration as including fellatio or any intrusion however slight into the genital or anal openings by any part of the body or any object.

Fellatio constitutes sexual penetration if there is any contact between the penis of one person and the mouth, tongue or lips of another person however slight. Any intrusion, however slight, of any part of one's person's

light of things that Mr. Mahoney has told me, particularly that it's important to have some kind of control and knowledge over which things are being watched, especially if one thing is being watched repeatedly to the exclusion of others, I think under all the circumstances, I have told --

MS. QUAINTANCE: It's up to them what they watch.

THE COURT: No. But what you're saying is you would have a record of what they may --

MR. DANFORTH: That's right.

THE COURT: We will bring the video tapes back there. That's evidence. But, obviously, they will have to let us know before they can see anything.

MR. DANFORTH: Yes, Your Honor.

THE COURT: Okay. Now, when they may want to come back, what's the preference with regard to whether you want to be here, assuming there will be no dialogue, this would be a matter of having them come into the courtroom, having the deputy put the video in, we would make a record of their request, and it would be displayed. Do the parties want to come back for that or do they not?

MR. DANFORTH: I hate to gum up the works, Your Honor, but I would feel much better, if I'm here.