**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## "RASMUSSEN" HEARING

## January 30, 1996

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

The memorandum we've submitted sets forth the reasons why this evidence is relevant and material with regard to this case. Clearly the State is in the position of having a case in the current case where a single victim was seven years old, there is no medical evidence because of the nature of the abuse, there is no medical evidence associated with oral sex on a child victim, there is little corroboration in the State's case of the child's testimony because of the nature of the offense and the way in which it occurred, and so the State -- it is important to the State to have this additional Spreigl evidence to show the Defendant's intent.

His defense as I understand it is that this child of this case has fabricated these allegations or has been coached to fabricate these allegations. And we need the Spreigl evidence in order to show the Defendant's intent, to show that it was in fact the Defendant who did this and to show that he, it was him because he has a similar modus operandi in the other offenses and to show that he had the intent to abuse, sexually abuse young boys because he had a pattern of prior abuse.

THE COURT: Mr. Tamburino.

MR. TAMBURINO: Thank you. Your Honor,

both relevant and/or exculpatory would be disclosed to the parties so that the entire psychological file is not turned over into the hands of the defense.

MR. DANFORTH: Your Honor --

THE COURT: -- No, I need to ask Mr. Tamburino, can you advise the Court to what extent there has been an investigation of these matters and the extent to which a report or the reports have been turned over to the Defendant?

MR. TAMBURINO: Your Honor, every piece of discovery that I got from Ms. Quaintance's office was turned over to my client. I was receiving discovery up until almost a week before trial and I made copies personally and gave them to my client. My client made an extensive record in front of Judge Burke yesterday and we went over all the communication we had in this case and it has been extensive.

In terms of the investigation, my client wishes to have these people contacted as witnesses and called as witnesses for the basic purpose of character evidence. I refused to place my client's character at issue in this case and that's why I did not call them.

Some other witnesses that he mentioned I put on the record yesterday outside of the hearing of Ms. Quaintance in order -- as Judge Burke stated, in order

that Mr. Danforth's trial would not be jeopardized for reasons that I discussed with my client and those reasons should not be told out here in front of the State, I did not contact those witnesses because they would not have been helpful to my client, and there is only a couple of those. Most of the witnesses he talked about relate to character evidence and that would basically be suicide in this case.

MS. QUAINTANCE: If the record needs to be enlarged, I can leave the courtroom again.

THE COURT: Yes, would you do that, please?

(Ms. Quaintance leaves the courtroom)

THE COURT: All right, Ms. Quaintance left the courtroom.

MR. TAMBURINO: Your Honor, as I stated yesterday, under Rule 1.6(b) and then (5), it does state that if a client makes a claim against his attorney and puts his attorney basically in an adversarial position, I'm allowed to defend myself. I also contacted the Board of Professional Responsibility about a week ago and I placed this on the record yesterday morning as well and they stated that, yes, I can divulge information in my defense.

Basically, Your Honor, Mr. Danforth wanted to call

a couple witnesses, one which I personally talked to, Ms. Cindy Lifeeney (ph), he wants these witnesses to come in including some children of the witnesses, Ms. Lifeeney's children to testify about him. Your Honor, these witnesses have information that if divulged on the record would seriously jeopardize Mr. Danforth's case. They have told me that they know that he is an admitted pedophile, they told me that he has admitted to wanting to have sexual contact with kids, to being attracted to them, he has admitted many things to them. And he wants to use them in a way that would basically open the door to character evidence. If they came up on the stand and said even one or two lines about Mr. Danforth's character, Ms. Quaintance would immediately be allowed to launch into any type of questioning she wants about Mr. Danforth's character and could bring up a whole host of investigations that occurred on this man approximately twenty years ago. This is already a hard case, we don't have to make it harder. These witnesses coming in would make it extremely difficult for Mr. Danforth's case.

THE COURT: If you could clarify as to which point this Ms. Lifeeney (sp) and -- how do you spell that, is it L-I-F-F-I-N-E or Y?

MR. TAMBURINO: L-I-F-F-I-N, I believe,

Your Honor.

THE COURT: All right. Which category does she fall into?

MR. TAMBURINO: She is someone who would be a character witness and would talk about her personal relationship with Mr. Danforth for over ten years and what his likes are, what his tendencies are, what his history is. She has nothing directly to say about this case, she was not around when any of these allegations, when any of these things supposedly occurred.

THE COURT: Okay.

MR. TAMBURINO: As to the children that have been -- about five of them that have been listed going back to one of the Spreigl cases, I told Mr. Danforth that it's my practice, I've had over forty jury trials and five crim sex trials two of which involved children. I told him it is my practice that I do anything that I can do to keep out Spreigl evidence. If the Court does allow Spreigl evidence to come in, I make a further motion that based on a 403 type of argument that the State not be allowed to call the actual witnesses to the stand and have them testify, rather we can put that evidence in on stipulated facts such as reading the Complaint from twenty years ago whenever the Spreigl evidence is to the jury, that is

a lot less prejudicial to the defense, and Mr. Danforth disagrees with all that, he wants witnesses to come in and talk about those Spreigl cases. Basically what that would be doing is harming his own case. He also wants people surrounding those Spreigl cases, fifteen to twenty years ago, to talk about how he did not abuse them. There were some that he abused and supposedly some he pled guilty to, he wants to call in these people that supposedly would say he never abused them. If I did call them, Ms. Quaintance would make a motion in limine before their testimony that any testimony they could give would be irrelevant. And she would succeed in that motion. And that's why we did not call those people.

