**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

**<u>TRANSCRIPT EXCERPT:</u>**

**TRIAL TRANSCRIPT,**

**Volume I**

**February 14, 1996**

SCANNED
AUG 03 2004
U.S. DISTRICT COURT ST. PAUL

MS. QUAINTANCE: Your Honor, by way of additional authority on the admissibility of that video tape, the State would offer the case, State versus Holscher, H-o-l-s-c-h-e-r, 417 Northwest Second, 698, a 1988 case from the Minnesota Court of Appeals.

In that case, a defendant was being tried for rape. When he was discovered, he had the victim in that case bound in the back of his van in a sadomasochistic kind of a set up. And present in the van were additional items, a leather belt, alligator clips weighted with lead sinkers, women's underwear, a dildo, a wig and some other items. And the Court allowed those items to be admitted as probative of the Defendant's intent and state of mind.

And the Court stated at page 703, "Further, the lack of an absolute connection does not affect the admissibility of the challenged evidence, but only the weight accorded it."

And starting at 702, "We agree that the challenged objects are probative of the appellant's intent and state of mind."

So I think that case is further authority along with Nailer (ph) for the admissibility of the video tape of the boy, roughly the same age as Josh, being filmed naked with particular focus and arrangement to expose his penis to show that the defendant's intent towards Josh was in

fact sexual. He has reiterated in his pretrial arguments that he had nothing but a sort of parental relationship with this child, and that he intends to introduce home videos to show the family rapport between him and Josh and Josh's family and these innocent outings that they went on and so forth.

So under those circumstances, I believe the State is entitled to the admissibility of this other evidence to show Mr. Danforth's sexual intent.

THE COURT: Well, I would like to see, I would like to see that film, and then we can argue it further. And I want Mr. Danforth to be able to view it also, if he wishes to, so as to accommodate argument that he may have.

I also watched a number of films early this morning that had been watched by Mr. Danforth yesterday and were left in the bag for me in my office. Maybe I ought to just run down and make sure we're all on the same wavelength with regard to these various films because they have become so numerous now.

Again, the locker room film is admissible. While the Court sees some potential prejudice in that film because some of the sounds on the film sounded like a grown man in some sexual utterances of some kind, it otherwise is not very prejudicial, because there is not

knowledge of the facts other than hearsay. And he should not be allowed to testify that the children made false allegations against anybody because it's purely his opinion.

THE COURT: Well, that's way down. That's next week's problem, I guess, when he testifies. But, at any rate, in terms of right now, I think you're going to need to show me if it's not going to be Darlene coming in here, what is going to be the evidence with regard to falsity, assuming that this is an accusation or that it has constituted an accusation.

And I will turn over to you the documents in the file that relate to -- to be honest with you, I think you have got the most thorough of that document because I think it's appended to the material you gave me. That document seems to be a lot more detailed and thorough than anything I've seen in these reports. But I will turn over to you those things that relate to this alleged accusation involving Darlene.

MS. QUAINTANCE: To both sides?

THE COURT: To both sides.

MR. DANFORTH: All right, Your Honor. But, for the record, I would like to say I do anticipate having to ask Josh about this in terms of whether it is a false accusation or not. And I differ extremely with Ms.

statements that Josh made, but not to the mere fact of prior sexual abuse independent of the existence of statements and the falsity of statements.

MR. DANFORTH: Okay. So I can inquire of the truth?

THE COURT: You can, but that's in the context of inquiring to him about a statement. I mean, if you ask him did you ever say, did you ever tell anybody that Darlene Zirul sexually abused you, and he says no, and then you inquire, did Darlene Zirul ever sexually abuse you, whether or not she sexually abused him, independent of the statement, is barred by 412.

MR. DANFORTH: Okay. I understand, Your Honor.

THE COURT: You may inquire, because what we're getting to is the credibility of these accusations made against you, not whether this youngster has been abused before. There may be a lot of persons that have been victims of criminal sexual conduct that have been abused by others before. The question is the truthfulness of those allegations.

Okay. Turning then to the second one referencing the mother. And that's an accusation that as I understand it Josh has reportedly made to Darlene and that Darlene reported to authorities or case workers or

somebody.

Now, it seems to me that if Darlene testifies that Josh made that accusation, and you have evidence that you want to prove that that accusation made to Darlene was false, I'd let you do it. If Darlene does not testify here, then I guess the question is what is going to be the method of proving the allegation, the accusation. And I'm not quite sure where you're going at that point, because I don't know whether Darlene's going to be here or not. I didn't know until you just told me, maybe she is not available as a witness. So can you tell me where you are on that one?

MR. DANFORTH: Well, I think you mean otherwise than the question of availability, whereas I say I don't have concrete answers as to availability yet. On the assumption that she would be unavailable, and really, actually, I've foreseen that even if she is available, as a matter of an exhibit concurrent with that testimony or unavailability without her testimony, the report of the Dakota County Social Services as indicating the existence of the accusation is what I plan to introduce.

MS. QUAINTANCE: First of all, I don't know how he plans to introduce it. Secondly, the document is hearsay.

approach things from a legalistic point of view in terms of when to challenge things and how to challenge things. And Dr. Underwager, having been an expert witness for a number of years, has some know how and savvy in that regard, but conversations we had were essentially about the legalistics, and that's it.

THE COURT: Let me see if I can cut into this.

MR. DANFORTH: Sure.

THE COURT: If a lawyer or a lawyer's investigator goes and talks to a potential witness and the witness or the lawyer/investigator elects not to write anything down, and nothing in fact is written down, then there are no memorials of that to produce. However, there is case law in Minnesota whereby a party that is in that position can compel some recitation of what the testimony or what the evidence would be.

