**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth,**

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# <u>TRANSCRIPT EXCERPT:</u>

## VOIR DIRE TRANSCRIPT,

## Volume IV

## February 8, 1996

SCANNED
AUG 0 3 2004
U.S. DISTRICT COURT ST. PAUL

(WHEREUPON, at 9:15 a.m., court reconvened and the following proceedings were had.)

MS. QUAINTANCE: Can I make a brief record about discovery matters?

THE COURT: Uh-huh.

MS. QUAINTANCE: At this time I am serving on the Defendant a copy of the lab results from the blood testing done on the two children in this case which was previously requested.

I'm also serving on the Court -- well, giving the Court and the Defendant a transcript of his 1987 plea, which should be considered by -- I would request be considered by the Court in connection with the Spreigl motions.

THE COURT: Okay.

MS. QUAINTANCE: (Handing to the Court and to Mr. Mahoney.)

(Short interruption.)

THE COURT: Okay. Should we bring in Mr. Hinschberger?

(WHEREUPON, Mr. Paul Riley Hinschberger was brought into the courtroom.)

THE COURT: Hi, Mr. Hinschberger.

JUROR HINSCHBERGER: Hi.

my office.

MR. DANFORTH: All right. I thank you very much.

THE COURT: So if you need to use the phone during the daytime to facilitate your ongoing work, we'll get that done.

MR. DANFORTH: Okay. Thank you for that.

THE COURT: Anything else?

MR. DANFORTH: Could I just have one second with Mr. Mahoney, please?

THE COURT: Why don't you make a record of what tapes you're leaving with him then, Ms. Quaintance, or with the deputies, and we'll assign -- we'll put these in the custody of the deputies, if you would gentlemen, and then you can leave them up here on my bench when they're done.

MS. QUAINTANCE: This is the Amanda Story tape, another tape which appears to be the locker room at the Century Court Apartments with Mr. Danforth and the children's voices, and three videotapes seized in the search of his car called Regenerate Spa, Sport Rally '94, and Hans Pasohlavky, cap V-E-N-U-S-E, '92.

THE COURT: Deputies, if you could leave those here, and if they're done being looked at -- or to the extent they're done being looked at, I'll probably

take them home and review them myself this evening.

If you might look at the tapes, other than the Amanda tape first, Mr. Danforth, because I've seen that one, and then when you start to conclude the tapes that you look at, if you could give it to the deputies so that -- or have the deputy bring it up here and put it on my bench and I'll probably take whatever you're done with home so that I can take a look at them.

MR. DANFORTH: I'm sorry, I -- I kind of got the speed a little bit late in that sentence. Are you saying that I should review the other tapes, other than the Amanda one, first and then --

THE COURT: If you could because I've already seen that --

MR. DANFORTH: Okay.

THE COURT: -- and that would permit me to take as many tapes with me tonight when I leave. I'll probably leave about a quarter to 5:00, 5 o'clock, something like that.

MS. QUAINTANCE: I should note that I have objection to any of these going to the jail because of their content.

THE COURT: Yes, I understand. We're not --

MS. QUAINTANCE: Okay.

**STATE OF MINNESOTA** | **DISTRICT COURT**

**COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth**,

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# <u>TRANSCRIPT EXCERPT:</u>

# VOIR DIRE TRANSCRIPT,

## Volume V

## February 9, 1996

(WHEREUPON, at 9:04 a.m. court reconvened in this matter and the following proceedings were had.)

THE COURT: I reviewed these tapes and I understand Mr. Danforth has reviewed these tapes and we'll make a record of that. This Regenerous Spa, Sport Rally '94, Posohlovsky Venuse '92, and Danforth Locker Room - Century Court Apartments, and Amanda Story. So as I understand it, all those have been reviewed --

MR. DANFORTH: Your Honor, I didn't finish reviewing the Amanda Story tape.

MR. MAHONEY: He didn't get through all of them.

MR. DANFORTH: The Amanda Story tape is one --

MS. QUAINTANCE: Can we hold it here, I think we have a juror in the room.

