RECEIVED
BY MAIL
APR 19 2005
CLERK, US DIST COURT
ST. PAUL, MN

United States District Court

District of Minnesota

United States, ex rel.
Stephen Danforth,
Petitioner,

vs.

David Crist, Warden, et al,
Respondents.

Civil File No. 01-2137 (JRT/RLE)

PETITIONER'S BRIEF IN SUPPORT OF MOTION TO RECONSIDER, UNDER CRAWFORD v. WASHINGTON

I. Under Crawford v. Washington, Petitioner's Right To Confrontation Is Violated By Admission At Petitioner's Trial Of The Videotaped CornerHouse Interview Of The Non-testifying Complainant.

"[Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354 (2004)] held that the Confrontation Clause requires that '[t]estimonial statements of witnesses absent from trial [be] admitted only where the declarant is unavailable and only where the defendant has had a prior opportunity to cross-examine.' Id, at 1369." (Order, p. 3)

Complainant did not testify at Petitioner's trial. Ibid. The CornerHouse interview of complainant was conducted without notice to Petitioner (Petition, p. 1). Petitioner had no opportunity to cross-examine complainant prior to the ruling excluding complainant as a trial witness (Ibid).

Police interviews of witnesses is one instance of statements deemed "testimonial." Crawford. CornerHouse interviews are arranged only at police request, and only for investigation and prosecution purposes. Questioning at CornerHouse aims to elicit an allegation of sexual molestation for those purposes, and with a specific eye to the likely admission of the resulting interview videotape as prosecution evidence in any criminal trial as to such allegation (Petition, Claim I.1.A, ¶2).

As pointed out at Order, p. 3, United States v. Bordeaux, ___ F.3d ___, 2005 WL 517003, *4-8 (8th Cir., March 7, 2005), held a closely similar videotaped interview was "testimonial" for Crawford purposes. Authority here

and elsewhere uniformly holds such social worker interviews of children at police request are "testimonial" under Crawford. State v. Courtney, 682 N.W.2d 185, 196 (Minn. App. 2004); State v. Bobadilla, 690 N.W.2d 345, 349-50 (Minn. App. 2004); State v. Mack, 101 P.3d 349 (Or. Supr. Ct., Nov. 26, 2004); Snowden v. State, 846 A.2d 36 (Md. App. 2004), aff'd Md. Supr. Ct., No. 42-2004, Feb. 7, 2005); People v. Sisavath, 13 Cal. Rptr.3d 753 (Cal. App. 2004); People ex rel. R.A.S., 2004 WL 1351383 (Colo. App. 2004); People v. Vigil, 2004 WL 1352647 (Colo. App. 2004); In re T.T., 815 N.E.2d 789 (Ill. App. 2004).

It is thus beyond question that Crawford v. Washington, supra, substantively applies to, and bars admission of the CornerHouse interview of the non-witness complainant at Petitioner's trial.

## II. Crawford v. Washington Is Not "New", For Purposes Of Petroactivity Analysis Under Teague v. Lane.

Teague v. Lane, 489 U.S. 288, 307, 109 S.Ct. 1060 (1989), only limits retroactive application of rules of criminal procedure which are "new". Crawford does not present a "new" rule of criminal procedure, but rather, simply enunciates a holding compelled by precedent.

The view that Crawford abrogated the rule of Ohio v. Roberts, 448 U.S. 56 (1980) is inaccurate. Crawford addressed only "testimonial" statements. Hence, Roberts continues to limit admissibility of non-testimonial hearsay statements (see: Mungo v. Duncan, post, at 393 F.3d 336, n. 7). Crawford itself describes its ruling as simply being "an empirically accurate explanation of the results our cases have reached." (p. 1369, footnote 9). Justice Scalia's opinion for the majority explains further:

> "Our cases have thus remained faithful to the framer's understanding: Testimonial statements... have been admitted only where the defendant has had a prior opportunity to cross-examine." (124 S.Ct. at 1369).

Richardson v. Newland, ___ F.Supp.2d ___, 2004 WL 2390038, 2004 U.S.

Dist. LEXIS 21901 (E.D. Cal. Nov. 4, 2004) applied this 'non-new' view of Crawford in habeas corpus where the state direct appeal ended ten years before Crawford:

> "....[T]he argument... that Crawford did not announce a new rule at a all,... is the more persuasive one. ...Crawford... was based on bedrock principles that 'date back to Roman times.' 124 S.Ct. at 1359.... ...[T]he Supreme Court had never applied Roberts to out-of-court testimonial statements. Id at 1367-1370. ...Crawford did not articulate a change in procedure, it merely reaffirmed and clarified procedures that had long been in place."