There is one area of investigation that we completely did, Your Honor, and I already did this yesterday on the record but I'll do it again. Earlier in this case and throughout the case, Mr. Danforth has been adamant in his innocence. And because of the serious nature of the case, there was only one thing to do, to try to see if we could have the case dismissed or negotiated to something acceptable to my client.

We hired without the State's knowledge and with an order by Judge Posten a polygraph expert and he came into the jail and for over two hours examined Mr. Danforth. He's an expert that the Hennepin County

Public Defender's Office has used in the past, he's done over two thousand polygraph exams. He gave me a lot of information about Mr. Danforth that I did not put on the record yesterday and I don't think I would have to put it on the record today except to say that Mr. Danforth did not pass any part of that test and that there are serious reservations about certain things Mr. Danforth has said.

Based on that, Your Honor, that was another reason why I felt it would be basically suicide to call some of the witnesses that Mr. Danforth has told me to call. I try a case the way I see it. Of course I am in contact with my clients and I accept their input and I have had numerous contacts with Mr. Danforth. He completely went over everything every single time I talked with him and met him with Judge Burke yesterday morning. I didn't even realize I talked to him that many times. But representing a client you can only go so far. When it comes to a situation where you think it's a situation where your client wants you to do what you think would totally jeopardize their case, you can't do it. And that's the disagreement we've had.

THE COURT: Yes. And are you aware of Mr. Danforth's statement that there might be staff at the pool of the Century Court Apartments?

MR. TAMBURINO: Your Honor, the Century Court Apartments -- the incident that supposedly -- the incident that surrounded that, the incident that supposedly occurred in that apartment, supposedly happened in the sauna where there were no witnesses and that was only one incident. The other incident supposedly happened at the apartment in Prescott, Wisconsin, there was nobody else around in that sauna. The people at the pool, the child makes no allegations that while he was with someone in the pool such as his mother or Gary Story, the father, there was any type of sexual abuse or sexual contact. And that's why the people at the pool were not contacted.

THE COURT: And as to the hosts at the apartment complex, Patty Weir, W-E-I-R, I assume.

MR. TAMBURINO: The reason why Mr. Danforth wants again to have a witness such as Ms. Weir come in is for the purpose of saying in my observations I didn't see anything go on. He has a number of people that will come in and say, you know, I saw Mr. Danforth with the kids and I never saw anything wrong. The problem with calling those people, first of all, again it's going to be objected to on relevency because they were not in the area at the time the allegations were made. But even beyond that, Mr. Danforth, and he's expressed this

several times, wishes to question these people about areas that I don't think they would have any knowledge of and I think that would open the door to basically character evidence and again give Ms. Quaintance an opportunity to attack him on that. There has been no allegation that anyone else has been with Mr. Danforth when the supposed sexual contacts happened with Josh.

THE COURT: And what about Diane Connor?

MR. TAMBURINO: I don't even remember who Diane Connor was.

Basically, Your Honor, to summarize and I put this very lengthy on the record yesterday.

THE COURT: Uh-huh.

MR. TAMBURINO: Our strategy in this case was to take the allegations that the State's own witnesses have given us about who else may have sexually abused this child Joshua and used it against them. There has already been an investigation of Darlene and if we investigate it further and call Darlene as our own witness, she would deny all this. It's a better strategical move not to call Darlene as a witness, to use the child Joshua's own words that Darlene has abused him and leave it at that. By calling Darlene and by getting her to admit or to say to us that she never abused these kids and by calling witnesses

surrounding the time when she was with the kids who also say she never abused them, we could be disproving our own theory. We have enough ammunition to raise the issue that this child was abused by Darlene and possibly his own mom with the State's own evidence.

We've also requested the child protection records of Hennepin and Dakota Counties, we know there are files in both counties, and we've already received some documentation from Dakota County that would substantiate some type of abuse, not sexual but some type of physical abuse. Judge Burke allowed us to discover those records and that is why some of the documents have already been brought to this Court for an in camera review.

THE COURT: Mm-hmm.

MR. TAMBURINO: By further questioning of Mrs. Zirul, Darlene Zirul, we would basically disprove our own theory that she was a possible perpetrator in this case.

THE COURT: Okay. Could you have Ms. Quaintance come back.

(Kathryn Quaintance enters the courtroom)

MS. QUAINTANCE: They tried to ask me questions and I told them I couldn't talk to them, that I would relay your concerns.

**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## VOIR DIRE TRANSCRIPT,

## Volume I

## February 5, 1996

there was something about a 36-hour issue with respect to you being held. I didn't see anything in the file that Judge Justman delivered to me with regard to anything about 36 hours, so I'm kind of in the dark about that.

So those are the three issues that I understand were before Judge Justman in the sort of Rasmussen pretrial area.

There also are motions before the Court in the written file that deal with obtaining the school records of one or both of the Story children, child protection records involving one or both of those children, and certain other medical records involving one or both of those children.

I have a fair amount of material that was delivered to me yesterday by, I think an official in Dakota -- or Friday, by an official in Dakota County that looked like child protection records. Is that your -- child protection may have --

MS. QUAINTANCE: Yes. I can clarify that Your Honor. Those motions which you have in writing were heard before Judge Burke the week prior to the start of trial. Judge Burke ruled that the child protection records should be reviewed in camera by the trial court judge, but denied the defense request to review school records and medical records. The medical records that

issue?

MS. QUAINTANCE: No.