Let's forget about that right now. You apparently have some actual notes taken?

MR. DANFORTH: On this conversation of February 10th?

THE COURT: Right.

MR. DANFORTH: Yes, I do.

THE COURT: And whether they constitute protectable -- I mean, the fact that if you

were -- had a lawyer, and your lawyer went out and took notes, handwritten notes of what a witness was saying or the investigator did, the fact that the lawyer took the notes or the investigator did as opposed to a statement that a witness signed, may not be the operative difference. The real issue is whether or not the notes are essentially notes which reflect or memorialize what a witness said about the topic or whether they essentially memorialized the client's or the lawyer's mental processes and impressions and thoughts about the topic.

Now, from time to time they're a mixed bag. And when that happens, judges sometimes look at the material and try to make some distinction. And if some of it's producible, they try to protect those things that constitute mental impressions of counsel or in this case of yourself. So I don't know what you have there, but that's sort of general guidance in terms of work product privilege in both criminal and civil areas. And maybe at some point I just have to know what it is.

I can tell you that with respect to expert witnesses on either side, I will require an offer of proof of what they're going to say if they're going to make any opinions about anything in this courtroom in this case. And I may, in addition to requiring an offer of proof, I may require that there be a hearing outside the presence

to fairly present my defense in full.

Let me give you some instances on that. For instance, you know, right in the Corner House videos you see that Josh has lost both of his two front teeth. Whereas the last time I had seen him on the 8th, he had them both, and they weren't remotely being complained of as being loose. I mean, the suggestion that something suddenly happened to have lost those two teeth is really very strong. Just one of two instances right there.

The other one at that particular moment in time is one on the amended complaint where she reports a scrape, and scrape is really putting it mildly. It was really the entire left side of the nose and this quadrant of her face all over the left check (indicating). She says quite candidly, "Mom hit me," and amplifies a little bit having something to do with being propelled into the door glass. That's a pretty violent hit, Your Honor.

I think that what's going on in this family, as I say, at this point looking back on it with the benefit of the records that I now do have access to, suggests very strongly to me something that I was not cognizant of at the time, and that is that the woman had a very out-of-control problem with physical abuse of the children. As I say, once again, it feeds in two ways, both in terms of her motivation to have a lie suddenly

Mr. Danforth, because then I would have something more to base a decision on with regard to prior bad acts of people, and so on. But until I have at least a statement or some real concrete evidence that somebody's going to come in here and testify, somebody with the ability to know, is going to testify that mom is doing this in connection with these accusations, the prejudicial value to the people involved here versus the probativeness of the child being physically abused weighs in favor of it not being admitted.

And as I indicated earlier, I suspect there is quite a number of people that would be of the view that children that are subjected to physical abuse are oftentimes the ones most vulnerable to acts of sexual violence. And those are profile kind of things I am hoping not to get into.

MS. QUAINTANCE: Your Honor, I just want to state that I think it's a common tactic to try to put the parents of the children on trial. It's basically irrelevant what the actions of the parents were. Clearly, if they were better parents, they would have never allowed Mr. Danforth to be around their children. But whether or not they're bad parents is not an issue in this case at all. And to allow it to become one is to bring -- is to drive a Mac truck through the middle of

correct. We did it yesterday.

MR. DANFORTH: All right, Your Honor. Basically, what I would like to have is under rule 901 discovery for whoever this person is regarding any written summary of conversations that there may have been between that advocacy person and either Josh or Amanda, depending on whom they have been speaking with or the parents, if that's the case, any written summary of conversations between Ms. Quaintance and the advocacy person.

MS. QUAINTANCE: Those have been disclosed to the extent they exist and were disclosed to the defense before the date of trial.

MR. DANFORTH: All I have, Your Honor, is a little single sheet of paper that seems to reference the dates of some conversations by some unidentified person. And I only assume that that's the single sheet that Ms. Quaintance is making reference to.

MS. QUAINTANCE: And that's satisfies my obligations.

THE COURT: I don't know what exists. I don't have any idea what exists.

MR. DANFORTH: Well, if Ms. Quaintance is telling me nothing more exists, that's all I can ask for, I guess.

Is that your position Ms. Quaintance?

MS. QUAINTANCE: Will the Court instruct Mr. Danforth he is not to address me directly?

THE COURT: Well, just let me understand this.

MS. QUAINTANCE: Just to clarify, Your Honor, there was a motion by Mr. Tamburino before Judge Burke on this issue a week or so prior to the trial date of January 29th. I did not oppose his motion and told him that I would comply with the rule and the statute, and have done so.

THE COURT: Well, I'm looking at 901, sub 1-2 and sub 1-3. And the prosecutor is ordered to comply with those 2 paragraphs. And I would expect the prosecutor would.

MS. QUAINTANCE: There is actually a statute that puts a greater burden on us, and that has been complied with.

THE COURT: Are there any notes of the advocate that reflect statements of the children in existence?

MS. QUAINTANCE: None, Your Honor.

THE COURT: Anything further you wish on that Mr. Danforth?

MR. DANFORTH: Well, Your Honor, if

object to using A, B and C tape. I guess I, in understanding their content, would have assumed, and with regard to most of the videos he's talking about, it strikes me with respect to both of you that the relevance of the videos of the children unrelated to the Storys in nonsexual circumstances, I don't want to spend a whole lot of time on things with that kind of relevance, so.

MS. QUAINTANCE: Well, I'm specifically addressing the issue of the 1980's Spriegl victims' tape. The Court has assumed an objection, but I am asking that that be clarified, because the Court is not --

THE COURT: Yeah

MS. QUAINTANCE: -- in the position of ruling that it's inadmissible if Mr. Danforth didn't object to it.