(Short interruption.)

THE COURT: Let me ask: The locker room, was that a tape that had much in the way of anything that was visual on it?

MS. QUAINTANCE: No.

THE COURT: There was maybe, at the beginning, some depictions of some doors and what looked like maybe the inside of a room of some kind.

I'm afraid that, given what we have here, there's a necessity that he be supervised.

THE COURT: Can you put more permanent kind of exhibit stickers and code them some way with just numbers? Just -- I mean, there's even an inadvertent chance, I suppose, a post-it falls off.

MS. QUAINTANCE: Well, you see, what we've done is to tape these on the outside and put our notes this way. Now, I mean, I suppose we could spend another several hours coordinating numbers with these post-its, but it's either our time or somebody else's time that's going to be taken up with this.

THE COURT: How many tapes are there?

MS. QUAINTANCE: Probably about 80.

THE COURT: Well, why don't I also --

MS. QUAINTANCE: And very few of them are of evidentiary value for this case, but --

THE COURT: Let me return the audio to you as well. (Handing.) Well, let me be thinking about it as we move through. Why don't we have Mr. Hunter come in, please.

THE DEPUTY: What's the name, Your Honor?

THE COURT: I believe it's Hunter, Thomas Hunter.

(WHEREUPON, Mr. Thomas Stewart Hunter was brought into the

Danforth to review tapes at this time?

THE COURT: I think so.

MR. DANFORTH: Yes, that was my intent. Is that all right, deputies?

THE COURT: Uh-huh.

MS. QUAINTANCE: Because my request is that the deputies who are with him during that time make sure that he does not see the work product writing that is on the post-its that we have on the sides of these tapes. That he just -- he gets the tapes, he can make his own notes about it, but that he doesn't know what we've written on here.

MR. DANFORTH: All right, Your Honor. May I ask Ms. Quaintance to provide me with one thing unrelated to the tapes? If she's going to be using cases in support of any of her motions on Monday, could I get copies as soon as practicable on those?

THE COURT: I don't know what cases she's going to be using, but if she starts citing cases we'll get the law books out pretty promptly when that happens and I'll give you time, certainly, to look at the cases if you need them.

You don't have any written motions, this is all going to be oral on Monday morning whenever we start?

**STATE OF MINNESOTA** **DISTRICT COURT**

**COUNTY OF HENNEPIN** **FOURTH JUDICIAL DISTRICT**

---

**State of Minnesota,**

Respondent,

-vs.-

**Stephen NMN Danforth**,

Appellant,

**TRANSCRIPT OF PROCEEDINGS**

Trial Court File No. SIP 95074990

Appellate Court File No. C0-96-1650

---

# TRANSCRIPT EXCERPT:

## VOIR DIRE TRANSCRIPT,

## Volume VI

## February 12, 1996

whether that went back to Ms. Quaintance's custody or what, but --

MS. QUAINTANCE: Well, I need to state for the record that the defense has absolutely no legitimate right to make copies of these tapes and to give them to Underwager or anybody else; that's clear from the FBI warning at the beginning of the tape.

Dr. Underwager has no business collecting copies of these tapes. They're protected by data privacy and all copies should be returned to our office at the close of the case. And it's difficult to enforce that when we don't know how many copies are being made.

THE COURT: Has a copy of the Joshua tape been turned over to the defense --

MS. QUAINTANCE: Uh-huh.

THE COURT: -- or have both of them?

MS. QUAINTANCE: A copy of each tape was turned over to Mr. Tamburino with the understanding that it would go no further. If other arrangements were to be made for that tape to go elsewhere, that's something that needs to be disclosed to the Court so that the Court can insure that copies of these children's tapes are not floating around the state --

THE COURT: Okay.

MS. QUAINTANCE: -- or the country.

THE COURT: Okay. So they fit in the same category as the ones found in the home that are -- well, I'm not sure they were found in the home, but the ones I looked at, Rally Sport --

MS. QUAINTANCE: Those are the ones you looked at, that's --

THE COURT: Okay.