Consistently, the concurring opinion by Circuit Judge Noonan in Bockting v. Bayer, ___ F.3d ___, 2005 WL 406284, 2005 U.S. App. LEXIS 3012 *33 at *36-7 (9th Cir. 2005), concludes that:

> "Crawford, therefore, does not announce a new rule. ....[A]s the Court pointed out, Roberts itself only admitted testimony that had been subjected to cross-examination. Id at 1368. Undoubtedly, a number of courts misinterpreted the Confrontation Clause... But a correction of a misinterpretation does not create a new rule."

As profound as Crawford is as to "testimonial" statements, it is not really new. It applies herein without any genuine retroactivity concern.[1]

III If "New" Under Teague, The Rule Stated In Crawford v. Washington Holds The Status Of A "Watershed" Rule Under Teague, And One "Without Which The Likelihood Of An Accurate Conviction Is Seriously Diminished."

First, Evans v. Luebbers, 371 F.3d 438 (8th Cir. 2004), neither controls nor persuades as to retroactive application of Crawford v. Washington. Evans was argued only under Roberts. Most of the Evans opinion simply analyzes those statements under Roberts. In passing, Evans concluded in substance that "Crawford does not apply to this particular case." (Id, p. 445), since the victim's statements were not "testimonial." Other statements were held harmless, having come "into evidence through the petitioner's own inculpatory statements." Id, p. 444. Hence, Evans' ensuing, brief, sua sponte, offhand suggestion that the Crawford rule "does not appear" to fall within either of

1. Mungo v. Duncan, Ibid, failed to address whether Crawford was truly new at all. Since Crawford is not new, Teague just does not govern.

the two Teague exceptions (Id, p. 444) is mere obiter dictum. This mere unexplained impression offers no mandatory, or useful precedent.

Also, Evans' observation that "the Crawford Court did not suggest that this doctrine would apply retroactively" (Ibid) does not bar subsequent examination and declaration of such retroactivity, including by District Courts in habeas corpus contexts. See, e.g.: Wiegand v. United States, 380 F.3d 890 (6th Cir. 2004).

For these reasons, we must draw upon authority elsewhere as to Crawford's retroactivity, if deemed "new."

The majority opinion in Bockting v. Bayer, ___ F.3d ___. 2005 WL 406284, 2005 U.S. App. LEXIS 3012 (9th Cir., Feb. 22, 2005, McKeown, J.) treats Crawford v. Washington as a new rule, but holds Crawford retroactive, since it sets forth a "bedrock" rule of criminal procedure (a "watershed rule"). Judge McKeown notes (Id, [*15]) that Schriro v. Summerlin, ___ U.S. ___, 159 L.Ed.2d 442, 124 S.Ct. 2519 (2004) focused the "watershed rule" status inquiry on Teague's requirement that the rule be "not only fundamental, but one 'without which the likelihood of an accurate conviction is seriously diminished.' Summerlin, 124 S.Ct. at 2523 (quoting Teague 489 U.S. at 313)." Ibid.

"That the Crawford requirement is fundamental to our legal regime is beyond dispute. Justice Scalia's eloquent recitation of the history, purpose, and place of the Confrontation Clause and cross-examination answers this question. Crawford, 124 S.Ct. at 1359....

"The question next posed is whether the rule implicates the accuracy of the criminal proceeding. Juxtaposed, Summerlin actually underscores why the Crawford rule implicates the 'fundamental fairness and accuracy of the criminal proceeding.' Saffle 494 U.S. at 495, and alters our understanding of bedrock procedural principles, whereas the sentencing scheme in Summerlin did not....

"....In contrast [to Summerlin's sentencing analysis], the evidence that cross-examination seriously decreases the possibility of inaccurate conviction is unequivocal.