MR. DANFORTH: No, Your Honor. If I may add a little bit of light to the subject?

THE COURT: Okay.

MR. DANFORTH: Judge Justman had requested we provide at least a specific name to the type of testing procedure that Dr. Underwager might employ in psychologically interviewing and analyzing the situation of the children. I have spoken with Dr. Underwager and I do have that information at hand, for the Court's benefit, at this point among my papers.

MS. QUAINTANCE: Well, no argument was heard on that motion, so --

THE COURT: Okay.

MS. QUAINTANCE: -- that will have to be taken up at some point.

THE COURT: Well, if you have some written material on what the proposal is, Mr. Danforth, why don't you supply that to Counsel and myself, I can look at it, and at such time as we have, address ourselves to some of these other issues and we'll argue it.

MR. DANFORTH: I'm sorry to mislead the Court, Your Honor, but I had written down a quote in some notes and --

MS. QUAINTANCE: He's on the defense witness list.

THE COURT: Okay. And has anybody looked at his file or --

MS. QUAINTANCE: No.

THE COURT: -- does he have a file do we know?

MS. QUAINTANCE: The prosecution was not intending to use him and has not obtained documents from him. Those are privileged documents --

THE COURT: Okay.

MS. QUAINTANCE: -- and the appropriate time for a motion was prior to trial.

THE COURT: All right. If you produce a subpoena, you use one of your subpoenas. If you fill it in for Dr. Cotter's file, I will impose upon the subpoena language which requires that file to be supplied to me to look at in camera and I'll do so.

MR. DANFORTH: Thank you, Your Honor.

THE COURT: Okay.

MR. DANFORTH: I would simply add that it's been my observation that it was highly significant that the State had chosen not to use Dr. Cotter as a witness, and that there was also a very peculiar appearance of the way that Dr. Cotter was referred to on

MR. DANFORTH: Okay, Your Honor. Very relatedly, a motion to exclude the testimony of the two young children, the complainants in question, as both being incompetent to testify due to essentially three prongs. The first, the ability to understand the nature of the proceedings and the significance of an oath and the crucial importance of truth telling.

Secondly, suggestibility.

And thirdly, an inability to independently and coherently relate events.

And let me just move on. There would be a motion, and we've already addressed the Spreigl so I'm just going to mention this for the Court's illustration in terms of where I'm going with this on Spreigl matters, that there would be, for one thing, a portion of a 1975, and related period, arrest and/or judicial records and Spreigl records due to the fact that it involves a non-conviction scenario, a non-guilty plea, and an entire dismissal of the matter and just straight out due to the age of the matter, as well.

Relatedly, there was a motion for use of all the requested Spreigl evidence in view of the substantial differences --

THE COURT: Well, I'm quite sure there's going to be a lot of issues on those Mr. Danforth, why

don't we just --

MR. DANFORTH: Move past that?

THE COURT: -- put them under this category of Spreigls and then we'll hear you on all the Spreigl issues.

MR. DANFORTH: Okay, Your Honor. I will dispense with any mention of that for now.

Let me just see, now. We've already mentioned Dr. Cotter. There would be a motion under 609.347, Subdivision 4, to the extent that it would be needed under State versus Kobow, I think it's pronounced, K-O-B-O-W, 466 NW2d, 747, for good cause due to my pro se status and, I might add, my pro say status starting essentially at the start of trial. And also by reason of the prior counsel's failure to make a motion -- failure to make an offer of proof of the existence of evidence of other allegations of sexual abuse made by the respective -- or alleged victims.

In essence, what we have here, Your Honor, is where this is apparently the third occasion on which allegations of sexual abuse have been made by one or both children. The latest one prior to the time of the alleged incident in this case surfaced only in the spring of this year. And so, I will be making a motion to that effect. In fact, you might say that by reference to it,

I'm making it now. And I would add that whether or not that motion is cognizable under 609.347, Subdivision 4, or for that matter, the Rules of Evidence, of which I have just discovered, has a similar parallel provision.

Nevertheless, under the circumstances, due process of my right to a fair trial and my right to confront my accusers requires that this matter be allowed to be gone into; "matters" in the plural, Your Honor.

THE COURT: I'm might as well ask you, Mr. Danforth, to take a look at Rule of Evidence 612 when you have time and determine what, if any, issues you think relate to the matter you've just talked to me about.

MR. DANFORTH: 612?

THE COURT: 412.

MS. QUAINTANCE: 412.

THE COURT: 412. And then we'll proceed from there. I don't know, has there been a 412 Notice provided by the Defendant to you?

MS. QUAINTANCE: No, I haven't -- no notice prior to today.

MR. DANFORTH: Your Honor, as I say, first off, in light of the fact that I've only just taken over the conduct of this defense and was not previously aware myself of any need to provide any such thing, that may be, under the circumstances, excused.

evidence presented either by way of cross examination or direct evidence, I'll have to address myself to the 412 issue and related issues.

MS. QUAINTANCE: Well, I would just like to state for the record that my position is that the Defendant's ignorance of the rules or ignorance of the law is not a defense to his violation of the notice provisions. He has been advised he's held to the same standard of any attorney.

THE COURT: Okay.

MR. DANFORTH: May I move on, Your Honor?

THE COURT: Uh-huh.