THE COURT: But as I said before, that all depends on the Spriegl landscape. If I don't allow the Spriegl, what relevance do pictures of these kids have back then? If I do allow it, it's pretty potent stuff. What does that add to it?

MS. QUAINTANCE: Well, Your Honor, if there is no objection by the defense, it's not the Court's position to intercede one on his behalf.

THE COURT: But plainly he's

extent, written up. Frankly, I didn't get a chance to finish.

THE COURT: Which there are some areas that I have forbidden you to go into, as you know. Absent some hearing outside of the presence of the jury, there will be no inquiry of these children about any incident of physical abuse. If you think by reason of something that is said during the course of this examination that that has -- that that landscape should change, you're just going to have to let me know, and we'll talk about it. But as far as the Court's concerned at this point knowing what I know about the records and the background of these children and the case, there will be no inquiry as to any physical abuse or history of physical abuse.

We talked yesterday about the nature of the questions you might ask about prior accusations of sexual abuse. And, obviously, you may ask questions that relate to the alleged occurrence. Plainly, any questions that probe at the question of whether this event did or did not happen or these events did or did not happen or are reasonably related to that. The questions must be asked in a manner, while they may be cross-examination questions, they may not include within them facts that you don't have any reasonable basis to be able to prove,

tape of the young boy Gray. I don't know if you're familiar with this tape Mr. Danforth. It starts out with you sort of describing to what I assume was the mother how to use the video camera. Then a fair number of shots both indoors and outdoors of Josh and Amanda. Then the reel goes to some shots indoors of this youngster Gray. Then the sound goes off and there is a zeroing in or focusing in on the camera of the naked beneath the waist portion of this youngster and attempts to remove clothing out of the way and remove legs, and so on, so that the genital area of the youngster is exposed. Then it goes back to an audible portion where there is sort of fun and companionship and that kind of thing between you and the same youngster.

Are you familiar with it enough to speak to it?

MR. DANFORTH: No. I have not seen it Your Honor.

THE COURT: Well, I will let you take a look at it then. And then were you planning on trying to make a decision about referencing that or not referencing it in your opening, Ms. Quaintance?

MS. QUAINTANCE: Yes. And when I made available the equipment yesterday afternoon, it was my understanding that that would be reviewed by Mr. Danforth yesterday afternoon.

THE COURT: Yes. We didn't get a chance to get it done, apparently, so...

MR. DANFORTH: Your Honor, what format tape is this on?

THE COURT: It's on 8 millimeter.

MR. DANFORTH: Well, that explains it. I don't know that we have had 8 millimeter.

MS. QUAINTANCE: Your Honor, Mr. Danforth is the person who made this videotape. Surely he knows what we're talking about here.

THE COURT: Yes, I realize that.

MR. DANFORTH: Your Honor, that assumes that --

THE COURT: Well, it's not an assumption to me, Mr. Danforth. It's fairly apparent from the tape. Well, we can do one of two things, we can go back and we can review it right now and take 10 minutes to do it, and I'll hear argument about it. What's everybody's view about it?

MR. DANFORTH: That sounds like a good idea.

THE COURT: Okay. Why don't -- can you tell the panel -- is everybody here? Are all 14 here?

THE CLERK: The last time I counted

we were at 12.

THE COURT: Can you check and see the others are here, and tell them about 10 minutes we'll be starting.

MR. KRIEGER: Judge, before we begin with the jury present, I wonder if the Court would guide the Defender's office in terms of what you would request us to do.

I've requested that I be allowed to sit in the back of the courtroom, and have articulated the reasons for that. There is a footnote in State versus Lande, L-a-n-d-e, 376 Northwest Second 483 is the footnote one. It says, "Even in this case, the preferred practice is to have counsel in the back of the courtroom for consultation."

There would be a case where there is stand-by counsel appointed. The reason for that would be that it would be our belief that by sitting here with him, that we're giving the jury the impression that he's anything less than a full participant when he has exercised his right to represent himself.

And, in addition to being seated in the back of the courtroom, I wonder if the Court would reconsider our role, Defender's role in assisting with regard to bringing documents up to the Court or having the

documents marked. It would seem that it is if he's functioning as his own attorney, then he would have full use of the courtroom in the same way that any other lawyer would.

Whatever the Court wishes, but I just am aware that this is a pretty vague area.

THE COURT: Well, my viewpoint about the defendant moving around the courtroom may be subject to be reanalyzed after these children testify. But during the course of the time the children are testifying, counsel will remain at their table. And Rachel, upon request of either side, will deliver documents or things or I will, one or the other, but they'll be delivered through the Court. And counsel will remain at counsel table.

Mr. Danforth, what's your viewpoint about where you would like stand-by counsel to be seated?

MR. DANFORTH: Generally, as a general matter Your Honor?

THE COURT: During the course of the trial when you are in front of the jury?

MR. DANFORTH: Frankly, Your Honor, I guess because I feel that there is a need for me to be asking him on an on-going basis for questions to answers of a legal nature, and that sort of thing, I prefer to

have him be close by.

THE COURT: Okay. You are ordered to sit at counsel table then, Mr. Krieger.

MR. KRIEGER: If that's the ruling then, Your Honor, I also request the Court for some guidance on what it is you would like me to do. Because I've tried probably as many criminal trials as anybody in the State of Minnesota, and consistently I tell my clients during the course of trial, when they are my clients, please don't say anything to me verbally. And I furnish that person with a pencil so that they can write out legitimate questions or observations that they feel, and then at the appropriate time to speak, consult fully. And/or they can slip me a note.