MS. QUAINTANCE: -- what I'm talking about.

THE COURT: Okay.

MS. QUAINTANCE: And I should note that this Memories of the '80s tape? There's nothing pornographic or sexual in that tape -- well, I shouldn't say there's nothing sexual, but there's no -- nobody having sex on that tape. There are -- there are people saying things that arguably are sexual, and there's one point where the tape is focused on the face of a 15 or 16-year-old boy, my guess. The person who's doing the taping, you hear the voice and it sounds like a younger child, and you can hear in the background people having sex. It's quite pronounced. I mean, you hear it.

THE COURT: Okay.

MS. QUAINTANCE: And this -- this is identified as all -- all this entire tape -- taping done at Mr. Danforth's residence at the time.

JUROR GIBSON: He did not wish any visitations from any of his friends or relatives.

THE COURT: Okay.

JUROR GIBSON: His parents were his only --

THE COURT: Visitors?

JUROR GIBSON: -- visitors during the time and his sister came up once. I think.

THE COURT: Uh-huh. And he was Stillwater?

JUROR GIBSON: Yes.

THE COURT: You didn't have any involvement in the legal proceedings of --

JUROR GIBSON: No, I didn't even go -- go to the trial or anything.

THE COURT: But there was a trial?

JUROR GIBSON: Yes, there was, sir.

THE COURT: Okay. Is there anything at all about him being charged, having a trial, being convicted, and sentenced to serve time that causes you to have any concern about your ability to be fair as a juror in this case?

JUROR GIBSON: All I can say is as long as you are with another party that is involved in anything, I believe you to be as guilty as they are. Unless it is

a spur of the moment on the other party, and I don't know how I would answer you then.

THE COURT: I take it you don't feel that the criminal justice system, with respect to your nephew, was unfair or unjust to him?

JUROR GIBSON: No. No. I don't think it was unfair. No, I don't.

THE COURT: You don't think it was overly hash or overly soft or anything of that nature, you felt that it was -- that the process was just and --

JUROR GIBSON: Uh-huh. He's turned out to be a wonderful fellow today and gets along real well.

THE COURT: Uh-huh.

JUROR GIBSON: He's working and very happy.

THE COURT: Uh-huh.

JUROR GIBSON: And through his rehabilitation he told his mother and father that he knew that he was just as guilty as the other party and he had to be here and if he wouldn't have been paroled he understood.

THE COURT: The victim of this offense, was the victim an adult?

JUROR GIBSON: He was a young man like my nephew.

THE COURT: But a 20-year-old -- late teenager, early 20s, something like that?

JUROR GIBSON: No -- no more than 21, I don't believe, sir.

THE COURT: Okay. Well again, do you think there's anything at all about your nephew's situation or his involvement with the criminal justice system or the commission of this offense that would interfere with you serving as a fair juror on this case?

JUROR GIBSON: I don't know. How do you feel?

THE COURT: How I feel doesn't matter at all. See, because I'm not going to go back with 11 other people and decide --

JUROR GIBSON: Yes, I understand.

THE COURT: -- guilt or innocence, that's going to be up to the jurors so they have to reach in -- you know, look into their hearts and minds and determine whether there's anything about their background, including something like this, that would cause them to be influenced one way or the other.

And if you can tell me that you don't think this will be influencing of a decision in this case, then that's all we need. If you can't, then we need to talk more about it.

THE COURT: There is a report from Cornerhouse that Amanda had a scratch on her face which she reported that mom did. And I'm assuming that's not news to you because I think that essentially is her words on the Cornerhouse tape, but there is a written report of that same issue.

Also a report in the Cornerhouse material, originating from Gary's ex-girlfriend, quote, "That parents would hold Joshua over balcony by ankles for discipline.", end quote. I assume you're also familiar with that issue because it was described by Amanda -- oh, excuse me, I'm not sure that one was.

MS. QUAINTANCE: No.

THE COURT: But the scratch was described by Amanda earlier in the tape.