"The Supreme Court has repeatedly and without deviation held that the purpose of the Confrontation Clause is to promote accuracy. See, e.g., Crawford, 124 S.Ct. at 1370 ('This open examination of witnesses... is much more conducive to the clearing up of truth.')...; Tennessee v. Street, [cite omitted]" (Bockting, Id, at LEXIS [*16-18]

Circuit Judge McKeown explains Crawford's critical role thus:

"Crawford itself answers the question of whether the absence of cross-examination 'so seriously diminish[es] accuracy that there is an impermissibly large risk of punishing conduct the law does not reach.' Summerlin, 124 S.Ct. at 2525: 'The Roberts framework is so unpredictable that it fails to provide meaningful protection from even core confrontation violations.' Crawford, 124 S.Ct. at 1371.

'The [general reliability] test is inherently and therefore permanently unpredictable.' Id at 1374, n. 10. 'It is difficult to imagine [the general reliability framework] providing any meaningful protection in [politically charged cases].' Id at 1374.

'We view this as one of those rare cases in which the result below is so improbable that it reveals a fundamental failure on our part to interpret the Constitution in a way that secures its intended constraint on judicial discretion.' Id at 1373.

"....The difference between pre- and post-Crawford Confrontation Clause jurisprudence is not the sort of change that can be dismissed as merely incremental. Instead, it is an 'absolute pre-requisite to fundamental fairness.' Sawyer, 497 U.S. at 244." (Bockting, Id at LEXIS [*21-22]:

Assuming that Crawford is to be deemed "new", the retroactivity analysis in Bockting v. Bayer, supra is both sound and incisive. Under such sharply defining lights, there can be no logical doubt that Crawford v. Washington satisfies the 'watershed', 'bedrock' prong of the exceptions in Teague v. Lane. Accordingly, it carries retroactivity, even if "new."

People v. Watson, 2004 N.Y. Misc. LEXIS 2133, 2004 N.Y. Slip Op. 51364U (Supr. Ct., New York Cty., Nov. 8, 2004, Kahn, J.) also held that Crawford v. Washington has 'watershed' status, and hence retroactive application to cases on collateral review, astutely noting that pre-Teague confrontation-violation cases applied Supreme Court rulings retroactively on similar concerns of impact on accuracy ("a serious flaw"). Roberts v. Russell, 392 U.S. [293] at 294 [20 L.Ed.2d 1100, 88 S.Ct. 1921 (1968); Berger v. California, 393 U.S. 314, 21 L.Ed.2d 508, 89 S.Ct. 540 (1969).

"....In Pointer v. Texas, 380 U.S. 400, 403-4, 13 L.Ed.2d 923, 85 S.Ct. 1065 (1965), the Court made obligatory on the states the Sixth Amendment's right of an accused to confront witnesses against him or her, precisely because it is a fundamental right" essential to a fair trial....

"The Supreme Court has not considered... retroactivity... implicating the Confrontation Clause since... Teague, supra. Therefore,... Roberts v. Russell and Berger v. California support the view that the constitutional right to

confront witnesses is a watershed rule, because they indicate that a violation of this right implicates the fairness of the trial and the accuracy of the fact-finding process." (Watson, at [**20-21, 23])

People v. Watson, supra, amply confirms that Bockting's analysis of the retroactivity of Crawford v. Washington is correct.

In contrast, Brown v. Uphoff, 381 F.3d 1219 (10th Cir. 2004), simply asserts that Crawford is no "watershed rule" only because confrontation violations are subject to harmless error analysis.

The apt answer is found in Bockting, at LEXIS [*27-28]:

"The two inquiries hinge on different questions. Whether a rule is a bedrock rule... depends on whether it increases the likelihood of accurate conviction.... Whether a rule is subject to harmless error analysis depends on whether the impact of the error can be measured.... In short, because accuracy and measurability are different concepts, whether a rule of constitutional law is subject to harmless error review does not answer the question whether it is a bedrock rule of procedure."

Similarly, Mungo v. Duncan, 393 F.3d 327, 335-6 (2d Cir. 2004), asserts that the Crawford rule is only "likely to improve accuracy in some circumstances and diminish it in others," citing exclusion of a "highly reliable" incriminating statement. Mungo thus incorrectly poses a comparison between the effect of admission, or non-admission of a statement, overlooking the correct comparison, i.e., between admission of a hearsay statement with cross-examination of a testifying declarant, versus admission of that statement, but without any testimony by, much less any cross-examination of the alleged declarant.

Bockting v. Bayer, id, at LEXIS [*28], astutely points out that in Mungo:

"The Second Circuit has substituted its judgment of whether the Crawford rule is one without which the accuracy of conviction is seriously diminished, for the Supreme Court's considered judgment" on that point.