MR. DANFORTH: Okay. All right. Service. Okay. Quite separately, I still have the question of when there ought to be suppression and I would just like to advance a motion, I think in limine would be the nature of it, to rule on the inadmissibility of each item found in each search. The thrust of this motion being is that either each item is irrelevant to this particular case and/or is prejudicial and suffers the other limitations on admissibility of otherwise admissible evidence under --

THE COURT: Okay. I understand what you're talking about. Essentially, the in limine motions on various items that were received when the --

MR. DANFORTH: Yes. I'm sorry.

THE COURT: -- when the warrant was executed?

MR. DANFORTH: Confusion of the issue and misleading the jury were the other two items.

THE COURT: Okay.

MR. DANFORTH: Okay. A motion for discovery, if it needs to be. I am unclear about whether or not everything in the prosecutor's file has been divulged already. If any and all notes summarizing the witnesses' statements -- and by the way, I am talking about not simply police reports, but any notes of police officers and/or of others, and/or memoranda of anyone regarding any such statements.

THE COURT: All right. Well, what's good for the goose is good for the gander, and I'm assuming Ms. Quaintance has complied with the Rules of Discovery with respect to the things that she's obliged to turn over. I'm going to leave both of you in the same spot.

MR. DANFORTH: All right.

THE COURT: We'll follow the Rules of Discovery and if there's an issue that's provoked from that, we'll have to deal with it at the time.

MR. DANFORTH: Okay. What I wanted from the Public Defender's office, separately, was a

MR. DANFORTH: Okay. I also wanted to advance another matter with the Spreigl that I'll just mention now. That if and when the Spreigl evidence is admitted that it be limited to simply the documents explaining the judgment of conviction of any matters that have reached conviction, and that with regard to the conviction that I've already spoken of.

THE COURT: Let's leave that in the Spreigl category.

MR. DANFORTH: Okay. The following thing is really sort of an alternative motion. I guess I would say alternatively, either Rule 4.03 of the criminal procedure rules may have been violated by --

THE COURT: Is that this 36 hour issue?

MR. DANFORTH: Not really, Your Honor. Along the way it became apparent, in the questioning last week, that there apparently was an ex parte hearing held without my presence after I was in custody.

Although this has some tangential relationship to the 36-hour rule violation, what I'm saying by this motion is that by having their ex parte hearing of the matter that they were having a probable cause determination and a setting of bail without my presence. And I regard this as being a critical phase of the case against me.

fruits of the search in Wisconsin, she does not have property inventory sheets relating to those because the Prescott police have that property stored in Prescott. She is arranging for that to be brought to Minneapolis, but she told me that she personally reviewed the videotapes seized from the Defendant's apartment in Prescott.

She said that in reviewing those videotapes there was no footage of anything relating to the Story family, but rather unidentified children on playgrounds and that kind of material. So that she doesn't know what the Defendant is talking about when he says he had home movies of himself with the Stories because she didn't see anything like that in those videotapes.

THE COURT: Let me ask: Is the date of the offense here, and I am looking at the charging clause, are we essentially in August of 1995, is that the --

MS. QUAINTANCE: July, I believe.

THE COURT: Is that the -- okay. If we say July of 1995, that's a close enough parameter?

MS. QUAINTANCE: Right. On or about July of 1995.

(Short interruption.)

MS. QUAINTANCE: Will there be any instruction at all regarding the Defendant's choice to represent himself?

THE COURT: All I was going to say was -- I was going to introduce him to the participants and I was going to say the State is represented in this case by Kathryn Quaintance, I'll ask you to rise. And I'll introduce Mr. Danforth and I'll indicate that he is representing himself and is assisted by John Mahoney --

MS. QUAINTANCE: Okay.

THE COURT: -- and ask the two of them to rise. And I'll indicate that Mr. Danforth could also be receiving assistance at other times in this proceeding by James Krieger who is not present today.

MS. QUAINTANCE: On the issue of voir dire, I think the law is clear that I am entitled to inquire with them about the issue of his choice to represent himself, and that it is his choice, and that they should not let that affect their determination in any way and will they tend to feel sympathetic because he's made that choice and those kinds things.

THE COURT: Well, let's wrestle with that. I don't want to -- I don't want to reel back and forth with the jurors about how this all came to be, that would, I think, be a neverending -- neverending deal.

MS. QUAINTANCE: No, I don't think how it came to be is in any way relevant. All that's relevant is to insure that they understand that it's his choice and that it's not -- he has not been put at a disadvantage by the system for some reason, but that it's -- he has decided to do that so that they will not let that affect their decision-making process. And I think there's some law on it and I'll find the authority.

THE COURT: Okay. Say, while we're on the record, Mr. Mahoney maybe you could approach, if you would be kind enough, and I will give to you the Minnesota Statutes Annotated, Volume 40 and the supplement -- the current supplement to that which contains, essentially, the entire criminal codes --

MR. MAHONEY: Is he going to be able to mark these up or --

THE COURT: That is a question I never asked anybody. Here Mr. Mahoney (handing).

MR. DANFORTH: It wouldn't be my intent, Your Honor, to mark in the books.

THE COURT: Do you have post-its in the jail?

MR. DANFORTH: No, unfortunately I don't.

THE COURT: All right. Mr. Mahoney, do you want to approach and you can give your client a pad

Honor.

THE COURT: Let's work on some of those tomorrow and the balance of the day. Okay. So you'll give him a pencil, post-it notes --

MR. DANFORTH: Your Honor?

THE COURT: Yes.

MR. DANFORTH: I'm just a little bit unclear. Once these are filled out, when will they be copied and when will I have them in my possession?

THE COURT: We'll get them copied this afternoon if we can, that may be tricky but we'll try to. If we do, I'll try to get them delivered over to the jail to you yet today.