I think it's incredibly disrespectful to the Court, I think it's disrespectful to Mr. Danforth and to the jury and the whole process, and my function as a lawyer, as an officer of the court, in the midst of the chaos and confusion legally that goes on in these trials. And I appreciate the fact that better trial lawyers probably win because they pay attention at all times to what it is that occurs in the courtroom, even if it's a pin dropping. Better lawyers are able to hear and understand where it fits. And if we're consulting or talking or he's seeking legal advice or there is any kind of

disruption in the trial process, it puts his case, so to speak, at a disadvantage.

And I also don't want to be in a position where I'm viewed by this Court with whom I have had many years of experience, and I have a deep respect for the court, yourself as a Judge, to be viewed by you as being disrespectful if there is any kind of disruptions, so to speak, in terms of the process when I'm whispering loudly or he's whispering loudly. And at the same time I'm also aware that he does have a right to participate and ask these questions. So I'm surely --

THE COURT: Why don't we do this, as sort of some general guidance, when the State is examining the witness, presumably, to be not interruptive of that process, you can communicate with each other by writing each other notes. That's relatively customary.

When you are examining witnesses, Mr. Danforth, if you wish to take a brief time out and ask, "May I have a moment, Your Honor," and turn and whisper or pass notes, whichever you wish to do, that would be permitted. I'm not going to feel disrespected by this. And at that point there would be nothing else happening in the courtroom. So why don't we have that as your general guidance.

Go tell the jury we'll be with them in about 10

minutes. And let's go back and take a look at this video.

(Whereupon, the defendant is allowed to view the video tape off the record and out of the presence of the jury.)

THE COURT: Do you wish to be heard then Mr. Danforth with respect to the State's offer of the tape?

MR. DANFORTH: Well, yes, I do, Your Honor. Has the State finished making its offer and argument?

THE COURT: I understood they made the argument about it yesterday, and we were awaiting the opportunity for me and you to to look at it.

MR. DANFORTH: All right. And I just need to make a cite here, Your Honor. I need a second here.

(Pause in proceedings.)

MR. DANFORTH: All right, Your Honor, I'm ready.

THE COURT: Okay.

MR. DANFORTH: All right. As an initial outset matter, I would object to the

admissibility of this on the basis of the lack of proper foundation. There really isn't any foundation at all in the sense of any definitive proof whatsoever that I am in essence the creator of that video. What you see there on the video tape is simply a video tape that after an unrelated scene goes black, and then you have a child in a crouching position, a voice that sounds like mine, although, I certainly don't have any memory and cannot attest that that's my voice, says a few things, culminating with something that apparently sounds like the phrase, "That does it." And the camera is cocked up, and it rather looks like there may be an effort to shut the camera off.

Then there is a lack of any sound, indicating some kind of malfunction, which calls into question as well whether what we're dealing with is indeed an original in this case or some kind of excerpted copy, especially because it was going black beforehand.

Subsequently, what we see in the depiction is that the camera apparently is being set down and remains on the floor for sometime. And during that process, the episode that Ms. Quaintance has described, apparently, as being some kind of manipulation of legs and an effort to make a clear view towards the genital region really is quite clearly a depiction of a shoe being removed. So

that certainly explains the first instance, the question of what's going on with the leg, whosever arm it is that's doing the moving of the shoe.

I might add, that I am not depicted anywhere in this video unless one were to argue from Ms. Quaintance's point of view that this arm is a body part of mine. But I certainly do not concede that, and I would have no way of affirming that. I would therefore contend that the State doesn't carry a burden that I'm depicted in this thing.

At this point the camera is moved generally in a few moves. I guess there is some question as to whether or not it's picked up or whether it's been nudged about. And then at that point we go into the second break of the control track and enter some kind of a commercial movie that I suppose from my general knowledge of video might be an indication, but not necessarily, that perhaps that commercial movie was already on there or perhaps that there was an over-recording effort. Which is another thing that entirely pollutes the very question of whether or not we're dealing with an original here or dub, and the question of, you know, what got recorded over what.

All these things in any traditional sense that I'm aware of evidentiary precepts tell me that we don't have a foundation for the admissibility of a piece of reel or

documentary evidence, depending on how you look at the videotape.

If I could just a have one second Your Honor.

(Pause in the proceedings.)

MR. DANFORTH: Secondarily, and quite independently from the issue of foundation, lack of foundation, rather, is the question of lack of relevancy just under the general concepts of relevance in Rule 401 of the rules, of this particular depiction on this tape. Even if it were everything that Ms. Quaintance says it is to the question in this particular case, which is, of course, whether or not I'm guilty of a specific act of molestation or however you look at it, but in any event, the point that I'm trying to make is that this is not a depiction of an act of molestation. This is not a depiction of any kind of sexual act whatsoever. This is a depiction of nudity. And while I suppose one might be able to make an arguable contention that maybe if this were a case in which voyeurism was the charge, in which a video camera was used to perfect the voyeurism that was the charge of it, I think I could understand the relevancy to that kind of a charge, but that's not the case here.

What is the case here is that the charge pertains to a specific act or series of acts of molestation. And

that what we have on the tape here is at most a plausible suggestion instead of a quite different kind of sexual pursuant, which is to say voyeurism, in this case, I suppose, of a deviant nature, but voyeurism. And therefore I would object on the sheer basis of relevance alone.

Any relevance that tape might have, especially in light of what I've just said, has got to be greatly attenuated and therefore greatly outweighed, not just substantially outweighed, but profoundly outweighed by what I would guess I would call kind a shock value kind of prejudice under Rule 403. I can't think of anything that would prejudice this jury more certainly than a display of something like this.