Second, there is a report dated August 14th, 1995, on a Dakota County child protection form that someone named Maureen took a phone report from someone named Mary Jackson of the Lewis House in Eagan that Therese, who apparently had been a former resident of Lewis House, called and told her that when her family was living with Mr. Danforth for three weeks in Wisconsin, and also at her sister-in-law's in Richfield, Mr. Danforth sexually abused Josh.

That report indicates that Therese asked

Josh, on occasions of him acting out sexually, if anything had happened, and that Josh showed her a doll and by putting his finger, and the exact words are, quote, "...finger up the butt...", end quote, and that it happened twice, she was caused to be concerned about it.

Josh also indicated to Therese, according to this report, that Darlene, quote, "...did it too", unquote, but that the reporter did not know what that meant.

Third, there is a Cornerhouse medical report and interview synopsis for both Josh and Amanda from -- transmitted from Beth Roberts to Desire Hopkins of child protection.

MR. DANFORTH: On what day, Your Honor?

THE COURT: I didn't write the date down, I can dig it out for you. And the reason I didn't is because I'm assuming you have that.

MR. DANFORTH: No, actually I don't.

THE COURT: This is a -- the Cornerhouse medical report and interview --

MR. DANFORTH: Oh, the general one. All right. Yes.

THE COURT: Again, I assume you've got that. It consists of a number of different things, but it's about 17 pages and has some medical reports and the

Cornerhouse report.

Dakota County. This file generally relates to the 1992, 1993 time frame, although there are some references to matters outside that period. I have to tell the parties that the handwritten visit notes, individual visit notes, were often illegible or too difficult to decipher.

The report reveals the following:

One, that in September of 1992, and these are in chronological order, Josh was seen with a fractured tooth, black eye, and red scrape on his neck. That Therese admitted the scrape on the neck when she grabbed Josh because he wouldn't eat, but she attributed the other two injuries to accidental causes. Child protection made a finding of no maltreatment.

Two. In June of 1993, Darlene reported that Josh asked her to kiss his poppy, P-O-P-P-Y, that's how it's described, with her tongue, and that others in the family, and then subsequently, that mom did it. Darlene also reported that Amanda frequently put her hands in her pants and touched herself. The caseworker interviewed the children, received no confirmation of the report from the children. Also interviewed Gary and Therese who denied any sexual abuse, Gary claiming that it was a lie by Darlene to keep -- to either get or keep

I will not be ordering an adverse psychological examination on these children at this time, but I am willing to listen to how that landscape may have changed, if at all, after conducting the competency exam and the 595.02, Sub. 3 hearing.

(Short interruption.)

THE COURT: And with respect to that issue, I'll be either filing a memorandum or giving some further rational when the decision is made finally.

With regard to the request of an anal/rectal sort of examination of Josh, and a penal examination of the Defendant, on the basis of any offers to date, that request is also denied.

One, it's not known at this point whether there will be any evidence of anal penetration in this case. Second, even if that issue may be one involving some impeachment characteristics, I would, as I indicated earlier, want to first see some firsthand evidence that Josh in fact claimed, clearly and unambiguously, that actual anal penetration had occurred. And third, I've heard no medical evidence with regard to whether or not any of these measurements would preclude the possibility of anal penetration in any event.

MS. QUAINTANCE: I have consulted with Dr. Gary Fifield on that issue and he simply laughed when I

| | |
|---|---|
| **STATE OF MINNESOTA** | **DISTRICT COURT** |
| **COUNTY OF HENNEPIN** | **FOURTH JUDICIAL DISTRICT** |

---

| | |
|---|---|
| **State of Minnesota,** | **TRANSCRIPT OF PROCEEDINGS** |
| Respondent, | Trial Court File No. SIP 95074990 |
| -vs.- | Appellate Court File No. C0-96-1650 |
| **Stephen NMN Danforth**, | |
| Appellant, | |

---

# <u>TRANSCRIPT EXCERPT:</u>

## VOIR DIRE TRANSCRIPT,

## Volume VII

## February 13, 1996

THE COURT: Okay. Are we ready to go?