Crawford itself decided that Roberts' "indicia of reliability" were insufficient to ensure accuracy of outcome as to "testimonial" statements. Mungo's refusal to apply Crawford, based on such intuitive impressions, or

imagined, extrasensory omniscience, baldly rejects Crawford. Using such rejection to refuse retroactive application is not contemplated by Teague. Neither Mungo nor Brown offer any cogent logical reason not to apply Crawford retroactively.

In sum, the analysis in Bockting v. Bayer, supra, confirmed by People v. Watson, supra, demonstrates that, if new, the rule enunciated in Crawford v. Washington should be accorded retroactive effect.

## IV. The Teague Provision For Retroactivity For "Watershed" Rules Applies To Habeas Corpus Claims Under The AEDPA.

Bockting v. Bayer, supra, examines this question incisively (LEXIS [*29-31]), noting that Williams v. Taylor, 529 U.S. 362, 380, 146 L.Ed.2d 389, 120 S.Ct. 1495 (2000), directs that a Teague inquiry be undertaken in AEDPA habeas corpus cases where retroactivity is in issue. Moreover:

"The constitutional doubt canon of construction mandates that we read [AEDPA] to incorporate the Teague exceptions to avoid the serious constitutional problem raised by depriving individuals of bedrock principles of Due Process. Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003)." Id at [*30].

Accord: Wiegand v. United States, 380 F.3d 890, 892 (6th Cir. 2004). Hence, this Court can, and should decide the retroactivity issue in this case.

## V. Even If Crawford v. Washington Were Not "Watershed", Barring Retroactivity Would Be Inequitable Herein, Since Petitioner's Direct Appeal Argued For The Very Per Se Exclusion In Crawford.

In his "direct appeal" (Pro Se Supplemental Brief of Defendant, original edition, pp. 23-25, re-worded in court-ordered edition), Petitioner argued for the rule in Crawford of exclusion per se of testimonial ("self-serving deposition", Id, p. 19) statements. Hence, it is unfair and inequitable not to apply that very rule herein. Such direct appeal argument, albeit not then successful, satisfies Teague's finality concern. Crawford, the vindicating authority adopting Petitioner's original proposition, should be applied herein.

## VI. The CornerHouse Interview Was Critical, And Its Admission Therefore Cannot Be Deemed Harmless Beyond A Reasonable Doubt.

### A. Crawford Violation Is Structural Error.

State v. Fero, 104 P.3d 49 (Wash. App. 2005) held a Blakely violation as to sentencing is a structural error. A fortiori, a Crawford violation of trial use of testimonial hearsay is certainly such structural error. Structural error at trial requires vacating the conviction without examining actual prejudice. Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302, 310 (1991). Crawford reversed the defendant's conviction without any examination of whether the error was harmful or harmless. Accord: State v. Bobadilla, 690 N.W.2d 345, 360 (Minn. App. 2004); Snowden v. State, 846 A.2d 36, 47 (Md. App. 2004); State v. Mack, 101 P.2d 349, 353 (Or. 2004). Hence, the Court should hold the Crawford violation is "structural error".

### B. Crawford Error Herein Was Not "Harmless."

#### 1. The Chapman Standard Presumes Harmfulness, And No Crawford Violation Has Been Found Harmless To Date.

The Chapman v. California (386 U.S. 18, 22, 87 S.Ct. 824 (1967)) standard of "harmless error" applies to Roberts violations. A Roberts violation is harmless only if it is clear beyond reasonable doubt that the erroneous admission did not contribute to the jury's guilty verdict. Olesen v. Class, 164 F.3d 1096 (8th Cir. 1999); Reed v. Thalacker, 198 F.3d 1058 (8th Cir. 1999).

A presumption of harmfulness applies to Roberts violations. Olesen.

Neither Crawford, Bobadilla, Snowden; nor Mack examines harmlessness. Bockting, at [*32], rejects harmlessness despite other evidence of guilt. No known Crawford-violation case thus far has found harmlessness. This case should not be the first.