MR. DANFORTH: All right.

THE COURT: It'll probably be later in the afternoon or early evening.

MR. DANFORTH: I would appreciate that.

THE COURT: If not, you'll know it's not for want of trying. If we don't get that done, we'll get them to you first thing in the morning. And then, we'll talk after we leave here, when they're filling them out, a little bit more about the scheduling, but you'll have a good 24 hours.

And then understand that we're only probably going to go through 10 to 15 people a day, would

groups than all of you as we move through the next few days.

Also, because we're getting your specific telephone number, there's a question in the questionnaire that asks for your address. What question is that, could somebody -- at any rate, the question that asks for your specific address you need not answer.

MS. QUAINTANCE: Number 3.

THE COURT: Okay. Thank you. So with respect to your specific address you need not answer it, but we would like your telephone number and that phone number will not be shared with anybody.

After we pass out the questionnaires, we're going to leave you here and Rachel will stay in the courtroom. She, however, will not answer any questions. The dialogue that goes on between jurors and a court is one that goes on only when a record is being capable of being made and only where both parties are present. So as a consequence, she will not be able to entertain any questions you might have about the questionnaire.

If you have a question, simply jot the question on the questionnaire and that will trigger our ability to enlighten you with the answer, if we can, when you come back and we ask you some questions -- some follow-up questions individually.

JUROR BARKER: Okay.

THE COURT: Thank you, sir.

JUROR BARKER: You're welcome, sir.

(WHEREUPON, Juror Barker left the courtroom and Mr. Everett Wayne Flynn was brought into the courtroom.)

THE COURT: All right. Now, Mr. Flynn, as I understand it, revealed to me that he had a conviction in a comparable charge, or a CSC matter?

JUROR FLYNN: CSC I, CSC II, and I'm a registered sex offender for ten years.

THE COURT: Are you still on parole or probation?

JUROR FLYNN: No, but I am registered with the Bureau of Criminal Affairs --

THE COURT: Uh-huh.

JUROR FLYNN: -- for the next ten years.

THE COURT: Were you convicted in this county?

JUROR FLYNN: No, I was convicted in this State.

THE COURT: Whereabouts is it?

JUROR FLYNN: I served my time in Stillwater and Oak Park Heights and Lino Lakes.

THE COURT: You approached me and

set some time to argue in the next several days or maybe the end of next week.

The records from Child Protection I guess I have and I will be continuing to go through those records. And I will put post-its on the records that have anything that I think may be even arguably germane to issues and copy those pages and have them provided to the parties.

The school records have been ruled on by a prior Judge and I see no reason to upset that ruling because I'm quite confident it would be consistent with my own.

And the medical records, apparently the sexual assault records, have been provided -- or are going to be provided. They've been -- are they in place somewhere, Ms. Quaintance?

MS. QUAINTANCE: The medical records were provided to the defense with the initial discovery months ago.

THE COURT: The sexual assault records?

MS. QUAINTANCE: The exam conducted at Cornerhouse; yes.

THE COURT: Okay. Now I recognize that doesn't get to the issue that you talked about with regard to a anal/rectum kind of exam, we'll talk about

MR. DANFORTH: Yes, I'm adopting it. I have no further argument.

THE COURT: Okay.

MS. QUAINTANCE: Your Honor, it's the State's position that there is a clear and obvious waiver. There's no Scale's issue because the entire statement was tape recorded. Mr. Danforth is more knowledgeable than most defendants about the law having graduated from law school. He also has six prior convictions and additional arrests and has been represented by counsel with regard to those matters.

He therefore is in an -- in a position to be highly educated about his rights, all of which were recited to him. And he continued to discuss the matter with Investigator Roberts in an exculpatory fashion, after they advised of his Miranda warning. So essentially, from the State's standpoint, there is no issue.

THE COURT: Okay. All right. The statement will be received and I've listened to it and read it. I think the requirements of Miranda and it's progeny with regard to the warning was given, and the Defendant indicated that those warnings were understood. I have every reason to believe, getting to know the Defendant as I am, that he did, in fact, understand them

**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

# VOIR DIRE TRANSCRIPT,

## Volume II

## February 6, 1996

what you're referring to as a Daubert hearing.

You've made some motions with respect to the ability for certain persons to testify as to what these -- either Joshua Story or possibly the sister, I assume mostly Joshua Story said to them.

Let me just tell both parties sort of where I am on that and then you can tell me if I'm understanding what you're referring to as a Daubert hearing or not.

If the State is going to offer out-of-court statements of these one or more children for affirmative evidence and there is an issue about that, and maybe even if there's not an issue about that, I need to make a determination with respect to the circumstances surrounding the making of that statement and that determination is made under Minnesota Statute 595.02, Subdivision 3.

And I have made a determination with respect to one out-of-court statement that I have observed on the videotape, and that determination is that that videotape of Joshua would be admissible. Because, I have found, in looking at the videotape, that the degree of spontaneity, not total absence, but largely the want of leading and suggestive questions, the want of any apparent motivation on the part of the child, and some

other features dealing with the child's reactions and language and movement around the room and so on, were sufficient in my mind to lead me to conclude, especially in a 595.02 situation where the child is going to testify -- is there anything I said, John?

MR. MAHONEY: No, I'm sorry --

THE COURT: That the --

MR. MAHONEY: -- just practicing.