It is, you know, such an attenuated thing that that has to be greatly outweighed. And there is no doubt in my mind that any reasonable juror taking a look at this would probably be very confused about the issues. And it's a separate ground under Rule 403. And I move that it would tend to mislead the jury, another ground yet under rule 403.

So all of these things under 403 are extremely violated by the proposition that this tape would come in. It would simply cloud an average juror's mind by the passion, by the suggestion that there was more than the

connection that I've just outlined here, and would appeal to sensibilities of supposed pop psychology and other media-conveyed misconcepts that are out there all over the place in terms of what this jury is going to decide this case on the basis of. So I would have to object on the basis of Rule 403. That's my third argument.

And, lastly, my fourth argument is really related and based on my constitutional right, first off, in a criminal case, for a fair trial, and also to due process. And in this I see that the prejudicial nature that I've already been talking about and the inflammatory nature of it combined with it's non relevancy, are at most a, no matter what the Court might decide, it's highly attenuated relevancy at best. To put me in a position where I'm deprived of that constitutional right of a fair trial, quite apart from the confines of a specific definition in Rule 401 and 403 regarding relevance and regarding what Rule 403 thinks about prejudicial evidence and confusion of issues and misleading the jury, I think that the underlying constitutional precept in a case like this is much stronger than that rule. And I therefore invoke it separately.

Additionally, and I might add, that this also ties in in the sense of due process, because of the lack of foundation that I've already cited, so lack of foundation

also becomes a constitutional impact here as well as in the due process sense which I'm also entitled to.

And, lastly, it would seem to me that if this piece of evidence comes in, what I'm going to be forced to do is forego any right that I might have against self incrimination to explain what I might remember at any point in this proceeding about the course of this tape, it's origins, its creation, et cetera. That puts me in a box that I don't think that I should be bound by simply so that the prosecutor can get a leg up with a highly prejudicial piece of evidence that's not directly pertaining to the charge in question.

If this were a depiction of this child in question, as we discussed the other day, I think that would -- no question in my mind that we would have a very much, much closer arguable case, even though it would not then depict an act, it would still depict, as I say, this kind of bizarre form of deviant voyeurism, but voyeurism it remains. And given the fact that it's clearly not one of the children who's being accused of here, I'm highly protesting this. And I would ask that the Court preclude it. It deprives me of a fair trial.

THE COURT: Okay. Well, Mr. Danforth, I've looked at an awful lot of video tapes over the last few days, many of them would be disturbing to a

number of people. And I'm keeping a number of them out, because I think their relevance to this, although having some relevance to it, would be pretty prejudicial to your case.

This tape, however, depicts a reel on which the Story children are significantly pictured. On that same reel is a tape where you're engaged in fun kind of fatherly playing sort of activities with the Story children and with this boy that's the subject of this depiction. You have indicated to these jurors that on questioning in voir dire about the number of times where there is opportunity to be involved sexually with young kids and nothing happens and how that would alter the landscape, and have indicated you wanted to show videos of playful sorts of innocent scenes with these children. And, in the Court's view, the relationship you have to the youngsters that's depicted here in a playful sort of way, and at the same time the portrayal of the youngster without any clothes on and being moved around and manipulated with respect to his genital area strikes me as being quite relevant to the issues of intent and motive, motive and opportunity.

And I also understand there is some checkbook entries that deal with buying gifts for this youngster and for Josh that are presumably relatively simultaneous

in terms of time. And I've listened to your voice over the last many days, and I think there is certainly a closeness there that that with the other foundation that I expect will come with respect to where this tape was retrieved from and where it came from and so on, and the other indications that you, sir, are on it, strike the Court as meaning that there is not going to be very much difficulty with regard to foundation. I'm not ruling on foundation right now, but I am going to rule that, assuming foundation is there and laid, the tape will be received.

Okay. Can you bring the panel in please?

(Whereupon, the following proceedings were held in the presence of the jury.)

(10:15 a.m.)

THE COURT: Okay. Well, good morning. I'm sorry to have kept you waiting and sorry about the delay from yesterday until today. I have to say to you that today will be a little bit broken up as well. We have been trying to finish some pretrial hearings, and we have got one yet to go that we'll do after the opening statement of the State in this case. That will probably be about a half-an-hour during which you will be in recess. And then, hopefully, there won't

be any further interruptions of any consequence.

I should tell you, however, that this being government, there is a government holiday on Monday, and we will be in recess on Monday, if that helps you in your planning with respect to employment and other activities. Notwithstanding those breaks, I think the likely schedule is still the same as indicated earlier. I think that we'll be done something in the neighborhood of a couple of weeks from yesterday or today. So I think that timing is still pretty sound timing.

You've been chosen to be jurors in this case, and in the same manner as any judicial officer is sworn with respect to their duties, so also are jurors. So at this time I would like all of you, if you would please, to rise, and I would like those in the courtroom to rise, and I'm going to administer to you an oath.

(Jury sworn.)

THE COURT: Let me just provide to you a few opening remarks, and then I'll ask Ms. Quaintance to address you with her opening statement.

As indicated during the course of the jury selection process and again in the oath that you just took, you must consider this case and deliberate to a verdict solely on the basis of the evidence that's presented in this courtroom. By reason of that, it's useful, perhaps,

that I explain to you what is and what is not evidence.

Evidence is the sworn testimony of witnesses that come into this courtroom and sit on the witness stand, that all of you sat on during the process over the last week, and testify. Evidence is also those exhibits or things or documents that the Court receives into evidence. So when I indicate a certain exhibit is received, that means it is evidence upon which you can consider your verdict. Generally speaking, nothing else is evidence.