MR. DANFORTH: Your Honor?

THE COURT: Uh-huh.

MR. DANFORTH: I have a number of things that I'd like to bring to the Court's attention this morning, but I'll do it in any order that you want as long as I get my chance.

THE COURT: Well, let's do the two jurors that are waiting there and --

MR. DANFORTH: Okay.

THE COURT: -- we'll turn our attention to those things. And by the way, my apologies again for yesterday. I now have a message on my cup --

MS. QUAINTANCE: There has been repeated reminders.

THE COURT: Thanks. No exceptions. I'm sorry. All right. Can you ask Mr. Koenigsfeld to come in, please?

(WHEREUPON, Mr. Kenneth E. Koenigsfeld was brought into the courtroom.)

THE COURT: How you doing?

JUROR KOENIGSFELD: Not too bad.

THE COURT: Mr. Koenigsfeld, you appreciate you're still under oath from last week?

JUROR KOENIGSFELD: Right.

THE COURT: You've indicated in your questionnaire that your hearing's not the best.

JUROR KOENIGSFELD: Right. I brought my last hearing test if you want it.

THE COURT: Okay. I'm going to turn off my microphone right now. Are you able to hear me pretty well?

JUROR KOENIGSFELD: Not real well, but I can hear you. That Monday I had problems catching some of your words from the back part of the room; yeah.

THE COURT: Okay. The other day when I introduced you to the parties, I introduced Mr. Danforth as someone who is representing himself in this case?

JUROR KOENIGSFELD: Right.

THE COURT: And in our system, all persons accused of an offense have the right to represent themselves if they wish to.

JUROR KOENIGSFELD: Uh-huh.

THE COURT: And accordingly, I introduced you to him as someone that was representing himself and I also introduced you to a gentleman named John Mahoney that was assisting Mr. Danforth --

JUROR KOENIGSFELD: Uh-huh.

THE COURT: -- and I introduced you to the name of a person named James Krieger --

JUROR KOENIGSFELD: Uh-huh.

THE COURT: -- who would be assisting Mr. Danforth, and this is Mr. Krieger that's sitting at counsel table --

JUROR KOENIGSFELD: Okay.

THE COURT: -- with Mr. Danforth now. I'd like to ask you if there's anything about the fact that Mr. Danforth is representing himself that would cause you to be prejudiced against him or sympathetic towards him in a way that would influence you and how you decided this case other than deciding it just on the evidence that was presented here?

JUROR KOENIGSFELD: No. No problem there.

THE COURT: Okay. Now with respect to this little chat we've had about Mr. Danforth representing himself, have you been able to hear me okay?

JUROR KOENIGSFELD: Yeah, fairly good. Yeah.

THE COURT: Okay. I'm going to ask the parties to ask some questions of you right now and whenever you feel you're not hearing them let me know, will you?

JUROR KOENIGSFELD: Okay.

THE COURT: Okay. Mr. Danforth.

MR. DANFORTH: Thank you, Your Honor.

JUROR KOENIGSFELD VOIR DIRE

BY MR. DANFORTH:

Q. Good morning, Mr. Koenigsfeld.

A. Good morning.

Q. If I speak at this level are you hearing me all right?

A. Could -- yeah, I guess so; I can.

Q. I'll try to speak a little louder. I think what I'd like to do is ask you some questions about your responses on your questionnaire and then go on to other areas. When I get done asking you questions about the matter on your questionnaire, I think what I'll do is ask, at that point, how you've been hearing me.

A. Okay.

Q. And we'll sort of make a kind of initial judgment at that point, I suppose, about whether or not we ought to talk about hearing some more or not.

Let's see here. On your questionnaire, on Question 21, it talks about relatives or close friends who are in the legal profession; lawyers, judges, and the like?

A. Yes.

Q. Douglas Sullivan, he's a lawyer I take it?

A. Right.

Q. And Marianne Maas.

THE COURT: That's sustained.