#### 2. Complainant's CornerHouse Interview Was Not "Harmless".

a. **The Crucial Role Of The CornerHouse Interview At Trial**

Complainant's CornerHouse ("CH") interview, the only thing heard from complainant, was crucial at trial. It also staged interviewer Martinetti's vouching, asserting complainant's responses were "credible", "reliable", and "accurately reflected" complainant's "actual experience." (Trial Tr., Vol. II, p. 402). In summation, the prosecutor misquoted from that untranscribed interview, and accused Petitioner of watching it obsessively (Petition, Claim VIII, ¶¶ 10-11, 18(e). That interview was played three times during jury deliberation (March 4 and 5, 1996 Transcripts).

b. **Barring Impeachment Of Complainant's Mental Condition And CH Interview Methods Worsened Crawford Harm.**

The trial judge refused to reveal to jurors complainant's incompetence to testify (Trial Tr., Vol. II, pp. 270-71, 289), and barred expert testimony about CH questioning and complainant's behaviors in that interview (Id, Vol. IX, pp. 1828, 1831); Voir Dire Tr., Vol. VII, p. 1205). All this barred Petitioner from lessening the Crawford-violating CH interview's harm.

c. **Avoided Cross-Examination Adds To Crawford Harm.**

Subjects for cross-examination of complainant, had he testified, point up more harm from the CH interview. Petitioner's 2nd I. Brief herein, pp. 86-88 (attached hereto as "Appendix A") lists 19 such subjects. Loss of such profound cross-examination adds to the Crawford-violation harm. See, e.g.: State v. Carroll, 639 N.W.2d 623 (Minn. App. 2002).

d. **Other Admitted Hearsay Statements Compounded The Harm.**

Complainant's other three alleged hearsay statements were not "substantive" (State's Memorandum, pp. 28-29), but were contingent upon the CH interview in evidence. Because that CH interview violates Crawford, they also

drop out of evidence, and hence do not lessen the harm from that interview.

Those statements, as to Officer Castilleja (cf.: Lopez v. State, 888 So.2d 693 (Fla. App. 2004)), also violate Crawford, and all three additional statements also violate Tome v. United States, 115 S.Ct. 696 (1995). ( (Petition, Claim I.4., ¶ 11; Petitioner's 3rd I. Brief, p. 4.) And their content cannot sustain Petitioner's conviction. Complainant's responses to his mother and to Off. Castilleja effectively denied the mouth contact alleged in the CH interview, which comprise the theory of conviction instructed to the jury. (Petition, Claim I.1.B., ¶ 36(b), pp. 23-4; Claim VIII, ¶ 4.) Complainant's statements to psychologist Cotter never specified any conduct of the crime tried (Trial Tr., Vol. IX, pp. 1754, 1756). Crawford was also violated by non-witness hearsay as to other crimes outside of Petitioner's prior convictions (Petition, Claim II.2.). This compounds the CH interview Crawford violation.

**e. Complainant's Sister's Testimony Does Not Lessen Harm.**

Complainant's sister's testimony was vague as to Petitioner's interaction with complainant she said she saw (Petition, Claim III.7., ¶ 1). Where she saw this is self-contradictory (Id, ¶ 2). And she testified the person in that interaction with complainant was not present in the courtroom, at the same time she beheld Petitioner sitting directly in front of her, not more than twenty feet away (Trial Tr., Vol III, p. 543; Petition, Claim III.7., ¶ 3), faulty testimony rejected in Olesen v. Class, supra. Such flawed testimony does not reduce the CornerHouse Crawford harm. Olesen.

Steve Danforth

Stephen Danforth
Petitioner, pro se

> inconsistencies may indicate that the testimony is mistaken or deliberately falsified, or that the child is confused, uncertain, highly suggestible, or lacking in personal knowledge of the facts. The examiner may hope to show that the child was coached, or that the direct testimony was memorized. Finally, cross-examination may demonstrate that the child lacks the capacity to observe, remember, or communicate." *J.E.B. Myers, Child Witness Law and Practice* (John Wiley, 1987), pp.182-3).

Quite literally, each one of these goals would have been well served by cross-examination of complainant. Accord, as to the value of cross-examination in the exact circumstance of inconsistencies in extra-judicial statements by a child sexual abuse accusation complainant: *State v. Carroll*, 639 N.W.2d 623 (Minn. App. 2002). (It thus appears that, some six years after Petitioner's appeal, the Minnesota Court of Appeals would today decide Petitioner's appeal differently.)