THE COURT: -- criteria of 595.02 has been met. It is that kind of analysis that I think the law permits and requires with regard to out-of-court statements of child witnesses if they're going to be used affirmatively. And I'm assuming that the hearsay notice that was given to me was a notice of witnesses that were going to testify, or would like to testify, about statements of one or both children, to be used affirmatively.

MS. QUAINTANCE: Correct. Actually, Your Honor, that notice indicates that we are intending to use those statements substantively as well as corroboration of the victims' in-court testimony.

So the State would request that a determination be made pretrial as to whether they meet the criteria of admissibility of substantive evidence, even if the child, for whatever reason, is unable to

MR. DANFORTH: Your Honor?

THE COURT: Okay.

MR. DANFORTH: Yes. Well, I would add a couple of authorities here. First off, State versus Huss, this is a Minnesota case, 506 NW2d, 290.

THE COURT: 2-9-0; 290?

MR. DANFORTH: That's right.

THE COURT: Okay.

MR. DANFORTH: This does not necessarily deal with expert opinion, but it's clear that the case has something to do with an examination of tape and non-independent recollection and, therefore, I think it is of some use to the Court.

In this, relatedly, also I think that there's a State versus Blohm, another Minnesota case going back to 1979, the cite there, 281 NW2d, 651. And I think, again, the suggestion in that case would be that if there were an out-of-court statement admitted such as the tape, there would have to, at the very least, be a limiting instruction due to the fact that it would not be admissible under the res gestae exception.

THE REPORTER: Under the what; I'm sorry?

MR. DANFORTH: The res gestae --

THE REPORTER: Thank you.

MR. DANFORTH: Yes. R-E-S G-E-S-T-A-I --

E rather.

In any event, I think between those authorities and the ones that I cited to you from the U.S Supreme Court, including Daubert and also this interpretation application in a similar case, in the case of Michael -- State versus Michael from New Jersey, that what I would like to put on the record here, since it does seem to be a matter of question of confrontation clause requirements as distinct and separate from, and not dependent on, Minnesota Statute 595.02, is an offer of proof as to what Dr. Underwager would, indeed, testify to about the process of the interview in which this statement was taken, in that the field of such interviewing is a professional field and subject to professional requirements and professional -- professional -- limits of professionality and subject to scientific principles.

May I be heard on what he would have to say?

THE COURT: Okay. Well, before we get to that there are, apparently, seven offered out-of-court statements. I don't know if they're still going to be offered or not, but let's walk through each of them and find out what anybody envisions with respect to how I need to go about making the 595.02 judgment and

MS. QUAINTANCE: That's the tape.

THE COURT: -- tape that I've seen. And number four, I take it, is a tape I have not yet seen but that I received yesterday?

MS. QUAINTANCE: Correct.

THE COURT: Then the statement to the father, is that one still proposed to be offered?

MS. QUAINTANCE: Yes. The ultimate decisions as to whether the State will, in fact, attempt to offer these cannot be made until after the testimony of the juvenile and until we know whether he's available or not.

So that's why I suggest rather than doing all this pretrial, that we wait until the time comes when those witnesses would ordinarily appear because it may not even be an issue by that time.

THE COURT: Yes. I'm just trying to make sure that some of them have not been excluded already in your trial plans so -- are all of them essentially --

MS. QUAINTANCE: Well, if they were, I'm not sure I would disclose that at this point, Your Honor.

THE COURT: All right. But then statements made by a known juvenile female --

MS. QUAINTANCE: That's the sister.

THE COURT: And those would be statements

MR. DANFORTH: Well, Your Honor, the matter, as I understand it, is within the Court's discretion. There is going to be no dispute about that fact except insofar as there may be a limit of the confrontation clause in terms of being able to -- and also due process, separately, as a rooting for the need for an adverse psychological exam.

Whenever you have the testimony of young children or, for that matter, hearsay renditions of statements allegedly made by them out of court previously, the -- the kinds of things that are done in these cases, according to Dr. Underwager, and which he would be doing, involve a series of instruments and interviewing. The interviewing is a one-shot deal, however, lest I be less than clear on that.

The instruments involved are something called a Child Behavior Checklist. Secondly, an instrument known as Minnesota Parent-Child Inventory. Thirdly, an I.Q. test designed for the use of children, delivered orally, it's called the Wechsler, that's spelled W-A-E-C-H-S-L-E-R, Child Intelligence Inventory.

And then lastly, an instrument which is prepared on the basis of an interview with the child that evidently is pre-formed in the sense of not having specifically prepared an exact question until the end of

the interview when there is. The name of this procedure is called the Criterian-based Content Analysis. And then, evidently, it also goes by yet another name in addition which is called Statement Validity Analysis.

And in that sense, what this last procedure does is, in interviewing children who have been suspected of being abused, and for analyzing the resulting interview, basically what you do in the first part of the test is assume that an account, based on a real memory of an actual event, will differ in content and quality from accounts that are based on fabricated lyric or suggested memory.

And the way you differentiate by that, as I understand it, is that through obtaining as much free narrative as possible and avoiding the use of leading questions and suggestions, and then at the end turning the process around where you do provide nothing but leading questions and suggestions, as I understand it, you get a differentiation that allows you to assess the child's susceptibility to suggestion in particular, and that is the most specific thing about this kind of thing.

However, I would hasten to add that in discussing with Dr. Underwager the utility of the three prior, more general things, that is to say the Child Behavior Checklist, the Minnesota Parent-Child Inventory,

and the child's I.Q. test, these are meant to cover some bases that are appropriate to this particular case.