From time to time parties stipulate about the truthfulness or existence of a fact. And if that happens in this case, I'll advise you of that. But generally speaking, nothing else is evidence. Nothing that I say in the course of these proceedings is evidence upon which you should consider a verdict. My sole obligation with respect to imparting information to you would be the instruction and the law that I will give to you at the end of the case. Nothing that the parties or lawyers say in providing opening statements or closing argument or in their questions is evidence. That part of the question that is complimented by an answer of a sworn witness of course is evidence, but it's the answer of the witness that is evidence.

In this case, as I indicated to you over last week,

Mr. Danforth is representing himself. It may be that with respect to certain statements in opening statements and closing arguments and in questions, Mr. Danforth may have personal knowledge about the subject matter that Ms. Quaintance, on the other hand, would not have. Notwithstanding that difference, nothing that either of the persons say as they act as lawyers in this case in giving statements or asking questions is evidence. Evidence from statements that are made consists only of statements made by sworn witnesses that take that witness stand and testify before you.

From time to time there are objections to certain questions or offers of material, and you've probably seen that on television. When there is an objection to information that's sought by way of testimony or exhibits, and the objection is sustained, that means simply that I agree that the offer is an offer of something that would not be evidence and should not be considered by you. When that happens, you should ignore the question and not speculate about what the answer might have been. On the other hand, when an objection is overruled, that means simply that I disagree with the objection. And that evidence may be considered by you when you are reaching a verdict. However, you should not give any greater or lesser weight to that evidence simply

because it was the subject of an objection.

Sometimes witnesses say things before an objection can be ruled on. And it may be from time to time I might ask you to disregard that which was said, if I should sustain an objection. And when I do that, you should disregard that portion of the evidence that I ask you to disregard as you consider a verdict in the case.

There may be occasions on which the parties or lawyers disagree with something I've done. And they may well rightly disagree with something I've done and want to argue about it. When that happens, that argument will take place out of your hearing. That's not because either of the parties want to keep anything from you that you should hear, it's because that if we argue about some evidence, invariably that evidence will be discussed. And in the discussion of it, if it ultimately is concluded that it's not evidence and should not be heard by you, then it would have been improper to have that argument in your hearing. On those occasions, I'll probably dismiss you. Rather than have the parties come up here at the bench and sort of talk behind your back, I'll probably have you go back into the jury room since jury accommodations are relatively close. And hopefully that won't take place too often, but when it does, it's for that purpose and not to keep anything from you that

you should otherwise know.

During the course of the trial and until such time as you have reached a verdict and been discharged, there is certain rules and obligations you have, many of which we talked about individually when I met each of you before. You should not pre-deliberate the case. The case is not over until it's over. And any pre-deliberation or conclusionary sort of mental processes would be unfair or could be unfair to one or both parties. You should not talk amongst yourselves about the case. You can visit with yourselves about other things, but you should not talk about case or the evidence among yourselves, and you should not talk to anyone else about the case.

If anyone seeks to talk to you about the case, and I'm confident that will not happen, but if it happens, you should let myself or Rachel know as soon as it does.

You may see parties or participants or witnesses in the common corridors and areas of the building. You should not engage those people in any conversation. You may say hello or good afternoon. You do not need to be discourteous, but even the appearance of having a conversation with a participant by a sitting juror would be improper. So refrain from talking or being in the presence of any participant. Sometimes you may get on an

elevator with a participant here, and I'm sure they will be mindful of the fact that you are on board and will not have any discussion concerning the case. And you should be mindful of that circumstance yourself.

Finally, I am advised or have learned that there will be some attention to this case today in the public media. So I am ordering you not only not to read about anything having to do with something at the courthouse, but to refrain from reading the newspaper tomorrow or viewing any newscast today. After that time, unless I order you otherwise, you should do that which we talked about before, and that's simply refrain from reading or listening to anything that pertains to something going on down at the courthouse or having as its subject matter this case.

In a case such as this, the parties have the right to provide to you opening statements. And Ms. Quaintance is going to make her opening statement today. Mr. Danforth has reserved his opening statement until his case.

Ms. Quaintance?

MR. DANFORTH: Your Honor, if I may?

THE COURT: Uh-hum

MS. QUAINTANCE: I would object to any colloquy in front of the jury.

MR. DANFORTH: I would like to have a hearing outside of the presence of the jury.

THE COURT: Okay. Can you ask the jury to -- Rachel, can you take the jury back please.

(Whereupon, the jury is excused from the courtroom.)

(The following proceedings were held out of the presence of the jury.)

MR. DANFORTH: Your Honor, if we're ready to proceed, the announcement that you just made about potential media coverage is something that takes me entirely by surprise. I would like the opportunity to make some motions to the Court with regard to it. May I do so?

THE COURT: Well, what kind of motions would you be making now?

MR. DANFORTH: Well, Your Honor, I think I would like to have, first, a clarification of what Your Honor has learned about media coverage.

THE COURT: I was called by a reporter from the Star and Trib and asked when the opening statements would be given. I was also asked that question by a reporter from WCCO. I advised them as to when they would be given. That leads me to believe that

there may be coverage of this case tonight or tomorrow. And as is my custom when that happens, I forbid jurors from all access to media during that time frame.

Anything further?

MR. DANFORTH: Yes. I would like the record to reflect that there are several people present in court today. And I would like Your Honor to essentially poll the audience to find out --

THE COURT: No. No. This is a public courtroom, Mr. Danforth. Anybody can come and go at will. They don't need to identify themselves or describe who they are. These are public proceedings. This is a public courtroom.

Anything further?