MR. DANFORTH: All right.

BY MR. DANFORTH:

Q. Well, let me just go on this way. Do you think, just by virtue of the fact that I've been charged that I'm probably guilty?

A. No, just -- not really. Not until, you know -- all I know is you've been charged, I don't know anything --

Q. Okay.

A. -- pertaining to it.

Q. And you understand that the mere fact of the charge is not evidence of guilt?

A. Right.

Q. Okay.

A. Uh-huh.

Q. Just jumping back to your hearing, we've been talking all this time and it doesn't seem that you've had any real trouble hearing me. I --

A. No. There's been a couple words I've missed I know, but the context was there.

Q. Okay. Would you feel fairly certain that throughout the trial when voices might rise and fall you'd hear almost everything that was said?

A. Yeah, unless they're real soft-spoken, that's

what I have the most problem with.
Q. Okay. Have you been uncomfortable talking to me about any of the things we've been talking about here?
A. Have I been -- pardon?
Q. Uncomfortable?
A. Yes.
Q. Okay. Now, you understand that the evidence that you'd be considering at the close of the case would not just be the prosecutor's questions and the answers that came from that, but also my cross examination of the prosecutors witness and also the answers that witnesses that I would bring forward --
A. Right.
Q. -- and evidence that we would show on my side of the case as well?
A. Uh-huh.
Q. You understand that you would hear all that evidence and have a duty to decide the case on all that; right?
A. Right.
Q. Okay. Of course, in your deliberations you'd be deliberating with others and a jury's verdict has to be unanimous of course.
A. Uh-huh.
Q. Are you the kind of person who just goes along

with the majority when decisions have to be made or do you tend to stick by your own beliefs if you really believe them to be right?

A. Well, I'd like to think I'd stick by my own beliefs.

Q. All right. From the viewpoint of others that know you, do you think that there would be agreement, that that's generally what you do?

A. Yeah, I guess so.

Q. Okay.

MR. DANFORTH: One second, Your Honor.

(Sotto voce dialogue between Mr. Danforth and Mr. Krieger.)

MR. DANFORTH: Your Honor, I guess I'm marginally concerned about the hearing issue, so I guess the only way I can get that before the Court at this point is to move for cause on that basis.

THE COURT: Okay. That motion's denied.

MR. DANFORTH: Okay.

THE COURT: Ms. Quaintance.

MS. QUAINTANCE: Thank you.

BY MS. QUAINTANCE:

Q. Mr. Koenigsfeld, I just have a few additional questions.

A. Okay.

Q. You've been asked a lot all ready.
A. Uh-huh.
Q. What community do you live in?
A. Pardon?
Q. What community do you live in?
A. North Minneapolis.
Q. Okay. And when this incident happened to your sister, were you working, both of you, at the County Home School?
A. Yes, this was down in Iowa. I was working there in the summer and she was a housekeeper; worked there year 'round.
Q. And so you lived on site?
A. We lived on site; yes.
Q. And a supervisor came in and exposed himself to your sister?
A. Right. Right.
Q. Did she tell anybody about that?
A. My folks, and they went -- went to the sheriff and he went to the guy and he said, well, she didn't do it, this type of thing, and then it was dropped.
Q. You said you thought things were different in those days?
A. Yeah, it was swept under the rug more. In a small community there's, you know, close -- more close

se defendants, the court is under no obligation to give him any greater leeway than an attorney in the same position. And we feel that this has been of prejudice to the State, the fact that he is allowed to continually re-raise issues.

So I wanted to be clear that that was a -- that is my position before I address these issues because I don't believe that I should even be in the position of having to address these issues.

The case, State verse Needham, which is a Minnesota Supreme Court case from 1992, deals with the fact that, "A pretrial motion to suppress should specify, with as much particularity as is reasonable under the circumstances, the grounds advanced for suppression in order to give the State as much advance notice as possible to contentions it must be prepared to meet at hearing". And that requirement has not been abided by here.