Simply illustrative of the virtually limitless list of such matters as to which cross-examination would have, or certainly could have been useful are the following:

1. The possibility of recantation of the accusation by complainant from the witness stand;
2. Complainant's demeanor and reactions to Petitioner, during *pro se* cross-examination were expected to be devoid of fear, anger, nervousness, embarrassment, naughty amusement, or discomfort of any kind, casting an incredible appearance of the accusation, thus revealing it to be nothing more than a tale he had been taught;
3. Clarification by complainant of the coaching by his mother on the evening of August 11, 1995, as the origin of the accusation, i.e., admission that it lacked any basis in reality;
4. Explanation of when and how complainant lost his two front teeth (as observed in the CornerHouse videotape), believed to have been punched out by his mother in a fit of anger over complainant's sexual misconduct with the smaller neighbor girl on August 11, 1995, or over complainant's failure to initially make an accusation against Petitioner in accord with her demand;

5. Confirmation by complainant that his mother had instructed him to use specific phrases, such as "put his mouth on my pee:, More than three times", and "It's Darlene and Steve's fault.;

6. Clarification by complainant that either or both of the prior accusations of abuse he had uttered against Darlene Zirul and his own mother had been false, and had been coached to him to state;

7. Acknowledgement by complainant of the occasions, following the last possible time of the alleged abuse, on which complainant and Petitioner were together, and during which complainant did not experience any fear, anger, nervousness, embarrassment, or discomfort as to Petitioner's presence or interactions with complainant;

8. Complainant's disavowal of:

   a. any rectal pain in July, 1995, contrary to the assertion by his mother;

   b. any sexual misconduct by Petitioner at Petitioner's residence in July, 1995; and

   c. any sexual aspect to the innocent, play incident of reciprocal neck-kissing with Petitioner at Petitioner's residence in July, 1995;

9. Description by complainant of the actual source of inspiration for his act of sexual coitus with that smaller neighbor girl;

10. Description by complainant of his interaction with Victim-Witness Assistance advocate Connie Bauman (a former CornerHouse staff member) and others between the evening of the origin of the accusation and the CornerHouse interview, as preparation/coaching for that interview;

11. In light of complainant's 'dual accusation' in the CornerHouse interview, explanation by complainant of the 'assignment' given to him by his mother for that interview;

12. Explanation by complainant of each of his behaviors during that interview, as clarifying their non-incriminating meaning (including complainant's various verbal interjections in that interview, such as "That's not right", and "This is stupid!"), and the origin and

significance of 'pat phrases' (e.g., "More than three times") and 'voice-overs' about fault;

13. Explanation by complainant of his understanding of the role of doll use by his mother in the origination of the accusation, and by the CornerHouse interviewer in eliciting recitation of the 'second version' of the accusation;

14. Description by complainant of the numerous earlier warnings to him, and interrogations of him by his parents, before the origin of the accusation, and the impact of such warnings and interrogations upon complainant;

15. Statement by complainant whether he had kissed his sister's clothed crotch, or had ever engaged in sexual misconduct of any kind with his sister, Amanda, and if so, when, and his mother's reaction at that time to such misconduct, or if not, the fact that his mother told complainant to lie to that effect to Officer Castilleja;

16. Elicitation of free-narrative by complainant of the accusation, followed by challenges as to internal inconsistencies and expressions of odd ignorance for its basic aspects;

17. Challenges to complainant's memories for other contemporaneous events and for recent events;

18. Description of complainant's state of embarrassment , shame, and anxiety upon being confronted by his mother about his sexual misconduct with the smaller neighbor girl, and the role of that mental state on his responses in his mother's interrogation, and during the CornerHouse interview; and

19. Confirmation by complainant that, from July, 1995 up to the moment of his mother's interrogation of him on August 11, 1995, complainant's mother was irate with Petitioner and bore spite as to Petitioner.

Each of these matters would have cast substantial light on the lack of credibility of the accusation contained in the CornerHouse interview of complainant. Hence, not just generally, but specifically as to

**NOTICE:** Mailed from a **MN CORRECTIONAL FACILITY**
Name: Stephen Danforth
OID#: 147636
Address: 970 Pickett St., N.
City/State/Zip: Bayport, MN 55003-1490

Minnesota Correctional Facility – Stillwater

UNITED STATES POSTAGE
02 1A
0004378506
MAILED FROM

Legal Mail

# FIRST CLASS MAIL

RECEIVED BY MAIL
APR 19 2005
CLERK, US DIST. COU
ST. PAUL, MN

Clerk of Court
United States District Court
700 Federal Building
316 N. Robert St.
St. Paul, MN 55101-1460