In terms of the behaviors, for instance of Josh, as shown on the tape during the course of the interview, there is reason, Dr. Underwager would testify, if I were to give an offer of proof on that, that those behaviors suggest the need for an evaluation regarding child behavior and what it may mean psychologically in this case.

Also, in particular, because of the fact that that particular interview shows quite clearly a rote memorization by means of, you know, prior to the videotape questionings and regurgitation of information, that there is a very strong indication that there may be some problems in terms of interrelationship between parent and child. And Dr. Underwager feels that the parent and child inventory will be capable of bringing that out if that's true.

And then lastly, since even the CornerHouse staff themselves demarcate some problem or inability on Josh's part to track to various lines of inquiry, including the most critical ones on their tape, the Wechsler Child Intelligence Scale may be of some utility in determining whether or not that is a more widespread problem in this particular child.

I would also add, Your Honor, that lest I have created an inadvertent misunderstanding, I did not mean to say that this was limited to Josh Story. We were discussing it yesterday in the context of Josh Story because of the fact that we'd all already viewed Josh Story's tape at CornerHouse.

However, it would seem to me, by the nature of the comments and the summary of the tape regarding Amanda, which I, like yourself, have not yet seen, that it's almost certainly going to be necessary to have the same evaluation performed as to Amanda.

THE COURT: Okay. Ms. Quaintance.

MS. QUAINTANCE: Thank you, Your Honor. Adverse psychological examinations of child victims of sexual abuse have been denied in all but one reported case. That one reported case is State versus Cain, 427 NW2d 5, Minnesota Court of Appeals, 1988.

In that case the specific facts -- and incidentally, that case did involve Mr. Underwager. That specific case involved certain facts; There was no physical evidence of the abuse, there was no demonstrated fear of the perpetrator, the allegations arose in the context of a custody battle and there were recantations.

Now, we don't have any lack of fear of the perpetrator here, we don't have allegations arising in

not the children are telling the truth; okay?

What, instead I'm trying to do here by the testing process is establish whether or not the accounts that have been given so far, to-date, not including, you know, whatever they might testify to on the stand, and whatever they testify to on the stand has a sanctity that must be decided, as you say, by the jury, and there's no dispute about that, however, it has been brought to my attention by Dr. Underwager, and after reviewing, as I say, the tape, that there's a high probability here that what has happened is that these accounts have been based on a learning experience which is really supplanted in the mind of the declarant that is to say the respective child, in this case Josh, since he's watched that tape of the actual events, for rather a substituted rote memory version of what actually did not occur but is now being represented as reality.

And there is well-known psychological phenomenon among children that allows the mind of a child to actually come to believe that something has happened and to state it as fact after it's been adduced and brought through the child's learning process a number of times by rote memory.

Dr. Underwager is quite emphatic that that's what's happened here. And therefore, we have a

case -- it is a case of suggested rather than realistic memory and it is that that we'd be trying to establish by scientific principle and procedure, and that is something that can be established by scientific procedure. So that's -- that's where we're at with that, Your Honor.

THE COURT: Well, I'm familiar with what you're talking about and I'm familiar that there is even courts that tell that child witnesses are not testifying from firsthand knowledge because they don't have their own memory of this.

But I'm going to want to see the surroundings and circumstances in which some of these statements have been made and the degree to which there is, in fact, factual support for inducing these kinds of beliefs that have now -- in your view, now constitute these children's memory before I make a ruling on whether there would be any expert psychological evaluation of the children or any expert testimony on either side with respect to whether they're testifying from their own memory, whether they were suggestible, whether they are truthful.

It all boils down to the same issue and that is experts getting on the stand and telling jurors reasons why they should or should not believe human beings and the recounting of historical fact, and that's

an area that I'm going to be quite cautious about with respect to either side.

Okay. The competency hearing that I will have, I guess you'll have to advise me, Ms. Quaintance, as to when we might do that in a meaningful way. If I do have that hearing, you, of course, and Mr. Danforth will be present. You will not be permitted to ask any questions nor will Ms. Quaintance. If you have questions you think the Court should ask, you should address them to me in writing and I'll consider them.

My questions, when I have done competency hearings, I've essentially talked to children about remembrance of their last birthday and what happened in school last month or the month before and what color their clothes are and what they did last weekend and what they can remember from last Christmas and what they understand it means to be telling the truth and not telling the truth and why they should or should not do that, and kind of retesting them on some of the same questions and add in slightly factual events. It will not deal with the circumstances of this case, but will be an attempt to explore their ability to understand truthfulness and their ability to recall historical facts.

So if you have ideas beyond the kinds of

generalities of what you've heard me say and you want to submit those to me, I'll consider them. And if you want to do that at the time we have the competency hearing to supplement what I've asked them, you may do so.

As well, I'm open to suggestions from each of you about where to have that happen. The two obvious choices are here in the courtroom with the courtroom closed and the parties as far removed from the children as possible and the child facing me. The other possibility, I suppose, would be in chambers, but to be able to separate the parties from one another at great distances is not possible in chambers. But I'm open to suggestions from either of you.

MS. QUAINTANCE: My preference, Your Honor, would be to have the competency hearing immediately before the child's testimony so the child needs come to court only one time. The child, by necessity, would be the first witness. That could occur either immediately before the opening statements or immediately afterwards depending on how it works out best.