MR. DANFORTH: Yes. There certainly is, Your Honor. In light of the apparent flurry of trial coverage that apparently is going to impinge upon this case, it's my contention that that is probably by the very nature of the flashiness of it going to deprive me of a fair trial in this location at this time. And for that reason, I would like to advance a motion for change of venue.

THE COURT: That, Mr. Danforth, that motion is denied. If you've got motions that would be reason to keep us from having the opening statement, why

don't you make them now. Otherwise, I would like to make the opening statements. We have kept the jury 45 minutes or so this morning, and now we have excused them again.

MR. DANFORTH: Yes, Your Honor. I would simply like to move a couple more things here. First off, as I say, alternatively for a motion for change of venue, I would like to move for a continuance so we can distance ourselves from this kind of coverage.

THE COURT: Okay. That motion is denied.

MR. DANFORTH: All right. And then I guess in light of any coverage that it seems that there is going to be about this case, I feel that it's probably sufficiently pervasive that I'm going to need to, and I am moving for complete sequestration of the jury. Well, that's what I'm moving for.

THE COURT: That motion is denied.

MR. DANFORTH: Your Honor, one other particular then. I would like to move that all portions of the proceedings that are not in front of the jury are closed to the public.

THE COURT: That motion is denied.

MR. DANFORTH: And, lastly, what I would like to do is move that certain portions of the trial be closed and, in particular, start with the

testimony of the child witnesses that are going to be part of the State's case.

MS. QUAINTANCE: Your Honor, I believe that is provided for under Minnesota Statutes, and the State would not oppose closing the courtroom during the testimony of the children.

THE COURT: Okay, that motion is granted.

Anything further?

MR. DANFORTH: Not at this time Your Honor.

THE COURT: Okay. Can we bring the panel in Rachel.

(In the presence of the jury.)

MR. DANFORTH: Your Honor, this is not a motion. Can I just say one thing to the Court?

THE COURT: It will have to wait until after the opening, Mr. Danforth.

MR. DANFORTH: It pertains to the opening.

THE COURT: Why don't you come up here with Ms. Quaintance then.

(Whereupon, a discussion was held off the record.)

THE COURT: Ms. Quaintance is going

penetration of this child. And the law says that sexual penetration means any oral or anal or vaginal sex. In this case, it means any contact between Mr. Danforth's mouth and the penis of Joshua Story, any contact between Mr. Danforth's mouth and the anus of Josh Story.

MR. DANFORTH: Objection.

MS. QUAINTANCE: Or any contact between --

MR. DANFORTH: Objection.

THE COURT: It's overruled.

MS. QUAINTANCE: Or any contact between Joshua Story's mouth and Mr. Danforth's penis or Mr. Danforth's anus. Or any penetration, however slight, of Joshua Story's anus by Mr. Danforth's penis or any other object.

We must also prove to you that the victim in this case, Joshua Story, was under 13 at the time this happened, and that Mr. Danforth was more than 36 months older, three years older than Joshua Story. And that this occurred on or about July of 1995, this past summer, in Hennepin County.

Because the defendant in this case is representing himself, and because you were questioned by him during voir dire, you have undoubtedly already formed some kind of initial impression of him. As we present this case,

time, had run into the locker room, men's locker room and she observed this. You will learn that this was reported to the police on August 11th. You will hear from the police officer who took that report and responded to the 911 call. He talked to Josh and Josh told him what Steve Danforth did.

You will learn that Josh was later taken to a place called Corner House. And you will hear that Corner House is a child-friendly place where children go and are interviewed by professionals in the field about potential allegations of sexual abuse. And you will learn that these interviews are video taped to ensure that there is no contamination of the interviews and that everybody knows what the questions were and what the answers were. And you will see the videotape of that interview which was done on August 15th, within a few days of the initial report of the abuse.

MR. DANFORTH: Objection, Your Honor.

THE COURT: No. Overruled.

MS. QUAINTANCE: You will meet the mother of Josh and Amanda. Her name is Terese Story. You will notice when she testifies that she is a little slow. She is not tremendously articulate. She appears to be perhaps mildly mentally retarded. She sometimes has difficulty following or tracking with what's going

MR. DANFORTH: As near as I understand it, Your Honor, what my investigator advised me of last night in a phone conversation without a memo, if I get a memo, I would be glad to provide it, and I'm going to be advising my investigator --

THE COURT: Just answer the question, what was it?

MR. DANFORTH: Okay. I'll do that. The assertion is, is that earlier in this day of August 11th, okay, in the mid to late evening of which Terese Story had called Minneapolis police, what transpired was that there was an incident of sex play, if you would like to call it that, between Joshua Story and a little neighbor girl.

Okay. The little neighbor girl from across the hall, quite literally, evidently was found by her maternal grandmother in this incident of sex play with Josh. And as near as I have it at this point, the incident of sex play involved simulated intercourse of some kind. I haven't really -- I'm really a little bit vague because I have to get more facts on it. But you're asking, so that's the state of my knowledge.

It's my understanding that at that point the maternal grandmother approached Terese Story about this, essentially, said that her son was way out of line,

speculated about the need to call police about this.

Terese seemed, according to the grandmother, to be pretty disturbed about the grandmother's remarks, and seemed to be apprehensive about the potential that police might be called. And that was the end of that conversation.

Apparently, what transpired later was that -- the maternal grandmother will apparently be called as a witness, I think, in this case. I'm not clear yet. But, in any event, what she said to our investigator was that she had noted the police car arriving and police officers going into the Story residence across the hall from her. At that time of the evening, this is approximately in the neighborhood of 9:30, to the best of my recollection. And, Your Honor, that she was really quite surprised by the fact that in her mind what was happening is that Terese had essentially struck preemptively by calling the police herself. She hadn't really expected Terese to do that, I gather.