THE COURT: That cite is what, please?

MS. QUAINTANCE: State versus Needham --

THE COURT: Uh-huh.

MS. QUAINTANCE: -- 488 NW2d, 294.

THE COURT: Okay.

MS. QUAINTANCE: And on those grounds, although I have objected so far to these new issues

against the probative value demonstrated by the fact that they do go to intent or motive under the cases that I have just referred to.

The tape of the '80s, Boys and Related '80s Memories, similarly shows the Defendant's interests and obsession with young boys. It also shows the age of the Spreigl victims at the time that Mr. Danforth was having contact with them, refuting his argument that Josh's age is -- is different from the age of his prior victims. And it shows that he has not particularly reformed since his prior conviction, because these were in his possession at the time of the current arrest.

The fact that the drapes are drawn in his apartment and there are blankets over the windows while he is filming these young children, that they are smoking cigarettes when they are clearly under ten-years-old, and his interaction with them also go to motive and intent as set out in Naylor and referred to in the Starkey case, which is really distinguishable because there the defense was attempting to get in pornographic evidence.

None of this, by the way, is pornographic, therefore its inflammatory or prejudicial nature is really very limited. It -- it is -- it is, in fact, not the kind of evidence that is addressed by the Nailer case or the Starkey case because there is no pornography

outside the panel.

The commercial tape involving diapering of babies and so on, and it's the fact that it was edited to repeat, will not be referenced until we've talked about it outside of the panel.

The tape of Josh at four-years-old, I'd like to have supplied to the deputies so that Mr. Danforth can watch it under the guidance of the deputies, and then I would like to look at it, and I'm reserving my ruling on the admissibility of that tape.

With regard to Mr. Danforth's attempting to put himself in a good light with the jury with regard to voir dire, that is one of the very few times in which he will be able to speak with the jury, or anybody will be able to speak with the jury, the other two times being argument. I will be addressing myself in cautionary remarks to the jury as soon as they're sworn with regard to what is and is not evidence that will have some particular reference to a case in which a defendant is acting as his own counsel. And I will be sharing that cautionary instruction with them so that it's clear to them that questions that Mr. Danforth asks in the examination of witnesses, except to the extent that it's answered by a witness, and statements that he makes in opening or closing, and/or voir dire, do not constitute

evidence in the case.

With regard to the tapes that were found in the car of the nudist colony, that -- those tapes also are not admissible at this point in time, absent further discussion with counsel.

The Memories of the '80s, that issue will be reserved until I make a ruling on the Spreigl issues. At this time, they're not to be allowed to be referred to.

The home video of the genitals, I'd like that tape delivered over to Mr. Danforth so that he can look at it.

And the checkbook of Dan Ribadoux, and indications that gifts were bought for Gray and Josh and so on, I'd like that material to be made available to Mr. Danforth so he can view it. And I am reserving ruling, but I will rule before the opening statements with regard to the admissibility of that video and that -- that checkbook, or checkbook entries.

The Century Court locker room, that video, if the prosecutor wishes to play it, will be received into evidence. And I appreciate that there's not much by way of visual things on there. There are some audio things, both with regard to the voices of children in the background, it sounds to the Court like voices of two

And the entry in the checkbook with regard to Dan Ribadoux, Gray -- purchases for Josh will be received, assuming that's what the checkbook shows and there's foundation with respect to it.

With regard to the Amanda tape, I have looked at it. I feel with respect to both the Josh tape and the Amanda tape that the basic ingredients or requirements under 595.023 is defined by State versus Larson I and Larson II, and State versus Lammar or Lamar, or whatever the case is, those fundamental tests that I'm suppose to make have been met. I know people could quarrel about the degree to which there are some suggestiveness in therapists or treatment professionals talking with children, and I'm relatively familiar with the literature about the need to have at least some directing of the child's attention to at least a subject matter.