My preference would be to have the competency hearing in chambers so that Your Honor is in a better position to address the child. It's a little awkward in this situation in that the focus can be clear

between you and the child, and the rest of us can be just observers as opposed to distracting the child in any way from your communications. Some --

THE COURT: The times I've done it in the courtroom I've actually brought a table. I haven't done it where the child was in the witness stand, I brought a table up. I've had the child with his back towards everybody else --

MS. QUAINTANCE: Uh-huh.

THE COURT: -- and facing me and then having everybody sit in the back of the courtroom. And usually with a number of different people so they all kind of appear to be sort of a group of people and there's not any real prominence of any one person that the child might see.

MS. QUAINTANCE: The only confusion there is that in orienting the children to courtrooms and to the roles of the various people, they have an expectation of where the judge sits, where the prosecutor sits, where they sit, where the defendant sits, and where the jury sits, and that would be a little confusing, I think.

THE COURT: Are you going to bring the child into the courtroom before he testifies?

MS. QUAINTANCE: They have already been; yes.

THE COURT: Okay.

MS. QUAINTANCE: Not this courtroom but another one.

THE COURT: What's your view about place and time Mr. Danforth?

MR. DANFORTH: Your Honor, I would tend to side with what you've done traditionally, according to your account. It just seems to me that makes the most sense and that there really shouldn't be any variation.

I frankly think, and I can go on record as being a little bit outspoken about this, in fact, that the whole business about previous orientations and rehearsals, in fact, of child witnesses is a matter that, in fact, borders, at least on occasion, depending on the circumstances in a given situation, may go right over the line of due process rights and perhaps rights of confrontation.

THE COURT: Well, you're going to get into --

MR. DANFORTH: No, Your Honor.

THE COURT: -- argument and I --

MR. DANFORTH: And you're here for this, I appreciate that.

THE COURT: Yes. There is a difference between orientation and rehearsal and there have been

that case, was involved in transporting some of that pornography and I believe that is the source for the fact that Story has seen slides and poses with minor children; I think it relates back to the '87 case.

And certainly, anybody might report that Mr. Danforth has an obsession with young boys considering he had six convictions for the same and prior charges as well.

THE COURT: The sentence that starts, "Story has seen photographic slides..."?

MS. QUAINTANCE: Yes.

THE COURT: Officer Koumshroeder is -- I take it that particular statement doesn't appear in the police reports, that is that Story has seen as opposed to Story believes?

MS. QUAINTANCE: Story has, in fact, in connection with the '87 case, seen pornography in possession of Mr. Danforth --

THE COURT: Okay.

MS. QUAINTANCE: -- pictures of children naked.

THE COURT: I appreciate that. What I was getting at, I was trying to address myself to Mr. Danforth's issue here. The police report, as I understand it, that -- or police reports that existed in

the City of Richfield don't contain any statement that Story has seen this as opposed to Story believes it, or do they?

MS. QUAINTANCE: No, they -- they don't. But these -- these investigators had information that was not contained in police reports.

THE COURT: Okay. That was my second question then. Is the representation of the State, then, that apart from the police reports Story informed one or more law enforcement people that he had seen --

MS. QUAINTANCE: I don't know, Your Honor, because I can't get inside the head of the person drafting this affidavit. What I'm saying is there is a factual basis for this statement that is contained in another investigation.

Story has been a 16 year friend and associate of Mr. Danforth. There is indication that during those 16 years Mr. Danforth was in possession of child pornography and that Mr. Story had access to it --

MR. DANFORTH: Your Honor, I --

MS. QUAINTANCE: -- and that Mr. Danforth was living in Prescott, Wisconsin at the time.

THE COURT: Okay. Then turning to the next statement, because that is the next paragraph, because I suspect that if you took out the second to the

thought you might hold that for the lady who might be in charge of copying.

Your Honor, I was able to draft, as it's labeled, a motion for admission of evidence of prior accusations of sexual abuse pursuant to Rule 412 of the Minnesota Rules of Evidence, and also to Minnesota Statute Section 609.347, Subdivision 4. As the motion itself indicates, Your Honor, this is to the extent required under those provisions.

The reason that I am framing it in that nature is that, as I indicated more loosely to the Court yesterday, it is my position that my right to confrontation will allow me to have the right to inquire about these matters on grounds and under criteria that are specific to the confrontation clause and not specifically to Rule 412.

In any event, this is the motion and it is with appendices consisting of the document called Assessment Dictation. This is, in essence, the report of the Dakota County Child Protection Agency with regard to one of the accusations of abuse against other members of the Story family.

And then there are one, two, three incidents -- no, there are three police reports, rather, pertaining to the other incident of abuse. This is the

MR. DANFORTH: Yes, Your Honor. Once again I find myself the victim of a bit of disruption. If you will give me a second here, I was trying to locate those materials as we were off on this side tangent.

(Short interruption.)

MR. DANFORTH: Your Honor, by the way, if I could just mention this: This, as I say, is the first that I have seen of, evidently, what is suppose to be a complete file regarding the search in Prescott. I am -- I am not at the present ready to respond to the fact that I now have it for the first time in my possession.

I certainly have not seen the document labeled Receipt Inventory and Return, apparently dated September 13th, so, I mean, that's -- that's news to me.

And the Evidence List appears to be more voluminous than what I have seen and I am confused a bit by what is part of this and what is part of this other document that may pertain to the release of property.

THE COURT: Well, that's why I asked you to take the overnight --

MR. DANFORTH: Yes. I'm going to have to have --

THE COURT: -- and take a look at it --

MR. DANFORTH: -- some time to look at this, Your Honor. I see that it does append a police