I think there may be an implication here that what the maternal grandmother was really doing when she referenced the police was simply trying to shake up Terese and get her to have a very serious conversation with her kid. And it's our present understanding that the grandmother had not really intended to call the

police.

In the end, however, after pondering this and staying up into the dead of night with it, apparently she did call the police and essentially conveyed to them that since Terese had called and given, quote, "her side of the story," that it was only fair that she, the maternal grandmother, be able to give hers.

Apparently following this, she was visited twice in the dead of night, once I think approximately 1:00 a.m., but I could be wrong about that, and once more definitively very close to 3:00 a.m.

Although I'm not quite clear as to which visit it was, one of these visits quite definitely included Officer Castilleja visiting. And yet in this case there has been no appended report of Officer Castilleja regarding that other incident, on that other stop-in and inquiry of the maternal grandmother.

And that is presently the facts, Your Honor, as I know them. I'll stop short of making argument.

MS. QUAINTANCE: Well, first of all, he says he has a vague knowledge of what this is about, and then he gives the Court a five minute, detailed description. What is the possible excuse for there not having been any discovery to the State on this?

It's a bald assertion, unsupported by police reports

proceed?

MS. QUAINTANCE: Your Honor, I must state my objection to Mr. Danforth being allowed to say in opening things that he has discovery on and has withheld discovery on. I want to state for the record that he told us his opening statement was going to take between 20 and 40 minutes. He knows that plans were made on that. He knows the concern about the children having to hang around for a long period of time. And he has gone on for over two hours causing these children to be in this building for a period of two hours, obviously, compromising their attention span and so forth. This is deliberate manipulation. I am asking this Court to take some degree of control over this man's abuse of the system.

THE COURT: Okay.

MR. DANFORTH: Your Honor, if I could respond to that?

THE COURT: No, you can't.

Tell me what you would like to do with regard to the competency hearing.

MS. QUAINTANCE: Your Honor, I need to get these children outside. And I need to get some food in them. And after that, I would be in a better position to tell you.

THE COURT: Why don't we return here at 1:30, and we'll proceed from there.

(Whereupon, a recess was taken and proceedings resumed at 1:30 p.m.)

(Out of the presence of the jury.)

THE COURT: So you prefer to do it here?

MS. QUAINTANCE: Yeah. Not the competency hearing, but we have some other matters we need to address before we get to that issue.

THE COURT: But you are still going to do the competency in the back?

MS. QUAINTANCE: I assume so, yes. The State has a motion that it wishes to make. And for that purpose, Judy Johnston of our office, who is the head of the child abuse team, is present in court and would like to be heard.

MS. JOHNSTON: Good afternoon, Your Honor. I appear specially in this case because we are presented here with a policy question that I really want the Court to address. I'm aware Ms. Quaintance has previously made a motion requesting that the Court review questions that Mr. Danforth intends to ask the children

who are going to be testifying in this case. I am here to renew that motion and to argue to the Court some policy reasons why that motion -- why it's important that that motion be granted.

As this Court is aware, the two victims in this case are ages 5 and 6. These children are particularly vulnerable, not just because there has been abuse, but because of other circumstances which I think are probably readily apparent to the Court, if you've reviewed the video tapes.

What we have before us is a situation where it is extremely unique, the defendant who's allegedly perpetrated abuse on at least one of these children is going to be here and having the opportunity to personally cross-examine that child. And that poses all kinds of intimidation-type issues for the witness who's going to be taking the witness stand.

Now, if I thought that it was even remotely possible that Mr. Danforth could follow the instructions of the Court, perhaps, it wouldn't be necessary for you to review the questions that he's going to be asking these children. But what is apparent is that while he may have at one time been a trained lawyer, he will not and chooses not to follow the rules of evidence. He will not and chooses not to follow the Court's orders regarding

matters that can't be inquired into. And he will not and can't confine himself to asking questions one a time.

What is apparent from my watching of his opening statement is that he will obviously be repeatedly asking these children question after question, and they'll be the same questions over and over and over again, which serves only to harass and confuse the child witness. It is also apparent that he will ask questions that are not probative or relevant to any issue in this case, and that he will do so whether or not you have issued an order indicating that that's a matter that cannot be inquired into. In fact, what will happen is that these children who have previously, we believe, been significantly victimized by this man, will be subjected to further abuse under the control and direction of the Court.

Now, it is our proposal that the Court review the questions that Mr. Danforth has written, that he apparently expects to ask each of these children. And we ask that you review them to determine, are they argumentative? Are they repetitive? Do they seek relevant information, relevant, admissible information that the Court has determined should come before this jury?

We believe that that is the only way to ensure that both parties receive a fair trial in this case, that the

jury be able to fairly hear the evidence without the distractions of Mr. Danforth harassing and repeating everything that he says. And it will also ensure that these children, when they come vulnerable as they are to testify before this Court, this jury, will not be subjected to future or to further abuse at the hands of Mr. Danforth under the direction and control of the Court.

We ask you to take charge of this, to review the questions and to strike questions that are not properly put to these children. We believe there is no violation of Mr. Danforth's rights in your doing so because we are not asking to personally see these questions. You are the Judge. You know what's admissible evidence. You would be the only person reviewing them. But it will ensure an orderly presentation of the case, and it will prevent these children from being further victimized. Thank you, Your Honor

THE COURT: There was a case that I read, I wish I had the cite of it now, on this issue last week written by Justice Todd that's probably about, well, it must be at least a dozen years old, I suppose.

In the area of Spriegl and 412, and so on, I feel fairly comfortable about requiring defendants and the state to do some advance notice, follow the discovery