But on balance, and given the totality of those interviews, it's the Court's view that the spontaneity, the use of words, the lack of apparent motivation to fabricate, are all items that meet the tests under the statute and the case law interpreting the confrontational clause issues. And this is without prejudice to you wanting to make further argument about Amanda, because I understand you want to review the tape

provide a listing of what I understood it to be asking for, and one respect was a -- prior fabrications of sexual abuse.

I have a listing of things that sort of comprise the compendium of things that may or may not be fabrications of prior sexual abuse, but certainly, to my knowledge, this is compendious as far as anything that I know of that might constitute a fabrication of prior sexual abuse. What I --

THE COURT: Okay. Let's -- let's just make sure that we're on the same wavelength. I have examined, at your request, some relatively voluminous child protection material. And I've tried to do that with a relatively broad scope in terms of what I caught --

MR. DANFORTH: Yes.

THE COURT: -- it may be conceivably relevant, or at least conceivably something that you may wish to be heard about, so I've included all instances of physical abuse and sexual abuse or references thereto, and even some additional sort of general problems with parenting and mental health and so on.

It is my view, from being on this court and reading materials and having cases tried before me, that some of those issues could bear on credibility of

State will accommodate a considerably greater body of intelligence to be put before the jury which would enhance the credibility of child witnesses rather than detract from it.

So I am not inclined to want to be involved in some of this profile kind of stuff. And I'm also inclined to be interested in abiding Rule 4.12 of the Rules of Evidence. And I think that rule can be applied harmoniously with rights of confrontation and I will be seeking to do that.

For that reason, prior sexual abuse, and evidence concerning prior sexual abuse of these children, or allegations about it, I'm -- I'm wanting to rule on that issue only after I hear you, Mr. Danforth, provide to me, with some real particularity, because I think 4.12 requires that, what the evidence would show with respect to State witnesses making allegations of sexual abuse in a way that has been fabricated.

MR. DANFORTH: I'm sorry, could you say that again or rephrase it, Your Honor?

THE COURT: Yes. I'm -- I'm wanting to know, with particularity, what evidence you would be able to produce that would show that a State witness, and of course the obvious ones here would be the youngsters, or at least Josh, have fabricated claims of sexual abuse in

sentence and so I was getting up to the point where I was going to make it.

I am contending that, in children especially of this young an age, that the sheer physical proximity of someone to whom the child has been compelled by circumstance or otherwise to regurgitate a falsehood, psychologically has a sufficient amount of impact upon the child to cause the child to continue with that falsehood, whereas otherwise, without the physical proximity of that person, they would not; that is my point.

THE COURT: What's -- is this -- has this person followed the typical protocol of --

MS. QUAINTANCE: That's correct, Your Honor.

THE COURT: Okay. The State made a motion to compel Mr. Danforth to supply to the Court alone questions he wishes to ask and I'm going to deny that motion. I am concerned about the cross examination and the sort of reactive nature of cross examination. I'm also concerned about my ability to rule, absent hearing from both parties and hearing objections, and so that kind of prior restraint seems to me to be overly inhibiting on the flexibility of the cross examination.

However, Mr. Danforth will be ordered not

to inquire of either of these children into areas that the Court has ruled may not be inquired into until there's a ruling, again out of the presence of the jury otherwise. And at the present time, until we go through the 4.12, 4.04 kind of issues, Mr. Danforth, that would, of course, include questions respecting prior physical abuse or prior sexual abuse issues involving either of these kids. And there may be other areas of preclusion, but those are the ones that have been brought before me right now.

But with respect to other prior restraints on the questions, I'm not inclined to do that. I will, however, if Mr. Danforth wishes to have a prior ruling on certain questions that he supplies to Ms. Quaintance and to the Court, so as to not feel that he may be stymied in connection with certain questions, I would be willing to look at them in an in limine sort of way and give him my views about the admissibility of the question after Ms. Quaintance has an opportunity to be heard on the issue as well.

So if you wish to avail yourself of that, you may do so, Mr. Danforth, but I'm not going to require you to supply me with questions beforehand.

MS. QUAINTANCE: Given that ruling, may I -- may I ask how you wish me to handle something?